JUDGE PRESKA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SENSIENT COLORS INC.,

        Plaintiff,

    - against -

ABBY F. KOHNSTAMM; PETER L.
KOHNSTAMM; SARAH F. KOHNSTAMM;
ELIZABETH K. OGDEN; RICHARD L.
OGDEN; THOMAS H. OGDEN; JOHN DOE
INDIVIDUALS 1-20 (fictitious names); and ABC
COMPANIES 1-20 (fictitious names),

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

Civil Action No.

**COMPLAINT**



07 CIV 7846

SEP 06 2007
U.S.D.C. S.D. N.Y.
CASHIERS

        Plaintiff Sensient Colors Inc. ("Sensient"), by its attorneys Bryan Cave LLP, for its Complaint against Abby F. Kohnstamm, Peter L. Kohnstamm, Sarah F. Kohnstamm, Elizabeth K. Ogden, Richard L. Ogden, Thomas H. Ogden, John Doe Individuals 1-20 (fictitious names), and ABC Companies 1-20 (fictitious names) (collectively "Defendants"), states and alleges as follows:

**INTRODUCTION**

        1.    In 1988, Sensient's parent company, Universal Foods Corporation ("Universal Foods"), entered into a transaction to purchase the stock of H. Kohnstamm & Co., Inc. ("Kohnstamm & Co.") from its shareholders, including Defendants. Because Universal Foods had serious concerns about the environmental condition of certain property owned by Kohnstamm & Co. located at 31st and Lemuel Avenue in Camden, New Jersey ("Camden Property"), the Camden Property was transferred, prior to the stock-purchase transaction, to General Color Company ("General Color"), another company in which Defendants held stock.

In connection with the transfer, Kohnstamm & Co. and the selling shareholders, including Defendants, represented to the New Jersey Department of Environmental Protection that the transfer was merely a reorganization that did not change the ownership of the Camden Property. Pursuant to the stock transaction, Universal Foods did not acquire any interest in General Color, nor did it assume any liability or interest associated with the operations of Kohnstamm & Co. or General Color on the Camden Property.

2.      Despite the parties' intentions in the 1998 stock purchase transaction to keep the Camden Property, and its potential environmental problems, with Defendants and the other selling shareholders, Sensient has been named in two actions in New Jersey, alleging that Sensient (formerly known as Kohnstamm & Co.) caused environmental contamination of the Camden Property and/or property located adjacent to the Camden Property.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and supplementary jurisdiction pursuant to 28 U.S.C. § 1367.

4.      Venue is proper pursuant to 28 U.S.C. § 1391 because the Defendants are subject to personal jurisdiction in this district.

## THE PARTIES

5.      Plaintiff Sensient, f/k/a Warner-Jenkinson Company, Inc., f/k/a Kohnstamm & Co., is a New York corporation with its principal place of business located in St. Louis, Missouri. Sensient is a wholly owned subsidiary of Sensient Technologies Corporation, f/k/a Universal Foods , a global manufacturer and marketer of colors, flavors and fragrances.

6.      Upon information and belief, Defendant Abby F. Kohnstamm is a New York citizen presently residing at 181 East 65th Street, New York, New York 10021.

2

7.     Upon information and belief, Defendant Peter L. Kohnstamm is a New York citizen presently residing at 15 Ocean Avenue, Larchmont, New York 10538.

8.     Upon information and belief, Defendant Sarah F. Kohnstamm is a New York citizen presently residing at 15 Ocean Avenue, Larchmont, New York 10538.

9.     Upon information and belief, Defendant Elizabeth K. Ogden is a New York citizen presently residing at 79 Winfield Avenue, Harrison, New York 10528.

10.    Upon information and belief, Defendant Richard L. Ogden is a New York citizen presently residing at 117 Wildwing Ext. Pk., Catskill, New York 12414.

11.    Upon information and belief, Defendant Thomas H. Ogden is a New York citizen presently residing at 79 Winfield Avenue, Harrison, New York 10528.

12.    Upon information and belief, Defendants John Doe Individuals 1-20 (fictitious names) are individuals presently residing in the State of New York.

13.    Upon information and belief, Defendants ABC Companies 1-20 (fictitious names) are corporations subject to jurisdiction in the State of New York.

## THE 1988 TRANSACTION

14.    On or about September 7, 1988, Kohnstamm & Co. transferred the Camden Property to its wholly owned subsidiary, General Color, a New Jersey corporation.

15.    After the transfer of the Camden Property, Kohnstamm & Co. transferred the stock of General Color, tax free, to the Kohnstamm family members who were shareholders of Kohnstamm & Co., the "Kohnstamm Family Shareholders" (including Defendants). This had the effect of dissolving the parent-subsidiary relationship that had previously existed between Kohnstamm & Co. and General Color.

16.    The stock of Kohnstamm & Co. was then acquired by Universal Foods, a Wisconsin corporation, in 1988 (hereinafter, the transfer of the Camden Property to General

3

Color, the transfer of the stock of General Color to the Kohnstamm Family Shareholders and the sale of the stock of Kohnstamm & Co. to Universal Foods shall be referred to as the "1988 Transaction"). As a result of the 1988 Transaction, Kohnstamm & Co. became a wholly owned subsidiary of Universal Foods.

17.     Universal Foods did not acquire any interest in General Color, which was no longer a subsidiary of Kohnstamm & Co. at the time Universal Foods acquired Kohnstamm & Co., nor did Universal Foods acquire any liability or interest associated with the operations of Kohnstamm & Co. or General Color at the Camden Property.

18.     Kohnstamm & Co., a New York corporation, changed its name to Warner-Jenkinson Company, Inc. on or about September 18, 1990. Warner-Jenkinson Company, Inc. changed its name to Sensient Colors Inc. on or about December 31, 2002.

19.     Section 5.3 of the agreement controlling the 1988 Transaction (hereinafter "1988 Transaction Agreement") provided that the "Selling Shareholders" and Kohnstamm & Co. would obtain a determination from the New Jersey Department of Environmental Protection ("NJDEP") that the Environmental Cleanup Responsibility Act ("ECRA") did not apply to the 1988 Transaction. The 1988 Transaction Agreement further provided that the Selling Shareholders would cause Kohnstamm & Co. to comply with this obligation.  Copies of portions of the 1988 Transaction Agreement are attached as Exhibit A.

20.     Each Defendant was a Selling Shareholder and a Kohnstamm Family Shareholder under the 1988 Transaction Agreement.

21.     Each Defendant executed a shareholder agreement that outlined the transfer of the Camden Property to General Color and the distribution of General Color shares to the Defendants.  A copy of the shareholder agreement is attached as Exhibit B.

4

22.    Pursuant to Section 5.3 of the 1988 Transaction Agreement, Kohnstamm & Co. and the Selling Shareholders (including Defendants) applied to the NJDEP for an ECRA letter of non-applicability for: (1) the transfer of the Camden Property by Kohnstamm & Co. to General Color; and (2) the transfer of the stock of General Color to the Kohnstamm Family Shareholders (including Defendants).

23.    That application asked the NJDEP to disregard the corporate form and treat the formal change of ownership of the Camden Property from Kohnstamm & Co. to General Color as a corporate reorganization not substantially affecting the ownership of the Camden Property. The application also asked the NJDEP to disregard the corporate form and to treat the formal change of ownership of General Color from Kohnstamm & Co. to the Kohnstamm Family Shareholders as a corporate reorganization not substantially affecting the ownership of the Camden Property.

24.    In support of those requests, Kohnstamm & Co. and the Selling Shareholders (including Defendants) represented in the application that the beneficial and equitable ownership of the Camden Property would remain with the Kohnstamm Family Shareholders (including Defendants) because: (1) Kohnstamm & Co. was the parent of General Color; (2) the Kohnstamm Family Shareholders (including Defendants) owned approximately 81% of the Kohnstamm & Co. stock; (3) after the stock distribution, they would own 100% of General Color; and (4) both before and after the proposed transaction the Kohnstamm Family Shareholders (including Defendants) would own the controlling interest in Camden Property and would control General Color.

25.    On the basis of the representations made by and on behalf of Kohnstamm & Co. and the Selling Shareholders (including Defendants), NJDEP issued ECRA letters of non-

5

applicability regarding the transactions proposed by the 1988 Transaction Agreement. Copies of the letters of non-applicability and the applications upon which they were issued are attached as Exhibit C.

26.     Upon information and belief, but for the representations made by and on behalf of Kohnstamm & Co. and the Selling Shareholders (including Defendants) in their ECRA application for letters of non-applicability, NJDEP would have required in 1988 an ECRA environmental investigation and remediation of the Camden Property. The cost of that environmental investigation and remediation would have directly or indirectly reduced the compensation paid to the Selling Shareholders (including Defendants) in exchange for their Kohnstamm & Co. stock.

27.     The above-referenced representations and actions of Defendants evidence a level of control over Kohnstamm & Co. and General Color such that these corporations were mere instrumentalities, or alter egos, of the Kohnstamm Family Shareholders, including Defendants.

28.     Defendants abused the corporate form to further their personal interests.

29.     Accordingly, it is appropriate to pierce the corporate veil and impose liability on the individual Defendants.

30.     In the alternative, Defendants should be held responsible individually for the actions and environmental liabilities of Kohnstamm & Co. prior to the transfer of the Camden Property in 1988. Defendants should also be held responsible individually for the actions and environmental liabilities of General Color after the transfer of the Camden Property in 1988.

31.     Upon information and belief, if not for sworn statements submitted to the NJDEP, Kohnstamm & Co. would have been required to either investigate and remediate the Camden Property prior to its transfer to General Color or enter into an agreement by which General Color

6

and/or the Selling Shareholders (including Defendants) would assume the obligation to investigate and remediate the Camden Property after the transfer. Either way, the Camden Property would have been investigated and remediated beginning in 1988.

### SUBSEQUENT LITIGATION REGARDING THE CAMDEN PROPERTY AND THE ADJACENT PROPERTY

32.     In 2004, Sensient and General Color were named as defendants in an action in the Superior Court of New Jersey, Law Division – Camden County, entitled *Pleasant Gardens Realty Corporation v. H. Kohnstamm & Company, Inc., et al.*, Docket No. CAM-L-6579-03 ("New Jersey Action"). The New Jersey Action alleges that Sensient (formerly known as Kohnstamm & Co.) and General Color caused environmental contamination of the Camden Property and property owned by Pleasant Gardens, which is located adjacent to the Camden Property ("Adjacent Property"). A copy of the New Jersey Action complaint is attached as Exhibit D.

33.     Sensient filed a third party complaint against the above-named Defendants, among others, in the New Jersey Action, alleging claims for contribution, indemnification and unjust enrichment. On or about February 3, 2006, the Court dismissed Sensient's third party complaint on the grounds that it lacked personal jurisdiction over Defendants.

34.     On or about March 16, 2007, Sensient was named as a defendant in an action commenced by the Justice Department of the United States ("DOJ") regarding the Camden Property. That matter is entitled *United States v. Sensient Colors Inc.* ("DOJ Action"), and was filed in United States District Court of New Jersey, Case No. 1:07-cv-1275. The DOJ's complaint seeks to recover costs incurred and to be incurred in response to the release or threatened release of hazardous substances at or from the Camden Property under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended

7

("CERCLA") 42 U.S.C. § 9607(a). A copy of the DOJ Action complaint is attached as Exhibit E.

35.     Among other things, the complaint in the DOJ Action alleges that from approximately 1922 to 1988, Kohnstamm & Co. owned and operated a facility on the Camden Property, and that during that time, various hazardous substances were disposed of there. It also alleges that from approximately March 1998 to December 2006, the EPA conducted removal activities at the Site, and has incurred over $16 million in "response" costs.

36.     To date, Sensient has incurred response costs in excess of $75,000.

37.     Plaintiff demands a trial by jury.

## COUNT I
## CONTRIBUTION - CERCLA § 113 (F)(1)

38.     Sensient incorporates each of the allegations in Paragraphs 1 through 37 as if fully set forth herein.

39.     CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), authorizes any person to "seek contribution from any other person who is liable or potentially liable under [CERCLA § 107(a)], during or following any civil action under [CERCLA § 106 or 107(a)]."

40.     Each of the Defendants is a person liable or potentially liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), for all necessary costs of response incurred at or from the Camden Property.

41.     Each of the Defendants is a "person," and an "owner" and/or "operator" of the Camden Property, as such terms are defined by CERCLA § 101 (21), (20(A)), 42 U.S.C. § 9601 (20(A), 21), at the times of "disposal" of hazardous substances at the Camden Property pursuant to CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2).

8

42.    The Camden Property is a "facility," and "hazardous substances" have been "release[d]" from the Camden Property, as such terms are defined by CERCLA § 101 (9), (14) & (22), 42 U.S.C. § 9601(9), (14) & (22).

43.    The complaint in the DOJ Action alleges that the release and threatened release of hazardous substances at the Camden Property has caused and continues to cause necessary costs of response consistent with the National Contingency Plan pursuant to CERCLA § 107(a)(2-4), 42 U.S.C. § 9607(a)(2-4).

44.    Sensient has been named as a defendant in the DOJ Action, which seeks to recover costs incurred and to be incurred in response to the release or threatened release of hazardous substances at or from the Camden Property under CERCLA § 107(a).

45.    If Sensient is adjudged to be responsible under CERCLA § 107(a) in the DOJ Action, then pursuant to CERCLA § 113(f), 42 U.S.C. § 9613(f), Sensient is entitled to contribution from Defendants for those damages, natural resources damages, restoration and response costs Sensient has incurred and will incur in connection with the Camden Property and Adjacent Property, with cost allocation based upon such equitable factors as the Court deems appropriate.

## COUNT II
## DECLARATORY JUDGMENT - CERCLA § 113(G)(2) AND 28 U.S.C. §§ 2201 & 2202

46.    Sensient incorporates each of the allegations in Paragraphs 1 through 45 as if fully set forth herein.

47.    CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), authorizes a court to "enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

C045118/0211610/1403279.2

48.    By reason of the foregoing, Sensient is entitled to a declaratory judgment, regarding liability for future response costs, damages and natural resource damages that will be binding upon any subsequent action or actions to recover future response costs, damages or natural resource damages, declaring that each of the Defendants is liable for past and future damages, natural resources damages and response costs associated with the Site, pursuant to the provisions of § 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), and 28 U.S.C. §§ 2201 and 2202.

## COUNT III
## CONTRIBUTION UNDER THE SPILL ACT

49.    Sensient incorporates each of the allegations in Paragraphs 1 through 48 as if fully set forth herein.

50.    Under the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 *et seq.* (the "Spill Act"), any person responsible for a discharge of hazardous substances is strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred.

51.    The term "person responsible for a discharge" is defined at N.J.A.C. 7:1E-1.6 to include: (a) any person whose act or omission results or has resulted in a discharge; (b) each owner or operator of a facility from which a discharge has occurred; (c) any person who owns or controls any hazardous substance which is discharged; (d) any person who has directly or indirectly caused a discharge; and (e) any person who has allowed a discharge to occur.

52.    The ECRA application submitted to the NJDEP by or on behalf of each of the Defendants admitted that they, as Kohnstamm Family Shareholders, were the beneficial and equitable owners of the Camden Property.  Accordingly, they are persons responsible for a discharge.

C045118/0211610/1403279.2

53.    The ECRA application submitted to the NJDEP by or on behalf of each of the Defendants admitted that they, as Kohnstamm Family Shareholders, controlled Kohnstamm & Co. and, therefore, the Camden Property.    Accordingly, they are persons responsible for a discharge.

54.    To the extent that it is determined that Sensient is required to pay for cleanup and removal costs at the Camden Property and/or the Adjacent Property, Defendants are liable in contribution to Sensient pursuant to the Spill Act.

## COUNT IV
## CONTRIBUTION UNDER THE SPILL ACT - VEIL PIERCING

55.    Sensient incorporates each of the allegations in Paragraphs 1 through 54 as if fully set forth herein.

56.    The plaintiff in the New Jersey Action alleges that Sensient discharged hazardous substances, as defined in the Spill Act, on or in the vicinity of the Camden Property and the Adjacent Property.

57.    The plaintiff in the New Jersey Action alleges that, as a result of such discharges, Sensient is liable under the Spill Act for the environmental contamination at the Camden Property and the Adjacent Property.

58.    Since Defendants avoided the costs associated with an environmental investigation and remediation of contamination at and emanating from the Camden Property by representing to the NJDEP that there was no relevant distinction between themselves, as Kohnstamm Family Shareholders, and Kohnstamm & Co. (now known as Sensient) or General Color, the liability of Defendants under the Spill Act is co-extensive with the liability of Sensient and General Color.

C045118/0211610/1403279.2

59.     To the extent that it is determined that Sensient is required to pay for cleanup and removal costs at the Camden Property and/or the Adjacent Property, Defendants are liable in contribution to Sensient pursuant to the Spill Act, including, but not limited to, that share of liability attributable to General Color.

### COUNT V
### CONTRIBUTION UNDER THE JOINT TORTFEASORS CONTRIBUTION ACT – NEW JERSEY ACTION

60.     Sensient incorporates each of the allegations in Paragraphs 1 through 59 as if fully set forth herein.

61.     Pursuant to the New Jersey Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1, *et seq.*, a joint tortfeasor has a right of contribution from any other joint tortfeasor.

62.     In the event that Sensient is adjudged to be liable in the New Jersey Action for any judgment, damages, costs or any other expenses relating to the Camden Property and/or the Adjacent Property, Sensient is entitled to and hereby seeks contribution from Defendants for all such judgments, damages, costs and expenses.

### COUNT VI
### CONTRIBUTION UNDER THE JOINT TORTFEASORS CONTRIBUTION ACT – DOJ ACTION

63.     Sensient incorporates each of the allegations in Paragraphs 1 through 62 as if fully set forth herein.

64.     Pursuant to the New Jersey Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1, *et seq.*, a joint tortfeasor has a right of contribution from any other joint tortfeasor.

65.     In the event that Sensient is adjudged to be liable in the DOJ Action for any judgment, damages, costs or any other expenses relating to the Camden Property, Sensient is entitled to and hereby seeks contribution from Defendants for all such judgments, damages, costs and expenses.

C045118/0211610/1403279.2

## COUNT VII
## COMMON LAW INDEMNIFICATION

66.     Sensient incorporates each of the allegations in Paragraphs 1 through 65 as if fully set forth herein.

67.     To the extent that any environmental contamination at the Camden Property and/or the Adjacent Property was caused or contributed to by operations at the Camden Property, such operations occurred prior to the 1988 acquisition of Kohnstamm & Co. (now known as Sensient) by Universal Foods.   Prior to 1988, Kohnstamm & Co. was controlled by the Kohnstamm Family Shareholders, including Defendants, and they were the beneficial and equitable owners of the Camden Property.   As between Sensient and Defendants, responsibility, if any, for the relief sought in the New Jersey Action and/or the DOJ Action rests on Defendants because of their primary responsibility for the environmental condition of the Camden Property and any contamination of the Camden Property and/or the Adjacent Property related thereto. Accordingly, Defendants are obligated to indemnify Sensient, whose responsibility, if any, is passive and secondary, for any and all sums which Sensient has paid or may be compelled to pay, including attorney's fees, if Sensient is held liable for any relief sought in the New Jersey Action and/or the DOJ Action.

## COUNT VIII
## UNJUST ENRICHMENT

68.     Sensient incorporates each of the allegations in Paragraphs 1 through 67 as if fully set forth herein.

69.     Defendants have been enriched by their acts and omissions which allowed them to avoid the costs of investigating and remediating the environmental condition of the Camden Property and any contamination caused or contributed to by the operations of Kohnstamm & Co.

C045118/0211610/1403279.2

70.     These acts and omissions allowed Defendants to save substantial sums they should have expended in order to investigate and remediate pursuant to ECRA environmental contamination arising from the operation of the business they owned and controlled.

71.     These acts and omissions also allowed Defendants to receive substantially more from Universal Foods in exchange for their shares of Kohnstamm & Co. than they would have received if the conditions at and emanating from the Camden Property had been properly investigated and remediated prior to the property transfer. As such, Defendants have knowingly and wrongfully received benefits to which they are not entitled. It would be unjust for Defendants to retain those benefits.

## PRAYER FOR RELIEF

WHEREFORE, Sensient prays that judgment be entered as follows:

1.     In favor of Sensient and against Defendants for contribution under the Spill Act, up to and including any amounts Sensient has paid or may be required to pay in connection with the New Jersey Action, and attorneys' fees and costs relating to the New Jersey Action;

2.     In favor of Sensient and against Defendants for contribution under the Joint Tortfeasors and Contribution Act, up to and including any amounts Sensient has paid or may be required to pay in connection with the New Jersey Action, and attorneys' fees and costs relating to the New Jersey Action;

3.     In favor of Sensient and against Defendants for contribution under the Joint Tortfeasors and Contribution Act, up to and including any amounts Sensient has paid or may be required to pay in connection with the DOJ Action, and attorneys' fees and costs relating to the DOJ Action;

14

4.    In favor of Sensient and against Defendants for indemnification for and including any amounts Sensient has paid or may be required to pay in connection with the New Jersey Action, and attorneys' fees and costs relating to the New Jersey Action;

5.    In favor of Sensient and against Defendants for indemnification for and including any amounts Sensient has paid or may be required to pay in connection with the DOJ Action, and attorneys' fees and costs relating to the DOJ Action;

6.    In favor of Sensient and against Defendants for disgorgement of Defendants' profits from the sale of their Kohnstamm & Co. shares to Universal Foods;

7.    In favor of Sensient and against Defendants for contribution under CERCLA § 113(f)(1), for those damages and response costs associated with the Camden Property that Sensient may incur in connection with the DOJ Action;

8.    In favor of Sensient and against Defendants, declaring that the Defendants are liable under CERCLA § 113(g)(2) for past and future damages and response costs associated with the Camden Property; and

9.    In favor of Sensient and against Defendants for all attorneys' fees, costs of suit, and such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
         September 5, 2007

BRYAN CAVE LLP

By: _____
     Mary M. Chang (MC 6345)
     Christopher R. Strianese (CS 1017)
     1290 Avenue of the Americas
     New York, New York  10104
     (212) 541-2000

*Attorneys for Plaintiff Sensient Colors Inc.*

15

12/09/87

AGREEMENT AND PLAN OF REORGANIZATION
BY AND BETWEEN
UNIVERSAL FOODS CORPORATION
(a Wisconsin corporation) ("Universal Foods"),
H. KOHNSTAMM & CO., INC.
(a New York corporation) (the "Company"),
GENERAL COLOR COMPANY
(a New Jersey corporation) ("General Color"),
AND THE SHAREHOLDERS OF THE COMPANY
WHO HAVE EXECUTED THIS AGREEMENT
(the "Selling Shareholders")

December 11, 1987

**EXHIBIT A**

<u>INDEX</u>

| Caption | | Page |
|---|---|---|
| ARTICLE I – EXCHANGE OF STOCK | | |
| 1.0 | Exchange of Company Capital Stock for Universal Foods Common Stock | 3 |
| 1.1 | Adjusted Book Value | 3 |
| 1.2 | Adjustments to Book Value | 10 |
| 1.3 | Delivery of UF Common Stock | 11 |
| 1.4 | Delivery of Additional Shares of UP Common Stock | 13 |
| 1.5 | Agents | 15 |
| | | 17 |
| ARTICLE II – REPRESENTATIONS AND WARRANTIES OF THE SELLING SHAREHOLDERS | | |
| 2.0 | Ownership; Authority | 21 |
| 2.1 | Corporate | 22 |
| 2.2 | Authorization | 23 |
| 2.3 | No Violation | 25 |
| 2.4 | Governmental Authorities | 26 |
| 2.5 | Financial | 27 |
| 2.6 | Undisclosed Liabilities | 27 |
| 2.7 | Tax Matters | 30 |
| 2.8 | Absence of Certain Events | 30 |
| 2.9 | Title To and Condition of Properties | 32 |
| 2.10 | Real Estate | 33 |
| 2.11 | Contracts and Commitments | 36 |
| 2.12 | Labor Matters | 40 |
| 2.13 | ERISA and Employee Benefit Plans | 43 |
| 2.14 | No Breach of Statute or Contract | 44 |
| 2.15 | No Litigation or Adverse Events | 46 |
| 2.16 | Patents, Trademarks, Etc. | 47 |
| 2.17 | Major Customers | 48 |
| 2.18 | Insurance | 50 |
| 2.19 | Brokers or Finders | 50 |
| 2.20 | S-4 Prospectus/Registration Statement | 51 |
| 2.21 | Compliance with Applicable Laws | 51 |
| 2.22 | General Color | 52 |
| 2.23 | Disclosure | 52 |
| | | 53 |
| ARTICLE III – REPRESENTATIONS AND WARRANTIES OF UNIVERSAL FOODS | | |
| 3.0 | Corporate | 53 |
| 3.1 | Authorization | 53 |
| 3.2 | No Violation | 54 |
| 3.3 | Capitalization | 54 |
| 3.4 | Government Authorities | 55 |
| 3.5 | No Breach of Statute or Contract | 55 |
| 3.6 | No Brokers or Finders | 56 |
| 3.7 | S-4 Prospectus/Registration Statement | 57 |
| 3.8 | SEC Reports | 57 |
| 3.9 | Continuation of the Company's Business | 58 |
| 3.10 | Disclosure | 58 |
| | | 59 |

(i)

| Caption | Page |
|---|---|
| **ARTICLE IV - CONDUCT OF COMPANY'S BUSINESS** | |
| **PENDING THE CLOSING DATE** | |
| 4.0 Full Access. | 59 |
| 4.1 Carry On in Regular Course | 59 |
| 4.2 General Increases Limited. | 60 |
| 4.3 Preservation of Organization | 61 |
| 4.4 Sales to Customers | 61 |
| 4.5 Indebtedness | 61 |
| 4.6 Dividends and Distributions. | 62 |
| 4.7 Capital Changes. | 62 |
| 4.8 Capital Expenditures | 62 |
| 4.9 No Default | 63 |
| 4.10 Insurance. | 63 |
| 4.11 Amendment to Articles of Incorporation | 63 |
| and By-laws. | 64 |
| **ARTICLE V - OBLIGATIONS OF THE SELLING SHARE-** | |
| **HOLDERS AND THE COMPANY** | 64 |
| 5.0 Confidentiality. | 64 |
| 5.1 Consents | 64 |
| 5.2 Antitrust Laws | 64 |
| 5.3 Environmental Cleanup Responsibility | |
| Act. | 65 |
| 5.4 Supplement to Disclosure Schedule. | 65 |
| 5.5 Registration on Form S-4 | 66 |
| 5.6 Undertakings of Affiliates | 67 |
| 5.7 No Negotiations, Etc. | 69 |
| 5.8 Supply Contract. | 69 |
| 5.9 Assumption of Certain Liabilities; | |
| Releases | 69 |
| 5.10 Advances | 70 |
| **ARTICLE VI - OBLIGATIONS OF UNIVERSAL FOODS** | 71 |
| 6.0 Confidentiality. | 71 |
| 6.1 Antitrust Laws | 71 |
| 6.2 Consulting and Employment Agreements | 72 |
| 6.3 Severance Arrangements | 72 |
| 6.4 Licensing Agreement. | 73 |
| 6.5 S-4 Prospectus/Registration Statement. | 73 |
| 6.6 Listing on New York and Pacific Stock | |
| Exchanges. | 74 |
| 6.7 Supply Contract. | 74 |
| 6.8 Negative Covenants | 74 |

| Caption | Page |
|---|---|
| ARTICLE VII - CONDITIONS PRECEDENT TO THE OBLIGATIONS OF UNIVERSAL FOODS. . | 75 |
| 7.0   Representations and Warranties True. . . | 75 |
| 7.1   Compliance with Agreement. . . . . . . | 75 |
| 7.2   No Proceeding or Litigation. . . . . . | 75 |
| 7.3   No Dividend. . . . . . . . . . . . . | 76 |
| 7.4   Receipt of Approvals, Etc. . . . . . . | 76 |
| 7.5   No Material Adverse Change . . . . . . | 76 |
| 7.6   Closing Certificate. . . . . . . . . | 77 |
| 7.7   Opinion of Company's Counsel . . . . | 77 |
| 7.8   Letter from Touche Ross & Co.. . . . . | 77 |
| 7.9   Certificates . . . . . . . . . . . | 78 |
| 7.10  Stock Certificates; Further Documents. . | 78 |
| 7.11  Effective S-4 Prospectus/Registration Statement. . . . . . . . . . . . . . . | 78 |
| 7.12  Distribution of General Color Stock. . . | 79 |
| 7.13  Affiliates Undertakings. . . . . . . . | 79 |
| 7.14  Blue Sky . . . . . . . . . . . . . . | 79 |
| 7.15  UF Common Stock Price. . . . . . . . . | 79 |
| 7.16  Termination of Plan. . . . . . . . . . | 80 |
| ARTICLE VIII - CONDITIONS PRECEDENT TO THE SELLING SHAREHOLDERS' OBLIGATION | 80 |
| 8.0   Representations and Warranties True. . . | 81 |
| 8.1   Compliance with Agreement. . . . . . . | 81 |
| 8.2   No Proceeding or Litigation. . . . . . | 81 |
| 8.3   Closing Certificate. . . . . . . . . . | 82 |
| 8.4   ECRA Compliance. . . . . . . . . . . | 82 |
| 8.5   Opinion of Counsel to Company. . . . . | 82 |
| 8.6   Certificates . . . . . . . . . . . . | 83 |
| 8.7   Receipt of Approvals, Etc. . . . . . . | 83 |
| 8.8   Effective S-4 Prospectus/Registration Statement. . . . . . . . . . . . . . . | 83 |
| 8.9   General Color Split-Up . . . . . . . . | 83 |
| 8.10  Blue Sky . . . . . . . . . . . . . . | 84 |
| 8.11  UF Common Stock Price. . . . . . . . . | 84 |
| ARTICLE IX - CLOSING; CLOSING DATE. . . . . . . . | 84 |
| ARTICLE X - TERMINATION AND ABANDONMENT . . . . . | 85 |
| ARTICLE XI - INDEMNIFICATION. . . . . . . . . . . | 86 |
| 11.0  General. . . . . . . . . . . . . . . | 86 |
| 11.1  S-4 Prospectus/Registration Statement. . | 92 |
| 11.2  General Color. . . . . . . . . . . . . | 96 |
| 11.3  Third Party Suit; Cooperation. . . . . | 96 |
| 11.4  Universal Foods' Conduct of Company's Business . . . . . . . . . . . . . . . | 97 |
| 11.5  Payment of Indemnification . . . . . . | 98 |
| ARTICLE XII - COVENANT NOT TO COMPETE . . . . . . | 99 |

| Caption | Page |
|---|---|
| ARTICLE XIII - MISCELLANEOUS PROVISIONS | 103 |
| 13.0    Amendment and Modification | 103 |
| 13.1    Waiver of Compliance; Consents | 104 |
| 13.2    Assignment | 104 |
| 13.3    Governing Law | 105 |
| 13.4    Notices | 105 |
| 13.5    Entire Agreement | 106 |
| 13.6    Counterparts | 106 |
| 13.7    Headings | 106 |
| 13.8    Accounting and Legal Fees; Expenses | 106 |
| 13.9    Severability | 107 |
| 13.10   Construction and Interpretation | 107 |
| 13.11   Further Documents | 107 |
| 13.12   Publicity | 107 |
| 13.13   Additional Financial Statements | 108 |

## SCHEDULES AND EXHIBITS

### Schedules

Schedule A          List of Selling Shareholders

Schedule B          Disclosure Schedule

### Exhibits

Exhibit A          Plan of Exchange

Exhibit B          Certificate of Exchange

Exhibit C          Form of Escrow Agreement

Exhibit D          Form of Supply Contract

Exhibit E          Form of Kaufman Agreement

Exhibit F          Form of Broderick Agreement

Exhibit G          Form of Zuckerman Agreement

Exhibit H          Form of "KOHNSTAMM" License Agreement

Exhibit I          Opinion of Wolf Haldenstein Adler
                         Freeman & Herz

Exhibit J          Opinion of T. M. O'Reilly

12/09/87

## AGREEMENT AND PLAN OF REORGANIZATION

AGREEMENT AND PLAN OF REORGANIZATION (the "Agreement"), dated as of December 11, 1987, by and between UNIVERSAL FOODS CORPORATION, a Wisconsin corporation ("Universal Foods"), H. KOHNSTAMM & CO., INC, a New York corporation (the "Company"), GENERAL COLOR COMPANY, a New Jersey corporation ("General Color"), and the shareholders of the Company who have executed this Agreement on the signature pages hereof personally or by power of attorney (individually referred to herein as "Selling Shareholder" and collectively as "Selling Shareholders").

### W I T N E S S E T H :

WHEREAS, Universal Foods is a duly organized and incorporated Wisconsin corporation.

WHEREAS, the Company is a duly organized and incorporated New York corporation; its authorized capital stock consists of 10,000 shares of preferred stock, $100 par value ("Company Preferred Stock"), of which 2,000 shares are duly and validly issued and 2,000 shares are outstanding on the date hereof; and 3,000,000 shares of common stock, $2 par value ("Company Common Stock"), of which 1,057,752 shares are duly and validly issued and 1,012,292 shares are outstanding and entitled to vote on the date hereof (the Company

Preferred Stock and the Company Common Stock are collectively referred to herein as "Company Capital Stock").

WHEREAS, the Selling Shareholders own in the aggregate approximately eighty percent (80%) of the Company's issued and outstanding Company Common Stock.

WHEREAS, certain of the larger holders of Company Capital Stock will be asked to execute this Agreement either personally or by power of attorney.

WHEREAS, Universal Foods desires to acquire all of such Company Capital Stock held by the Selling Shareholders, and each Selling Shareholder desires to exchange all Company Capital Stock owned by such Selling Shareholder with Universal Foods for Universal Foods common stock, on the terms and conditions hereinafter set forth.

WHEREAS, the parties hereto desire to use the share exchange procedure available under Section 913 of the New York Business Corporation Law ("NYBCL §913") to implement the foregoing exchange.

WHEREAS, prior to such exchange it is intended that the Company transfer certain of its assets to a wholly-owned subsidiary and split-up that subsidiary to certain of its shareholders in a transaction intended to qualify as a reorganization within the meaning of Sections 355 and 368(a)(1)(D) of the Internal Revenue Code of 1986, as amended (the "Code").

-2-

WHEREAS, for Federal income tax purposes it is intended that the reorganization contemplated herein shall qualify as a reorganization within the meaning of Section 368(a)(1)(B) of the Code.

NOW, THEREFORE, in consideration of the premises and the mutual agreements, covenants and provisions hereinafter set forth, the parties hereto agree as follows:

<u>ARTICLE I</u>

EXCHANGE OF STOCK

1.0  <u>Exchange of Company Capital Stock for Universal Foods Common Stock</u>.

(a)  Subject to the terms and conditions hereof, on the Closing Date (as hereinafter defined), each Selling Shareholder will exchange, sell, transfer, assign, convey and deliver, and cause to be exchanged, sold, transferred, assigned, conveyed and delivered, to Universal Foods, all of the issued and outstanding Company Capital Stock owned by each such Selling Shareholder as further described on the attached Schedule A, and Universal Foods will purchase and accept all of such shares.

(b)  For each share of Company Preferred Stock, Universal Foods shall exchange such number of shares of Universal Foods common stock, $.10 par value ("UF Common Stock"), calculated by dividing $100 (the par value of a share of Company Preferred Stock) by a number equal to the

-3-

workpapers and documents used in preparing the proposed Clos-
ing Balance Sheet. Within thirty (30) days after receipt of
the proposed Closing Balance Sheet, Universal Foods shall
communicate to the Company and/or the Selling Shareholders
in writing any dispute or disagreement with respect to any
aspect of the proposed Closing Balance Sheet. In the event
that the Selling Shareholders, Universal Foods and their
respective independent certified public accountants are unable
to resolve any dispute or disagreement with respect to the
Closing Balance Sheet, the dispute or disagreement shall be
finally resolved by a mutually agreeable Big Eight accounting
firm, whose fees and expenses shall be borne one-half (1/2)
by the Company and one-half (1/2) by the Selling Shareholders.
Within three (3) days after the final Closing Balance Sheet
has been prepared, Universal Foods shall transfer to the
Escrow Agent shares of UF Common Stock and/or cash, if any,
then due the Selling Shareholders based upon the final Closing
Balance Sheet, or the Escrow Agent shall return to Universal
Foods such shares of UF Common Stock and/or cash, if any,
transferred to the Escrow Agent on the Closing Date in excess
of the aggregate purchase price as finally determined based
upon the final Closing Balance Sheet.

    1.2  Adjustments to Book Value. For purposes
of determining the Adjusted Book Value as defined in Paragraph
1.1 hereof, the book value of the Company shall be adjusted

-11-

in the following amounts upon the occurrence of the following events subsequent to July 25, 1987 but prior to the Closing:

(a) Distribution of all of the capital stock of General Color, wholly-owned by the Company, to the Kohnstamm Family Shareholders in a split-up. Book Value shall be decreased by an amount equal to the book value of General Color Company on the day immediately prior to the date of the split-up determined in accordance with generally accepted accounting principles consistently applied. The Company's Camden, New Jersey real property (including all property, plant and equipment at such location) shall be transferred by a quit-claim deed to General Color prior to the split-up, but the Book Value shall not be reduced by reason thereof.

(b) Incurrence by the Company of certain selling and other expenses. Book Value shall be decreased by an amount equal to (i) 50% of the first $200,000 of the Company's Selling Expenses (as hereinafter defined), plus (ii) 100% of such Selling Expenses in excess of $200,000 paid by the Company on or prior to the Closing Date or accrued by the Company as of the Closing Date. For purposes of this Paragraph 1.2(b), Selling Expenses shall include the accounting and legal fees, investment banking fees and other expenses in connection with the negotiation and execution of this Agreement, amounts paid at the Direction of the Company in settlement of consult-ing agreements, employment agreements and supplemental pension

-12-

agreements of which the Company is a party, and such other accruals for additional severance or other payments as Universal Foods and the Selling Shareholders shall mutually deem necessary, appropriate or convenient, all of which expenses will be set forth on the Statement of Selling Expenses to be delivered to Universal Foods on or prior to the Closing. The Statement of Selling Expenses shall include a list identifying each person known to be entitled to severance pay, the amount due each such person and such other information as Universal Foods shall reasonably request.

(c) Creation of an escrow fund as of the Closing Date for the expenses of the Agents (the "Agents' Expense Fund") in an amount to be determined by the Company. An amount equal to the amount transferred to the Agents' Expense Fund shall be deducted from the Book Value in determining Adjusted Book Value. Upon the transfer on the Closing Date of the amount provided above to the Agents' Expense Fund, neither Universal Foods nor the Company shall have any further liability or obligation with respect to the Agents' Expense Fund.

1.3 Delivery of UF Common Stock.

(a) As soon as practicable (but in no event more than 72 hours) after the Closing Date, Universal Foods shall deliver, or cause to be delivered, to or for the benefit of each of the Selling Shareholders exchanging Company Common

-13-

2.21  Compliance with Applicable Laws.  The Company
in the conduct of its business is in compliance with all
foreign, Federal, state and local laws, statutes, ordinances
and regulations applicable to them, the enforcement of which,
if any one were not in compliance, would have a material
adverse effect on the Company.

2.22  General Color.  The Company has no material
agreement with General Color which will remain in effect
after the split-up of General Color to the Kohnstamm Family
Shareholders, nor will there be on the Closing Date any mater-
ial liability or obligation owed to or remaining with the
Company arising out of or resulting from such split-up or
the business, operations, activities or ownership of assets
of General Color (including the business, operations, activi-
ties or ownership of the Camden, New Jersey facility trans-
ferred by the Company to General Color prior to the split-
up) at any time prior to such split-up.  No asset owned,
controlled or used by General Color at the time of the split-
up is or will be material to the continued operation of the
Company's business (except to the extent otherwise provided
in the Supply Contract).  The split-up of General Color to
the Kohnstamm Family Shareholders will comply in all respects
with Section 355 of the Internal Revenue Code of 1986 ("Code")
and the rules and regulations thereunder, and neither the

-52-

Company nor Universal Foods will incur any obligation, liability or damage as a result of such split-up.

2.23  Disclosure.  No representation or warranty by the Company or any Selling Shareholder in this Agreement nor any statement, certificate or exhibit furnished to or to be furnished by the Company or any Selling Shareholder pursuant to this Agreement or any document or certificate delivered to Universal Foods pursuant to this Agreement or in connection with the transactions contemplated herein contains or will contain any untrue statement of a material fact or omits or will omit a material fact necessary to make the statements contained therein not misleading.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF UNIVERSAL FOODS

Universal Foods makes the following representations and warranties, each of which is true and correct on the date hereof and each of which will be true on the Closing Date, each of which shall be unaffected by any investigation hereto or hereafter made by or on behalf of the Company or any Selling Shareholder and each will survive the Closing and the transactions contemplated hereby:

3.0  Corporate.  Universal Foods is a corporation duly organized, validly existing and in good standing under Wisconsin law with all requisite corporate power to carry out the terms and conditions of this Agreement.

-53-

prior to the Closing Date, all consents necessary to the consummation of the transactions contemplated hereby.

5.2 <u>Antitrust Laws</u>. The Selling Shareholders and the Company will furnish to Universal Foods such necessary information and reasonable assistance as Universal Foods may request in connection with its preparation of necessary filings or submissions to any governmental agency.

5.3 <u>Environmental Cleanup Responsibility Act</u>. The Selling Shareholders and the Company shall promptly take all necessary steps to obtain a determination(s) of ECRA nonapplicability ("Determination") for the transactions contemplated hereby from the New Jersey Department of Environmental Protection ("NJDEP") under ECRA for all New Jersey real property. This shall include, but not be limited to, a prompt filing of a complete initial notice to the NJDEP, and a prompt application for a favorable determination. Copies of all submissions and correspondence and other communications both to and from the Selling Shareholders and the Company which relate to ECRA shall be promptly forwarded to Universal Foods.

5.4 <u>Supplement to Disclosure Schedule</u>. From time to time prior to the Closing Date, the Company and the Selling Shareholders will promptly supplement or amend the Disclosure Schedule with respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would

-65-

and the rules of the New York and Pacific Stock Exchanges, no public announcement or other publicity regarding this Agreement or the transactions contemplated hereby shall be made by Universal Foods, the Company, General Color or any Selling Shareholder without the express written approval of the other parties as to form, content, timing and manner of distribution of such announcements or other publicity.

13.13  Additional Financial Statements.  The Selling Shareholders agree for and on behalf of the Company to provide Universal Foods with such additional accounting information which shall be deemed necessary by Universal Foods in satisfying its obligation to file a Form 8-K with the Securities and Exchange Commission to report this transaction.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed all as of the day and year first above written.

UNIVERSAL FOODS CORPORATION
("Universal Foods")

By: _____
Its:  CEO

[Corporate Seal]

Attest: T.M. O'Reilly
Its:  Sec.

-108-

H. KOHNSTAMM & CO., INC.
("Company")

By:_____
Its:_____

[Corporate Seal]

Attest:_____
Its:_____

GENERAL COLOR COMPANY
("General Color")

By:_____
Its:_____

[Corporate Seal]

Attest:_____
Its:_____

SELLING SHAREHOLDERS

_____(SEAL)     _____(SEAL)

_____(SEAL)     _____(SEAL)

_____(SEAL)     _____(SEAL)

_____(SEAL)     _____(SEAL)

*_____(SEAL)     _____(SEAL)

*_____(SEAL)     _____(SEAL)

*_____(SEAL)     _____(SEAL)

*By:_____(SEAL)

_____
Attorney-in-Fact

UNIVERSAL FOODS CORPORATION
("Universal Foods")

By: _____
    Its: _____

[orate Seal]

Attest: _____
    Its: _____


H. KOHNSTAMM & CO., INC.
("Company")

By: _Paul L. Kohn___
    Its: _Chairman of_

Seal]

Attest: _____
    Its: _Secretar_


GENERAL COLOR COMPANY
("General Color"

By: _Paul L. K_____
    Its: _Presi___

rporate Seal]

Attest: _____
    Its: _Secret___

30rld002

## SHAREHOLDERS AGREEMENT

AGREEMENT made this 7th day of September, 1988, among those shareholders of H. Kohnstamm & Co., Inc., a New York corporation (the "Company") who have executed this Agreement and are named in Schedule A attached hereto.

WHEREAS, the Company, General Color Company, a New Jersey corporation and a wholly owned subsidiary of the Company ("General Color"), Universal Foods Corporation, a Wisconsin corporation ("Universal Foods") and certain shareholders of the Company entered into an Agreement and Plan of Reorganization dated December 11, 1987 (the "Reorganization Agreement"); and

WHEREAS, the Reorganization Agreement contemplates a tax free exchange of shares of common stock and preferred stock of the Company for shares of common stock of Universal Foods (the "Exchange"); and

WHEREAS, immediately prior to the Exchange, it is contemplated that certain real estate owned by the Company shall be transferred to General Color and the shares of General Color shall than be distributed, tax free, to certain shareholders of the Company (the "Split-up") who are members of the families of Paul L. Kohnstamm and Richard L. Kohnstamm (the "Kohnstamm Family Shareholders"); and

WHEREAS, in order to preserve the tax free nature of the Exchange and the Split-up it is necessary for the parties to this

**EXHIBIT B**

Agreement to make certain undertakings with respect to the Exchange and Split-up.

NOW, THEREFORE, the parties hereto agree as follows:

1.   <u>Holding Period of Shares</u>.  The parties to this Agreement covenant and agree that they shall hold their shares of Universal Foods common stock received as a result of the Exchange and their shares of General Color common stock received as a result of the Split-up for a period of at least one (1) year from the date of the Closing (as defined in the Reorganization Agreement), and shall not sell, transfer, assign or otherwise dispose of such shares until the expiration of one (1) year from the date of Closing.

2.   <u>Legend on Shares</u>.  The certificates for the shares of UF common stock and General Color common stock shall contain legends which refer to the restrictions on transfer set forth in this Agreement.

3.   <u>Change of Circumstances</u>.  In the event that a party to this Agreement suffers or undergoes a change in his personal financial circumstances, such party may request of General Color that he be allowed to transfer his shares, and such request may be granted by General Color provided that counsel for General Color is of the opinion that such transfer shall not have any adverse effect on the tax free reorganization effected by the Exchange or the tax free distribution effected by the Split-up.

4.   <u>Miscellaneous</u>.  This Agreement sets forth the complete understanding of the parties hereto with respect to the

subject matter hereof, and may not be modified or terminated, nor may any of its provisions be waived, except by an agreement in writing signed by all the parties hereto. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and date first above written.

David C. Beal
_____

Emily K. Beal
_____

Abby F. Kohnstamm
_____

Daniel Frank Kohnstamm
_____

David Kohnstamm
_____

Elizabeth Bryan Kohnstamm
_____

Jeffrey Kohnstamm
_____

John Kohnstamm
_____

Joshua G. Kohnstamm
_____

-3-

Kevin Kohnstamm

Mary L. Kohnstamm

Paul Kenneth Kohnstamm

Paul L. Kohnstamm

Peter L. Kohnstamm

Peter L. Kohnstamm, Custodian
f/b/o Sarah Francis Kohnstamm
under UGMA

Richard L. Kohnstamm

Ricka Robb Kohnstamm

Elizabeth K. Ogden

Richard L. Ogden

Thomas H. Ogden

Naomi Ellen Perman, custodian
f/b/o Adam Michael Kohnstamm
under UGMA

-4-

_____
Charles J. Piven

_____
Charles J. Piven, custodian
f/b/o Matthew Beck Piven under
UGMA

_____
Katherine Piven

_____     _____
Charles Piven                        Katherine Piven
          Custodians f/b/o Benjamin K. Piven
                    under UGMA

Trust u/w of Lothair S.
Kohnstamm f/b/o Elizabeth Kohnstamm

By: _____
        Paul L. Kohnstamm,
        Trustee

    _____
        Richard L. Kohnstamm,
        Trustee

    U.S. Trust Co., Trustee

By: _____
        Name: _____
        Title:

Trust u/w of Lothair S.
Kohnstamm f/b/o Paul L.
Kohnstamm

By: _____
        Paul L. Kohnstamm,
        Trustee

_____
Richard L. Kohnstamm,
Trustee

_____
Elizabeth K. Ogden,
Trustee

_____
Bank of New York, Trustee

By: _____
    Name:
    Title:

Trust u/w of Lothair S.
Kohnstamm f/b/o Richard Kohnstamm

By: _____
    Elizabeth K. Ogden,
    Trustee

_____
Paul L. Kohnstamm,
Trustee

U.S. Trust Co., Trustee

By: _____
    Name:
    Title:

38MCS049b
10/3/88

## EXHIBIT A

### KOHNSTAMM FAMILY SHAREHOLDERS

| Beneficial Owner | Record Holder | Shares of Company Common Stock Owned |
|---|---|---|
| David C. Beal | David Curtis Beal | 100 |
| Emily K. Beal | Emily K. Beal | 17,000 |
| Abby F. Kohnstamm | Abby F. Kohnstamm | 100 |
| Daniel Frank Kohnstamm | Daniel Frank Kohnstamm | 14,634 |
| David Kohnstamm | Cede & Co.* | 7,009 |
| Elizabeth Bryan Kohnstamm | Elizabeth Bryan Kohnstamm | 100 |
| Jeffrey Kohnstamm | Cede & Co.* | 7,009 |
| John Kohnstamm | Cede & Co.* | 7,009 |
| Joshua G. Kohnstamm | Cede & Co.* | 17,475 |
| Kevin Kohnstamm | Cede & Co.* | 7,009 |
| Mary L. Kohnstamm | Cede & Co.** | 21,450 |
| Paul Kenneth Kohnstamm | Paul Kenneth Kohnstamm | 15,817 |
| Paul L. Kohnstamm | Paul L. Kohnstamm | 180,138 |
| | Cede & Co. | 146,787 |
| Peter L. Kohnstamm | Cede & Co.** | 13,951 |
| Peter L. Kohnstamm, cust. Sarah Francis Kohnstamm, UGMA | Cede & Co.** | 2,500 |

---

\*   Merrill Lynch, Pierce Fenner & Smith, Inc.

\*\*   Shearson Lehman Hutton, Inc.

| | | |
|---|---|---|
| Richard L. Kohnstamm | Richard L. Kohnstamm | 886 |
| | Richard Kohnstamm | 7,085 |
| | Cede & Co. | 132,388 |
| Ricka Robb Kohnstamm | Ricka Rob Kohnstamm | 100 |
| Elizabeth K. Ogden | Elizabeth K. Ogden | 350 |
| Richard L. Ogden | Leslie P. Ogden | 175 |
| Thomas H. Ogden | Leslie P. Ogden | 175 |
| Naomi Ellen Perman, cust. Adam Michael Kohnstamm, UGMA | Naomi Ellen Perman cust. Adam Michael Kohnstamm, UGMA | 11,000 |
| Charles J. Piven | Charles J. Piven | 105 |
| Charles J. Piven, cust. Matthew Beck Piven, UGMA | Charles J. Piven, cust. Matthew Beck Piven, UGMA | 3,915 |
| Katherine Piven | Katherine Piven | 15,123 |
| Katherine Piven & Charles Piven, cust. Benjamin K. Piven, UGMA | Katherine Piven & Charles Piven, cust. Benjamin K. Piven, UGMA | 11,000 |
| Trust u/w of Lothair S. Kohnstamm f/b/o Elizabeth Kohnstamm; Paul L. Kohnstamm, Richard L. Kohnstamm and U.S. Trust Co., Trustees | Atwell & Co.* | 45,702 |
| Trust u/w of Lothair S. Kohnstamm f/b/o Paul L. Kohnstamm; Paul L. Kohnstamm, Richard L. Kohnstamm, Elizabeth K. Ogden and Bank of New York, Trustees | Way & Co.** | 62,221 |

NOT INCLUDED

---

\* U.S. Trust Co.

\*\* Bank of New York

```
Trust u/w of Lothair   Atwell & Co.*          60,908
S. Kohnstamm f/b/o
Richard L. Kohnstamm;
Paul L. Kohnstamm;
Elizabeth K. Ogden
and U.S. Trust Co.,
Trustees
                                              _____

TOTAL                                         809,221
```

---

*     U.S. Trust Co.

subject matter hereof, and may not be modified or terminated, nor may any of its provisions be waived, except by an agreement in writing signed by all the parties hereto. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and date first above written.

David C. Beal

Emily K. Beal

Abby F. Kohnstamm

Daniel Frank Kohnstamm

David Kohnstamm

Elizabeth Bryan Kohnstamm

Jeffrey Kohnstamm

John Kohnstamm

Joshua G. Kohnstamm

-3-

Kevin Kohnstamm
_____

Mary L. Kohnstamm
_____

Paul Kenneth Kohnstamm
_____

Paul L. Kohnstamm
_____

Peter L. Kohnstamm
_____

Peter L. Kohnstamm, Custodian
f/b/o Sarah Francis Kohnstamm
under UGMA
_____

Richard L. Kohnstamm
_____

Ricka Robb Kohnstamm
_____

Elizabeth K. Ogden
_____

Richard L. Ogden
_____

Thomas H. Ogden
_____

Naomi Ellen Perman, custodian
f/b/o Adam Michael Kohnstamm
under UGMA

subject matter hereof, and may not be modified or terminated, nor may any of its provisions be waived, except by an agreement in writing signed by all the parties hereto. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and date first above written.

_____
David C. Beal

_____
Emily K. Beal

_____
Abby F. Kohnstamm

_____
Daniel Frank Kohnstamm

_____
David Kohnstamm

_____
Elizabeth Bryan Kohnstamm

_____
Jeffrey Kohnstamm

_____
John Kohnstamm

_____
Joshua G. Kohnstamm

-3-

subject matter hereof, and may not be modified or terminated, nor may any of its provisions be waived, except by an agreement in writing signed by all the parties hereto. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and date first above written.

_____
David C. Beal

_____
Emily K. Beal

_____
Abby F. Kohnstamm

_____
Daniel Frank Kohnstamm

_____
David Kohnstamm

_____
Elizabeth Bryan Kohnstamm

_____
Jeffrey Kohnstamm

_____
John Kohnstamm

_____
Joshua G. Kohnstamm

-3-

subject matter hereof, and may not be modified or terminated, nor may any of its provisions be waived, except by an agreement in writing signed by all the parties hereto. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and date first above written.

---------------------------------------
David C. Beal

---------------------------------------
Emily K. Beal

---------------------------------------
Abby F. Kohnstamm

*Daniel Frank Kohnstamm*
---------------------------------------
Daniel Frank Kohnstamm

---------------------------------------
David Kohnstamm

*Elizabeth Bryan Kohnstamm*
---------------------------------------
Elizabeth Bryan Kohnstamm

---------------------------------------
Jeffrey Kohnstamm

---------------------------------------
John Kohnstamm

---------------------------------------
Joshua G. Kohnstamm

-3-

subject matter hereof, and may not be modified or terminated, nor may any of its provisions be waived, except by an agreement in writing signed by all the parties hereto. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and date first above written.

_____
David C. Beal

_____
Emily K. Beal

_____
Abby F. Kohnstamm

_____
Daniel Frank Kohnstamm

_____
David Kohnstamm

_____
Elizabeth Bryan Kohnstamm

_____
Jeffrey Kohnstamm

_____
John Kohnstamm

_____
Joshua G. Kohnstamm

-3-

subject matter hereof, and may not be modified or terminated, nor may any of its provisions be waived, except by an agreement in writing signed by all the parties hereto. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and date first above written.

_____
David C. Beal

_____
Emily K. Beal

_____
Abby F. Kohnstamm

_____
Daniel Frank Kohnstamm

_____
David Kohnstamm

_____
Elizabeth Bryan Kohnstamm

_____
Jeffrey Kohnstamm

_____
John Kohnstamm

_____
Joshua G. Kohnstamm

_____
Kevin Kohnstamm

_____
Mary L. Kohnstamm

_____
Paul Kenneth Kohnstamm

_____
Paul L. Kohnstamm

_____
Peter L. Kohnstamm

_____
Peter L. Kohnstamm, Custodian
f/b/o Sarah Francis Kohnstamm
under UGMA

_____
Richard L. Kohnstamm

_____
Ricka Robb Kohnstamm

_____
Elizabeth K. Ogden

_____
Richard L. Ogden

_____
Thomas H. Ogden

_____
Naomi Ellen Perman, custodian
f/b/o Adam Michael Kohnstamm
under UGMA

-4-

Kevin Kohnstamm

_____
Mary L. Kohnstamm


Paul Kenneth Kohnstamm

Paul L. Kohnstamm
_____
Paul L. Kohnstamm


_____
Peter L. Kohnstamm


_____
Peter L. Kohnstamm, Custodian
f/b/o Sarah Francis Kohnstamm
under UGMA


_____
Richard L. Kohnstamm


_____
Ricka Robb Kohnstamm


_____
Elizabeth K. Ogden


_____
Richard L. Ogden


_____
Thomas H. Ogden


_____
Naomi Ellen Perman, custodian
f/b/o Adam Michael Kohnstamm
under UGMA


-4-

Kevin Kohnstamm

_____

Mary L. Kohnstamm

_____

Paul Kenneth Kohnstamm

_____

Paul L. Kohnstamm

_____

Peter L. Kohnstamm

_____

Peter L. Kohnstamm, Custodian
f/b/o Sarah Francis Kohnstamm
under UGMA

_____

Richard L. Kohnstamm

_____

Ricka Robb Kohnstamm

_____

Elizabeth K. Ogden

_____

Richard L. Ogden

_____

Thomas H. Ogden

_____

Naomi Ellen Perman, custodian
f/b/o Adam Michael Kohnstamm
under UGMA

Kevin Kohnstamm
_____

*Mary L. Kohnstamm* (signature)
Mary L. Kohnstamm
_____

Paul Kenneth Kohnstamm
_____

*Paul L. Kohnstamm* (signature)
Paul L. Kohnstamm
_____

Peter L. Kohnstamm
_____

Peter L. Kohnstamm, Custodian
f/b/o Sarah Francis Kohnstamm
under UGMA
_____

Richard L. Kohnstamm
_____

Ricka Robb Kohnstamm
_____

Elizabeth K. Ogden
_____

Richard L. Ogden
_____

Thomas H. Ogden
_____

Naomi Ellen Perman, custodian
f/b/o Adam Michael Kohnstamm
under UGMA

_(signature)_

Kevin Kohnstamm

_____
Mary L. Kohnstamm

_____
Paul Kenneth Kohnstamm

_____
Paul L. Kohnstamm

_____
Peter L. Kohnstamm

_____
Peter L. Kohnstamm, Custodian
f/b/o Sarah Francis Kohnstamm
under UGMA

_(signature)_

Richard L. Kohnstamm

_____
Ricka Robb Kohnstamm

_____
Elizabeth K. Ogden

_____
Richard L. Ogden

_____
Thomas H. Ogden

_____
Naomi Ellen Perman, custodian
f/b/o Adam Michael Kohnstamm
under UGMA

-4-

Kevin Kohnstamm
_____

Mary L. Kohnstamm
_____

Paul Kenneth Kohnstamm
_____

Paul L. Kohnstamm
_____

Peter L. Kohnstamm
_____

Peter L. Kohnstamm, Custodian
f/b/o Sarah Francis Kohnstamm
under UGMA
_____

Richard L. Kohnstamm
_____

Ricka Robb Kohnstamm
_____

Elizabeth K. Ogden
_____

Richard L. Ogden
_____

Thomas H. Ogden
_____

Naomi Ellen Perman, custodian
f/b/o Adam Michael Kohnstamm
under UGMA

Kevin Kohnstamm

Mary L. Kohnstamm

*Paul Kenneth Kohnstamm*
Paul Kenneth Kohnstamm

Paul L. Kohnstamm

Peter L. Kohnstamm

Peter L. Kohnstamm, Custodian
f/b/o Sarah Francis Kohnstamm
under UGMA

Richard L. Kohnstamm

Ricka Robb Kohnstamm

Elizabeth K. Ogden

Richard L. Ogden

Thomas H. Ogden

*Naomi Ellen Perman*
Naomi Ellen Perman, custodian
f/b/o Adam Michael Kohnstamm
under UGMA

-4-

Charles J. Piven

Charles J. Piven, custodian
f/b/o Matthew Beck Piven under
UGMA

Katherine Piven

Charles Piven        Katherine Piven
Custodians f/b/o Benjamin K. Piven
under UGMA

Trust u/w of Lothair S.
Kohnstamm f/b/o Elizabeth Kohnstamm

By: _Paul L. Kohnstamm_
Paul L. Kohnstamm,
Trustee

Richard L. Kohnstamm,
Trustee

U.S. Trust Co., Trustee

By:
Name:
Title:

Trust u/w of Lothair S.
Kohnstamm f/b/o Paul L.
Kohnstamm

By: _Paul L. Kohnstamm_
Paul L. Kohnstamm,
Trustee

-5-

Charles J. Piven
_____

Charles J. Piven, custodian
f/b/o Matthew Beck Piven under
UGMA
_____

Katherine Piven
_____

Charles Piven                    Katherine Piven
Custodians f/b/o Benjamin K. Piven
under UGMA

Trust u/w of Lothair S.
Kohnstamm f/b/o Elizabeth Kohnstamm

By: _____
     Paul L. Kohnstamm,
     Trustee

     _____
     Richard L. Kohnstamm,
     Trustee

U.S. Trust Co., Trustee

By: _____
     Name:
     Title:

Trust u/w of Lothair S.
Kohnstamm f/b/o Paul L.
Kohnstamm

By: _____
     Paul L. Kohnstamm,
     Trustee

_____

Charles J. Piven

_____

Charles J. Piven, custodian
f/b/o Matthew Beck Piven under
UGMA

_____

Katherine Piven

_____                    _____

Charles Piven                              Katherine Piven
        Custodians f/b/o Benjamin K. Piven
                under UGMA

Trust u/w of Lothair S.
Kohnstamm f/b/o Elizabeth Kohnstamm

By: _____
    Paul L. Kohnstamm,
    Trustee

_____
Richard L. Kohnstamm,
Trustee

U.S. Trust Co., Trustee

By: _____
    Name: ROBERT Y. SIMMONS
    Title: VICE PRESIDENT

Trust u/w of Lothair S.
Kohnstamm f/b/o Paul L.
Kohnstamm

By: _____
    Paul L. Kohnstamm,
    Trustee

-5-

_____
Charles J. Piven

_____
Charles J. Piven, custodian
f/b/o Matthew Beck Piven under
UGMA

_____
Katherine Piven

_____          _____
Charles Piven                              Katherine Piven
Custodians f/b/o Benjamin K. Piven
under UGMA

Trust u/w of Lothair S.
Kohnstamm f/b/o Elizabeth Kohnstamm

By:  _Paul L. Kohnstamm_____
     Paul L. Kohnstamm,
     Trustee

     _____
     Richard L. Kohnstamm,
     Trustee

     U.S. Trust Co., Trustee

By:  _____
     Name:
     Title:

Trust u/w of Lothair S.
Kohnstamm f/b/o Paul L.
Kohnstamm

By:  _Paul L. Kohnstamm_____
     Paul L. Kohnstamm,
     Trustee

_(signature)_

Richard L. Kohnstamm,
Trustee


Elizabeth K. Ogden,
Trustee


Bank of New York, Trustee


By: _____
     Name:
     Title:


Trust u/w of Lothair S.
Kohnstamm f/b/o Richard Kohnstamm


By: _____
     Elizabeth K. Ogden,
     Trustee


_____
Paul L. Kohnstamm,
Trustee


U.S. Trust Co., Trustee


By: _____
     Name:
     Title:

Richard L. Kohnstamm,
Trustee

_Elizabeth K. Ogden_
Elizabeth K. Ogden,
Trustee

Bank of New York, Trustee

By: _____
Name:
Title:

Trust u/w of Lothair S.
Kohnstamm f/b/o Richard Kohnstamm

By: _Elizabeth K. Ogden_
Elizabeth K. Ogden,
Trustee

_____
Paul L. Kohnstamm,
Trustee

U.S. Trust Co., Trustee

By: _____
Name:
Title:

-6-

Richard L. Kohnstamm,
Trustee

Elizabeth K. Ogden,
Trustee

Bank of New York, Trustee

By: _____
Name: Kathleen C. Shoemanof
Title: Vice President

Trust u/w of Lothair S.
Kohnstamm f/b/o Richard Kohnstamm

By: _____
Elizabeth K. Ogden,
Trustee

Paul L. Kohnstamm,
Trustee

U.S. Trust Co., Trustee

By: _____
Name:
Title:

Richard L. Kohnstamm,
Trustee

Elizabeth K. Ogden,
Trustee

Bank of New York, Trustee

By: _____
     Name: _____
     Title: _____

Trust u/w of Lothair S.
Kohnstamm f/b/o Richard Kohnstamm

By: _____
     Elizabeth K. Ogden,
     Trustee

     *Paul L. Kohnstamm*
     Paul L. Kohnstamm,
     Trustee

U.S. Trust Co., Trustee

By: _____
     Name: _____
     Title: _____

Richard L. Kohnstamm,
Trustee

_____
Elizabeth K. Ogden,
Trustee

Bank of New York, Trustee

By: _____
Name:
Title:

Trust u/w of Lothair S.
Kohnstamm f/b/o Richard Kohnstamm

By: _____
Elizabeth K. Ogden,
Trustee

_____
Paul L. Kohnstamm,
Trustee

U.S. Trust Co., Trustee

By: _____
Name: Kathleen C. Shoemaker
Title: Vice President





## State of New Jersey

### DEPARTMENT OF ENVIRONMENTAL PROTECTION

DIVISION OF HAZARDOUS WASTE MANAGEMENT

John J. Trela, Ph.D., Director

401 East State St.

CN 028

Trenton, N.J. 08625

609 - 633 - 1408

Mr. Daniel Rabinowitz
McCarter & English
550 Broad St.
Newark, NJ 07102-4578

OCT 21 1987

RE: H. Kohnstamm & Co., Inc.
    Camden City, Camden County
    Newark City, Essex County
    #N73402

Dear Mr. Rabinowitz:

This is in response to your letter dated 08/31/87 concerning the applicability of the Environmental Cleanup Responsibility Act (ECRA) to the above referenced company. On the basis of the sworn statements set forth in the affidavit signed by Daniel Kaufman, the Department finds that these transactions are not subject to the provisions of ECRA.

This decision is made in light of the absence of a transaction covered by the Act. The transfer of Kohnstamm's Camden facility to General Color Company, a wholly owned subsidiary of Kohnstamm, and the transfer of General Color Company to Kohnstamm's shareholders on a pro-rata basis is considered a corporate reorganization not substantially affecting the ownership of the Industrial Establishments. However, the sale of the stock of H. Kohnstamm & Co., Inc. to a third party, also mentioned in number 4, letter C of the affidavit signed by Mr. Kaufman, would be a transaction covered by ECRA. Any inaccuracies in the affidavit or subsequent changes in the facts as stated therein could alter the Department's determination.

The inapplicability of the Environmental Cleanup Responsibility Act (ECRA) to this transaction does not relieve the above referenced of any responsibilities under any other environmental statutes, regulations or permits.

Moreover, this determination of ECRA nonapplicability does not constitute any finding by the New Jersey Department of Environmental Protection as to the current site condition or the existence or non-existence of any hazards to the environment at this location.

## EXHIBIT C

Should you have any further questions regarding this matter, please contact Mark Fisher at (609) 633-7141.

Sincerely,

*Michael S. DeTalvo*

Michael DeTalvo, Supervisor
Bureau of ECRA Applicability and
Compliance

E37:dr

August 31, 1987

RE:  H. Kohnstamm & Company, Inc.
     Application for a Letter or Non-Applicability

Lance R. Miller, Chief
Industrial Site Evaluation Element
Department of Environmental Protection
CN 028, 401 E. State Street, 5th flr.
Trenton, New Jersey 08625

Dear Mr. Miller:

     We represent H. Kohnstamm & Company, Inc.
("Kohnstamm").  I write to request a determination by the
Industrial Site Evaluation Element ("ISEE") that the transaction
described below does not fall within the regulatory jurisdiction
of the New Jersey Environmental Cleanup Responsibility Act of
1983, N.J.S.A. 13:1K-6, et seq. ("ECRA").  We support this request
for a determination of non-applicability with the Affidavit of
Daniel Kaufman ("Kaufman Aff."), sworn to on August 17, 1987.  We
also enclose our certified check in the amount of $100.

Description of Kohnstamm

     Kohnstamm is a New York corporation with its principal
place of business at 161 Avenue of the Americas, New York, New
York 10013.  Kaufman Aff. ¶ 2.  Kohnstamm is a closely held
company having approximately 300 shareholders.  Id.  Approximatel
75% of the Common Stock is held, directly or in trust, by members
10087/159

MᶜCARTER & ENGLISH

-2-

of the Kohnstamm family. Id.

Kohnstamm manufactures and sells flavors, certified colors and industrial pigments. Kohnstamm has three operating divisions: (1) the flavor division, which produces a variety of synthetic and natural flavors at a facility in Kearny, New Jersey; (2) the color division, which manufactures a variety of certified colors for use in the food, drug and cosmetic industries at a facility located at 31st Street and Lemuel Avenue, Camden, New Jersey (the "Camden facility"); and (3) General Color Company, a wholly owned subsidiary, which manufactures Cadmium pigments at its facility at 24 Avenue B, Newark, New Jersey (the "Newark facility").

## The Proposed Transaction

Kohnstamm and its shareholders currently plan to undertake the following actions:

a. Transfer of the Camden facility from Kohnstamm to General Color;

b. Spin off of General Color on a pro-rata basis to Kohnstamm's shareholders; and

c. Sale of the stock of Kohnstamm to a third-party in a tax free stock for stock exchange.

Kaufman Aff. ¶ 4. As a result of the proposed transaction, beneficial ownership of the Camden and Newark facilities will remain where it is today--in the shareholders of Kohnstamm. Kaufman Aff. ¶ 5. General Color -- which will own the Camden and Newark facilites -- will continue to be owned by the shareholders of Kohnstamm. Kaufman Aff. ¶ 5. The Camden plant will continue in operation--manufacturing and selling colors on a cost-plus basis to the third party for a period not yet determined, but in all events not less than 2-3 years. Id. Thereafter, General Color plans to add some additional, related products at Camden. The Newark facility will continue in operations as well. Id.

## Discussion

ECRA applies to owners and/or operators of New Jersey "industrial establishments" upon closure or "transferring operations" of such industrial establishments. N.J.S.A. 13:1K-8(b). ECRA provides, in pertinent part, that "transferring operations" means "any ... transaction or proceeding through which an industrial establishment ... undergoes change in ownership, except for corporate reorganization not substantially affecting the ownership of the industrial establishment, including but not

MᴄCᴀʀᴛᴇʀ & Eɴɢʟɪsʜ

-3-

limited to sale of stock in the form of a statutory merger or consolidation, sale of the controlling share of the assets, the conveyance of the real property, dissolution of corporate identity, financial reorganization and initiation of bankruptcy proceedings." N.J.S.A. 13:1K-8(b) (Emphasis added).[1]

The issue here is whether ECRA applies to:

> 1) the transfer of title of an industrial establishment -- the Camden facility -- from Kohnstamm, the parent

---

1. The ECRA Regulations, N.J.A.C. 7:1-3.1, et seq., are to the same effect. Section 7:1-3.18 provides in pertinent part:

(a) For the purposes of this subchapter, the closing, terminating or transferring operations of an industrial establishment shall mean:

Any change in ownership including but not limited to:

i. sale of stock in the form of a statutory merger or consolidation;

ii. sale of the controlling share of assets;

iii. conveyance of the real property;

iv. dissolution of corporate identity;

v. financial reorganization, and

vi. initiation of bankruptcy proceedings.

(b) For the purposes of (a)(4)i through vi above and this subchapter corporate reorganization not substantially affecting the ownership of the industrial establishment shall not be considered any change in ownership. (Emphasis added).

-4-

entity, to its wholly-owned subsidiary; followed by

2) the transfer of the shares of General Color to the shareholders of Kohnstamm.

Although such a transaction results in a formal "change of ownership", we believe that this transaction falls within the statutory exception for "corporate reorganizations not substantially affecting the ownership" of the industrial establishment. N.J.S.A. 13:1K-8(b); N.J.A.C. 7:1-3.18. We reach this conclusion since, both before and after the Closing of the proposed transaction, the shareholders of Kohnstamm remain beneficial and equitable owners of General Color's assets, including the two industrial establishments. We believe that a contrary result would be at odds with the statutory language, construed in light of independently valid principles of New Jersey corporate law.

Both the statute and the interpretative regulations provide that ECRA does not apply to a "corporate reorganization not substantially affecting the ownership" of the industrial establishment. N.J.S.A. 13:1K-8(b); N.J.A.C. 7:1-3.18. It is clear from the statutory structure that this provision was intended to create an exception to ECRA's coverage for certain types of transactions that nevertheless entail formal, as opposed to beneficial, changes in ownership of New Jersey industrial establishments, thereby permitting the deployment and redeployment of corporate assets whose beneficial ownership is unchanged.

In this case, both components of the two step transaction fall within the "corporate reorganization" exception. The transfer of the Camden plant from Kohnstamm to General Color does not "substantially affect the ownership of th[at] industrial establishment", since beneficial ownership at all times remains in the present shareholders of Kohnstamm. Similarly, the spin off transaction preserves beneficial and equitable ownership of General Color's assets -- including the Newark and Camden industrial establishments -- in the Kohnstamm shareholders. After the spin off, these shareholders will own directly what they formerly owned indirectly by virtue of their Kohnstamm shares. It follows that the sale of the Kohnstamm shares to the third party will not result in a change in ownership of the Newark or Camden facilities, since these facilities will no longer be assets of

MCCARTER & ENGLISH                    -5-

Kohnstamm.[2]

In short, the proposed transaction is not covered by
ECRA, either in logic or in law. A determination of
non-applicability is appropriate for legal and policy reasons, and
we respectfully request the issuance of such a Ruling from the
ISEE.

Very truly yours,

*Daniel L. Rabinowitz*

Daniel L. Rabinowitz

DLR/gc
cc: Ms. Barbara Strollo (w/enclosure)
Enclosures

---

2.        In the event the sale of stock to the third-party is
completed in the manner presently planned, the Kearny facility
will, of course, be transferred. However, we believe that the
Kearny plant falls outside the SIC codes covered by ECRA and it is
anticipated that a request for a Letter of Non-Applicability will
be submitted with respect to this facility. In the event NJDEP
does not issue a Letter of Non-Applicability with respect to the
Kearny facility, Kohnstamm will undertake ECRA compliance with
respect to that facility.

In the Matter of
H. Kohnstamm & Company, Inc.--
Application for a Letter of
Non-Applicability with respect          Affidavit of
to facilities at Newark, New            Daniel Kaufman
Jersey and Camden, New Jersey

STATE OF NEW YORK  :

                  SS.

COUNTY OF NEW YORK  :

          DANIEL KAUFMAN, of full age, duly sworn according to
law, upon his oath deposes and says:

          1.  I am Vice President of H. Kohnstamm & Company, Inc.
("Kohnstamm").  I submit this Affidavit in connection with
Kohnstamm's Application for an Applicability/Non-Applicability
Determination with respect to a proposed transaction (described
below) involving Kohnstamm's facilities at Camden and Newark, New
Jersey.

Description of Kohnstamm

         2.  Kohnstamm is a New York corporation with its
principal place of business at 161 Avenue of the Americas, New

10087/117

Kohnstamm's shareholders; and

       c.  Sale of the stock of Kohnstamm to a third-party in a tax free stock for stock exchange.

       5.  As a result of the proposed transaction, beneficial ownership of the Camden and Newark facilities will remain where it is today--in the shareholders of Kohnstamm. General Color -- which will own the Camden and Newark facilities -- will continue to be owned by the former shareholders of Kohnstamm. The Camden plant will continue in operation--manufacturing and selling colors on a cost-plus basis to the third party for a period not yet determined, but in all events not less than 2-3 years. Thereafter, the Kohnstamm Board of Directors expects that General Color will add some additional, related products at Camden. It is anticipated that the Newark facility will continue in operations as well.

STATE OF NEW YORK )
              ) ss.
COUNTY OF NEW YORK )

                                    Daniel Kaufman

Sworn to and subscribed
before me this 17th day
of August , 1987

RUTH ZAKENBERG
NOTARY PUBLIC, State of New York
No. 31-4813251
Qualified in New York County
Commission Expires February 20, 1990



Let's protect our earth

## State of New Jersey
### DEPARTMENT OF ENVIRONMENTAL PROTECTION
#### DIVISION OF HAZARDOUS WASTE MANAGEMENT
John J. Trela, Ph.D., Director
401 East State St.
CN 028
Trenton, N.J. 08625
609 - 633 - 1408

Mr. Daniel Rabinowitz
McCarter & English
550 Broad St.
Newark NJ 07102-4578

RE: H. Kohnstamm & Co.
Camden City, Camden County
Newark City, Essex County
#N80293

JAN 27 1988

Dear Mr. Rabinowitz:

This is in response to your letter dated 1/12/88, concerning the applicability of the Environmental Cleanup Responsibility Act (ECRA) to the above referenced company. On the basis of the sworn statements set forth in the affidavit signed by Daniel Kaufman, the Department finds that this transaction is not subject to the provisions of ECRA.

This decision is made in light of the absence of a transaction covered by the Act. The transfer of Kohnstamm's Camden facility to General Color Company, a wholly owned subsidiary of Kohnstamm, and the transfer of General Color Company to Kohnstamm's shareholders, who are members of the Kohnstamm family on a pro-rata basis are considered corporate reorganizations not substantially affecting the ownership of the Industrial Establishments. In addition, the initiation of a supply contract between General Color and a third party is not a ECRA trigger. Any inaccuracies in the affidavit or subsequent changes in the facts as stated therein could alter the Department's determination.

The inapplicability of the Environmental Cleanup Responsibility Act (ECRA) to this transaction does not relieve the above referenced of any responsibilities under any other environmental statutes, regulations or permits.

In addition, this determination of ECRA nonapplicability does not constitute any finding by the New Jersey Department of Environmental Protection as to the current site condition or existence or nonexistence of any hazards to the environment at this location.

Should you have any further questions regarding this matter, please contact Mark Fisher at (609) 633-7141.

Sincerely,

Michael DeTalvo, Supervisor
Bureau of ECRA Applicability and
Compliance

McCARTER & ENGLISH

ATTORNEYS AT LAW

550 BROAD STREET

NEWARK, NJ 07102-4578

CHERRY HILL, NJ

NEW YORK, NY

BOCA RATON, FL

WILMINGTON, DE

(201) 622-4444

DOMESTIC TELEX 642828

INTERNATIONAL TRT 178018

TELECOPIER (201) 622-0012

CABLE "McCARTER" NEWARK

January 12, 1988

Mr. Lance R. Miller
New Jersey Department of Environmental
 Protection
Bureau of Industrial Site
 Evaluation
401 East State Street
Trenton, New Jersey 08625

DRAFT

Re: H. Kohnstamm & Co., Inc.
    Application for a Letter
    of Non-Applicability

Dear Mr. Miller:

We represent H. Kohnstamm & Co., Inc. ("Kohnstamm").
On October 21, 1987, the Industrial Site Evaluation Element
("ISEE") issued a Letter of Non-Applicability with regard
to a transaction involving Kohnstamm's facilities at Camden
and Newark, New Jersey. Since the issuance of the letter,
the terms of the proposed transaction have changed slightly.
Because we believe the transaction as amended is not subject
to ECRA, we submit this amended Application for a Letter
of Non-Applicability. We support the Application with the
Supplemental Affidavit of Daniel Kaufman which describes
the modest changes that have taken place in the structure
of the transaction.

As set forth in the initial Affidavit of Daniel Kaufman,
Kohnstamm is a New York corporation with its principal place

MᶜCARTER & ENGLISH

January 12, 1988
Mr. Lance R. Miller
Page Two

of business in New York city. Kohnstamm manufactures flavors, certified colors and industrial pigments. Kohnstamm's color division manufactures a variety of certified colors at a facility in Camden, New Jersey. A wholly-owned subsidiary of Kohnstamm, General Color Company ("General Color"), manufactures Cadmium pigments at a facility in Newark, New Jersey.

In the initial LNA application, Kohnstamm reported that it planned to undertake the following actions:

a. Transfer of the Camden facility from Kohnstamm to General Color;

b. Spin-off of the stock of General Color on a pro-rata basis to Kohnstamm's stockholders; and

c. Sale of the stock of Kohnstamm to a third party.

As set forth in the initial Affidavit, it was anticipated that General Color would continue to manufacture colors at Camden on a cost-plus basis for the third party buyer for an undetermined period of not less than 2-3 years, and would thereafter add related, additional products at Camden.[1]

As a result of negotiations with the third party, the structure of the transaction will change in the following two respects:

1. The spin-off of General Color's shares will not be on a pro-rata basis. Instead, the stock will be distributed on a pro-rata basis to those stockholders of Kohnstamm who are members of the Kohnstamm family. The Kohnstamm family consists of Paul Kohnstamm, currently the majority owner of Kohnstamm, Richard Kohnstamm, his brother and a director of Kohnstamm, and the spouses, children and grandchildren of Paul and Richard Kohnstamm. This group currently owns approximately 81% of the stock of Kohnstamm.

---

[1] The Newark facility would continue in operations as well.

# McCARTER & ENGLISH

January 12, 1988
Mr. Lance R. Miller
Page Three

2. General Color and the third party buyer of Kohnstamm will enter into a Supply Contract, pursuant to which General Color will supply certified colors to the buyer. The duration of the Supply Contract is to be as follows:

> Duration. The term of this Agreement shall be eighteen (18) months from the date hereof. This Agreement shall continue thereafter for a period of six (6) months, and thereafter from month-to-month, provided, however, that, at any time after the first fifteen (15) months from the date hereof, either party may give notice to the other terminating this Agreement as of a date at least three (3) months after the date of such notice.

After the termination of the Supply Contract, it is anticipated that General Color will add additional products and will continue operations. Except as set forth above, the terms of the transaction will remain as previously disclosed to the ISEE.

The change in the distribution of the shares of General Color described above is being made in substantial part because a pro-rata spin-off would, in the opinion of the staff of the Securities and Exchange Commission, which was consulted on the point, require a Registration Statement. This would be expensive, time-consuming and unnecessary in light of the fact that the Kohnstamm family, both before and after the spin-off, will have control of the Company.

In its October 21, 1987 Letter of Non-Applicability, the ISEE found that both the proposed transfer of the Camden facility to General Color and the spin-off of General Color stock to Kohnstamm's stockholders are "corporate reorganization[s] not substantially affecting the ownership of the industrial establishment[s]." We submit the transaction as amended is similarly exempt. At the present time, beneficial ownership of the Camden and Newark facilities

In the Matter of
H. Kohnstamm & Co., Inc. --
Application for a Letter of
Non-Applicability With Regard
to Facilities at Newark, New
Jersey and Camden, New Jersey

Supplemental Affidavit of
Daniel Kaufman

---

STATE OF NEW YORK     :
                      SS
COUNTY OF NEW YORK    :

Daniel Kaufman, of full age, duly sworn according to law, upon his oath, deposes and says:

1.  I am Vice President of H. Kohnstamm & Co., Inc. ("Kohnstamm").  I submit this Supplemental Affidavit in connection with Kohnstamm's Application for an Applicability/ Non-Applicability Determination with respect to a proposed transaction involving Kohnstamm's facilities at Camden and Newark, New Jersey.

2.  On August 31, 1987, Kohnstamm submitted to the Industrial Site Evaluation Element ("ISEE") an Application for an Applicability/Non-Applicability Determination with respect to Kohnstamm's facilities at Camden and Newark.  The application was supported by my Affidavit, (the "initial Affidavit") a copy of which is attached hereto as Exhibit 1.

3.   The transaction concerning which Kohnstamm sought the non-applicability ruling was described in Paragraph 4 of the initial Affidavit.  On October 21, 1987, the ISEE issued a Letter of Non-Applicability, finding that the transaction described in Paragraph 4 of the initial Affidavit was not subject to ECRA.  A copy of this letter is attached as Exhibit 2.

4.   Since August 31, 1987, Kohnstamm has engaged in a negotiation with a third party for the purchase of Kohnstamm's common stock.  That negotiation has resulted in two changes in the proposed transaction described in Paragraph 4 of the initial Affidavit.  I submit this Affidavit to set forth the nature of these changes and to request that the ISEE determine that the proposed transaction as amended is not subject to ECRA.

The Proposed Transaction.

5.   The transaction described in Paragraph 4 of the initial Affidavit will be changed as follows:

A.   The spin-off of General Color Company ("General Color") to Kohnstamm shareholders will not be on a pro rata basis.  Instead, the stock of General Color will be distributed pro rata to those stockholders of Kohnstamm who are members of the Kohnstamm family.  The family consists of Paul Kohnstamm, currently the majority owner of Kohnstamm, Richard Kohnstamm, his brother and a director

of Kohnstamm, and the spouses, children and grandchildren of Paul and Richard. This group currently owns in the aggregate approximately 81% of the outstanding shares of common stock of Kohnstamm. As a result, the shares of General Color will be spread among the holders of 81% of Kohnstamm stock. The controlling interest in the New Jersey industrial establishments will remain where it is today--in the Kohnstamm family.

B. General Color and the third party buyer will enter into a Supply Contract, pursuant to which General Color will supply certified colors to the third party. The duration of the Supply Contract is to be as follows:

> Duration. The term of this Agreement shall be eighteen (18) months from the date hereof. This Agreement shall continue thereafter for a period of six (6) months, and thereafter from month-to-month, provided, however, that, at any time after the first fifteen (15) months from the date hereof, either party may give notice to the other terminating this Agreement as of a date at least three (3) months after the date of such notice.

As before, after the termination of the Supply Contract, General Color plans to add new products and to continue in operations.

6.   The change in the distribution of the shares of General Color described above is being made in substantial part because a pro-rata spin-off would, in the opinion of the staff of the Securities and Exchange Commission, which was consulted on the point, require a Registration Statement.  This would be expensive, time consuming and unnecessary in light of the fact that the Kohnstamm family, both before and after the spin-off, will have control of General Color.

7.   Except as set forth in this Supplemental Affidavit, the terms of the proposed transaction remain as stated in the initial Affidavit.

_____
Daniel Kaufman

Sworn to and subscribed
before me this      day
of           , 1988

_____

— 4 —

FITZGERALD, McGROARTY & LIPARI, P.A.
401 New Road, Suite 104
Linwood, New Jersey 08221
(609) 927-0015
Attorneys for Plaintiff
PLEASANT GARDENS REALTY
CORPORATION

|  |  |
|---|---|
| | : SUPERIOR COURT OF NEW JERSEY |
| | : LAW DIVISION - CAMDEN COUNTY |
| Plaintiff | : |
| v. | : DOCKET NO: *L 6579-03* |
| | : Civil Action |
| H. KOHNSTAMM & COMPANY, | |
| INC.; WARNER-JENKINSON | |
| COMPANY, INC.; SENSIENT | COMPLAINT AND |
| COLORS INC.; SENSIENT | DEMAND FOR JURY TRIAL |
| TECHNOLOGIES, formerly known | |
| as Universal Foods Corporation; | |
| UNIVERSAL FOODS | |
| CORPORATION; GENERAL | |
| COLOR COMPANY; | |
| and JOHN SMITH | NOV 2 6 2007 |
| COMPANIES/INDIVIDUALS 1-20 | |
| (fictitious names); J/S/A, | |
| Defendants. | |

The Plaintiff, Pleasant Gardens Realty Corporation, a corporation of the State of New

Jersey, by way of Complaint against the Defendants, says:

## I. PARTIES

1      The Plaintiff, Pleasant Gardens Realty Corporation, is a New Jersey corporation with

offices at 550 North 30th Street, Camden, New Jersey.

2.     The Defendant, H. Kohnstamm & Company, Inc., incorporated under the laws of the

State of New York in January, 1922 is currently known as Sensient Colors, Inc

**EXHIBIT D**

3.     The Defendant, Warner-Jenkinson Company, Inc., formerly known as H. Kohnstamm & Company, Inc., maintained the corporate status of H. Kohnstamm & Company, Inc. under the laws of the State of New York and is currently known as Sensient Colors, Inc

4.     The Defendant, Sensient Colors, Inc., formerly known as H. Kohnstamm & Company, Inc. and Warner-Jenkinson Company, Inc., an active corporation under the laws of the State of New York with its original incorporation date of January, 1922.

5.     The Defendant, Universal Foods is a corporation under the laws of the State of Wisconsin.

6.     The Defendant, Sensient Technologies, formerly known as Universal Foods is a corporation under the laws of the State of Wisconsin.

7.     The Defendant, General Color Company is a company incorporated under the laws of the State of New Jersey.

8.     The Defendant, John Smith Companies/Individuals 1-20 are fictitious names of those entities who, in any way, contributed to the contamination of the Pleasant Gardens Apartments site in the City of Camden, County of Camden, and State of New Jersey, whose identifies are not presently known to the Plaintiffs.

## SUBSTANTIVE ALLEGATIONS

9.     The Plaintiff, Pleasant Gardens Realty Corporation owns and operates an apartment complex on property known as Lot 1, Block 983, and Lots 1 and 20 of Block 985 on the Municipal Tax Map of the City of Camden, Camden County, New Jersey

10.     From approximately 1922 to 1988 the Defendant, H. Kohnstamm & Company, Inc. owned the real estate and/or operated a business at 31st Street and Lemuel Street in Camden,

2

New Jersey (hereinafter the "Site").  The Site is adjacent to the Plaintiff's property as set forth above.

1.     In or about 1988, the Defendant, H. Kohnstamm & Company, Inc. sold the Site to General Color Company.  General Color Company continued operations on the Site until approximately 1997.

12.     In or about September of 1990 the Defendant, H. Kohnstamm & Company, Inc. amended its Certificate of Incorporation to change its name to Warner-Jenkinson Company, Inc   In December, 2002, the Defendant Warner-Jenkinson Company, Inc., formerly known as H Kohnstamm & Company, Inc. changed its name to Sensient Colors, Inc.  Sensient Colors, Inc., formerly known as H. Kohnstamm & Company, Inc., continues to operate as a New York Corporation and has a listed registered agent as CT Corporation, 111 8th Avenue, New York, New York, 10011

13.     The Defendant Universal Foods Corporation was a parent company and/or was responsible for the acts or omissions of H. Kohnstamm & Company, Inc., Warner-Jenkinson Company, Inc. and Sensient Color, Inc. and/or was otherwise affiliated with these entities in the time period relevant to the causes of action alleged in the Complaint.

14.     In or about 2000, Universal Foods Corporation changed its name to Sensient Technologies and remained as the parent of Sensient Colors, Inc., (formerly known as Warner-Jenkinson Company, Inc. and H. Kohnstamm & Company, Inc.).

15.     In or about November of 2002, an investigation by the United States Environmental Protection Agency, revealed that the Defendants had unlawfully released and disposed of hazardous substances on the Plaintiff's property.  The hazardous substances include but are not

3

limited to polynuclear aromatic hydrocarbons, lead, tar, dyes, and pigment. Evidence reveals that the Defendants intentionally and/or negligently disposed of these hazardous substances on the Plaintiff's property and in a pond that previously existed thereon.

## FIRST COUNT

### NEGLIGENCE

16.     The Plaintiff repeats the allegations in the preceding paragraphs of the Complaint and incorporates same by reference as though fully set forth herein.

7.     The Defendants, at all times material hereto, acted through their respective officers, employees, and agents, who in turn were acting within the scope of their authority and employment in furtherance of the business of the Defendants.

8.     As a result of the Defendants' acts and omissions as aforesaid, extensive contamination has been documented on the Plaintiff's property.

19.     At all times relevant, the Defendants knew or should have known, that the hazardous and toxic substances discharged by the Defendants were contaminating the Plaintiff's property thereby causing damage.

20.     At all times relevant, the Defendants failed to safely and properly remove and discharge its waste and failed to advise or warn Plaintiff of the dangers emanating from the discharge of hazardous and toxic substances into the subsurface.

21     Defendants failed to use reasonable care to safeguard those residing on nearby properties from injury or property damage.

4

22.    As a direct and proximate result of the acts and omissions of the Defendants

    a.    Plaintiff's have lost the beneficial use, enjoyment and exclusive possession of its property;

    b.    Plaintiff's property has declined in value as a result of the contamination and the specter of contamination in the future; and

    c.    Plaintiff suffered property damage, economic loss, inconvenience and other damages flowing directly or indirectly from the Defendants actions

WHEREFORE, Plaintiff demands judgment against the Defendants, individually, jointly and severally, for compensatory damages, punitive damages, attorneys fees, together with costs of suit, and for such other or further relief as the court may deem just, equitable and appropriate.

## SECOND COUNT

### ABSOLUTE / STRICT LIABILITY

23.    The Plaintiff repeats the allegations in the preceding paragraphs of the Complaint and incorporates same by reference as though fully set forth herein.

24.    The Defendants by generating, discharging, transporting or allowing the discharge of hazardous and toxic substances, and/or concealing knowledge of same, knowingly and deliberating engaged in abnormally dangerous activities.

25.    As a direct and proximate result of the acts and omissions of the Defendants:

    a.    Plaintiff's have lost the beneficial use, enjoyment and exclusive possession of its property;

b.  Plaintiff's property has declined in value as a result of the contamination and the specter of contamination in the future;

c.  Plaintiff suffered property damage, economic loss, inconvenience and other damages flowing directly or indirectly from the Defendants actions.

26.  Defendants are absolutely and strictly liable for the above damage, which resulted directly from their engaging in abnormally dangerous activities.

WHEREFORE, Plaintiff demands judgment against the Defendants, individually, jointly and severally, for compensatory damages, punitive damages, attorneys fees, together with costs of suit, and for such other or further relief as the court may deem just, equitable and appropriate.

## THIRD COUNT

### TRESPASS

27.  The Plaintiff repeats the allegations in the preceding paragraphs of the Complaint and incorporates same by reference as though fully set forth herein.

28.  The Defendants' wrongful conduct as set forth above resulted in the direct physical invasion of Plaintiff's property by hazardous and toxic substances contaminating its property.

29.  The hazardous and toxic substances deposited by the Defendants and emanating from the Defendants' property continues to contaminate the Plaintiff's property and surrounding surface and subsurface areas.

30.  The presence of hazardous and toxic constituents on Plaintiff's property is unauthorized and unreasonable.

31    The Defendants have not sought nor obtained Plaintiff's consent to store its substances and waste on its property.

32.    As a direct and proximate result of the acts and omissions of the Defendants:

a.    Plaintiff's have lost the beneficial use, enjoyment and exclusive possession of its property;

b.    Plaintiff's property has declined in value as a result of the contamination and the specter of contamination in the future; and

c.    Plaintiff suffered property damage, economic loss, inconvenience and other damages flowing directly or indirectly from the Defendants actions.

WHEREFORE, Plaintiff demands judgment against the Defendants, individually, jointly and severally, for compensatory damages, punitive damages, attorneys fees, together with costs of suit, and for such other or further relief as the court may deem just, equitable and appropriate.

## FOURTH COUNT

### NUISANCE

33.    The Plaintiff repeats the allegations in the preceding paragraphs of the Complaint and incorporates same by reference as though fully set forth herein.

34.    The Defendants' wrongful conduct resulted in the interference with the Plaintiff's right to exclusive use and enjoyment of its property through the invasion of hazardous and toxic substances contaminating its property.

35.    The Defendants knew that the invasion of contamination on Plaintiff's property was substantially certain to result from their actions / omissions, as aforesaid.

36.    This interference with Plaintiff's use and enjoyment of its property is unreasonable,

7

unwarranted and unlawful

37.    Plaintiff has suffered material damages, annoyance, displacement, and economic loss due to the Defendants' wrongful interference with the Plaintiff's property rights.

38.    As a direct and proximate result of the acts and omissions of the Defendants.

    a      Plaintiff's have lost the beneficial use, enjoyment and exclusive possession of its property;

    b.     Plaintiff's property have declined in value as a result of the contamination and specter of contamination in the future; and

          Plaintiff suffered property damage, economic loss, inconvenience and other damages flowing directly or indirectly from the Defendants actions

WHEREFORE, Plaintiff demands judgment against the Defendants, individually, jointly and severally, for compensatory damages, punitive damages, attorneys fees, together with costs of suit, and for such other or further relief as the court may deem just, equitable and appropriate

## FIFTH COUNT

### WILFUL AND WANTON CONDUCT
### (GROSS NEGLIGENCE/EXEMPLARY/PUNITIVE DAMAGE)

39.    The Plaintiff repeats the allegations in the preceding paragraphs of the Complaint and incorporates same by reference as though fully set forth herein.

40.    At all times pertinent hereto, the conduct of the Defendants in the use, disposal, release, discharge, transportation, storage, treatment and handling of hazardous and toxic substances or concealment of knowledge of same, was more than momentary thoughtlessness, inadvertence, or err of judgment on the part of these Defendants.  Instead, their conduct constitutes such an entire want of care and conscious indifference to the rights, welfare, safety and health of the

8

Plaintiff, that these acts constitute gross negligence.

41. At all times pertinent hereto, the conduct of the Defendants in the use, disposal, release, discharge, transportation, storage, treatment and handling of hazardous and toxic substances or concealment of knowledge of same, that have caused, or threatened to cause property damage including damage to the natural resources such as soil, groundwater and surface water, demonstrates a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the welfare of the Plaintiff.

42. As a direct and proximate result of the reckless indifference in the use, disposal, release, discharge, storage, treatment, and handling of hazardous and toxic substances that have caused or threatened to cause property damage including damage to the natural resources such as soil, groundwater and surface water, Defendants caused Plaintiff's injuries.

43. Defendants' conduct in the use, disposal, release, discharge, transportation, storage, treatment and handling of hazardous and toxic substances or concealment of knowledge of same that have caused or threatened to cause property damage including damage to soil, groundwater and surface water, demonstrated a wilful and wanton, malicious and reckless disregard of the rights of the Plaintiff herein as to warrant imposition of punitive damage.

WHEREFORE, Plaintiff demands judgment against the Defendants, individually, jointly and severally, for compensatory damages, punitive damages, attorneys fees, together with costs of suit, and for such other or further relief as the court may deem just, equitable and appropriate

## SIXTH COUNT

### INDEMNIFICATION

44. The Plaintiff repeats the allegations in the preceding paragraphs of the Complaint and

9

incorporates same by reference as though fully set forth herein.

45.     In the event that the Plaintiff is obligated to remediate its property, compensate third parties, or incur any losses, said damages are the result of the primary act and direct actions of the Defendants and the Plaintiff is entitled to common law indemnification from the Defendants

        WHEREFORE, Plaintiff demands judgment against the Defendants, individually, jointly and severally, for compensatory damages, indemnification, attorneys fees, together with costs of suit, and for such other or further relief as the court may deem just, equitable and appropriate.

## SEVENTH COUNT

### ENVIRONMENTAL RIGHTS ACT

46      The Plaintiff repeats the allegations in the preceding paragraphs of the Complaint and incorporates same by reference as though fully set forth herein

47.     The New Jersey Department of Environmental Protection (NJDEP) has not taken any action under its legislative authority, including the New Jersey Spill Act to direct and require the Defendants at their own expense to investigation, remediate, remove and clean up hazardous substances on the Plaintiff's property

48.     Accordingly, Pleasant Gardens Realty Corporation, pursuant to the Environmental Rights Act, *N.J.S.A. 2A:35A-1 et seq.* brings this action directly against the Defendants to require the Defendants, at their own expense, to investigate, remediate, remove and clean up the hazardous substances from the Plaintiff's property consistent with State and Federal regulations.

49.     By reason of the Defendants' refusal to recognize and undertake the aforementioned obligation to remediate the alleged contamination on or about the Plaintiff's property, the Plaintiff has suffered and will suffer injury  This injury can only be cured by an order being

10

issued from this court directing the Defendants to pay and to take whatever steps are required by the NJDEP to decontaminate the aforementioned property.

50. By reason of the Defendants' failure and refusal to take action required by statute to decontaminate the Plaintiff's property, the Plaintiff suffered financial losses including the loss of business opportunities.

WHEREFORE, Plaintiff demands judgment against the Defendants as follows

a) Directing Defendants to investigation, remediate, remove and clean up hazardous substances from the Plaintiff's property at its own expense;

b) Directing Defendants to reimburse the Plaintiff for any and all sums expended by the Plaintiff for investigation, remediation, removal and clean up of hazardous substances on the Plaintiff's property;

c) Directing Defendants to assume direct responsibility for all future sums which may be expended for investigation, remediation, removal and clean up of hazardous substances from the Plaintiff's property made necessary by the Defendant or its predecessors in title or interest;

d) Directing Defendants to indemnify the Plaintiff for all future sums of money which may be expended for investigation, remediation, removal and clean up of hazardous substances on the Plaintiff's property;

e) For damages as allowed by the Environmental Rights Act and any environmental statutes;

f) For compensatory damages;

g) For temporary or permanent equitable relief;

11

h)     For punitive damages;

i)     or interest;

j)     For costs;

k)     For attorneys fees; and

l)     For such other or further relief as the court may deem just and proper under the circumstances.

## NINTH COUNT

### NEW JERSEY SPILL COMPENSATION AND CONTROL ACT

51     The Plaintiff repeats the allegations in the preceding paragraphs of the Complaint and incorporates same by reference as though fully set forth herein

52.     Under the terms of the New Jersey Spill Compensation and Control Act, *N.J.S.A. 58:10-23.11 et seq.* the Defendants are strictly liable, jointly and severally for all clean up and removal costs.  As a result of the Defendants' activities at the Site and on the Plaintiff's property, the Defendants are responsible for the discharge of numerous hazardous substances.

53.     To the extent that Pleasant Gardens Realty Corporation may be obligated to pay costs of investigation, remediation, clean up and removal of hazardous substances, the Defendants are strictly liable, without regard to fault, to reimburse Pleasant Gardens Realty Corporation for any such costs paid by it and to assume responsibility for all costs which might otherwise be imposed upon it

WHEREFORE, the Plaintiff demands judgment against the Defendants as follows

a)     Directing Defendants to investigation, remediate, remove and clean up hazardous substances from the Plaintiff's property at its own expense;

12

b) Directing Defendants to reimburse the Plaintiff for any and all sums expended by the Plaintiff for investigation, remediation, removal and clean up of hazardous substances on the Plaintiff's property;

c) Directing Defendants to assume direct responsibility for all future sums which may be expended for investigation, remediation, removal and clean up of hazardous substances from the Plaintiff's property made necessary by the Defendant or its predecessors in title or interest;

d) Directing Defendants to indemnify the Plaintiff for all future sums of money which may be expended for investigation, remediation, removal and clean up of hazardous substances on the Plaintiff's property;

e) For damages as allowed by the New Jersey Spill Compensation and Control Act and other State and Federal environmental regulations.

f) For compensatory damages;

g) For punitive damages;

h) For interest;

i) For costs;

j) For attorneys fees; and

k) For such other or further relief as the court may deem just and proper under the circumstances.

## TENTH COUNT

### ISRA/ECRA

54. The Plaintiff repeats the allegations in the preceding paragraphs of the Complaint and

13

incorporates same by reference as though fully set forth herein.

55. Under the terms of the Environmental Cleanup and Responsibility Act ("ECRA") and the Industrial Site Recovery Act ("ISRA") the defendants are obligated to comply with the conditions and requirements of the said laws prior to any change in ownership as defined by this statute.

56. The defendants have failed to comply with the requirements of ECRA and ISRA arising out of the transaction which occurred in or about 1988.

57. Accordingly, Pleasant Gardens Realty Corporation, in accordance with the Environmental Rights Act brings this action directly against the defendants to require the defendants to comply with its ECRA/ISRA obligations. In the alternative, the plaintiff will seek to void the sale/transfer of the business or real property to General Color in or about 1988 and revert ownership and control to the defendant, H. Kohnstamm & Company currently known as Sensient Colors, Inc.

WHEREFORE, the Plaintiff demands judgment against the Defendants as follows:

a) Directing Defendants to investigation, remediate, remove and clean up hazardous substances from the Plaintiff's property at its own expense;

b) Directing Defendants to reimburse the Plaintiff for any and all sums expended by the Plaintiff for investigation, remediation, removal and clean up of hazardous substances on the Plaintiff's property;

c) Directing Defendants to assume direct responsibility for all future sums which may be expended for investigation, remediation, removal and clean up of hazardous substances from the Plaintiff's property made necessary by the

14

Defendant or its predecessors in title or interest;

d) Directing Defendants to indemnify the Plaintiff for all future sums of money which may be expended for investigation, remediation, removal and clean up of hazardous substances on the Plaintiff's property;

e) Directing the defendants to comply with ECRA/ISRA and other State and Federal environmental regulations;.

f) For an order voiding the transfer of real estate/business interest from H. Kohnstamm & Company (currently known as Sensient Colors, Inc.) to General Color;

g) For compensatory damages;

h) For punitive damages;

i) For interest;

j) For costs;

k) For attorneys fees; and

l) For such other or further relief as the court may deem just and proper under the circumstances.

## ELEVENTH COUNT

### FRAUD AND FRAUDULENT CONCEALMENT

58. The Plaintiff repeats the allegations in the preceding paragraphs of the Complaint and incorporates same by reference as though fully set forth herein.

59. Defendants, at all times material hereto, acted through their respective officers,

15

employees and agents, who in turn were acting within the scope of their authority of employment and in furtherance of the business of the Defendants.

60. Defendants collectively and individually misrepresented and knowingly omitted material information regarding the conditions present at the Site and on the Plaintiff's property.

61 By way of example, and not by way of limitation, Defendants purposely, intentionally and for the purpose of personal profit concealed the fact that the Defendants and its predecessors had unlawfully buried hazardous materials on the Plaintiff's property and in the surrounding areas.

62. The Defendants knew or should have known that their concealment of this information was improper and that the failure to disclose this information was in violation of the law.

63. The Defendants' concealment of these material facts was intended to deceive governmental agencies, government officials, and the general public including the Plaintiff.

64. The conduct of the Defendants as aforesaid, constituted common law fraud, fraudulent concealment and intentional misrepresentation.

65. As a direct and proximate result of the acts and omissions of the Defendants

    a. Plaintiffs have lost the beneficial use, enjoyment and exclusive possession of its property;

    b. Plaintiff's property has declined in value as a result of the contamination and the specter of contamination in the future; and

    c. Plaintiff suffered property damage, economic loss, inconvenience and other damages flowing directly or indirectly from the Defendants actions.

66. Furthermore, until the Defendants remediate and restore the Plaintiff's property, the

Plaintiff will continue to suffer economic losses including loss of business opportunity, for which the Defendants will be responsible.

67.     The Defendants' concealment of the disposal of hazardous waste on the Plaintiff's property was wilful and wanton and warrants the imposition of punitive damages

WHEREFORE, Plaintiff demands judgment against the Defendants, individually, jointly and severally, for compensatory and punitive damages, attorneys fees, together with costs of suit, and for such other or further relief as the court may deem just, equitable and appropriate.

## TWELFTH COUNT

### EQUITABLE FRAUD

68.     The Plaintiff repeats the allegations in the preceding paragraphs of the Complaint and incorporates same by reference as though fully set forth herein.

69.     Defendants, at all times material hereto, acted through their respective officers, employees and agents, who in turn were acting within the scope of their authority, employment and in furtherance of the business of the Defendants.

70.     By way of example, and not by way of limitation, Defendants purposely, intentionally and for the purpose of personal profit concealed the fact that the Defendants and its predecessors had unlawfully buried hazardous materials on the Plaintiff's property and in the surrounding areas.

71.     The Defendants knew or should have known that their failure to disclose these actions was unlawful and would result in damage and harm to others.

72.     The conduct of the Defendants as aforesaid, constituted equitable fraud.

73.     As a direct and proximate result of the acts and omissions of the Defendants

17

a. Plaintiff's have lost the beneficial use, enjoyment and exclusive possession of its property;

b. Plaintiff's property has declined in value as a result of the contamination and the specter of contamination in the future; and

c. Plaintiff suffered property damage, economic loss, inconvenience and other damages flowing directly or indirectly from the Defendants actions.

74. Furthermore, until the Defendants remediate and restore the Plaintiff's property, the Plaintiff will continue to suffer economic losses including loss of business opportunity, for which the Defendants will be responsible.

75. The Defendants' concealment of the disposal of hazardous waste on the Plaintiff's property was wilful and wanton and warrants the imposition of punitive damages

WHEREFORE, Plaintiff demands judgment against the Defendants, individually, jointly and severally, for compensatory and punitive damages, attorneys fees, together with costs of suit, and for such other or further relief as the court may deem just, equitable and appropriate

## THIRTEENTH COUNT

### UNJUST ENRICHMENT

76. The Plaintiff repeats the allegations in the preceding paragraphs of the Complaint and incorporates same by reference as though fully set forth herein.

77. Defendants, at all times material hereto, acted through their respective officers, employees and agents, who in turn were acting within the scope of their authority, employment and in furtherance of the business of the Defendants.

18

78. The Defendants have been enriched by their acts and omissions which allowed hazardous materials to be placed on and under the Plaintiff's property

79. These acts and omissions allowed the Defendants to save hundreds, thousands, and millions of dollars in costs that they should have expended in order to properly contain and control the hazardous contaminants generated from their operation.

80. The Defendants lack any legal justification for permitting their hazardous waste to leave their property and to be buried on the Plaintiff's property and remain on and under Plaintiff's property at the Plaintiff's expense.

81. No other remedy can adequately compensate Plaintiff for the damages occasioned by the Defendants' conscious choice to store hazardous materials on the Plaintiff's property in order to save the expense of properly disposing of, controlling and containing such hazardous material

82. Accordingly, the Defendants are indebted to the Plaintiff for the value of storing the materials on the Plaintiff's property in the past and until such time as the materials are removed.

WHEREFORE, Plaintiff demands judgment against the Defendants, individually, jointly and severally, for equitable relief, including but limited to disgorgement of the Defendants' profits (which were monies improperly retained/obtained as aforesaid), interest, attorneys fees, costs of suit, compensatory damages, the costs of cleaning up and remediating the contamination and for such other or further relief as the court may deem just, equitable and appropriate

FITZGERALD , McGROARTY & LIPARI

Dated: November 25, 2003     By: _____
                                  Joseph P. McGroarty, Esquire
                                  Attorneys for Plaintiff

19

i

## JURY DEMAND

Demand is hereby made for a trial by jury as to all issues raised herein.

FITZGERALD, McGROARTY & LIPARI

Dated: November 25, 2003          By: _____
                                   Joseph P. McGroarty, Esquire
                                   Attorneys for Plaintiff

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:24-4, Joseph P. McGroarty, Esquire and Christopher S. Lipari, Esquire are hereby designated as trial counsel on behalf of the law firm of Fitzgerald, McGroarty and Lipari.

FITZGERALD, McGROARTY & LIPARI

Dated: November 25, 2003          By _____
                                   Joseph P. McGroarty, Esquire
                                   Attorneys for Plaintiff

## CERTIFICATION

Pursuant to Rule 4:5-1, I hereby certify, to the best of my knowledge, information and belief, there are presently no other actions pending or filed with respect to this action, and there are no other parties who should be joined in this action at this time, with the possible exception

20

of the substitution of specific named individuals or entities for those identified as John Smith

Companies/Individuals 1-20.

FITZGERALD, McGROARTY & LIPARI

Dated: November 25, 2003        By: _____

Joseph P. McGroarty, Esquire
Attorneys for Plaintiff

21

01/21/2004   09:35   4143   3 → 912156552995   NU.967   P002

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
### Use for initial pleadings (not motions) under Rule 4:5-1

FOR USE BY CLERK'S OFFICE ONLY
Payment Type  CK  CG  CA
CHG/CK NO _____
AMOUNT _____
OVERPAYMENT _____
BATCH NUMBER: _____

| | |
|---|---|
| **ATTORNEY NAME** Joseph P. McGroarty, Esq. | **TELEPHONE #** (609) 927-0015 |

**COUNTY OF VENUE** Camden County

**FIRM NAME** (If Applicable) FITZGERALD, McGROARTY & LIPARI, P.A.

**Docket Number** (When Available) L 6579-03

**OFFICE ADDRESS** 401 New Road, Suite 104 Linwood, NJ 08221

**DOCUMENT TYPE:** Complaint
**JURY DEMAND:** [X] YES [ ] NO

**NAME OF PARTY** (e.g. John Doe, Plaintiff) Pleasant Gardens Realty Corp., **Plaintiffs**

**CAPTION** Pleasant Gardens Realty Corp. v. H. Kohnstamm & Co., Inc., Warner-Jenkinson, Co., Inc., Sensient Colors, Inc., Sensient Technologies, Inc. formerly known as Universal Foods Corp., Universal Foods Corp., General Color Co., and John Smith Companies/Individuals 1-20 (fictitious names); j/s/a

**CASE TYPE NUMBER:** 608

Is this a Professional Malpractice Case? [ ] Yes [X] No
If you have checked "yes" see N.J.S.A. 2A:53A-27 and applicable case law regarding your obligation to file an Affidavit of Merit.

**RELATED CASES PENDING?** [ ] YES [X] NO

**IF YES, LIST DOCKET NUMBERS:**

**DO YOU ANTICIPATE ADDING ANY PARTIES?** (arising out of the same transaction or occurrence) [ ] YES [X] NO

Name of Defendant's Primary Insurance Company, If Known: [ ] None [X] Unknown

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF A CASE IS APPROPRIATE FOR MEDIATION

A. DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP [ ] YES [X] NO

IF YES, IT THAT RELATIONSHIP:
[ ] EMPLOYER-EMPLOYEE [ ] FRIEND/NEIGHBOR [ ] OTHER
[ ] FAMILIAL [ ] BUSINESS (explain)

B. DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY? [ ] YES [X] NO

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION:

Do you or your client have any needs under the American Disabilities Act? [ ] Yes [X] No If yes, please identify

Will an Interpreter be needed? [ ] Yes [X] No If yes, for what Language?

**ATTORNEY SIGNATURE**

NOV 2 6 2003

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SENSIENT COLORS, INC., ) <br> f/k/a WARNER-JENKINSON COMPANY, INC., ) <br> f/k/a H. KOHNSTAMM & COMPANY, INC., ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. |

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States, through the undersigned attorneys, at the request of the Administrator of the U.S. Environmental Protection Agency ("EPA"), files this complaint and alleges as follows:

## STATEMENT OF THE CASE

1.    This is a civil action under Sections 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9607(a).  By this action, the United States seeks to recover costs incurred and to be incurred in response to the release or threatened release of hazardous substances at or from the General Color Superfund Site ("Site"), located in Camden, New Jersey.

**EXHIBIT E**

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this action pursuant to

Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a), 9613(b), and 28 U.S.C. §§ 1331,

1345.

3.    Venue is proper in this district pursuant to Section 113(b) of CERCLA, 42 U.S.C.

§ 9613(b) and 28 U.S.C. § 1391, because the release or threatened release of hazardous

substances that gives rise to the claim set forth herein occurred in this district.

## DEFENDANT

4.    Defendant is Sensient Colors Inc. ("Sensient Colors"), f/k/a Warner-

Jenkinson Company, Inc. ("Warner-Jenkinson"), f/k/a H. Kohnstamm & Company, Inc.

("H. Kohnstamm").  Sensient Colors is a New York corporation with principal place of

business in St. Louis, Missouri.  Sensient Colors is a wholly-owned subsidiary of Sensient

Technologies Corporation, a Wisconsin corporation with principal place of business in

Milwaukee, Wisconsin.[1/]

5.    Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42

U.S.C. § 9601(21).

## GENERAL ALLEGATIONS

6.    The Site encompasses approximately six acres located adjacent to 31st Street and

Lemuel Avenue in the City of Camden, Camden County, New Jersey.

---

[1/] Hereinafter the term "Defendant" is used to refer to Sensient Colors as well as the same corporation by any of its former names, including without limitation Warner-Jenkinson and H. Kohnstamm.

2

7.    On the south of the Site is a multi-family residential development known as the Pleasant Gardens Apartment Complex ("Pleasant Gardens"). On the north, east and west of the Site are properties owned and operated by the New Jersey Transit Authority.

8.    From approximately 1922 to 1988, Defendant owned all or a portion of the Site. During that period, Defendant operated a facility on the Site that manufactured several products, including without limitation inorganic and organic pigments and dyes.

9.    During the time Defendant was an owner or operator of Site property, hazardous substances, within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), were disposed of there.

10.    From approximately March 1998 to December 2006, EPA conducted removal activities at the Site, pursuant to Section 104 of CERCLA, 42 U.S.C. § 9604.

11.    In or about March 1998, at the request of the New Jersey Department of Environmental Protection ("NJDEP"), EPA initiated investigations at the Site. Those investigations revealed the presence at the Site of thousands of tanks, vats, drums, cylinders and other containers. In and around those containers, EPA found numerous hazardous substances, within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), including without limitation, benzene, diethylamine, sodium perchlorate, xylene, toluene, mercury, aniline, and hydrochloric acid. Many of those substances exhibited one or more of the following characteristics: acutely toxic, chronically toxic, poisonous, corrosive, flammable, reactive, shock-sensitive, and ignitable.

12.    From approximately April 1998 to July 1998, EPA conducted removal activities at the Site, included without limitation securing the Site and detonating or removing highly reactive and shock-sensitive hazardous substances from the Site.

13.    From approximately September 1998 to December 1999, EPA conducted removal activities at the Site, including without limitation:  securing the Site; stabilizing, removing and disposing off-Site of thousands of drums, bags and small containers of hazardous substances; sampling dust from the floors of buildings at the Site; and decontaminating Site buildings. Analysis of such dust samples showed elevated levels of hazardous substances, including without limitation lead, chromium and cadmium.

14.    In or about October 1998 and August 1999, EPA conducted investigations, including detailed screening, of surface soils at the Site and found elevated levels of lead and other hazardous substances.

15.    At the time of EPA's initial investigations, the Site was unsecured and evidence of trespassing by children and adults was observed.  Children utilized the Site as a playground and were repeatedly observed playing in contaminated areas and coming in contact with contaminated materials.  Pleasant Gardens, located on the south side of the Site, was a low-income housing development consisting of 19 low-rise apartment buildings with numerous families and children.

16.    In March 2000, the Agency for Toxic Substances and Disease Registry ("ATSDR") issued a Health Consult for the Site.  The Health Consult finds that elevated levels of lead in soil threaten public health.  The Health Consult concludes, *inter alia*, that the Site is accessible to the public, that children and adults are potentially exposed to unacceptable levels of

4

lead in soils at the Site, and that the cleanup level adopted by EPA for surface soil at the Site is protective of public health.

17.    In or about November and December 2001, EPA excavated approximately the upper one foot of soil from areas of known surface soil contamination at the Site. That excavation uncovered, *inter alia*, dye and pigment waste, stained soil, and buried hydrocarbon sludge and coal tar. Post-excavation sampling and screening indicated that the horizontal and vertical extent of hazardous substances in soils at the Site was greater than previously known. Those hazardous substances included without limitation lead, chromium, cadmium, mercury, benzo(a)pyrene, and other polynuclear (a/k/a polycyclic) aromatic hydrocarbons ("PAHs"). In addition, Toxicity Characteristic Leaching Procedure ("TCLP") analysis revealed that the lead was leaching at concentrations well over the regulatory limit for hazardous waste. This highly leachable lead was threatening the contamination of groundwater in an aquifer used as a source of drinking water for local communities in New Jersey.

18.    Groundwater from the Site recharges (*i.e.*, flows into) the Potomac-Raritan-Magothy ("PRM") aquifer. The PRM aquifer is designated a "sole-source aquifer" pursuant to Section 1424(e) of the Safe Drinking Water Act, 42 U.S.C. § 300h-3(e). A sole-source aquifer is an aquifer which is the sole or principal drinking water source for the area and which, if contaminated, would create a significant hazard to public health. *Id.*

19.    From approximately March 2002 to December 2006, EPA performed additional soil removal activities at the Site. The objectives of those removal activities included mitigating the direct and contact exposure of the public, particularly local children, to hazardous substances in surface soils, and mitigating the threat of contamination of New Jersey drinking water

5

resources from buried hazardous substances leaching into groundwater. As contaminated soil was removed, EPA continued to conduct subsurface investigations at the Site. Those investigations revealed that the horizontal and vertical extent of soil contamination was greater than had previously been known. EPA expanded the horizontal and vertical extent of the removal activities in order to meet applicable cleanup criteria.

20. The removal activities referenced in the previous paragraph included, without limitation: consolidation of contaminated soil from previous excavations; clearing and grubbing; demolition of various structures, including without limitation a garage, sheds, concrete pads, slabs and foundations, paved surfaces, timber pilings, and above- and below-ground tanks and vaults; removal and replacement of sewer pipe; installation of dewatering trenches and sumps; excavation of contaminated surface and subsurface soil; study and selection of on-Site treatment technologies; stockpiling and on-Site treatment of excavated soil; transportation and off-Site disposal of treated soil; pre- and post-excavation investigations, including sampling and screening; additional excavation if necessary to meet cleanup criteria; backfilling with imported clean soil; installation of high density polyethylene ("HDPE") liners between areas of clean backfill and contaminated soils; decontamination of paved surfaces and a building; revegetation; and reconstruction of wetlands, including without limitation installation of a drainage structure, grading, soil preparation, planting and seeding.

21. In total, EPA removed approximately 125,094 tons of contaminated soil and debris from the Site.

22. In total, the United States has incurred over $16 million in "response" costs, within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), in connection with

the Site. The United States is continuing and will continue to incur response costs in connection

with the Site, including without limitation enforcement costs incurred in an effort to recover

response costs from Defendant.

23.    In or about June 2004, EPA sent Defendant a notice of potential liability and

demand for reimbursement of response costs incurred by the United States in connection with the

Site.

24.    To date, the United States has not received reimbursement of any Site-related

response costs from Defendant, or from any other person.

<u>CLAIM FOR RELIEF</u>

25.    Paragraphs 1 through 24 are re-alleged and incorporated herein by reference.

26.    The Site is a "facility" within the meaning of Section 101(9) of CERCLA,

42 U.S.C. § 9601(9).

27.    There has been a "release" or threatened "release," within the meaning of Section

101(22) of CERCLA, 42 U.S.C. § 9601(22), of a "hazardous substance," within the meaning of

Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), from the Site.

28.    As a result of the release or threatened release of hazardous substances from the

Site, the United States has taken a "response" action and has incurred "response" costs within the

meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

29.    The response action taken by the United States and the response costs incurred by

the United States in connection with the Site are not inconsistent with the National Oil and

Hazardous Substances Pollution Contingency Plan (a/k/a "national contingency plan"),

7

promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, and codified at 40 C.F.R. Part 300.

30. Defendant "owned" or "operated" a facility at the Site at the time of "disposal" of hazardous substances at such facility, within the meaning of Sections 101(20), 101(29) and 107(a)(2) of CERCLA, 42 U.S.C. §§ 9601(20), 9601(29), 9607(a)(2).

31. Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendant is liable to the United States for all costs incurred by the United States in connection with the Site, plus interest.

32. Pursuant to Section 113(g) of CERCLA, 42 U.S.C. § 9613(g), the United States is entitled to a declaratory judgment on the liability of Defendant to the United States for response costs incurred in the future by the United States in connection with the Site and with any area to which hazardous substances therefrom may have come to be located, plus interest.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff United States of America respectfully prays that the Court:

1. Enter judgment against Defendant Sensient Colors Inc., f/k/a Warner-Jenkinson Company, Inc., f/k/a H. Kohnstamm & Company, Inc., in favor of the United States, for all costs, including enforcement costs, incurred by the United States in connection with the Site, plus interest;

2. Enter a declaratory judgment, pursuant to Section 113(g) (2) of CERCLA, 42 U.S.C. Section 9613(g), against Defendant, in favor of the United States, for all costs, including enforcement costs, incurred in the future by the United States in connection with the Site and

8

with any area to which hazardous substances therefrom may have come to be located, plus

interest; and

3.     Grant such other and further relief as the Court deems appropriate.

Respectfully submitted,

MATTHEW J. McKEOWN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


DAVID L. WEIGERT
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
P.O. Box 7611, Ben Franklin Station
U.S. Department of Justice
Washington, D.C. 20044-7611
(202) 514-0135

CHRISTOPHER J. CHRISTIE
United States Attorney
District of New Jersey

SUSAN J. STEELE (SJS 7042)
Assistant U.S. Attorney
Chief, Civil Division
U.S. Attorney's Office
970 Broad Street, Suite 700
Newark, NJ 07101
(973) 645-2920

OF COUNSEL:

DEBORAH SCHWENK
Assistant Regional Counsel
U.S. Environmental Protection
   Agency, Region 2
290 Broadway
New York, NY 10007-1866
(212) 637-3149