UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |  |
|---|---|---|
| SENSIENT COLORS INC., | : | |
| | : | Civil Action No. 07 CIV 7846 |
| Plaintiff, | : | |
| | : | |
| - against - | : | |
| | : | |
| ABBY F. KOHNSTAMM; PETER L. | : | |
| KOHNSTAMM; SARAH F. KOHNSTAMM; | : | |
| ELIZABETH K. OGDEN; RICHARD L. | : | |
| OGDEN; THOMAS H. OGDEN; JOHN DOE | : | |
| INDIVIDUALS 1-20 (fictitious names); and ABC | : | |
| COMPANIES 1-20 (fictitious names), | : | |
| | : | |
| Defendants. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

**BRYAN CAVE LLP**
1290 Avenue of the Americas
New York, New York  10104
(212) 541-2000
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 3

    A.    The Property And The 1988 Transaction.................................................................. 3

    B.    The ECRA Application.............................................................................................. 6

    C.    After The Transaction Closed, The Kohnstamm Family Shareholders Divested Themselves of General Color ................................................................................... 9

    D.    Sensient is Subsequently Named in Two Actions Due to the Environmental Condition of the Camden Property ......................................................................... 11

ARGUMENT ..................................................................................................................... 12

I.     THE AMENDED COMPLAINT STATES VALID CLAIMS UPON WHICH RELIEF MAY BE GRANTED ...................................................................................................... 12

II.    SENSIENT CAN REACH DEFENDANTS BY PIERCING THE CORPORATE VEIL OF KOHNSTAMM & CO. AND GENERAL COLOR.................................................... 13

    A.    Sensient Can Pierce The Corporate Veil Under Federal Common Law .............. 13

    B.    Sensient Can Pierce the Corporate Veil Under New York Law........................... 18

    C.    Sensient Can Pierce the Corporate Veil Under New Jersey Law ......................... 21

    D.    Sensient Can Reach Defendants By Piercing the Veil of General Color ............. 22

III.   THE ACTS OF EACH KOHNSTAMM FAMILY SHAREHOLDER ARE ATTRIBUTABLE TO ALL KOHNSTAMM FAMILY SHAREHOLDERS ................. 25

IV.   SENSIENT HAS ALLEGED SUFFICIENT FACTS TO SUPPORT VEIL PIERCING AND ACTIONABLE UNDERLYING TORTS ............................................................... 26

    A.    As Determined by NJDEP, Defendants Controlled Kohnstamm & Co., General Color, and the Camden Property........................................................................... 26

    B.    Even Without the NJDEP's Determination, Sensient Has Alleged Sufficient Facts to Justify Veil Piercing.................................................................................. 28

V.    THE AMENDED COMPLAINT STATES A CAUSE OF ACTION UNDER CERCLA............................................................................................................................ 29

VI.   THE AMENDED COMPLAINT STATES A CAUSE OF ACTION UNDER THE NEW JERSEY SPILL ACT........................................................................................................ 31

VII.  THE AMENDED COMPLAINT STATES A CAUSE OF ACTION FOR INDEMNIFICATION, UNJUST ENRICHMENT AND CONTRIBUTION................. 32

VIII. DEFENDANTS CANNOT PRECLUDE THIS COURT FROM CONSIDERING SENSIENT'S VEIL-PIERCING CLAIM ........................................................................ 33

CONCLUSION................................................................................................................... 36

# TABLE OF AUTHORITIES

## CASES

AG Capital Funding Partners, L.P. v. State St. Bank and Trust Co.,
　　5 N.Y.3d 582 (2005) ................................................................................................ 12

AMW Materials Testing, Inc. v. Town of Babylon,
　　187 Fed. Appx. 24 (2d Cir. 2006) ......................................................................... 30

In re Adoption of N.J.A.C. 7:26B,
　　128 N.J. 442 (1992)................................................................................................ 27

Anderson v. Abbott,
　　321 U.S. 349 (1944) .............................................................................................. 16

Arnold Graphics Industries, Inc. v. Independent Agent Center, Inc.,
　　775 F.2d 38 (2d Cir. 1985)..................................................................................... 35

B.F. Goodrich Co. v. Murtha,
　　958 F.2d 1192 (2d Cir. 1992), cert. denied, 524 U.S. 926 (1998) ............................ 29

Baker by Thomas v. General Motors Corp.,
　　522 U.S. 222 (1998) .............................................................................................. 35

Baker's Aid, a Division of M. Raubvogel Co., Inc. v. Hussman Foodservice,
　　730 F. Supp. 1209 (E.D.N.Y. 1990)....................................................................... 20

Barrett v. Tema Development (1988), Inc.,
　　463 F. Supp. 2d 423 (S.D.N.Y. 2006)..................................................................... 33

In re Bean,
　　252 F.3d 113 (2d Cir. 2001)................................................................................... 34

Bedford Affiliates v. Sills,
　　156 F.3d 416 (2d Cir. 1998)............................................................................ 17, 18

Bell Atlantic v. Twombly,
　　127 S. Ct. 1955 (2007) .......................................................................................... 12

Berenhaus v. Ward,
　　70 N.Y.2d 436 (1987) ............................................................................................ 27

Boucher v. Sears,
No. 89 Civ. 1353, 1997 WL 599316 (N.D.N.Y. Sept. 19, 1997)................................ 25, 26

Brotherhood of Locomotive Engineers v. Springfield Terminal Railway Co.,
210 F.3d 18 (1st Cir. 2000) ...................................................................................... 14

In re Buildings by Jamie, Inc.,
230 B.R. 36 (Bankr. D.N.J. 1998)......................................................................... 21, 22

California Federal Savings & Loan Association v. Guerra,
479 U.S. 272 (1987) .................................................................................................. 16

City of New York v. Exxon Corp.,
112 B.R. 540 (S.D.N.Y. 1990) aff'd in part 932 F.2d 1020 (2d Cir. 1991)...................... 28

Consolidated Edison Co. of New York, Inc. v. UGI Utilities, Inc.,
153 Fed. Appx. 749 (2d Cir. 2005) cert. denied, 127 S. Ct. 2995 (2007)................... 30

D'Ambrosio v. City of New York,
55 N.Y.2d 454 (1982) ................................................................................................ 32

DeOliveira v. New York State Department of Motor Vehicles,
271 A.D.2d 607 (2d Dep't 2000)............................................................................... 27

Delaney v. Town of Carmel,
55 F. Supp. 2d 237 (S.D.N.Y. 1999).......................................................................... 30

Derven v. PH Consulting, Inc.,
427 F. Supp. 2d 360 (S.D.N.Y. 2006)........................................................................ 32

Diorinou v. Mezitis,
132 F. Supp. 2d 139 (S.D.N.Y. 2000)........................................................................ 34

Erickson v. Pardus,
127 S. Ct. 2197 (2007) .............................................................................................. 12

In re Eurocrafters, Ltd.,
183 Fed. Appx. 70 (2d Cir. 2006) .............................................................................. 33

First National City Bank v. Banco Para El Comercio Exterior De Cuba,
462 U.S. 611 (1983) .................................................................................................. 23

Fletcher v. Atex, Inc.,
68 F.3d 1451 (2d Cir. 1995)....................................................................................... 34

iii

Four Star Capital v. Nynex Corp.,
No. 93 Civ. 3706 (LMM), 1993 WL 350016 (S.D.N.Y. Sept. 9, 1993) ..................... 35

Freeman v. Complex Computing Co. Inc.,
119 F.3d 1044 (2d Cir. 1997)................................................................................. 23

Goldberg v. Colonial Metal Spinning and Stamping Co., Inc.,
No. 92 Civ. 3721 (JFK), 1993 WL 361672 (S.D.N.Y. Sept. 14, 1993)..................... 14

Idylwoods Associates v. Mader Capital, Inc.,
915 F. Supp. 1290 (W.D.N.Y. 1996) .............................................. 13, 15, 28

International Controls Corp. v. Vesco,
490 F.2d 1334 (2d Cir. 1974)................................................................................. 22

Interoceanica Corp. v. Sound Pilots, Inc.,
107 F.3d 86 (2d Cir. 1997)..................................................................................... 33

Iqbal v. Hasty,
490 F.3d 143 (2d Cir. 2007)................................................................................... 12

Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi
Negra,
313 F.3d 70 (2d Cir. 2002)..................................................................................... 21

Kashi v. Gratsos,
790 F.2d 1050 (2d Cir. 1986)................................................................................. 25

Keller v. Levy,
265 A.D. 723 (1st Dep't 1943) ............................................................................... 25

In re Kimber Petroleum Corp.,
110 N.J. 69 (1988)................................................................................................. 31

Lake Minneweaska Mountain Houses, Inc. v. Rekis,
259 A.D.2d 797 (3d Dep't 1999)............................................................................ 32

Local 2-1971 of Pace International Union v. Cooper,
364 F. Supp. 2d 546 (W.D.N.C. 2005)................................................................... 14

Marsh v. Rosenbloom,
499 F.3d 165 (2d Cir. 2007)............................................................................ 16, 18

Musico v. Champion Credit Corp.,
764 F.2d 102 (2d Cir. 1985)................................................................................... 19

New York v. National Serv. Industrial, Inc.,
    460 F.3d 201 (2d Cir. 2006)...................................................................................... 15

New York v. National Serv. Industrial, Inc.,
    352 F.3d 682 (2d Cir. 2003)...................................................................................... 16

New York v. Westwood-Squibb Pharm. Co.,
No. 90 Civ. 13246, 2004 WL 1570261 (W.D.N.Y. May 25, 2004) ................................. 15

Niagara Mohawk Power Corp. v. Bankers Trust Co. of Albany, N.A.,
    791 F.2d 242 (2d Cir. 1986)...................................................................................... 24

Niagara Mohawk Power Corp. v. Consolidated Rail Corp.,
    291 F. Supp. 2d 105 (N.D.N.Y. 2003) ....................................................................... 15

Pennsylvania v. Union Gas Co.,
    491 U.S. 1 (1989)........................................................................................................ 18

Pfohl Brothers Landfill Site Steering Committee v. Allied Waste System, Inc.,
    255 F. Supp. 2d 134 (W.D.N.Y. 2003) ................................................................. 17, 28

Pfohl Brothers Landfill Site Steering Committee v. Browning-Ferris Ind.,
    No. 95 Civ. 956A (F), 2004 WL 941816 (W.D.N.Y. Jan. 30, 2004)........................... 16

Phar-Mor, Inc. v. Coopers & Lybrand,
    22 F.3d 1228 (3d Cir. 1994)................................................................................. 21, 22

Piccoli A/S v. Calvin Klein Jeanswear Co.,
    19 F. Supp. 2d 157 (S.D.N.Y. 1998)......................................................................... 25

Priester v. Senkowski,
No. 01 Civ. 3441 (LMM) (GWG), 2002 WL 1448303 (S.D.N.Y. July 3, 2002) ............. 15

Prisco v. A & D Carting Corp.,
    168 F.3d 593 (2d Cir. 1999)...................................................................................... 15

Remsen Funding Corp. v. Ocean West Holding Corp.,
    No. 06 Civ. 15265 (DLC), 2007 WL 3254403 (S.D.N.Y. Nov. 1, 2007).................... 12

Rodriguez de Quijas v. Shearson/America Exp., Inc.,
    490 U.S. 477 (1989) .................................................................................................. 15

Rutigliano v. Rutigliano,
    10 A.D.3d 516 (1st Dep't 2004) ................................................................................ 28

Scardace v. Mid Island Hosp., Inc.,
  21 A.D.3d 363 (2d Dep't 2005) ................................................................. 35

Schiavone v. Pearce,
  79 F.3d 248 (2d Cir. 1996) ........................................................... 13, 14, 15, 18

Schaefer v. Town of Victor,
  457 F.3d 188 (2d Cir. 2006) ...................................................................... 18

Seymour v. Hull & Moreland Engineering,
  605 F.2d 1105 (9th Cir. 1979) .................................................................... 16

Simon v. Safelite Glass Corp.,
  128 F.3d 68 (2d Cir. 1997) ........................................................................ 27

Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration
International, Inc.,
  198 F.3d 88 (2d Cir. 1999) ........................................................................ 19

State Department of Treasury, Division of Investment ex rel McCormac v. Quest
Commc'n International, Inc.,
  387 N.J. Super. 469 (N.J. Super. Ct. App. Div. 2006) ................................. 26

State of New York v. Air-Flo Manufacturing Co., Inc.,
  No. 02 Civ. 762S, 2004 WL 1563081 (W.D.N.Y. June 3, 2004) ............... 15

State of New York v. Shore Realty Corp.,
  759 F.2d 1032 (2d Cir. 1985) .................................................................... 30

State v. Arky's Automobile Sales,
  224 N.J. Super. 200 (N.J. Super. Ct. App. Div. 1988) ............................... 32

Stein Jewelry Co. v. United Parcel Serv., Inc.,
  228 F. Supp. 2d 304 (S.D.N.Y. 2002) ....................................................... 12

TDH-Berkshire Inc. v. Korff,
  33 A.D.3d 437 (1st Dep't 2006) ................................................................ 21

The Limited Inc. v. McCrory Corp.,
  169 A.D.2d 605 (1st Dep't 1991) .............................................................. 32

Town of East Hampton v. Omabuild USA No. 1, Inc.,
  215 A.D.2d 746 (2d Dep't 1995) ............................................................... 34

Town of Oyster Bay v. Occidental Chemical Corp.,
  987 F. Supp. 182 (E.D.N.Y. 1997) .................................................. 13, 24, 28

Trustees of National Elevator Industrial Pension, Health, Benefit and Education
    Funds v. Lutyk,
        332 F.3d 188 (3d Cir. 2003) ...................................................................................... 16

U.S. Through Small Business Admin. v. Pena,
        731 F.2d 8 (D.C. Cir. 1984) ...................................................................................... 16

U.S. v. Bestfoods,
        524 U.S. 51 (1998) ............................................................................... 14, 15, 16, 30

U.S. v. General Battery Corp., Inc.,
        423 F.3d 294 (3d Cir. 2005) ............................................................................. 15, 17

U.S. v. Kimbell,
        440 U.S. 715 (1979) ........................................................................................ 16, 17

U.S. v. Weiss,
No. 97 Civ. 4949, 1998 WL 118091 (E.D.N.Y. Mar. 13, 1998) ...................................... 22

Van Diepen v. Baeza,
        No. 96 Civ. 8731 (SHS), 1998 WL 199909 (S.D.N.Y. Feb. 26, 1998) ...................... 32

Vigilent Insurance Co. v. Federal Insurance Co.,
        163 A.D.2d 202 (1990) ............................................................................................. 32

W.R. Grace & Co. v. Weja, Inc.,
        No. A-5527-03T1, 2006 WL 3435047 (N.J. Super. Ct. App. Div. Nov. 30,
        2006).......................................................................................................................... 31

In re Weinstein's Estate,
        25 A.D.2d 776 (2d Dep't 1966) ................................................................................ 19

Williams v. McAllister Brothers, Inc.,
        534 F.2d 19 (2d Cir. 1976) ....................................................................................... 16

## STATUTES

42 U.S.C. § 9607(a)......................................................................................................... 11, 29

42 U.S.C. § 9613(f) ............................................................................................................... 29

Fed. R. Civ. P. 8(a)................................................................................................................ 12

N.J.S.A. § 13:1K-6 et seq........................................................................................................ 4

N.J.S.A. 58:10-23.llg.c(1) ................................................................................................ 31

**MISCELLANEOUS**

Piercing the Corporate Veil: The Alter Ego Doctrine Under Federal Common
    Law, 95 Harv. L. Rev. 853 (1982) ............................................................................ 16

## PRELIMINARY STATEMENT

The facts underlying this action chronicle the concerted efforts of the Kohnstamm family (including Defendants) to avoid significant environmental liabilities associated with property that they owned and controlled together through two corporations in which they were the principal shareholders, Kohnstamm & Co. and General Color. Through their coordinated scheme, they evaded these liabilities altogether – notwithstanding that they received over $8 million dollars from Sensient's parent, Universal Foods, in a transaction in which the Kohnstamm family expressly agreed to remain the owners of and responsible for the property.

In the wake of actions against them here and in other jurisdictions,[1] Defendants labor to create the illusion that Sensient is "trying to pierce its own corporate veil, for its own benefit, in order to evade corporate environmental liabilities" by relying on representations Defendants now claim Sensient made to NJDEP. Defendants' characterizations, however, fly in the face of the fact that it was for the benefit of the Kohnstamm family – and not Sensient or Universal Foods – that: (1) it was represented to the New Jersey Department of Environmental Protection ("NJDEP") that the Kohnstamm family had been and would continue to be the beneficial and equitable owners of the property; (2) Defendants rendered that application false and fraudulent; and (3) the Kohnstamm family conspired to divest themselves of General Color shares through a stock redemption program that depleted the assets of an already undercapitalized General Color.

---

[1]    Because the Kohnstamm family members are domiciled throughout the country, Sensient has been forced to file actions against them in multiple jurisdictions. To date, Sensient has filed actions here and in Federal District Court in Minnesota. Here, Defendants complain that they owned "less than 2 percent" of Kohnstamm & Co. by omitting from their calculation over 100,000 shares held in at least two (2) trusts for which Elizabeth K. Ogden is a trustee. In the Minnesota action, the defendants complain that they owned only 4.4% of the outstanding shares. Because some of the Kohnstamm family members involved in these events are deceased, and the remainder are scattered around the country, it is highly unlikely that Sensient will be able to obtain jurisdiction over Kohnstamm family members that represent a "majority" of Kohnstamm & Co.'s shares in any one jurisdiction.

Defendants strain to argue, however, that they are simply former minority shareholders – no more than mere investors in a large corporation, without any voice, without any control, without any power. Indeed, the Kohnstamm family, including Defendants, have capitalized on the inability of any one court to obtain jurisdiction over the entire family by characterizing themselves, individually, as "minority" shareholders of Kohnstamm & Co. To credit this fiction, however, the Court would have to disregard the fact that the Kohnstamm family members were controlling shareholders in two closely-held corporations and that, as a family, they schemed to sidestep state-mandated environmental remediation of the property they owned and controlled for decades. While Defendants' characterization conveniently ignores the lack of a single "majority" shareholder, Kohnstamm & Co. as it existed prior to 1988 necessarily acted through the cooperation of the Kohnstamm family members. In fact, the Kohnstamm family members collectively owned over 81% of the stock of Kohnstamm & Co., and abused their position as collective majority shareholders to dominate the company and injure Sensient.

Moreover, although they claim otherwise, the Defendants here were actively involved in the events at issue in this litigation, and, of course, have not denied that they received their share of the over $8 million the Kohnstamm family members were paid as a result of the 1988 transaction. These facts, along with others alleged in the Amended Complaint, evidence that Sensient has pled more than sufficient detail to withstand the motion to dismiss on all of its causes of action. Accordingly, the Motion to Dismiss should be denied in its entirety.

## STATEMENT OF FACTS

### A.    The Property And The 1988 Transaction

The property at issue is located in Camden, New Jersey ("Camden Property"), and was owned and controlled by the Kohnstamm family through H. Kohnstamm & Co., Inc.

2

("Kohnstamm & Co.") until September 7, 1988, and thereafter through General Color Company ("General Color").[2] See Amended Complaint ("Compl.") ¶¶ 1, 14 and 44.

On December 11, 1987, Universal Foods Corporation (the parent corporation of Plaintiff), Kohnstamm & Co., and General Color executed an Agreement and Plan of Reorganization ("Reorganization Agreement"). See Compl., Exh. A, Reorganization Agreement. Kohnstamm & Co., at the time, was a closely-held corporation with approximately 81% of its common stock held, directly or in trust, by Defendants and their family members ("Kohnstamm Family Shareholders"). See Compl., ¶ 24. Pursuant to the Reorganization Agreement, Kohnstamm & Co. and the Kohnstamm Family Shareholders agreed to: (1) transfer the Camden Property from Kohnstamm & Co. to General Color; (2) spin off General Color's stock on a pro-rata basis to the Kohnstamm Family Shareholders; and (3) thereafter sell the stock of Kohnstamm & Co. to Universal Foods in a tax free stock-for-stock exchange.[3] See Reorganization Agreement, at 1-3, 12, 83 (Compl., Exh. A). The 1988 Transaction was expressly structured in this way because Universal Foods raised concerns about the environmental condition of the Camden Property and refused to acquire the Camden Property or any of its liabilities. See Compl., ¶ 1; Declaration of Mary Chang ("Chang Dec."), Exh. 1, Kohnstamm & Co. Prospectus/Proxy Statement, August 8, 1988 ("Prospectus") at SCI 7943. The parties thus agreed that the Camden Property and its liabilities would remain with the Kohnstamm Family Shareholders (including Defendants), who would be (and were)

---

[2]    Prior to September 7, 1988, General Color was a wholly-owned subsidiary of Kohnstamm & Co., and was also controlled by the Kohnstamm Family, including Defendants. See Compl., ¶¶ 1, 14 and 15.

[3]    The transfer of the Camden Property to General Color, the transfer of General Color stock to the Kohnstamm Family Shareholders, and the subsequent sale of Kohnstamm & Co. stock to Universal Foods is referred to as the "1988 Transaction." See Compl., ¶¶ 14-34.

compensated accordingly (the Kohnstamm Family Shareholders received $8,166,618 from the 1988 Transaction). See Chang Dec., Exh. 1 at SCI 1947-48.

Because the sale or transfer of property in New Jersey would trigger a complete environmental review and possible remediation under the Environmental Cleanup Responsibility Act, N.J. Stat. Ann. § 13:1K-6 et seq. ("ECRA"), Section 5.3 of the Reorganization Agreement set forth a self-imposed obligation on the Selling Shareholders (including Defendants and the other Kohnstamm Family Shareholders) and Kohnstamm & Co. as it then existed to "promptly take all necessary steps to obtain a determination(s) of ECRA nonapplicability ("Determination") for the transactions contemplated [by the agreement] from the New Jersey Department of Environmental Protection ("NJDEP")." See Compl., Exh. A; see also Section B., infra.

A Prospectus/Proxy Statement dated August 8, 1988, prepared and provided to, inter alia, each Kohnstamm & Co. shareholder, including the Kohnstamm Family Shareholders, see Chang Dec., Exh. 1, made manifest that the Camden Property would be transferred to General Color and that General Color would be transferred to only the Kohnstamm Family Shareholders. Id. at SCI 7941-48. The Prospectus (and Reorganization Agreement attached to it) referred to two classes of "Selling Shareholders" – Kohnstamm Family Shareholders (including Defendants) and Minority Shareholders, id. at 7947 – as well as to the obligation of Kohnstamm & Co. and the Selling Shareholders to obtain "clearance" under ECRA. Id. at SCI 7955. Notably, the Prospectus advised that: (i) Universal Foods refused to acquire the Camden Property because of "concern over contingent liabilities that might be asserted against the owner of the Camden facility, including environmental claims that might arise under ECRA"; (ii) the Camden Property would be operated after the consummation of the proposed transaction for a period of eighteen months by the Kohnstamm Family through General Color, pursuant to a supply contract with a

4

subsidiary of Universal Foods; (iii) it was uncertain whether General Color would realize any income during the term of the supply contract; (iv) after the expiration of the supply contract, the Camden Property would be subject to a covenant not to compete which would prohibit it from being used for its primary purpose; and (v) the Camden Property would be subject to a "required clean-up" under ECRA "if it ceased to operate as a manufacturing facility or was transferred or sold." Id. at SCI 7942-44. Thus, because the non-compete covenant prevented the Camden Property from being used for its primary purpose (as a manufacturing facility of colors for food, drugs and cosmetics) after eighteen months, the Camden Property should have been subject to a "required clean-up" by the end of the eighteen month period.

In contemplation of the 1988 Transaction, a committee of Kohnstamm & Co. directors prepared a valuation of General Color ("General Color Valuation Report"), which, as summarized in the Prospectus, also confirmed that Universal Foods refused to participate in a transaction in which it would acquire the Camden Property and that "a change of ownership of H. Kohnstamm's New Jersey properties…would trigger New Jersey's ECRA statutes." Id. at SCI 7942.[4] The Minutes of the Kohnstamm & Co. Board of Directors Meeting ("Minutes") reflect that ECRA clean-up costs would "be in excess of [the Camden Property's] book value/market value" and would render the Camden Property "economically unsalable." See Chang Dec., Exh. 2, Minutes. The Minutes also confirmed the understanding that transferring the Camden Property to General Color prior to Universal Food's acquisition of Kohnstamm & Co. would "maintain continuity of ownership," and stated:

> The sale of the regulated color business requires that Camden produce certain products for [Universal Foods] under the terms of a supply contract. This supply contract calls for Camden to operate under a break-even or a cost recovery basis. That is, during the term of the supply contract, Camden, while not precluded from doing

---

[4]    Unless otherwise indicated, all emphasis has been supplied.

> so, is not expected to generate an operating profit. Further, a key element of the ownership of this facility will be the development of new products to be produced to enable it to continue operating and, therefore, <u>avoid closure and ECRA compliance</u>.

<u>Id</u>. Thus, at the time the General Color Valuation report was prepared, two things were clear: (i) the Kohnstamm Family Shareholders understood that liability for the environmental condition of the Camden Property was supposed to remain with them, and (ii) the Kohnstamm Family Shareholders were looking for a way to "avoid…ECRA compliance." This conclusion is supported by the notes of Kohnstamm Family Shareholder Paul Kenneth Kohnstamm ("Notes"), describing the 1988 Transaction: "Downside would be <u>family would have full control</u> of Gen. Color." <u>See</u> Chang Dec., Exh. 3, Notes.

In view of the condition of the Property, the $2,700,000 book value of the Camden Property was not included in the fair value of General Color, <u>see</u> Chang Dec., Exh. 1 at SCI 7942-44 – which effectively allowed the Kohnstamm Family Shareholders to <u>acquire the Camden Property without having to pay its book value</u>.

**B.    The ECRA Application**

The key to the 1988 Transaction for the Kohnstamm Family Shareholders was to consummate a transaction with Universal Foods <u>without</u> triggering costly ECRA clean-up requirements at the Camden Property for which they knew they would be solely responsible. To effectuate that result, the attorney representing the interests of the Kohnstamm Family Shareholders, Daniel Rabinowitz, Esq., filed a letter with NJDEP on August 31, 1987, with an affidavit from Daniel Kaufman, Vice President of Kohnstamm & Co., requesting a determination that the proposed transaction was not subject to ECRA. <u>See</u> Compl., Exh. C, 1987 Letter from Rabinowitz. The letter essentially asked NJDEP to ignore the distinction between Kohnstamm & Co., General Color, and the Kohnstamm Family Shareholders and treat the formal change of ownership of the Camden Property from Kohnstamm & Co. to General Color, and of General

6

Color from Kohnstamm & Co. to all Kohnstamm Selling Shareholders, as "a corporate reorganization not substantially affecting the ownership of the [Camden Property.]" Id.

Mr. Rabinowitz represented on behalf of the Kohnstamm Selling Shareholders, that "both before and after the Closing of the proposed transaction, the shareholders of Kohnstamm remain beneficial and equitable owners of General Color's assets, including [the Camden Property]." Id. The Rabinowitz letter further represented that "[a]fter the spin off, these shareholders will own directly what they formerly owned indirectly by virtue of their Kohnstamm shares." Id. The Kaufman affidavit asserted that "as a result of the proposed transaction, beneficial ownership of the Camden and Newark facilities will remain where it is today – in the shareholders of Kohnstamm." Id, 1987 Kaufman Affidavit. On October 21, 1987, NJDEP issued its response, determining that the proposed transactions constituted "a corporate reorganization not substantially affecting ownership of the Camden Property" – and was not subject to ECRA. Id.

On January 12, 1988, Mr. Rabinowitz filed an amended application with NJDEP for a determination of non-applicability on behalf of the Kohnstamm Family Shareholders, along with a supplemental affidavit of Mr. Kaufman, based on two modifications to the proposed 1988 transaction: (1) General Color's shares would not be spun off on a pro-rata basis to all shareholders, but instead would be distributed on a pro-rata basis to only the Kohnstamm Family Shareholders (who owned 81% of the stock of Kohnstamm & Co.), and (2) General Color and Universal Foods would enter into a supply contract, pursuant to which General Color would supply certified colors to Universal Foods. Id., 1988 Letter from Rabinowitz. The stated reason for the change in the proposed transaction, as represented both in the January 12, 1988 filing and the affidavit, was:

> In substantial part because a pro-rata spin off would, in the opinion of the Securities and Exchange Commission, which was consulted on the point, require a Registration

7

Statement. This would be expensive, time consuming, and unnecessary in light of the fact that the Kohnstamm Family, both before and after the spin-off, will have control of the Company.

Id. Significantly, Mr. Rabinowitz represented that "the controlling interest in [the Camden Property] will remain where it is today – in the Kohnstamm family." Id. On January 27, 1988, NJDEP issued its response to the amended application, determining that the proposed transaction as modified was not subject to the provisions of ECRA ("NJDEP Nonapplicability Determination"). Id., NJDEP Nonapplicability Determination. If NJDEP had not ignored the corporate form, but instead determined that ECRA in fact applied to the 1988 Transaction, NJDEP would have required an ECRA environmental investigation and remediation of the Camden Property at that time – for which the Kohnstamm Family Shareholders would have been solely responsible. See Compl., ¶ 26, 34.

As discussed above, the ECRA Non-Applicability Determination was based, in significant part, on the representation that the distribution of General Color's shares to the Kohnstamm Family Shareholders would be made on a "pro-rata" basis and that ownership of the property would remain with the Kohnstamm Family. See Compl., Exh. C. However, at least two Kohnstamm Family Shareholders, Abby F. Kohnstamm and Peter L. Kohnstamm (Defendants herein), prevented General Color's shares from being distributed on a "pro-rata" basis either by (i) refusing to accept their pro-rata share of General Color's shares, or (ii) accepting their pro-rata shares of General Color and then immediately transferring the shares to a trust entity controlled by other Kohnstamm Family Shareholders.[5] See Compl., ¶¶ 27-28. This action by Defendants Abby Kohnstamm and Peter Kohnstamm effectively rendered the application to NJDEP false and fraudulent because it destroyed a key factor – the pro-rata

---

[5]    Abby and Peter Kohnstamm took the same action with respect to the stock that should have been transferred to their then-minor daughter Sarah F. Kohnstamm, named as a Defendant here.

distribution of General Color shares to all Kohnstamm Family Shareholders – upon which

NJDEP relied in determining that the transfer of the Camden Property to General Color was a

"corporate reorganization not substantially affecting ownership of the property" and, thus, not

subject to the ECRA. See Compl., Exh. C.

**C.    After The Transaction Closed, The Kohnstamm Family
        Shareholders Divested Themselves of General Color**

The 1988 Transaction closed on or about September 7, 1988. As a result of the

Transaction: (1) Kohnstamm & Co. ceased having any interest in the Camden Property or

General Color; (2) the Kohnstamm Family sold their shares in, and ceased being shareholders of,

Kohnstamm & Co.; and (3) Universal Foods did not acquire any interest in General Color or any

interest in or liability for the Camden Property. See Compl., ¶¶ 1, 15-17; Exh. A at 52, § 2.22.

The Kohnstamm Family Shareholders continued to be the beneficial owners of the Camden

Property through General Color as they had been prior to 1988 through Kohnstamm & Co.[6]

On or about September 7, 1988, but prior to Universal Foods' acquisition of Kohnstamm

& Co., each of the Kohnstamm Family Shareholders (including Defendants) executed a

Shareholders Agreement, which was necessary to consummate the 1988 Transaction and which

referred to the Reorganization Agreement, the transfer of the Camden Property to General Color,

and the transfer of General Color to the Kohnstamm Family Shareholders. See Compl., Exh. B.,

Shareholders Agreement. The Shareholders Agreement provided that:

> The parties to this Agreement covenant and agree that they shall hold their shares of
> Universal Foods common stock received as a result of the Exchange and their shares
> of General Color common stock received as a result of the split-up for a period of at
> least one (1) year from the date of Closing (as defined in the Reorganization

---

[6]    Kohnstamm & Co. changed its name to Warner-Jenkinson Company, Inc. on or about
September 18, 1990, and Warner-Jenkinson Company, Inc., changed its name to Sensient Colors,
Inc., on or about December 31, 2002. Id. at ¶18.

> Agreement), and <u>shall not sell, transfer, assign or otherwise dispose of such shares until the expiration of one (1) year from the date of closing</u>.

<u>Id</u>. Defendants Abby Kohnstamm and Peter Kohnstamm breached their obligations under the Shareholders Agreement, however, by refusing to acquire and/or immediately divesting themselves of their General Color shares. <u>See</u> Compl., ¶¶ 27-28. Evidencing their conspiratorial cooperation, none of the other Kohnstamm Family Shareholders took any action to compel these Defendants to comply with their contractual obligations, notwithstanding that their breach of the Shareholders Agreement rendered the NJDEP application false and fraudulent. <u>Id</u>. at ¶ 75-82.

To the contrary, and in furtherance of their conspiratorial cooperation, the Kohnstamm Family Shareholders followed Defendants' example and divested themselves of their General Color shares (and in the process siphoning General Color's assets) through a series of stock transfers and stock redemption program – all of which was designed to allow them to continue to avoid liability for the environmental contamination at the Camden Property. <u>Id</u>. Specifically, at some point after the 1988 Transaction and prior to November 1990, General Color began to redeem the stock of the Kohnstamm Family Shareholders. <u>Id.</u> General Color apparently did not have sufficient funds to complete the redemption, as most of the redemptions were accomplished with a 10% cash payment and a promissory note for the remainder. <u>See</u> Chang Dec., Exh. 5. In addition, it appears that certain trust entities (which held a significant percentage of shares) were requested to "waive" their right to a redemption because General Color had "insufficient funding therefore." <u>Id.</u> In short, the redemption program appears to have drained whatever funds General Color had which could otherwise have been used to remediate the Camden Property, and instead further enriched the Kohnstamm Family Shareholders.

10

**D.    Sensient is Subsequently Named in Two Actions**
       **Due to the Environmental Condition of the Camden Property**

In 2004, both Sensient and General Color were named as defendants in an action in the

Superior Court of New Jersey, Law Division – Camden County, Pleasant Gardens Realty

Corporation v. H. Kohnstamm & Company, Inc., et al., Docket No. CAM-L-6579-03 ("New

Jersey Action"). See Compl., ¶ 35. The New Jersey Action alleges that Sensient and General

Color are responsible for environmental contamination of the Camden Property as well as

adjacent property owned by Pleasant Gardens. Id. Sensient filed a third-party complaint against

the Kohnstamm Family Shareholders, including Defendants, in the New Jersey Action. Id. at

¶ 36. On February 3, 2006, the Court dismissed Sensient's third-party complaint as to certain

defendants, including Defendants here, holding that it lacked personal jurisdiction over them. Id.

On or about March 16, 2007, Sensient was named as a defendant in an action commenced

by the United States Justice Department ("DOJ"), United States v. Sensient Colors Inc., filed in

the United States District Court of New Jersey, Case No. 1:07-CV-1275 ("DOJ Action"). Id. at ¶

37. The DOJ seeks to recover costs incurred and to be incurred in response to the release or

threatened release of hazardous substances from the Camden Property under Section 107(a) of

the Comprehensive Environmental Response, Compensation, and Liability Act, as amended

("CERCLA"), 42 U.S.C. § 9607(a). Id. Among other things, the complaint alleges that prior to

1988 (when the Kohnstamm Family Shareholders, including Defendants, indisputably owned

Kohnstamm & Co. and the Camden Property), Kohnstamm & Co. owned and operated a facility

on the Camden Property, and that during that time, various hazardous substances were disposed

of there, id. at 38; it also alleges that from approximately March 1988 to December 2006, the

United States Environmental Protection Agency ("EPA") conducted removal activities at the

11

site, and has incurred $16 million in "response" costs. Id. To date, Sensient has incurred response costs in excess of $75,000. Id. at ¶ 39.

## ARGUMENT

## I.    THE AMENDED COMPLAINT STATES VALID CLAIMS UPON WHICH RELIEF MAY BE GRANTED

Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief…." Fed. R. Civ. P. 8(a); Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the…claim is and the grounds upon which it rests.'" Erickson, 127 S. Ct. at 2200, citing Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007). In Bell Atlantic, the Supreme Court explicitly held that it was not requiring heightened fact pleading of specifics." 127 S. Ct. at 1974; see also Erickson, 127 S. Ct. at 2200; Iqbal v. Hasty, 490 F.3d 143, 156 (2d Cir. 2007). A complaint must be viewed in a light most favorable to the plaintiff and all well-pled factual allegations must be taken as true. See Erickson, 127 S. Ct. at 2200. A complaint "may be supported by showing any set of facts consistent with the allegations in the complaint," Bell Atlantic, 127 S. Ct. at 1960, and any deficiencies in the complaint may be amplified by supplemental pleadings and any other evidence. See AG Capital Funding Partners, L.P. v. State St. Bank and Trust Co., 5 N.Y.3d 582 (2005). Because motions to dismiss are disfavored, they are granted only in rare instances, Stein Jewelry Co. v. United Parcel Serv., Inc., 228 F. Supp. 2d 304 (S.D.N.Y. 2002), and ordinarily without prejudice. See, e.g., Remsen Funding Corp. v. Ocean West Holding Corp., No. 06 Civ. 15265 (DLC), 2007 WL 3254403 (S.D.N.Y. Nov. 1, 2007). As set forth below, Sensient has provided ample factual detail to give Defendants fair notice of all claims and the grounds upon which they rest.

**II.    SENSIENT CAN REACH DEFENDANTS BY PIERCING THE
        CORPORATE VEIL OF KOHNSTAMM & CO. AND GENERAL COLOR**

**A.    Sensient Can Pierce The Corporate Veil Under Federal Common Law**

Defendants' sweeping allegation that the Amended Complaint must be dismissed because a corporation cannot pierce its own corporate veil is misguided and should be rejected. First, Sensient is not seeking to pierce its own corporate veil – it has not sued its parent, subsidiary, or current shareholders. Rather, it has asserted viable claims of concerted wrongdoing against the self-proclaimed owners of the Camden Property who are former shareholders of Kohnstamm & Co. as it existed prior to the 1988 Transaction. Second, however, even if the Court concluded that an action against these former shareholders was somehow an attempt to pierce the corporate veil of Sensient, this action ought to be sustained because a corporation may pierce its own corporate veil under federal common law, which applies here.

New York courts have long held that liability "under corporate veil-piercing standards should be analyzed under federal common law, since 'it is well established that when a federal statute is silent as to the choice of law to be applied, but over-riding federal interests exist, courts should fashion uniform federal rules of decision.'" Town of Oyster Bay v. Occidental Chemical Corp., 987 F. Supp. 182, 203 (E.D.N.Y. 1997), citing Idylwoods Assocs. v. Mader Capital, Inc., 915 F. Supp. 1290, 1305 (W.D.N.Y. 1996), reconsidered in part, 956 F. Supp. 410 (W.D.N.Y. 1997). Indeed, the Second Circuit in Schiavone v. Pearce confirmed that it subscribed to the views adopted by the First, Third, Fourth, Seventh, Eighth and Eleventh Circuits, 79 F.3d 248, 255 (2d Cir. 1996) (citations omitted), and explicitly rejected the proposition that CERCLA liability "strictly adheres to traditional veil-piercing concepts." Id.; see also id. at n.10. Reconciling the tension between direct liability and liability based on veil piercing against the overall goals of CERCLA, the Schiavone Court noted that Congress enacted CERCLA with the

13

expansive remedial purpose of ensuring "that those responsible for any damage, environmental

harm, or injury from chemical poisons bear the costs of their actions, and that "one of

CERCLA's primary goals is to extend liability to all those involved in creating harmful

environmental conditions," and emphasized that courts thus should construe the statute liberally

in order to effect these congressional concerns.  Id. at 253-54.  The Schiavone Court further

noted that "[s]uch a departure from common law principles of corporate insulation can be

explained by the uniqueness of CERCLA's legislative scheme, specifically by the recognition

that "CERCLA liability is often broader than these traditional purposes would justify."  Id.

Consistent with Schiavone and CERCLA's over-arching remedial purpose, federal

common law rejects formalistic veil piercing rules in favor of broad principles of equity and

fairness.  Under federal common law:

> Federal Court's are not bound by the strict standards of the common law alter
> ego doctrine….Nor is there any litmus test in the federal courts governing
> when to disregard the corporate form. Instead the rule in federal cases is
> founded only on the broad principle that a corporate entity may be disregarded
> in the interests of public convenience, fairness, and equity.

Local 2-1971 of Pace Int'l Union v. Cooper, 364 F. Supp. 2d 546 (W.D.N.C. 2005), citing Bhd.

of Locomotive Eng'rs v. Springfield Terminal Ry. Co., 210 F.3d 18, 26-27 (1st Cir. 2000); see

also Goldberg v. Colonial Metal Spinning and Stamping Co., Inc., No. 92 Civ. 3721 (JFK), 1993

WL 361672 (S.D.N.Y. Sept. 14, 1993).

Contrary to Defendants' mischaracterization, (Defendants' Brief at 13), while the

Supreme Court in U.S. v. Bestfoods, 524 U.S. 51, 56 n.1 (1998), stated that "the entire corpus of

state corporation law [should not] be replaced simply because plaintiff's cause of action is based

upon a federal statute," the Bestfoods Court explicitly declined to address the central issue here –

whether "courts should borrow state law, or instead apply a federal common law of veil

piercing." Id. at 64 n.9. Because the Second Circuit has not directly addressed this issue since Bestfoods, controlling authority is set forth in Schiavone.[7] See also U.S. v. General Battery Corp., Inc., 423 F.3d 294, 298-301 (3d Cir. 2005) (federal common law still applies to CERCLA actions after Bestfoods, and noting that "[i]f anything, Bestfoods cuts in favor of a uniform federal standard…"); New York v. National Serv. Indus., Inc., 460 F.3d 201, 208 (2d Cir. 2006) (strongly suggested that federal common law should apply in cases where there is a conflict between state law and federal common law).[8]

Even if Schiavone did not control, application of federal common law under the Second Circuit's reasoning in National Services is appropriate. 460 F.3d at 206-09. If New York state law in fact prohibits self-piercing, there is an actual conflict between CERCLA and federal common law on the one hand, and New York state law on the other. Under federal common law, there is no prohibition against a corporation piercing its own corporate veil, a principle which is consistent with CERCLA's broad federal goal of ensuring that everyone who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup. See Bestfoods, 524 U.S. at 56 n.1. If such a prohibition exists under New York law, an

---

[7]    Neither the Supreme Court nor Second Circuit has overruled Schiavone, and subsequent Second Circuit caselaw indicates that it would likely be upheld on the facts presented here. Accordingly, Schiavone controls and federal common law should be applied here. Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions" ); Priester v. Senkowski, No. 01 Civ. 3441 (LMM) (GWG), 2002 WL 1448303, at *7 (S.D.N.Y. July 3, 2002); see also Prisco v. A & D Carting Corp., 168 F.3d 593, 602 (2d Cir. 1999); State of New York v. Air-Flo Mfg. Co., Inc., No. 02 Civ. 762S, 2004 WL 1563081 (W.D.N.Y. June 3, 2004).

[8]    See also New York v. Westwood-Squibb Pharm. Co., No. 90 Civ. 13246, 2004 WL 1570261, *18-20 (W.D.N.Y. May 25, 2004) (federal common law still applies to CERCLA actions); Niagara Mohawk Power Corp. v. Consolidated Rail Corp., 291 F. Supp. 2d 105 (N.D.N.Y. 2003) (finding that federal common law has developed for determining contribution liability under CERCLA, and citing Idylwoods for proposition that federal law applies under CERCLA).

actual conflict exists between the federal and state common law, both because they are mutually

exclusive, i.e., they cannot be applied simultaneously, and because the state common law is "an

obstacle to the accomplishment and execution of the full purposes [of CERCLA]." <u>Cal. Fed.

Sav. & Loan Ass'n v. Guerra</u>, 479 U.S. 272, 281 (1987) ("An actual conflict between state and

federal law exists when compliance with both federal and state regulations is a physical

impossibility, or when state law is an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress.")[9]

    As noted by the <u>National Services</u> Court, in determining whether to apply general federal

common law or borrow from state law, federal courts look to the three <u>Kimbell</u> factors – (i)

whether there is a need for a uniform body of law; (ii) whether application of state law would

---

[9] Defendants' mischaracterization of <u>Pfohl Brothers Landfill Site Steering Committee</u> to the contrary, the District Court there did not "[hold] that New York state corporate law, and not federal common law, applied to issues of CERCLA liability." Defendants' Brief at 13. Rather, the <u>Pfohl</u> Court expressly (and accurately) stated the "Second Circuit held 'the substantial continuity doctrine is not part of the general federal common law and, following <u>Bestfoods</u>, should not be used to determine whether a corporation takes on CERCLA liability as the result of an asset purchase." <u>Pfohl Bros. Landfill Site Steering Committee v. Browning-Ferris Ind.</u>, No. 95 Civ. 956A(F), 2004 WL 941816 (W.D.N.Y. Jan. 30, 2004). Similarly, in <u>Marsh v. Rosenbloom</u>, 499 F.3d 177, 183 (2d Cir. 2007), the Court determined not to adopt the "equitable trust fund doctrine" in CERCLA cases because the "equitable trust fund doctrine," like the "substantial continuity doctrine" in <u>New York v. National Servs. Indus., Inc.</u>, 352 F.3d 682 (2003), is "not a part of the federal common law." In contrast, a federal common law with respect to veil-piercing has long been articulated by federal courts. See <u>Anderson v. Abbott</u>, 321 U.S. 349, 363 (1944) ("It has often been held that the interposition of a corporation will not be allowed to defeat a legislative policy, whether that was the aim or only the result of the arrangement."); <u>Williams v. McAllister Bros., Inc.</u>, 534 F.2d 19, 21 (2d Cir. 1976) (applying federal common law to veil piercing analysis); <u>Trustees of Nat. Elevator Indus. Pension, Health, Benefit and Educ. Funds v. Lutyk</u>, 332 F.3d 188 (3d Cir. 2003) (same); <u>Seymour v. Hull & Moreland Eng'g</u>, 605 F.2d 1105, 1109 (9th Cir. 1979) (same); <u>U.S. Through Small Bus. Admin. v. Pena</u>, 731 F.2d 8 (D.C. Cir. 1984) (same) citing <u>Piercing the Corporate Veil: The Alter Ego Doctrine Under Federal Common Law</u>, 95 Harv. L. Rev. 853 (1982) (outlining circumstances under which federal law applies to whether corporate veil ought to be pierced). <u>Marsh</u> is also distinguishable because the issue there was whether federal common law could be created where it conflicted with a state's statute; here, the issue is whether existing federal or state common law should be applied.

frustrate specific objectives of the federal program; and (iii) the extent to which application of the federal rule would disrupt commercial relationships predicated on state law. U.S. v. Kimbell, 440 U.S. 715, 728 (1979). All three factors weigh strongly in favor of applying federal common law here.

First, there is a need for a uniform rule because, as discussed above, if New York law prohibits a corporation from piercing its own veil as Defendants contend, an actual conflict exists here – which undermines the federal interest in a uniform application of CERCLA and justifies pre-empting state common law in favor of the federal common law rule. See Bedford Affiliates v. Sills, 156 F.3d 416, 426 (2d Cir. 1998) (noting that "[u]nder the Supremacy Clause of article VI, Congress may enact laws that preempt state or local law," and holding that while CERCLA does not preempt state law as a whole, it does preempt state law that conflicts with CERCLA's specific provisions, including CERCLA § 113(f)); Pfohl Bros. Landfill Site Steering Comm. v. Allied Waste Sys., Inc., 255 F. Supp. 2d 134, 152 (W.D.N.Y. 2003) (holding that state law on contribution conflicts with CERCLA's "carefully crafted" provisions, and thus is preempted); General Battery, 423 F.3d at 301-03 (finding that state law conflicts with CERCLA on veil piercing, and holding that a "uniform and predictable federal liability standard corresponds with specific CERCLA objectives"). Because an actual conflict exists between state law on the one hand, and federal common law which gives effect to CERCLA's broad remedial provisions on the other, the first factor of the Kimbell test – the need for a uniform national rule – application of federal common law here is appropriate.

Second, the application of the state common law frustrates specific objectives – and in this case, the main objective – of CERCLA. CERCLA manifests Congress' intent that hazardous waste sites should be cleaned up and that those responsible for the contamination

should bear the costs. Union Gas, 491 U.S. at 7. CERCLA, by design, imposes wide-ranging liability. Schaefer v. Town of Victor, 457 F.3d 188, 194 (2d. Cir. 2006) ("CERCLA establishes a regime of broad-ranging liability…") (citation omitted); Schiavone, 79 F.3d at 253. The expansive, remedial mandate of CERCLA would be frustrated – indeed defeated – if formalistic state common law principles, such as that espoused by Defendants here, are allowed to trump congressional intent that CERCLA provide a mechanism by which those responsible for contamination can be pursued. Bedford Affiliates, 156 F.3d 416. This conclusion is only reinforced here because the Defendants misused, for their own fraudulent purposes, the very corporate form behind which they now seek to hide.

Third, in direct contrast to the facts in Marsh, application of the federal common law here would have almost no impact on commercial relationships predicated upon state law. 499 F.3d at 183 (holding that the extension of post-dissolution liability would interfere with commercial relationships). If, as Defendants contend, this case involves the "highly unusual situation of a New York corporation seeking to pierce its own corporate veil," (Defendants' Brief at 1), then it is highly unlikely that permitting a corporation to pierce its own veil in CERCLA cases would disrupt commercial relationships predicated on state law.

For all of the above reasons, this Court should apply federal common law to Sensient's veil-piercing claim under CERCLA. Because there is no prohibition against a corporation piercing its own corporate veil under federal common law, Sensient is not barred from doing so here and Defendants' motion to dismiss Count I of the Amended Complaint should be denied.

**B.    Sensient Can Pierce the Corporate Veil Under New York Law**

Defendants' Motion to Dismiss should be denied even if this Court determines that New York state rather than federal common law of veil-piercing applies here.

18

Contrary to Defendants' claim that New York courts have "routinely" concluded that a corporation may not pierce its own corporate veil – and notwithstanding that Sensient is seeking to hold responsible the beneficial owners of the Camden Property through Kohnstamm & Co. as it existed before the 1988 Transaction – a corporation may pierce its own veil under New York law to prevent fraud or achieve equity. Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88 (2d Cir. 1999); see also Musico v. Champion Credit Corp., 764 F.2d 102, 108 (2d Cir. 1985); In re Weinstein's Estate, 25 A.D.2d 776 (2d Dep't 1966). As stated by the Second Circuit in Musico:

> To achieve equity in the present case, which deals with the overall relationships between the parties, it is fitting that…the separate status of the corporations wholly owned by the estate be disregarded. The equities call for this because in dealing with one another the parties themselves disregarded the corporate form.

764 F.2d at 109. Smith/Enron is instructive. There, the Enron Petitioners argued that the relationship between the Enron corporate entities and the defendant justified allowing Enron to pierce its own corporate veil. Smith/Enron, 198 F.3d at 97. The Second Circuit held that Enron could pierce its own corporate veil stating: "[the defendant] treated a group of related companies as though they were interchangeable, but now it asks for strict adherence to the corporate form in its opposition to arbitration. On this record, that is not called for." Id.

Application of Enron here is straightforward. The Kohnstamm Family Shareholders (including Defendants) requested that NJDEP essentially disregard the distinction between Kohnstamm & Co., General Color, and the Kohnstamm Family Shareholders (i.e. to treat them for purposes of environmental liability as "interchangeable") when doing so allowed them to avoid ECRA compliance and consummate the 1988 Transaction. See Compl., ¶ 23. Now, in the face of this and other actions, Defendants ask for strict adherence to the corporate form – a

19

corporate form they ignored and abused to perpetrate a fraud – to avoid the liabilities for which they expressly agreed to remain responsible through General Color. [10]

Cases cited by Defendants are not only distinguishable but wholly fail to support their principal thesis. (Defendants' Brief at 7-8). Harris v. Stony Clove and Coast Mfg. v. Keylon stand for the notion that a corporation cannot pierce its own veil, but Defendants conveniently fail to indicate that they are limited to instances where the corporation is seeking to assert a claim or defense that belongs to another party – i.e., a subsidiary – or is attempting to create jurisdiction where it does not otherwise exists. (Defendants' Brief at  7), citing Harris (affirmative defenses belong to the corporation, not the an individual shareholder); Coast Mfg. (veil cannot be pierced to manufacture jurisdiction). Unlike the corporations in Harris or Coast, Sensient has been sued in two actions alleging it is responsible for the environmental condition of the Camden Property.  As such, claims for contribution under CERCLA and the N.J. Spill Act, for example, belong to it; moreover, jurisdiction is not at issue here.

Sensient is permitted to pierce its own veil to reach Defendants.  In any event, whether equity requires that Sensient be permitted to pierce its own veil or that of Kohnstamm & Co. as it existed prior to the 1988 Transaction, is a question of fact not properly decided on a motion to dismiss. Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussman Foodservice, Co., 730 F. Supp. 1209, 1220 (E.D.N.Y. 1990).

---

[10]    As a practical matter, Sensient is not seeking to simultaneously benefit from and pierce its own corporate veil.  Rather, it is asking the Court to disregard the sham corporate form that existed immediately prior to closing of the 1988 Transaction, in light of the fact that the Kohnstamm Family Shareholders ignored and abused that corporate form to engage in wrongful conduct.  See Compl., ¶ 31.

**C.**   **Sensient Can Pierce the Corporate Veil Under New Jersey Law**

Defendants' motion should be denied because Plaintiff can also pierce the corporate veil of Kohnstamm & Co. under New Jersey law.  In actions which relate to property, New York's choice of law rules apply an "interests analysis," in which "the law of the jurisdiction having the greatest interest in the litigation is applied...."  Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negra, 313 F.3d 70, 85 (2d Cir. 2002) (citation and quotations omitted).  The heaviest weight is given to the location of the property.  TDH-Berkshire Inc. v. Korff, 33 A.D.3d 437 (1st Dep't 2006).  Here, it is clear that New Jersey has the greatest interest in Sensient's claims.  First, the contaminated property is located in Camden, New Jersey.  See Compl., ¶ 1.  Second, Sensient is seeking relief, in part, under a New Jersey statute.  Id. at ¶¶ 52-62.  Third, General Color was a New Jersey Corporation.  Id. at ¶ 14. Fourth, this case necessarily implicates a determination made by NJDEP.  Id. at ¶¶ 22-27. Accordingly, New Jersey has the greatest interest here and its law should be applied.

Under New Jersey law, a corporation may pierce its own corporate veil.  In re Buildings by Jamie, Inc., 230 B.R. 36 (Bankr. D.N.J. 1998).  In Buildings by Jamie, the court held that "an alter ego action is an equitable remedy that belongs to the corporate entity and may be asserted by the corporation when it suffers harm from the fraudulent acts of its principals."  Id., 230 B.R. at 43.  Similarly, in Phar-Mor, Inc. v. Coopers & Lybrand, the Third Circuit stated:

> It may seem strange to allow a corporation to pierce its own veil, since it cannot claim to be either a creditor that was deceived or defrauded by the corporate fiction, or an involuntary tort creditor.... Because piercing the corporate veil or alter ego causes of action are based upon preventing inequity or unfairness, it is not incompatible with the purposes of the doctrines to allow a debtor corporation to pursue a claim based upon such a theory.

22 F.3d 1228, 1240 n.20 (3d Cir. 1994) (applying New Jersey law) (citations omitted).

Although both <u>Buildings by Jamie</u> and <u>Phar-Mor</u> address piercing one's own corporate veil in the bankruptcy context, because veil-piercing issues are typically considered non-core proceedings, the rule of law is equally applicable to issues involving corporate law. <u>Phar-Mor</u>, 22 F.3d at 1229; <u>U.S. v. Weiss</u>, No. 97 Civ. 4949, 1998 WL 118091, at *3 (E.D.N.Y. Mar. 13, 1998) (finding that adversarial proceeding involving piercing the corporate veil was non-core, in that liability did not arise under federal bankruptcy law, but could have been decided in district court). In short, Plaintiff can pierce the veil of Kohnstamm & Co. under New Jersey law.

**D.     Sensient Can Reach Defendants By Piercing the Veil of General Color**

Sensient can also reach Defendants individually by piercing the corporate veil of General Color, whether under federal common law or that of New York or New Jersey.

Although the law will ordinarily treat the corporation as an entity distinct from its shareholders, "it is equally well-established that 'whenever it is necessary to relieve or protect from frauds, the corporation may be disregarded as against the responsible parties'" – here, the Kohnstamm Family Shareholders. <u>International Controls Corp. v. Vesco</u>, 490 F.2d 1334, 1350-51 (2d Cir. 1974) (district court, as court of equity, had power to pierce corporate veil of holding company in action by plaintiff corporation against former shareholder who transferred shares of plaintiff corporation to holding company in furtherance of fraudulent scheme, even where the court could not assert traditional jurisdiction over the holding company).

Defendant Elizabeth Ogden, was a shareholder of General Color both in her individual capacity and as the trustee of at least two trusts which owned over 100,000 shares of Kohnstamm & Co. which, upon information and belief, received a significant percentage of General Color stock. <u>See</u> Compl., Exh. B at SCI 7401-02. For the reasons set forth in Points III and IV <u>infra</u>, Sensient has pled sufficient facts to justify piercing General Color's veil as to defendant Elizabeth Ogden.

With respect to the remaining Defendants, if these Defendants accepted their pro-rata shares, then General Color's veil may be pierced as to them for the same reasons the veil may be pierced as to Defendant Elizabeth Ogden. If these Defendants never accepted their General Color shares, the veil may still be pierced as to them for three independent reasons. First, as discussed below, see Section III infra, civil conspiracy allows any act by one conspirator to be attributed to all other co-conspirators. Because some Kohnstamm Family co-conspirators indisputably received and held General Color stock, the consequences of such having stock are attributable to all Defendants. Id.

Second, "New York courts have recognized for veil-piercing purposes the doctrine of equitable ownership" which allows the corporate veil to be pierced as to individuals who are not shareholders of the corporation. Freeman v. Complex Computing Co. Inc., 119 F.3d 1044, 1051 (2d Cir. 1997). Thus, even if certain Defendants in fact refused to accept their General Color shares, they may nonetheless be deemed equitable owners of that entity – General Color – and Sensient can reach them by piercing its corporate veil.

Third, piercing the corporate veil is an action taken in equity to prevent fraud or injustice. See, e.g., First National City Bank v. Banco Para El Comercio Exterior De Cuba, 462 U.S. 611, 629 (1983) (holding that "our cases have long recognized the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice"). Here, these Defendants' refusal to accept General Color stock was itself a wrongful act which had the effect of rendering the NJDEP application false and fraudulent and breaching their obligations under the Shareholders Agreement. If the veil of General Color cannot be pierced as to these Defendants because of that wrongful act, they would (and did) profit from their fraudulent conduct. Such a result runs

counter to the fundamental purpose of veil piercing. Niagara Mohawk Power Corp. v. Bankers Trust Co. of Albany, N.A., 791 F.2d 242 (2d Cir. 1986) (veil-piercing "permit[s] a decision based on substance rather than form").

Finally, that General Color may now be a defunct entity which cannot be joined as a party here only underscores the individual liability of the Kohnstamm Family Shareholders. "[A] corporation subject to CERCLA claims based upon hazardous waste disposal that occurred before the corporation was dissolved and became dead and buried is not absolved from suit under CERCLA." Town of Oyster Bay, 987 F. Supp. at 201.[11] Accordingly, even if General Color is now a defunct or non-existent entity, it is still liable under CERCLA, and Sensient may still bring claims against its former shareholders under a veil-piercing theory because it has alleged that General Color became a defunct entity, in part, through the fraudulent acts of the Defendants, the other Kohnstamm Family Shareholders and co-conspirators. See Compl., ¶ 75-82; see also Town of Oyster Bay, 987 F. Supp. at 202 (if a corporation is dissolved fraudulently and its assets subsequently distributed to its shareholders, the shareholders hold the assets they receive in trust). Indeed, it appears that the entire purpose of the stock redemption program was for the Kohnstamm Family Shareholders to divest themselves of CERCLA liability and siphon General Color's assets. See Compl., ¶¶ 75-82. Simply put, Plaintiff can reach Defendants by piercing the veil of General Color.

---

[11]    In Town of Oyster Bay, it was possible to join the entity at issue, G.A.Corrugated, through service on another entity, Lin Pac Corrugated Containers Corporation. Here it is unclear whether General Color can be formally joined, a fact which Sensient will determine in the course of discovery. However, the issue is largely irrelevant, because whether a defunct entity can be sued should not be determined by whether the entity can be formally joined as a party, but by whether the entity was subject to a CERCLA claim before it was dissolved, and whether it was misused and dissolved fraudulently by the shareholders, two facts alleged here by Sensient with respect to General Color. See Town of Oyster Bay, 987 F. Supp at 201-02.

## III.    THE ACTS OF EACH KOHNSTAMM FAMILY SHAREHOLDER ARE ATTRIBUTABLE TO ALL KOHNSTAMM FAMILY SHAREHOLDERS

Defendants' blanket assertion to the contrary, they are unquestionably deemed to have committed each and every act set forth in the Amended Complaint, whether that act was actually committed by Defendants themselves, or by one of Defendants' family members and co-conspirators (whether named or yet to be named herein or in the Minnesota action).

The allegation of civil conspiracy "connects a defendant with the transaction and charges him with the acts and declarations of his co-conspirators," where otherwise he could not have been implicated. Kashi v. Gratsos, 790 F.2d 1050 (2d Cir. 1986) (citation and quotations omitted); Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 173 (S.D.N.Y. 1998). As Sensient has done here, see Compl., ¶¶ 75-82, a plaintiff may properly plead civil conspiracy to "render all defendants liable for each other's acts in furtherance thereof, and thus broaden liability." Keller v. Levy, 265 A.D. 723, 724 (1st Dep't 1943). Where civil conspiracy is properly pled, "all co-conspirators are liable, jointly and severally, as tortfeasors." Boucher v. Sears, No. 89 Civ. 1353, 1997 WL 599316, *6 (N.D.N.Y. Sept. 19, 1997) (citation omitted).

Defendants sole argument – that the Amended Complaint fails to identify any underlying tort – is baseless. As set forth in the Amended Complaint, Sensient has sufficiently pled that the Defendants along with the other Kohnstamm Family Shareholders, entered into a conspiratorial scheme by their agreement to evade CERCLA and the New Jersey Spill Act, and unjustly enriched themselves at Sensient's expense, while coordinating their efforts to avoid the liability associated with their conduct. See Compl., Counts I, II, III, IV, VII, VIII.

Accordingly, Sensient has connected its civil conspiracy to a number of underlying torts and, therefore, in analyzing whether Sensient has pled a cause of action for each underlying tort, the Court should consider the actions undertaken by all co-conspirators. Boucher, 1997 WL

599316, at *6; see also State Dep't of Treasury, Div. of Inv. ex rel McCormac v. Quest

Commc'n Int'l, Inc., 387 N.J. Super. 469, 484 (N.J. Super Ct. App. Div. 2006).

## IV.    SENSIENT HAS ALLEGED SUFFICIENT FACTS TO SUPPORT VEIL PIERCING AND ACTIONABLE UNDERLYING TORTS

### A.    As Determined by NJDEP, Defendants Controlled Kohnstamm & Co., General Color, and the Camden Property

The amended application to NJDEP made by Kohnstamm & Co. as it existed prior to the

1988 Transaction and certain co-conspirators on behalf of themselves and the other Kohnstamm

Family Shareholders in January 1988, admitted that the Kohnstamm Family owned and

controlled Kohnstamm & Co., General Color, and the Camden Property.  See Compl., Exh. C.

Defendants and their co-conspirators explicitly stated that:

- "at the present time, beneficial ownership of the Camden and Newark facilities rests in the stockholders of Kohnstamm in proportion to their share ownership";

- "the Kohnstamm Family, both before and after the spin-off, will have control of the Company";

- "the controlling interest in the Camden and Newark industrial establishments will remain where it is today – in the Kohnstamm family."

Id. Defendants' sleight of hand aside, these representations were made by or on behalf of the

Kohnstamm Family Shareholders (including Defendants) prior to Universal Foods' acquisition

of Kohnstamm & Co. stock.  See Compl., Exh. A, § 5.3.

In any event, in relying on this representation, and in determining that the transaction

contemplated by the Reorganization Agreement was a "corporate reorganization not substantially

affecting ownership" of the Camden Property, NJDEP determined that: (i) the transfer of

ownership of the Camden Property from Kohnstamm & Co. to General Color was not a change

in ownership; (ii) the transfer of General Color from Kohnstamm & Co. to the Kohnstamm

Family Shareholders was not a change in ownership; and (iii) both before and after these

26

transfers "the Kohnstamm Family" had "control of the Company." See Compl., Exh. C.  Thus, NJDEP effectively pierced the corporate veil and determined that in the context of responsibility for the environmental remediation of the Camden Property, there was no distinction between Kohnstamm & Co., General Color, and the Kohnstamm Family Shareholders. Id.

For nearly 20 years, Defendants relied on the NJDEP determination in order to evade environmental liabilities plaguing the Property they owned before and after the 1988 Transaction.  They now ask this Court to not only disregard the prior factual determinations of NJDEP, but to elevate the corporate fiction the NJDEP was expressly asked to ignore in 1988. At a minimum, Defendants are estopped from disclaiming the representations made to the NJDEP. Simon v. Safelite Glass Corp., 128 F.3d 68, 72 (2d Cir. 1997).

The factual determinations of an administrative agency are afforded great deference when the subject matter falls within the purview of the agency's expertise. Berenhaus v. Ward, 70 N.Y.2d 436, 443-44 (1987) ("The courts may not weigh the evidence or reject the choice made by [an] agency where the evidence is conflicting and room for choice exists.") (citation and quotations omitted); see also DeOliveira v. New York State Dep't of Motor Vehicles, 271 A.D.2d 607, 608 (2d Dep't 2000).  This is plainly the case here.  The New Jersey Legislature delegated to NJDEP responsibility for making factual determinations regarding the applicability of ECRA, including distinguishing changes in ownership from corporate reorganizations that do not substantially affect ownership. In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 449 (1992) ("the Legislature has directed DEP to identify the events that trigger ECRA and the amount of land or waste governed by the statute").

**B.     Even Without the NJDEP's Determination, Sensient Has Alleged
         Sufficient Facts to Justify Veil Piercing**

Courts consider the following factors in determining whether to pierce a corporate veil

under federal common law: (i) inadequate capitalization in light of the purposes for which the

corporation was organized; (ii) extensive or pervasive control by shareholders; (iii) intermingling

of the corporation's properties or accounts with those of its owner; (iv) failure to observe

corporate formalities and separateness; (v) siphoning of funds from the corporation; (vi) absence

of corporate records; and (vii) nonfunctioning officers or directors. Pfohl Bros., 255 F. Supp. 2d

at 180; see also City of New York v. Exxon Corp., 112 B.R. 540 (S.D.N.Y. 1990) (applying

same factors to veil piercing under CERCLA), aff'd in part, 932 F.2d 1020 (2d Cir. 1991),

abrogated on other grounds; Town of Oyster Bay, 987 F. Supp. at 203; Idylwoods Assocs., 915

F. Supp. at 130. Sensient has alleged, and even at this early state of the litigation can

demonstrate, many of these elements with respect to both General Color and Kohnstamm & Co.

As an initial matter, the Kohnstamm Family Shareholders admitted on numerous prior

occasions that they owned, controlled, and dominated Kohnstamm & Co., General Color, and the

Camden Property. Co-conspirator Paul Kenneth Kohnstamm stated that the Kohnstamm Family

Shareholders had "full control over General Color." See Chang Dec., Exh. 3. Co-conspirator

Kaufman stated that, as a result of the reorganization, "beneficial ownership of the Camden

[Property] will remain where it is today – in the shareholders of Kohnstamm." See Compl., Exh.

C. Kaufman also stated that "the Kohnstamm Family, both before and after the spin-off, will

have control of the Company." Id. These admissions, of themselves, are sufficient evidence of

control and domination to overcome the Motion to Dismiss. Rutigliano v. Rutigliano, 10 A.D.3d

516 (1st Dep't 2004).

In addition, the Kohnstamm Family Shareholders dominated and conspired to use Kohnstamm & Co. and General Color as mechanisms through which to evade CERCLA and the New Jersey Spill Act, and avoid the liabilities associated with their conduct. See Compl., ¶¶ 31, 75-82. In furtherance of this scheme, the Kohnstamm Family shareholders utilized the General Color transfer, the fraudulent NJDEP application, the inadequate capitalization of General Color, and the stock redemption program, to first delay and then ultimately divest themselves of the liabilities associated with the Camden Property. Id. at ¶¶ 27, 31, 75-82. This wrongful conduct unjustly enriched the Kohnstamm Family Shareholders at Sensient's expense. In the context of a motion to dismiss, Sensient's allegations are more than sufficient for this Court to conclude that the corporate veils of both Kohnstamm & Co. and General Color may be pierced.[12]

## V.    THE AMENDED COMPLAINT STATES A CAUSE OF ACTION UNDER CERCLA

CERCLA is a "broad remedial statute," enacted to assure "that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions." B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1197 (2d Cir. 1992), cert. denied, 524 U.S. 926, (1998), quoting S. Rep. 848, 96th Cong., 2d Sess. 13 (1980). CERCLA provides that any person who, at the time of the disposal of hazardous substance, owned or operated a facility at which such hazardous substances were disposed may be held liable directly or sued by another party for contribution. 42 U.S.C. 9607(a); 42 U.S.C. 9613(f).

As set forth above, the Kohnstamm Family Shareholders – first through Kohnstamm & Co. (at the time it was owned and controlled by Defendants) and then General Color – owned

---

[12]    These allegations also satisfy the Morris standard urged by Defendants because Plaintiff has alleged (i) domination and control of both Kohnstamm & Co. and General Color; (ii) such control was used to commit a fraud and engage in wrongful conduct; and (iii) Plaintiff was injured by such wrongful conduct. (Defendants' Brief at 9.)

the Camden Property. Defendants, named and unnamed, thus are liable as owners under CERCLA because the corporate veil may be pierced as to the Defendants with respect to both Kohnstamm & Co. and General Color. See Section IV supra.

However, even if the corporate veil could not be pierced, Defendants may still be found liable under CERCLA as "operators" of the Camden Property. Bestfoods, 524 U.S. at 64-67. Under CERCLA, an "operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." AMW Materials Testing, Inc. v. Town of Babylon, 187 Fed. Appx. 24, 27 (2d Cir. 2006) citing Bestfoods, 524 U.S. at 66. It is undisputed that certain Kohnstamm Family Shareholders and co-conspirators managed and/or conducted the affairs of the Camden Property. Thus, there can be no question but that certain Kohnstamm Family Shareholders and co-conspirators are "operators" under CERCLA.

Defendants' have failed to establish, through documentary or other evidence, that they had no operation or management role. Defendants' level of participation in the management of the Camden Property, in any event, is a question of fact not properly resolved at the summary judgment stage, let alone here.[13] Even if Defendants had established (they have not) that they did not directly operate or manage the Camden Property, they are still liable for the acts of their co-conspirator family members who indisputably managed the Camden Property by virtue of Plaintiff's civil conspiracy count. See Section III supra.

---

[13] Defendants rely on Delaney v. Town of Carmel, 55 F. Supp. 2d 237, 255 (S.D.N.Y. 1999), State of New York v. Shore Realty Corp., 759 F.2d 1032, 1052 (2d Cir. 1985), and Consolidated Edison Co. of New York, Inc. v. UGI Utilities, Inc., 153 Fed. Appx. 749, 751 (2d Cir. 2005) cert. denied, 127 S. Ct. 2995 (2007). Not one of these cases, however, was decided in the context of a motion to dismiss before the opportunity for full discovery was afforded to the plaintiff, which only underscores the premature nature of the relief requested by Defendants here.

## VI.  THE AMENDED COMPLAINT STATES A CAUSE OF ACTION UNDER THE NEW JERSEY SPILL ACT

Under the New Jersey Spill Act, "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred." N.J.S.A. 58:10-23.11g.c(1). Like CERCLA, the Spill Act is construed broadly and imposes wide ranging liability such that "a party even remotely responsible for causing contamination will be deemed a responsible party." In re Kimber Petroleum Corp., 110 N.J. 69, 85 (1988). Indeed, any level of "ownership or control over the property at the time of the discharge... will suffice" for Spill Act liability. W.R. Grace & Co. v. Weja, Inc., No. A-5527-03T1, 2006 WL 3435047, *13 (N.J. Super. Ct. App. Div. Nov. 30, 2006).

Under the Spill Act, Defendants are liable as "owners...of a facility from which a discharge has occurred" because the corporate veil may be pierced as to the Defendants with respect to both Kohnstamm & Co. and General Color . See Section IV supra. In addition, the definition of an "operator" under the New Jersey Spill Act is substantially similar to the definition of "operator" under CERCLA and, therefore, Defendants can be held liable as operators under the Spill Act for the same reasons set forth above. See Section V supra.

In an attempt to avoid Spill Act liability, Defendants wholly misstate Plaintiff's allegations: (i) "Plaintiff's allegations do not even hint that any of the Defendants personally participated in, or had anything to do with, H. Kohnstamm's ECRA filing, either directly or indirectly"; and (ii) "there is no allegation in the Amended Complaint that Plaintiff (then H. Kohnstamm), it's employees, agents, or outside legal counsel made any false or misleading statements or material omissions in the ECRA Filing." (Defendants' Brief at 16). To the contrary, the Amended Complaint specifically alleges that Defendants were involved in

31

Kohnstamm & Co.'s ECRA filing and rendered such filing false and fraudulent through their conduct. <u>See</u> Compl., ¶¶ 25-27.

Moreover, Defendants' claim that the ECRA filing did not contain admissions that the Defendants were the beneficial owners of the Camden Property, (Defendants' Brief at 15), is contradicted by the Kaufman affidavit, which provided that "<u>as a result of the proposed [1988] transaction, beneficial ownership of the Camden [facility] will remain where it is today – in the shareholders of Kohnstamm,</u>" <u>see</u> Compl., Exh. C, which included Defendants.

Finally, the authorities cited by Defendants are unpersuasive. Relying heavily on <u>State v. Arky's Auto Sales</u>, 224 N.J. Super. 200, 203-07 (N.J. Super. Ct. App. Div. 1988), Defendants contend that they cannot be held liable under the Spill Act on a veil-piercing theory. In <u>Arky's</u>, the Court determined, <u>after trial</u>, that there was insufficient evidence to pierce the veil. Here, the only question is whether the Amended Complaint, taken as true and given every favorable inference, alleges sufficient facts to support veil-piercing. Plaintiff has alleged more than enough to satisfy this requirement.

## VII.  THE AMENDED COMPLAINT STATES A CAUSE OF ACTION FOR INDEMNIFICATION, UNJUST ENRICHMENT AND CONTRIBUTION

Defendants' assertion that Plaintiff's unjust enrichment, contribution, and indemnification claims are derivative claims, (Defendants Brief at 18), is wholly deficient and must be rejected as a matter of law. Unjust enrichment and common law indemnification are independent causes of action under New York law. <u>Derven v. PH Consulting, Inc.</u>, 427 F. Supp. 2d 360, 368 (S.D.N.Y. 2006); <u>Van Diepen v. Baeza</u>, No. 96 Civ. 8731 (SHS), 1998 WL 199909, *1 (S.D.N.Y. Feb. 26, 1998) (unjust enrichment); <u>Lake Minneweaska Mountain Houses, Inc. v. Rekis</u>, 259 A.D.2d 797 (3d Dep't 1999) (same); <u>The Limited Inc. v. McCrory Corp.</u>, 169 A.D.2d 605 (1st Dep't 1991) (same); <u>D'Ambrosio v. City of New York</u>, 55 N.Y.2d 454, 461 (1982)

(common law indemnification); <u>Vigilent Ins. Co. v. Federal Ins. Co.</u>, 163 A.D.2d 202 (1990). In the Amended Complaint, Plaintiff amply alleged the requisite elements for each cause of action, which Defendants do not contest. <u>See</u> Compl., ¶¶ 69-74. Moreover, even if Defendants were correct (they are not) that Plaintiff's claims for contribution, indemnification, and unjust enrichment are derivative (they are not), those claims still would not be subject to dismissal because Plaintiff has alleged numerous viable underlying causes of action.

## VIII. DEFENDANTS CANNOT PRECLUDE THIS COURT FROM CONSIDERING SENSIENT'S VEIL-PIERCING CLAIM

Under New York law, "dismissal for want of personal jurisdiction ... does not preclude a second action on the same claim in a court that can establish personal jurisdiction." <u>Barrett v. Tema Development (1988), Inc.</u>, 463 F. Supp. 2d 423 (S.D.N.Y. 2006) (citation omitted). In order to successfully assert collateral estoppel, a party must demonstrate each of the following five elements: (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits; and (5) the disposition must be rendered by a court of competent jurisdiction. <u>Interoceanica Corp. v. Sound Pilots, Inc.</u>, 107 F.3d 86, 91 (2d Cir. 1997). The party seeking to invoke collateral estoppel has the burden of proving each of the elements. <u>In re Eurocrafters, Ltd.</u>, 183 Fed. Appx. 70, 72 (2d Cir. 2006). Defendants are unable to demonstrate any of the requisite elements and thus fail to carry this burden.

As an initial matter, the issues being litigated here are not identical to the issues litigated in the New Jersey action, in part, because this action seeks relief under CERCLA, which relief was not – and could not have been – sought in the New Jersey action because the DOJ had not

33

yet filed its CERCLA action against Sensient at the time Sensient's Third-Party claims were dismissed for lack of jurisdiction. This fact alone precludes the application of collateral estoppel.

Defendants' collateral estoppel argument is also defective because it hinges upon dicta statements made at oral argument, see, e.g., Diorinou v. Mezitis, 132 F. Supp. 2d 139 (S.D.N.Y. 2000) (statements made by a court without jurisdiction are dictum), which are insufficient to support a collateral estoppel defense. Town of East Hampton v. Omabuild USA No. 1, Inc., 215 A.D.2d 746 (2d Dep't 1995); see also In re Bean, 252 F.3d 113 (2d Cir. 2001). Indeed, it is clear that the New Jersey Court did not intend for its dicta statements to have any preclusive effect with respect to Plaintiff's claims because, after making the statements, the Court inquired whether Plaintiff was "going to bring the action in New York to pierce the veil?" See Chang Dec., Exh. 4, Transcript of New Jersey Action, at 33. Based on the above, Defendants cannot establish that substantive issues were "actually decided" by the New Jersey Court.

Even if substantive issues had been decided by the New Jersey Court (they were not), Defendants nonetheless would not be able to demonstrate, as they must, that such substantive issues were "essential" to the New Jersey Court's judgment. Fletcher v. Atex, Inc., 68 F.3d 1451, 1458 (2d Cir. 1995) (in order for collateral estoppel to apply "the issue must have been material to the first action or proceeding and essential to the decision rendered therein") (citation omitted). Here, the New Jersey Court's discussion of substantive issues, if any, was unnecessary to its resolution of the sole issue before it: whether the Court had personal jurisdictional question over the defendants, who claimed to be domiciled in other states and purportedly lacked minimum contacts with New Jersey. See Chang Dec., Exh. 4.

Moreover, even if Defendants were correct that a factual determination on substantive issues was "essential to deciding jurisdiction" (which they are not), their argument that an

34

adverse ruling on those issues at the jurisdictional stage precludes re-litigation in a court with competent jurisdiction, has been squarely rejected by the Southern District of New York in <u>Four Star Capital v. Nynex Corp.</u>, No. 93 Civ. 3706 (LMM), 1993 WL 350016 (S.D.N.Y. Sept. 9, 1993). In <u>Nynex</u>, the plaintiff brought a breach of contract action against defendant in the Northern District of California. There, the California court determined that it lacked jurisdiction over the defendant because "there's nothing about the agreement here which suggests that NYNEX was a party [to the contract]." <u>Id.</u>, 1993 WL 350016 at *2. Plaintiff subsequently brought a breach of contract action in New York and Nynex moved to dismiss on the ground that the California Court's determination that Nynex was not a party to the contract was entitled to collateral estoppel. On facts remarkably similar to those here, the Court held that collateral estoppel was not applicable because the California Court's "determination that personal jurisdiction was lacking does not constitute 'a valid and final judgment on the merits'" and was only a "binding determination on the jurisdictional question." <u>Id.</u> citing <u>Arnold Graphics Industries, Inc. v. Indep. Agent Center, Inc.</u>, 775 F.2d 38, 41 (2d Cir. 1985). Nynex applies with equal force here. Indeed, without jurisdiction, any statements made by the New Jersey Court are not subject to collateral estoppel. <u>Baker by Thomas v. General Motors Corp.</u>, 522 U.S. 222, 223-24 (1998) (in order for issue preclusion to apply the Court rendering the initial judgment must have had "adjudicatory authority over the subject matter and persons governed by the judgment"); <u>Scardace v. Mid Island Hosp., Inc.</u>, 21 A.D.3d 363 (2d Dep't 2005) (the doctrines of res judicata and collateral estoppel are not applicable where the court lacks personal jurisdiction). Because the New Jersey Court lacked personal jurisdiction, any statements made with respect to veil-piercing simply cannot support issue preclusion.

## CONCLUSION

For the foregoing reasons, Sensient respectfully requests that the Motion to Dismiss be

denied in all respects. In the alternative, if the Motion to Dismiss is granted in whole or in part,

Sensient respectfully requests leave to re-plead.

Dated: New York, New York          **BRYAN CAVE LLP**
       December 14, 2007


                   /s/ Mary M. Chang
           Mary M. Chang (MC 3345)
           Christopher R. Strianese (CS 1017)

           1290 Avenue of the Americas
           New York, New York  10104
           (212) 541-2000
           Attorneys for Plaintiff