UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SENSIENT COLORS INC.,

              Plaintiff,

              - against -

ABBY F. KOHNSTAMM; PETER L.
KOHNSTAMM; SARAH F. KOHNSTAMM;
ELIZABETH K. OGDEN; RICHARD L.
OGDEN; THOMAS H. OGDEN; JOHN DOE
INDIVIDUALS 1-20 (fictitious names); and ABC
COMPANIES 1-20 (fictitious names),

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Civil Action No. 07 CIV 7846

**DECLARATION OF
MARY M. CHANG**

Mary M. Chang, Esq., hereby declares under penalty of perjury, to the best of her knowledge and based upon the documents available to her, as follows:

1.      I am an attorney duly admitted and in good standing to practice before the United States District Court for the Southern District of New York.  I am a member of the firm of Bryan Cave LLP ("Bryan Cave"), counsel for Plaintiff, Sensient Colors, Inc.  Bryan Cave maintains an office for the practice of law at 1290 Avenue of the Americas, New York, New York 10104.  I submit this declaration in opposition to the Defendants' Motion to Dismiss the Amended Complaint.

2.      Attached hereto as Exhibit 1 is a true and correct partial copy of a Prospectus/Proxy Statement dated August 8, 1988 and covering letter dated August 9, 1988.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the minutes of the meeting held on May 5, 1988 of the Board of Directors of H. Kohnstamm & Company, Inc.

4.    Attached hereto as Exhibit 3 is a true and correct copy of handwritten notes of Paul Kenneth Kohnstamm.

5.    Attached hereto as Exhibit 4 is a true and correct copy of a transcript of a hearing held before the Honorable Charles A. Little, Justice of the Superior Court of New Jersey, on February 30, 2006, in the action titled <u>Pleasant Gardens Realty Corporation v. H. Kohnstamm & Company, Inc., et al.</u>, Docket No. CAM-L-6579-03.

6.    Attached hereto as Exhibit 5 is a true and correct copy of the following documents related to redemption of General Color Company shares: letter dated February 15, 1991 from Richard L. Kohnstamm, Bank of New York, Paul L. Kohnstamm and Elizabeth K. Ogden; letter dated February 4, 1991 to Richard L. Kohnstamm, Paul L. Kohnstamm and U.S. Trust Company.


Dated: December 14, 2007                    /s/ Mary M. Chang
                                            Mary M. Chang, Esq.

August 9, 1988

### H. KOHNSTAMM & CO., INC.

Dear Fellow Shareholder:

        You are cordially invited to attend a special meeting of shareholders of H. Kohnstamm & Co., Inc. (the "Company") to be held at The Williams Club, 24 East 39th Street, New York, New York, on Wednesday, September 7, 1988, at 10:30 A.M., local time.

        At this meeting, there will be a vote on a proposed reorganization ("Reorganization") pursuant to which, if approved, the Company will become a wholly-owned subsidiary of Universal Foods Corporation ("Universal Foods").

        Under the terms of the Reorganization, each outstanding share of Company common stock and each outstanding share of Company preferred stock (except shares as to which shareholders properly exercise dissenters' rights and except as described below) will be converted into shares of Universal Foods Common Stock.  Immediately prior to the consummation of the Reorganization, all of the capital stock of General Color Company, a wholly-owned subsidiary of the Company ("General Color"), will be transferred to certain Company shareholders, including Paul L. Kohnstamm, Richard L. Kohnstamm, Paul Kenneth Kohnstamm and Katherine Piven (directors, officers and substantial shareholders of the Company), their spouses, lineal descendants and/or trusts for the benefit of such persons (collectively, the "Kohnstamm Family Shareholders") in a separate tax-free reorganization.  The Kohnstamm Family Shareholders will receive fewer shares of Universal Foods Common Stock than they would otherwise be entitled to because of the value of the General Color stock they are receiving.  See "The Reorganization - Consideration to be Received by Selling Shareholders" for an example of the effect of the transfer of General Color to the Kohnstamm Family Shareholders upon the number of shares of Universal Foods Common Stock to be received by Company shareholders. Notwithstanding the difference in the form of the consideration, the Company's Board of Directors has determined that each Company shareholder will receive on the effective date of the Reorganization securities of approximately equivalent value.  See "The Reorganization - Reasons for the Reorganization and Recommendation of the Company's Board of Directors." Cash will be paid in lieu of issuing any fractional shares of Universal Foods Common Stock.

SCI 7907

SCI 7908

The Company expects that the transaction with Universal Foods will be treated as a tax-free reorganization for Federal income tax purposes so that the receipt of Universal Foods Common Stock by Company shareholders will not be taxed. However, cash received in lieu of a fractional share or as a result of the exercise of dissenters' rights will constitute taxable income.

Consummation of the Reorganization is subject to several conditions, including approval of the Reorganization by the holders of at least two-thirds (2/3) of the outstanding shares of Company common stock. In addition, the affirmative vote of the holders of a majority of the outstanding shares of Company preferred stock, voting as a class, is required in order to approve the Reorganization. Holders of 70.6% of the Company common stock have already agreed to vote in favor of the Reorganization. The trustee of the Company's pension trust, the holder of all the outstanding Company preferred stock, has also agreed to vote in favor of the Reorganization.

Your vote is important. A failure to vote will have the same effect as a vote against the Reorganization.

THE COMPANY'S BOARD OF DIRECTORS HAS UNANIMOUSLY APPROVED THE REORGANIZATION AND RECOMMENDS THAT COMPANY SHAREHOLDERS VOTE FOR APPROVAL OF THE REORGANIZATION.

To assist you in evaluating the proposed Reorganization, Universal Foods and the Company have prepared the accompanying Prospectus/Proxy Statement.

To assure your representation at the special meeting of Company shareholders, please complete, sign, date and return the enclosed proxy, whether or not you plan to personally attend. Should you desire to revoke your proxy, you may do so at any time before the proxy is voted.

Sincerely,

Paul L. Kohnstamm,
    Chairman of the Board

Frank J. Lichtenberger,
    President

SCI 7909

SCI 7910

H. KOHNSTAMM & CO., INC.
161 Avenue of the Americas
New York, New York  10013
(212) 620-4800

NOTICE OF SPECIAL MEETING OF SHAREHOLDERS

To be held September 7, 1988

A special meeting ("Special Meeting") of share-
holders of H. Kohnstamm & Co., Inc., a New York corporation
(the "Company"), will be held at The Williams Club, 24 East
39th Street, New York, New York  10016, on Wednesday,
September 7, 1988, at 10:30 A.M., local time, for the
following purposes:

(1)  To consider and act upon an Agreement
and Plan of Reorganization, dated as of December
11, 1987, as amended ("Agreement"), attached to
the Prospectus/Proxy Statement as Appendix A.
The Agreement provides for a reorganization
("Reorganization") pursuant to which the Company
will become a wholly-owned subsidiary of Universal
Foods Corporation.

(2)  To transact such other business as may
properly come before the Special Meeting.

The close of business on July 29, 1988 has been
fixed by the Board of Directors of the Company as the record
date for determining shareholders entitled to vote at the
Special Meeting.

The Special Meeting may be postponed or adjourned
from time to time without any notice other than by announce-
ment at the Special Meeting of any postponements or adjourn-
ments thereof, and any and all business for which notice is
hereby given may be transacted at any such postponed or
adjourned Special Meeting.

Company shareholders have the right to dissent from
the Reorganization and, if the Reorganization is consummated,
to receive payment in cash of the "fair value" of their Company
common stock and Company preferred stock upon compliance with
the provisions of Section 623 of the New York Busines Cor-
poration Law.  In order to perfect this right, a Company
shareholder must not vote in favor of the Reorganization and
must deliver a written objection to the Reorganization before
the vote on the Reorganization is taken.  A copy of Section

623 of the New York Business Corporation Law is attached as Appendix C to the Prospectus/Proxy Statement.

We hope that you will be able to attend the Special Meeting in person, but if you are unable to do so, you are urged to complete, date and sign the enclosed proxy, which is solicited by the Company's Board of Directors, and return it promptly in the enclosed return envelope, so that your shares may be voted in accordance with your wishes and in order that the presence of a quorum may be assured. The giving of such proxy does not affect your right to vote in person in the event you attend the Special Meeting.

By Order of the Board of Directors


Daniel Kaufman,
Secretary


August 9, 1988


WHETHER OR NOT YOU PLAN TO ATTEND THE SPECIAL MEETING IN PERSON PLEASE COMPLETE, DATE, SIGN AND PROMPTLY RETURN THE ENCLOSED PROXY.

SCI 7912

UNIVERSAL FOODS CORPORATION

Up to 400,000 Shares of Common Stock to be
Issued in connection with a Reorganization with

H. KOHNSTAMM & CO., INC.

_____

## INTRODUCTION

This Prospectus and Proxy Statement ("Prospectus/Proxy Statement") relates to shares of Common Stock, $.10 par value, of Universal Foods Corporation, a Wisconsin corporation ("Universal Foods"), to be issued pursuant to an Agreement and Plan of Reorganization, dated as of December 11, 1987, as amended (the "Agreement"), providing for a reorganization ("Reorganization") pursuant to which H. Kohnstamm & Co., Inc., a New York corporation (the "Company"), will become a wholly-owned subsidiary of Universal Foods. This Prospectus/Proxy Statement also serves as a proxy statement for the special meeting of Company shareholders to be held on September 7, 1988, and any adjournments thereof (the "Special Meeting"), relating thereto. A description of the proposed Reorganization is included herein and a copy of the Agreement is attached as Appendix A hereto.

Upon the effective date of the Reorganization, each outstanding share of Company common stock and each outstanding share of Company preferred stock will be exchanged for the number of shares of Universal Foods Common Stock as provided in the Agreement. Immediately prior to the consummation of the Reorganization, all of the capital stock of General Color Company, a wholly-owned subsidiary of the Company ("General Color"), will be transferred to certain Company shareholders, including Paul L. Kohnstamm, Richard L. Kohnstamm, Paul Kenneth Kohnstamm and Katherine Piven (directors, officers and substantial shareholders of the Company), their spouses, lineal descendants and/or trusts for the benefit of such persons (collectively, the "Kohnstamm Family Shareholders") in a separate tax-free reorganization. The Kohnstamm Family Shareholders will receive fewer shares of Universal Foods Common Stock than they would otherwise be entitled to because of the value of the General Color stock they are receiving. Notwithstanding the difference in the form of the consideration, the Company's Board of Directors has determined that each Company shareholder will receive on the effective date of the Reorganization securities of approximately equivalent value. See "The Reorganization - Reasons for the Reorganization and Recommendation of the Company's Board of Directors, Consideration to be Received by Selling Shareholders".

The Reorganization is subject to several conditions, including approval by the holders of at least two-thirds (2/3) of the outstanding shares of Company common stock and approval by the holders of a majority of the outstanding shares of Company preferred stock.

This Prospectus/Proxy Statement does not cover any resales of Universal Foods Common Stock received by Company shareholders upon consummation of the Reorganization, and no person is authorized to make any use of this Prospectus/Proxy Statement in connection with any such resale.

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS/PROXY STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

The date of this Prospectus/Proxy Statement is August 8, 1988.

_____

H. KOHNSTAMM & CO., INC.
161 Avenue of the Americas
New York, New York  10013
(212) 620-4800

PROXY STATEMENT

     This Prospectus/Proxy Statement is being furnished
to shareholders of H. Kohnstamm & Co., Inc. (the "Company")
in connection with the solicitation on behalf of the Board
of Directors of the Company of proxies to be used at the
special meeting of Company shareholders (the "Special Meeting")
to be held on September 7, 1988, at 10:30 A.M., local time,
at The Williams Club, 24 East 39th Street, New York, New
York, and at any postponement or adjournment thereof, for
the purposes set forth below.  The form of proxy to be used
in connection with the Special Meeting has been enclosed
with the copies of this Prospectus/Proxy Statement sent to
Company shareholders.

     The purpose of the Special Meeting is to consider
and act upon the Agreement and Plan of Reorganization, dated
as of December 11, 1987, as amended (the "Agreement"), which
provides for a reorganization (the "Reorganization") pursuant to
which the Company will become a wholly-owned subsidiary of
Universal Foods Corporation, a Wisconsin corporation ("Universal
Foods").  The Agreement provides that each outstanding share
of Company common stock and each outstanding share of Company
preferred stock (except shares as to which shareholders
properly exercise dissenters' rights and except as described
below) will be converted into the number of shares of Universal
Foods Common Stock as determined under the Agreement.

     Immediately prior to the consummation of the Reor-
ganization, all of the capital stock of General Color Company,
a wholly-owned subsidiary of the Company ("General Color"),
will be transferred to certain Company shareholders, including
Paul L. Kohnstamm, Richard L. Kohnstamm, Paul Kenneth Kohn-
stamm and Katherine Piven (directors, officers and substantial
shareholders of the Company), their spouses, lineal descen-
dants and/or trusts for the benefit of such persons (collec-
tively, the "Kohnstamm Family Shareholders") in a separate
tax-free reorganization (the "Split-Up").  A list of the
Kohnstamm Family Shareholders and number of shares of Company
common stock held by each is attached hereto as Appendix E.
The Kohnstamm Family Shareholders will receive fewer shares
of Universal Foods Common Stock than they would otherwise be
entitled to because of the value of the General Color stock
they are receiving.  Prior to the Split-Up, certain assets

-7-

SCI 7921

of the Company, including its Camden, New Jersey real property, machinery and equipment, its Millville, New Jersey property and the assets comprising its fragrance operations will be transferred to General Color pursuant to the Agreement. Notwithstanding the difference in the form of the consideration, the Company's Board of Directors has determined that each Company shareholder will receive on the effective date of the Reorganization securities of approximately equivalent value. See "The Reorganization – Reasons for the Reorganization and Recommendation of the Company's Board of Directors". Cash will be paid in lieu of issuing any fractional shares of Universal Foods Common Stock. The Agreement is described in this Prospectus/Proxy Statement and a copy of the Agreement is attached hereto as Appendix A. As more fully described in the Prospectus/Proxy Statement, it is anticipated that the Reorganization will be a tax-free transaction for Federal income tax purposes. See "The Reorganization - Certain Federal Income Tax Consequences."

Each Company shareholder of record at the close of business on July 29, 1988 will be entitled to one vote for each share then registered in such shareholder's name. As of that date, there were outstanding and entitled to vote 1,012,292 shares of Company common stock and 2,000 shares of Company preferred stock. A majority of the outstanding Company common stock and a majority of the outstanding Company preferred stock will constitute a quorum for the transaction of business at the Special Meeting.

Approval of the Agreement requires the affirmative vote of holders of at least two-thirds (2/3) of the outstanding shares of Company common stock entitled to vote at the Special Meeting and the affirmative vote of holders of a majority of the outstanding shares of Company preferred stock. Holders of 70.6% of the Company common stock, consisting of directors, executive officers and substantial shareholders of the Company and their affiliates, have already agreed to vote in favor of the Agreement. The trustee of the Company's pension trust, the holder of all the outstanding Company preferred stock, has also agreed to vote in favor of the Agreement. Thus, approval of the Agreement by the Company's shareholders is assured.

Universal Foods will bear the costs of soliciting the proxies from the Company's shareholders. The Company expects to solict proxies primarily by mail. Proxies may also be solicited by the Company's directors, officers and employees by personal interview, telephone or telegram. Such directors, officers and employees will not receive

-8-

SCI 7922

special compensation for such solicitation but may be reimbursed for out-of-pocket expenses incurred in connection therewith. It is not anticipated that anyone will be specially engaged to solicit proxies.

A Company shareholder giving a proxy may revoke the proxy at any time prior to the exercise thereof by executing and returning a proxy bearing a later date or by filing written notice of such revocation with the Secretary of the Company prior to the voting of such proxy. All properly executed proxies that are not revoked will be voted at the Special Meeting in accordance with the instructions contained therein. Proxies containing no instructions regarding the Agreement will be voted FOR approval of the Agreement in accordance with the recommendation of the Company's Board of Directors. The presence at the Special Meeting of any Company shareholder who has given a proxy shall not revoke such proxy unless the Company shareholder files written notice of such revocation prior to the voting thereof.

The Board of Directors knows of no other matter that will come before the Special Meeting. However, if any other matter is properly brought before the Special Meeting, all proxies will be voted in accordance with the judgment of the persons authorized to vote the proxies.

Copies of this Prospectus/Proxy Statement and the accompanying form of proxy and Notice of Special Meeting of Shareholders will first be mailed on or about August 9, 1988.

SCI 7923

## SUMMARY

The following is a summary of certain information contained elsewhere or incorporated by reference in this Prospectus/Proxy Statement. This summary is not intended to be complete and is qualified in all respects by reference to the detailed information appearing elsewhere in this Prospectus/Proxy Statement, including the documents incorporated by reference. Certain capitalized terms used in this summary are defined elsewhere in this Prospectus/Proxy Statement.

Universal Foods:   Universal Foods, a Wisconsin corporation whose Common Stock is traded on the New York Stock Exchange and the Pacific Stock Exchange, is engaged (with its subsidiaries) in the manufacture and distribution of specialized food ingredients to food processors, food service providers and consumers. Principal products of Universal Foods include specialty cheeses, fermentation products, dehydrated vegetables, frozen potato products and colors and flavors. Universal Foods' principal executive offices are located at 433 East Michigan Street, Milwaukee, Wisconsin 53202 (telephone: (414) 271-6755).

Company:   H. Kohnstamm & Co., Inc., a New York corporation, is principally engaged (with its subsidiaries) in the manufacture and distribution of colors and pigments for use in the food, drug, cosmetic and plastics industries, inorganic and organic colors for use in inks, paints and other products, and flavors and fragrances for use in the food, beverage and cosmetics industries. The Company's principal executive offices are located at 161 Avenue of the Americas, New York, New York 10013 (telephone: (212) 620-4800).

Reorganization:   Universal Foods, the Company, General Color (a wholly-owned subsidiary of the Company) and certain Company shareholders have entered into an Agreement and Plan of Reorganization, dated as of December 11, 1987, as amended (the

-10-

SCI 7924

"Agreement"), providing for a reorgani-
zation ("Reorganization") pursuant to
which the Company is proposed to become
a wholly-owned subsidiary of Universal
Foods.  Under the Agreement each out-
standing share of Company common stock
and each outstanding share of Company
preferred stock (except shares as to
which shareholders properly exercise
dissenters' rights and except as described
below) will be exchanged for a fraction
of a share of Universal Foods Common
Stock as determined in accordance with
the Agreement, based upon the adjusted
net worth of the Company on the Closing
Date.  Cash will be paid in lieu of issuing
fractional shares.  The Reorganization
is conditioned upon, among other things,
approval by the holders of at least two-
thirds (2/3) of the outstanding shares
of Company common stock and by the holders
of a majority of the outstanding shares
of Company preferred stock.  The Reorganiza-
tion is also subject to other conditions.
See "The Reorganization - Terms of the
Agreement."

A portion of the Universal Foods Common
Stock to be received in the Reorganization
will be held in escrow for a period of
time.  See "The Reorganization - Escrow
Agreement."

Exchange Ratio:    The exchange ratio of shares of Company
common stock for shares of Universal
Foods Common Stock is based on a number
of factors, including the consolidated
book value of the Company, the average
of the daily closing prices of Universal
Foods Common Stock as reported on the
Composite Transactions Tape of the New
York Stock Exchange for the five trading
days immediately preceding the fifth
trading day preceding the Closing Date
(the "Base Period Price") (but not less
than $26 per share nor more than $32 per
share) and the number of outstanding
shares of Company common stock.  The

-11-

SCI 7925

book value of the Company will be cal-
culated by taking the sum of $9,500,000
less $200,000 (the par value of the out-
standing Company preferred stock), plus
or minus a dollar amount based upon the
adjusted book value of the Company on
the Closing Date.  Also, the book value
of the Company will be decreased by an
amount based upon certain severance obli-
gations of the Company and certain other
expenses incurred by the Company in con-
nection with the negotiation, execution
and performance of the Agreement.  As a
result of the Company's operating losses
during its last fiscal year and the
expenses being borne by the Company's
shareholders (as discussed above), it is
anticipated that the aggregate purchase
price will be less than $9,500,000.  The
Kohnstamm Family Shareholders will receive
fewer shares of Universal Foods Common
Stock than they would otherwise be entitled
to because all of the capital stock of
General Color will be transferred to
them prior to the consummation of the
Reorganization.

The exchange ratio of shares of Company
preferred stock for shares of Universal
Foods Common Stock will be calculated by
dividing $100 (the par value of Company
preferred stock) by the Base Period Price.

Purpose of the          As a result of the Reorganization, the
Reorganization:         Company will become a wholly-owned sub-
                        sidiary of Universal Foods.  The Reorgani-
                        zation will strengthen and enhance
                        Universal Foods' competitive position in
                        the colors and flavors business.  The
                        Reorganization will provide Company share-
                        holders with an opportunity to obtain a
                        financial interest in Universal Foods
                        through an exchange of stock, and to
                        participate in the potential growth of
                        Universal Foods, and of the Company as
                        part of Universal Foods.  In addition,
                        Company shareholders who desire liquidity
                        should be able to dispose of their shares
                        of Universal Foods Common Stock acquired
                        in the Reorganization far more readily

-12-

SCI 7926

than they would have been able to dispose of Company shares.

**Related Party Transactions:**

Prior to the Reorganization, certain assets of the Company will be transferred to General Color, and then all of the issued and outstanding shares of General Color will be distributed by the Company pro rata to the Kohnstamm Family Shareholders ("Split-Up"). As a result of the Split-Up, the exchange ratio of shares of Company common stock for shares of Universal Foods Common Stock will be fixed separately for Kohnstamm Family Shareholders and other Company shareholders to take into account the value of General Color being distributed to the Kohnstamm Family Shareholders.

Messrs. Malik, Ettinger, Shevis and Lichtenberger (present or retired directors and/or officers of the Company) have written agreements with the Company which provide for payments and other benefits upon termination of employment. Universal Foods will not assume these agreements as part of the Reorganization. The Company will arrange a lump sum payment to such individuals in exchange for which they each will release the Company from these agreements.

As part of the Reorganization, Universal Foods will continue the employment agreements between the Company and Messrs. Kaufman and Broderick, respectively, and the supplemental pension agreement between the Company and Dr. Zuckerman.

Pursuant to the Agreement, the Company will grant to Paul L. Kohnstamm and General Color an exclusive license to use certain trademarks of the Company (including "Atlas," " H. Kohnstamm & Co., Inc. & Design," "Kohnstamm" and "Hercules") in the United States for industrial pigments and food colors for use in the plastics industry and fragrance products.

-13-

SCI 7927

At the Closing, Universal Foods and General Color will enter into a supply contract pursuant to which General Color will supply Universal Foods with certain colors for use in the food, drug and cosmetic industries.

It is presently intended that Paul L. Kohnstamm will be nominated to the Board of Directors of Universal Foods.

**Operation of Company after Reorganization:**

Following the Reorganization, Universal Foods intends to conduct the business of the Company as a separate subsidiary of Universal Foods, with its principal office located at 2526 Baldwin Street, St. Louis, Missouri.

**Approval of Board of Directors:**

The Board of Directors of Universal Foods unanimously approved the Agreement and the Reorganization.

The Board of Directors of the Company unanimously approved the Agreement and the Reorganization. In deciding to approve the Reorganization, the Board of Directors of the Company considered conflicts inherent in the Reorganization, such as the Split-Up of General Color, the License Agreement between the Company and General Color and Paul L. Kohnstamm and certain employment agreements which will be assumed by Universal Foods as part of the Reorganization. See "The Reorganization – Reasons for the Reorganization and Recommendation of the Company's Board of Directors", "The Reorganization – Interests of Management in the Reorganization" and "Certain Related Party Transactions".

**Conditions to the Reorganization:**

In addition to the requisite approval by Company shareholders, there are other conditions to the obligations of the parties to consummate the Reorganization. These conditions may be waived or modified, or the Agreement may be terminated, whether before or after the Agreement is approved by Company shareholders. See

-14-

SCI 7928

including filing a written objection to
the Reorganization with the Company at
or prior to the Special Meeting.  If
holders of more than 0.25% of the shares
of Company common stock exercise their
rights to dissent, the Reorganization
may be abandoned in favor of a direct
exchange of stock by Universal Foods to
Company shareholders (unless such condition
is waived by the Company).  No right to
dissent will exist in the event of such
exchange offer and any Company shareholder
not desiring to exchange his shares will
remain as a holder of Company securities.
See "The Reorganization - Rights of
Dissenting Shareholders."

| | |
|---|---|
| Accounting Treatment: | Universal Foods intends to treat the Reorganization as a purchase for accounting purposes.  See "The Reorganization - Accounting Treatment." |
| New York Stock Exchange and Pacific Stock Exchange Listing: | Universal Foods Common Stock is traded on the New York Stock Exchange and the Pacific Stock Exchange.  Universal Foods has agreed to use diligent efforts to cause the Universal Foods Common Stock to be issued in connection with the Reorganization to be approved for listing on the New York Stock Exchange and the Pacific Stock Exchange, subject to official notice of issuance and the effectiveness of this Registration Statement, on or prior to the closing of the transactions contemplated by the Agreement. |
| The Special Meeting: | The Special Meeting will be held at The Williams Club, 24 East 39th Street, New York, New York at 10:30 A.M., local time, on September 7, 1988.  The close of business on July 29, 1988 is the record date for determining the holders of record of Company stock entitled to notice of and to vote at the Special Meeting and any postponement or adjournments thereof.  The purpose of the Special Meeting is to consider and act upon the Agreement and the transactions contemplated thereby. |

-16-

SCI 7930

Vote Required:

Section 913 of the New York Business Corporation Law requires that the Agreement be approved by the holders of two-thirds (2/3) of the outstanding shares of Company common stock. In addition, Section 913 requires that the Agreement be approved by a majority of the outstanding shares of Company preferred stock. Holders of 70.6% of the Company common stock, consisting of directors, executive officers and substantial shareholders and their affiliates, have already agreed to vote in favor of the Agreement. The trustee of the Company's pension trust, the holder of all the outstanding Company preferred stock, has also agreed to vote in favor of the Agreement. Thus, the Company is assured of a sufficient number of votes to approve the Agreement.

Effective Date of the Reorganization:

It is contemplated that the Reorganization will be consummated as soon as practicable after the approval of the Agreement by the Company shareholders and the satisfaction or waiver of various conditions. The Reorganization will be consummated by the filing of a Certificate of Exchange with the New York Department of State. It is presently contemplated that the effective date of the Reorganization will be on or about September 9, 1988.

Recommendation:

The Board of Directors of the Company has unanimously approved the Agreement and recommends that Company shareholders vote FOR the Agreement.

Market Prices:

Universal Foods Common Stock is listed on the New York Stock Exchange and the Pacific Stock Exchange.

The table below shows the high and low sales prices for Universal Foods Common Stock on the New York Stock Exchange Composite Tape.

If the Reorganization had been consummated on July 22, 1988, each share of Company common stock would have been converted into .19 shares of Universal Foods Common

-17-

SCI 7931

Stock based on the assumption that there is no Split-Up and all Company share-holders receive only shares of Universal Foods Common Stock. The table also shows the high and low values of .19 shares of Universal Foods Common Stock during the periods indicated, determined by multiply-ing .19 by the reported high and low sales prices of Universal Foods Common Stock during such periods. The Pro Forma Condensed Consolidated Financial State-ments included herein were prepared assuming each share of Company common stock will be converted into .19 shares of Universal Foods Common Stock. This conversion ratio will not necessarily apply on the Closing Date. See "The Reorganization — Consideration to be Received by Selling Shareholders".

All prices of Universal Foods Common Stock have been adjusted for a three-for-two stock split effected in the form of a stock distribution by the issuance of three shares of Common Stock for every two shares outstanding on July 18, 1986.

| Fiscal Years Ending September 30 | Universal Foods | | | |
| | 1 Share | | .19 of a Share | |
| | High | Low | High | Low |
| 1986 .......................... | $27\frac{1}{4} | $16\frac{7}{8} | $5\frac{1}{8} | $3\frac{1}{4} |
| 1987 .......................... | 31 | 22\frac{1}{4} | 5\frac{7}{8} | 4\frac{1}{8} |
| 1988 (through June 30, 1988) ................. | 34\frac{5}{8} | 21 | 6\frac{5}{8} | 4 |

On December 11, 1987, the last full trading day immediately prior to the public announcement of the Agreement, the closing price of Universal Foods Common Stock on the New York Stock Exchange Composite Tape was $23.

While there are limited or sporadic quo-tations of Company common stock in the over-the-counter-market, there is no established public trading market for Company common stock. From time to time the Company's Secretary has facilitated transactions in Company common stock by

-18-

SCI 7932

referring interested buyers and sellers
to each other.  While the Company's
Secretary has not always been aware of
the prices agreed upon, transactions in
Company common stock have been reported
to the Secretary at prices of approxi-
mately $3.00 to $4.50 during fiscal 1986
and $3.00 to $4.50 during fiscal 1987.
The Company's Secretary is not aware of
the sales prices in any transactions in
Company common stock immediately prior
to the date of this Prospectus/Proxy
Statement.  See "Certain Information
About Universal Foods and the Company -
Comparative Market Prices."

SCI 7933

## THE REORGANIZATION

Universal Foods, the Company, General Color and certain Company shareholders (the "Selling Shareholders") executed the Agreement on December 11, 1987. A copy of the Agreement is attached as Appendix A to this Prospectus/Proxy Statement. See "The Reorganization - Terms of the Agreement" for a description of certain provisions of the Agreement.

### Background of Transaction.

During the past several years it has become evident to the Company's Board of Directors that the Company has been experiencing serious difficulties in its largest division, the food color division, as a result of increased foreign competition and increased competition with larger American companies that are able to produce competitive products at lower costs. As a result of these operating difficulties, the Company has been forced to utilize earnings from its other divisions and other capital resources to cover losses in the food color division. In addition, the Company's lending banks have forced the Company to restructure its debt from term loans to demand loans and have requested pay- ment of the outstanding balances. The Board of Directors believes that the future growth of the Company's color and flavor operations will require significant capital investment and major additional personnel changes in the near future. The Company's Board of Directors also believes that it is in the best interests of shareholders if their investment in the Company is made more liquid by the exchange of their shares for either cash or publicly-traded securities. For these reasons, the Board of Directors has concluded that it would be in the best interests of shareholders to sell the Company, and during the past year management has explored a number of possible transactions for the purchase of all or a portion of the Company's assets or stock.

During the Fall of 1985, the Company explored the possibility of entering into a transaction for the sale of substantially all of its assets to Universal Foods. Nego- tiations at that time were terminated because the parties were unable to agree on certain key aspects of the transaction.

In April 1987, the Company sold all of the assets comprising its industrial and institutional division, which manufactured and distributed commercial laundry products, to Ecolab Inc. The proceeds of the sale were used to reduce bank debt and to provide working capital. After the sale of these assets, the Company continued to seek a purchaser of all or a portion of the Company's remaining assets.

-25-

SCI 7939

should be sold, the Board of Directors adopted the Agreement, subject to the requisite vote of Company shareholders.

The transaction with Universal Foods is being structured as a tax-free reorganization, which will allow Company shareholders to retain their investment without immediate tax consequences (see "The Reorganization — Certain Federal Income Tax Consequences"). Shareholders of the Company (other than Kohnstamm Family Shareholders) who desire liquidity should be able to dispose of the shares of Universal Foods Common Stock acquired in the Reorganization far more readily than they would have been able to dispose of Company shares in the limited trading market that now exists for shares of Company common stock.

Treatment of General Color. Prior to the consummation of the Reorganization, all of the issued and outstanding shares of General Color will be distributed by the Company pro rata to the Kohnstamm Family Shareholders. The Board of Directors considered structuring the transaction so that there could be a "spin-off" of General Color pro rata to all holders of Company common stock. If the transaction had been so structured, each holder of Company common stock would have received a pro rata portion of the Universal Foods Common Stock and a pro rata portion of the General Color stock. However, the Board of Directors ultimately determined that it is in the best interests of Company shareholders to "split-up" General Color so that its shares of common stock are distributed solely to Kohnstamm Family Shareholders. The reasons for the decision to structure the distribution of General Color as a split-up to the Kohnstamm Family Shareholders included: a spin-off of General Color shares to all shareholders would have required an effective registration statement with the Securities and Exchange Commission covering shares of General Color, an expensive and time-consuming process which is avoided by distributing the General Color shares only to the Kohnstamm Family Shareholders; it may be necessary for principal shareholders of General Color to guarantee bank loans required by General Color, and management believes it more appropriate if General Color is owned entirely by the principal shareholders of the Company and their families because of this financial exposure; in general, a company the size of General Color should not be required to bear the expenses required of maintaining approximately 275 shareholders and the expenses that will be saved by reducing the number of shareholders to approximately 20 will be substantial.

An independent committee (the "Independent Committee") of the Company's Board of Directors, consisting of Daniel Kaufman, Frank J. Lichtenberger and William Shevis, Vice President of the Company, acting ex officio, was appointed

-27-

to recommend to the entire Board of Directors the fair value of General Color in order to determine the number of additional shares of Universal Foods Common Stock that should be distributed to the holders of Company common stock who will not be receiving General Color common stock.  In determining the fair value of General Color, the Independent Committee considered the following factors, among others: the earnings history and future prospects of the industrial pigment operations conducted by General Color; the earnings history and future prospects of the color operations conducted by the Company at its Camden, New Jersey facility, with due consideration given to the Supply Contract (see "The Reorganization – Supply Contract"), the covenant not to compete of the selling shareholders who will control General Color (see "Terms of the Agreement – Noncompetition Agreements") and the uses of the facility when the Supply Contract terminates; the book value and insurance appraisal value of the assets to be transferred to General Color pursuant to the Agreement; and the possible impact of the New Jersey Environmental Clean-up Responsibility Act ("ECRA") which requires the clean-up of chemical facilities before they may be transferred or closed.

In considering the Supply Contract, and its impact on the fair value of the Camden property, plant and equipment, the Independent Committee considered the following factors: the increases in production required to obtain the maximum revenues available under the Supply Contract; the substantial change in the mix of products required under the Supply Contract as compared to historical production; the possible adverse effects of changes in raw material and other costs; the possible uses for the color manufacturing equipment in light of General Color's principal shareholders' covenant not to compete in the color business with Universal Foods; the possible products that could be produced at the Camden facility which would not violate the covenant not to compete; and the possible revenues and income (loss) which would be earned at the Camden facility.  It is possible that General Color will realize income under the Supply Contract if production schedules are met and raw materials and manufacturing costs do not increase materially.  However, there can be no assurance that any such income will be earned or that the Camden facility will not operate at a loss.

In considering the impact of ECRA, the Independent Committee noted that the Camden facility would be subject to the required clean-up if it ceased to operate as a manufacturing facility or it was transferred or sold.  The Independent Committee considered other possible uses of the property in light of its industrial location in Camden and the nature of its surrounding environment.

-28-

SCI 7942

The Independent Committee noted that under the
Agreement, Universal Foods had agreed to purchase all of the
Company, other than General Color, for $9,500,000, subject
to certain adjustments.  This price was based on the assumption
that the book value of the Company, other than General Color,
was $8,300,000 and that its fair value was $1,200,000 above
its book value, or $9,500,000.  The Independent Committee,
accordingly, was of the opinion that General Color should
be valued at its book value plus a premium above such book
value.

Based on its evaluation of the foregoing factors,
the Independent Committee recommended to the Board that the
fair value of General Color be deemed to be (i) its book
value at the Closing, including the book value of all of the
assets transferred to General Color pursuant to the Agreement,
but excluding the book value of the Camden property, plant
and equipment, plus (ii) a premium of $300,000.

The recommendation not to include any value for
the Camden property, plant and equipment was based on a number
of factors.  The Independent Committee noted the fact that
Universal Foods refused to acquire these assets even though
the book value of these assets was included in determining
the consideration paid by Universal Foods to all of the
Company's selling shareholders.  The Company would have trans-
ferred the Camden facility to Universal Foods pursuant to
the Reorganization if Universal Foods had desired to acquire
it without any changes in the purchase price or other terms
of the Reorganization Agreement.  Universal Foods decided
not to acquire these assets because of its concern over contin-
gent liabilities that might be asserted against the owner of
the Camden facility, including environmental claims that
might arise under ECRA.  The Independent Committee noted the
uncertainty of General Color realizing any income during the
term of the Supply Contract and that after the expiration of
the Supply Contract, the Camden facility will be subject to
a covenant not to compete which will prohibit it from being
used for the manufacture of regulated colors for use in the
food, drug and cosmetic industries, which is its primary use
at this time.  The Independent Committee also noted the
uncertainty involved in using the Camden facility to manufac-
ture other products.  Based upon all of the foregoing factors,
the Independent Committee recommended not to include any
value for the Camden property, plant and equipment in the
fair value of General Color for purposes of the Agreement.
The book value of the Camden property, plant and equipment
on April 30, 1988 was approximately $2,700,000, which

SCI 7943

represented approximately 18% of the Company's total assets
and approximately 28% of the Company's shareholders' equity
as of that date.

       The Board of Directors unanimously agreed with
the recommendation of the Independent Committee for the
value of General Color.

       NO ASSURANCES CAN BE GIVEN AS TO THE VALUE OF
GENERAL COLOR OR THE GENERAL COLOR STOCK TO BE ISSUED IN THE
SPLIT-UP, AND IT IS POSSIBLE THAT THE FUTURE VALUE OF GENERAL
COLOR MAY BE MORE OR LESS THAN THE VALUE PLACED ON IT BY THE
INDEPENDENT COMMITTEE.  WITHOUT LIMITING THE GENERALITY OF
THE FOREGOING, EACH COMPANY SHAREHOLDER SHOULD CONSIDER
WHETHER AND TO WHAT EXTENT THE VALUE OF GENERAL COLOR MAY BE
IMPACTED BY THE FOLLOWING FACTORS, AMONG OTHERS:  (1) THE
INDEPENDENT COMMITTEE'S CONCLUSION THAT THE CAMDEN PLANT AND
RELATED ASSETS SHOULD NOT BE INCLUDED IN THE BOOK VALUE OF
GENERAL COLOR FOR THE PURPOSE OF DETERMINING ITS FAIR VALUE
NOTWITHSTANDING THE FACT THAT SUCH PLANT AND ASSETS HAD A
SUBSTANTIAL BOOK VALUE ON THE COMPANY'S BOOKS, (2) THE
EXISTENCE AND TERMS OF THE SUPPLY CONTRACT (WHICH SHOULD
PRODUCE REVENUES FOR GENERAL COLOR FOR AT LEAST 18 MONTHS
AND WHICH MIGHT GENERATE NET INCOME FOR GENERAL COLOR), (3)
ALTERNATIVE USES FOR THE CAMDEN PLANT AT SUCH TIME, IF EVER,
THAT GENERAL COLOR CEASES MANUFACTURING OPERATIONS AT THIS
FACILITY AND (4) THE POSSIBILITY THAT ANY POTENTIAL ECRA
LIABILITY CAN BE POSTPONED TO A DATE RELATIVELY FAR IN THE
FUTURE OR INDEFINITELY.

Reasons for the Reorganization:  Universal Foods Board of
Directors

       In reaching its decision to approve the Agreement,
the Universal Foods Board of Directors received presenta-
tions from, and reviewed the terms and conditions of the
transactions contemplated by the Agreement with, Universal
Foods' management and counsel.

       The Universal Foods Board of Directors considered,
among other factors deemed relevant by them, the financial
condition, assets, liabilities, businesses and operations of
Universal Foods and the Company on both a historical and a
prospective basis, including certain information reflecting
the two companies on a pro forma combined basis; their recent
trends and prospects; and the historical value of Universal
Foods Common Stock and Company common stock.

       The Universal Foods Board of Directors believes
that the Reorganization furthers Universal Foods' commitment
to continued expansion and diversification through internal

-30-

SCI 7944

Total Amount to be Distributed to Shareholders
Exchanging Common Stock of the Company

| | | |
|---|---|---|
| Contract Purchase Price | | $9,500,000 |
| Less: | | |
| Adjustment for Book Value of Less than $8,000,000 ($8,000,000-$6,138,000) | $ 1,862,000 | |
| Selling and Severance Expenses | 1,181,000 | |
| | | (3,043,000) |
| | | 6,457,000 |
| Preferred Stock | | ( 200,000) |
| TOTAL | | $6,257,000 |

Fair Value of General Color

| | |
|---|---|
| Book Value | $3,659,000 |
| Premium | 300,000 |
| | $3,959,000 |

Consideration Received by Selling Shareholders

| | Kohnstamm Family Shareholders as a Group | Minority Share-holders as a Group | Total |
|---|---|---|---|
| Number of shares of Company common stock held | 809,221 | 203,071 | 1,012,292 |
| Percentage Ownership | 79.9% | 20.1% | 100% |

Value Received

| | | | |
|---|---|---|---|
| Value of Universal Foods Shares of Common Stock | $4,207,618 | $2,049,382 | $ 6,257,000 |

-33-

SCI 7947

| | | |
|---|---|---|
| Fair Value of General Color Shares of Common Stock* | 3,959,000 | -0- | 3,959,000 |
| Total of Value Received | $8,166,618 | $2,049,382 | $10,216,000 |
| Percentage of Value Received | 79.9% | 20.1% | 100% |
| Per Share | $5.20 in Universal Foods Common Stock | $10.09 in Universal Foods Common Stock | |
| | $4.89 in General Color Common Stock* | | |

---

\* The value of General Color is as determined by the Independent Com-
mittee and approved by the Company's Board of Directors.  See "The
Reorganization - Reasons for the Reorganization and Recommendation
of the Company's Board of Directors" for a more complete discussion
of the methodology used and the factors considered by the Independent
Committee in making this determination.

Assuming that the Base Period Price for Universal
Foods Common Stock is $32 per share, each Kohnstamm Family
Shareholder will receive .162 shares of Universal Foods Common
Stock for each share of Company common stock owned prior to
the Split-Up; and each Minority Shareholder will receive .315
shares of Universal Foods Common Stock for each share of
Company common stock owned at the Closing.  Twenty-five per-
cent of the Universal Foods Common Stock received by each
selling shareholder is subject to the Escrow Agreement.  See
"The Reorganization - Escrow Agreement."

Each Kohnstamm Family Shareholder will receive
one-tenth of one share of General Color stock for each share
of Company common stock held at the time of the Split-Up.

Terms of the Agreement

The following description of the Agreement is only
a summary and does not purport to be complete, and is quali-
fied in its entirety by reference to the Agreement, a copy

-34-

The obligations of the Company and the Selling Shareholders to effect the Reorganization are subject to various additional conditions, including: (1) the accuracy of the representations and warranties of Universal Foods made in the Agreement and the performance of the covenants of Universal Foods contained in the Agreement; and (2) the receipt of a satisfactory legal opinion and certificates of officers of Universal Foods.

Each of these conditions may be waived by the party or parties for whose benefit the condition has been included in the Agreement.

Covenants.  In the Agreement Universal Foods, on the one hand, and the Company and the Selling Shareholders, on the other hand, made various covenants and agreements concerning the transaction, including the following: (1) to keep confidential information received in connection with the transactions contemplated by the Agreement; (2) to provide all necessary information to the other parties in order to comply with applicable antitrust laws; (3) to enter into a licensing agreement with respect to certain Company trademarks, including the "Kohnstamm" trademark; and (4) to execute a supply contract (the "Supply Contract") relating to colors for use in foods, drugs and cosmetics.

Universal Foods made various additional covenants and agreements, including: (1) a commitment to honor the employment agreements with Messrs. Kaufman and Broderick and the supplemental pension agreement with Dr. Zuckerman (present and retired officers and/or directors of the Company); (2) after the Closing, to make limited severance payments to certain employees of the Company, including employees whose employment is terminated within twenty-five (25) months after the Closing (thirteen (13) months after the Closing for employees at the Company's Kearny, New Jersey plant); and (3) to cause Universal Foods Common Stock issuable pursuant to the Reorganization to be authorized for listing on the New York Stock Exchange and the Pacific Stock Exchange, subject to official notice of issuance.

The Company and the Selling Shareholders made various additional covenants and agreements, including, (1) in general, to operate the Company's business, pending Closing, in the ordinary course; (2) to provide Universal Foods full access to the books, records, contracts and other documents of the Company; (3) not to make any changes in the outstanding capital stock of the Company, except as contemplated

-40-

SCI 7954

by the Agreement; (4) not to make material capital expendi-
tures; (5) to obtain clearance for the transactions contem-
plated by the Agreement from the New Jersey Department of
Environmental Protection under ECRA; (6) to provide Universal
Foods with appropriate releases in connection with employment
agreements not assumed by Universal Foods and to indemnify
Universal Foods against loss, damage or expense with respect
to any such agreement; and (7) to furnish to Universal
Foods an opinion of legal counsel as to the identity of those
persons deemed to be affiliates of the Company.

     Termination of the Agreement.  The Agreement may
be terminated and abandoned on or prior to the Closing (i)
by mutual consent of all parties thereto; (ii) by Universal
Foods if the conditions to its obligations have not been
satisfied or waived; (iii) by the Company or the Selling
Shareholders if the conditions to their obligations have not
been satisfied or waived; or (iv) by Universal Foods, on the
one hand, or the Company or the Selling Shareholders, on the
other hand, if the Closing has not occurred by September 15,
1988.

     In addition, Universal Foods and the Company and
the Selling Shareholders each have the right to cancel the
Agreement upon written notice to the other in the event the
average closing price for Universal Foods Common Stock as
reported on the Composite Transactions Tape of the NYSE for
any successive ten (10) trading days prior to the Closing
Date is less than $22 per share.  As of the date of this
Prospectus/Proxy Statement, the market price for Universal
Foods Common Stock has been in excess of $22 per share and,
therefore, no party has a right presently to terminate the
Agreement on this basis.

     No Negotiations.  In the Agreement the Company and
the Selling Shareholders agreed that they would not, directly
or indirectly, solicit, initiate or encourage the submission
of any proposal or offer from any person or entity relating
to any liquidation, dissolution or recapitalization of,
merger or consolidation with or into, or acquisition or
purchase of assets of or of any equity interest in (except
as permitted under the Agreement), the Company or any of its
subsidiaries, or participate in any discussions or negotia-
tions regarding the foregoing.

     Noncompetition Agreements.  In the Agreement certain
of the Selling Shareholders (Paul L. Kohnstamm, Richard Kohn-
stamm, Paul Kenneth Kohnstamm and Katherine Piven) each agreed
that for a period of five (5) years from the Closing, neither
such shareholder, nor any of such shareholder's affiliates
would (i) directly or indirectly engage in, continue in or

SCI 7955

Company common stock surrendered, provided the
Company common stock is held as a capital asset.

(d)  Upon payment of cash to a Company share-
holder in lieu of a fractional share of Universal
Foods Common Stock, gain or loss will be recognized
by such shareholder measured by the difference
between the amount of cash received and the allo-
cated basis of the fractional share.

The foregoing is only a general description of
certain Federal income tax consequences of the Reorganization
and Split-Up without consideration of the facts and circum-
stances of each shareholder's particular situation.  Each
shareholder is urged to consult with his tax and financial
advisors as to the tax consequences to him of the Reorgani-
zation and Split-Up, including any state or local tax con-
sequences.

Holding Period for Certain Shareholders; Appointment of
Attorneys-in-Fact

In order to preserve the tax-free nature of the
exchange of shares contemplated by the Agreement and the
tax-free nature of the distribution of General Color shares
to Kohnstamm Family Shareholders, Kohnstamm Family Shareholders
will agree not to sell their shares of Universal Foods Common
Stock or General Color common stock for a period of at least
one (1) year from the Closing Date.  Certain Kohnstamm Family
Shareholders have executed the Shareholders Agreement annexed
hereto as Appendix B.  All other Kohnstamm Family Shareholders
who approve the Agreement will irrevocably appoint Paul L.
Kohnstamm, Paul Kenneth Kohnstamm and Robert L. Davidson
(the "Attorneys-in-Fact") as attorneys-in-fact with full
power of substitution to execute on behalf of each Kohnstamm
Family Shareholder the Shareholders Agreement and any other
documents or certificates required pursuant to the Shareholders
Agreement.  The appointment of the Attorneys-in-Fact will
not be revocable by any Kohnstamm Family Shareholder in any
manner for any reason.  The power of attorney is a durable
power of attorney and will continue in full force and effect
notwithstanding the death, disability or incapacity of a
Kohnstamm Family Shareholder after such person has approved
the Agreement.

-52-

SCI 7966

H. KOHNSTAMM & CO., INC.

NEW YORK

DATE September 29, 1988    STENOG. AR

MEMO TO:       JAMES J. BRODERICK
               THOMAS C. DABOVICH
               ROBERT L. DAVIDSON
               DANIEL KAUFMAN
               PAUL KENNETH KOHNSTAMM
               PAUL L. KOHNSTAMM
               RICHARD L. KOHNSTAMM
               FRANK J. LICHTENBERGER
               WARREN C. MALIK
               KATHERINE K. PIVEN

FROM:          DANIEL KAUFMAN

SUBJECT:       MINUTES OF THE BOARD OF DIRECTORS MEETING
               HELD ON MAY 5, 1988.


Enclosed you will find the minutes of the Board of Directors Meeting held
last May 5, 1988.

You should recall that Bob Davidson held up distribution of these minutes
pending the actual closing with Universal Foods so that certain open
items could be addressed, particularly as set forth in Attachments
#2 and #3.

Please dispose of any copies you may have of the General Color Evaluation
Report other than the copy annexed to these minutes. There are several
early drafts that are slightly inconsistent with the final product.

I trust you will find these in order.


DK:ar
ENC.                          Daniel Kaufman
                              Secretary


KENKOHN 0108

4083

Minutes of a meeting of the Board of Directors of H. KOHNSTAMM & CO., INC., held at the offices of Wolf Haldenstein Adler Freeman & Herz, 270 Madison Avenue, New York, New York on the 5th day of May, 1988 at 10:00 A.M.

Mr. Paul L. Kohnstamm, Chairman of the Board, called the meeting to order and presided.

Mr. Daniel Kaufman, Secretary, kept the minutes of the meeting.

The following directors were present in person, or as indicated below were present by means of conference telephone which allowed all persons participating in the meeting to hear each other at the same time:

> JAMES J. BRODERICK
> THOMAS C. DABOVICH
> ROBERT L. DAVIDSON
> DANIEL KAUFMAN
> PAUL KENNETH KOHNSTAMM
> PAUL L. KOHNSTAMM
> RICHARD KOHNSTAMM
> FRANK J. LICHTENBERGER (by conference telephone)
> WARREN C. MALIK
> KATHERINE K. PIVEN

constituting all of the Board of Directors.

Mr. William Shevis, Vice President of the Company, was present by invitation.

The reading of the minutes of the meetings held on September 16, 1987, November 17, 1987 and December 11, 1987 was dispensed with, such minutes being approved as they appeared in copies thereof previously distributed to the Directors.

KENKOHN 0109

4084

A discussion was had concerning the Report of the Independent Committee of the Board consisting of Frank Lichtenberger, Daniel Kaufman and William Shevis, _ex officio_, concerning the valuation to be given General Color Company for the purposes of the Reorganization Agreement with Universal Foods Corp.  Mr. Shevis summarized the Report for the members of the Board, including the financial materials distributed with the Report.  Mr. Shevis noted that the recommendation of the Independent Committee was that General Color be valued at an amount equal to the book value of all assets owned by it and transferred to it by the Company at the Closing of the Reorganization Agreement, excluding the book value of the Camden property, plant and equipment, plus a premium of $300,000.  Mr. Kaufman discussed regulatory requirements of General Color relating to OSHA and the cadmium industry in general.  Mr. Lichtenberger discussed the relocation of certain operations to Camden after the Supply Contract with Universal Foods terminates.  The probable cost involved in the demolition of the CMC Building at Camden was reviewed.  General Color's insurance requirements as they relate to product liability and plant closings were reviewed.  The pro forma financial statements of General Color and its working capital requirements as a "stand alone" company following the Closing with Universal Foods were considered.  Mr. Davidson discussed whether the Independent Committee had followed proper procedures and whether the proposed valuation was developed in a manner that would probably satisfy the Securities and Exchange Commission when it reviewed

KENKOHN 0110

4085

the Proxy/Registration Statement.  Mr. Shevis noted his conclusion that General Color Company would require $500,000 in working capital in addition to the $250,000 advance that Universal Foods would pay at the closing.

On motion duly made, seconded and unanimously carried, the following resolutions were adopted:

> RESOLVED, that the Report of the Independent Committee of the Board, a copy of which is annexed hereto as Attachment No. 1, which recommends that the value of General Color for the purposes of the Reorganization Agreement with Universal Foods be an amount equal to the book value of its assets at the time of Closing, including all assets transferred to it by the Company at the Closing, but excluding the book value of the Camden property, plant and equipment transferred to General Color, plus a premium of $300,000, is hereby ratified, approved and adopted;

> RESOLVED, that the Company shall transfer to General Color prior to the Closing of the Reorganization Agreeement with Universal Foods the sum of $500,000 in cash for purposes of working capital, provided, however, that the amount of working capital will be reduced on a dollar for dollar basis by the amount of any loans that principal shareholders of General Color are able to arrange for General Color and which are evidenced by the actual availability of funds or firm bank commitments without contingencies for the lending of such funds promptly after the Closing.

A discussion was had concerning the management structure of General Color.  Frank Lichtenberger noted that he was willing to serve as General Manager of General Color for six months for compensation of $10,000 per month and was thereafter willing to

KENKOHN 0111

4086

remain as a consultant to General Color for an additional six months on terms to be agreed. It was noted that his duties should include the development of a long range plan for the use of the Camden facility after the Supply Contract between General Color and Universal Foods terminates and to locate a person to succeed him as CEO at General Color, subject to the approval of the Board of Directors of General Color. It was agreed that Mr. Paul Kohnstamm, as principal shareholder of General Color and Frank Lichtenberger were to negotiate the specific terms of Mr. Lichtenberger's employment and consulting agreement with General Color, with the assistance of Messrs. Davidson, Dabovich, Malik and Kaufman.

Mr. Shevis reviewed the report on results of the first quarter of fiscal 1987-1988 and the projections of results of the second quarter of the fiscal year.

Mr. Davidson and Mr. Dabovich delivered the recommendations of the Compensation Committee. The Committee recommended that William Shevis be granted a raise of $8,000 per annum, retroactive to January 1, 1988, pursuant to a prior commitment made to Mr. Shevis by Company management. The Committee noted that all other officers of the Company, except Mr. Kaufman and Mr. Paul Kohnstamm, had contracts or arrangements which provided for appropriate raises in salary. The Committee noted that any increases granted at this time must be disclosed in the Proxy to shareholders, and that in light of the Company's fiscal performance in 1987 any such increases, other than for Mr. Shevis,

KENKOHN 0112

4087

would be inappropriate. The Committee did recommend that Mr. Davidson informally advise Universal Foods that Daniel Kaufman should be considered for a raise of approximately $8,000 per annum after the Closing based on his prior performance for the Company and the need that Universal Foods will have for his services.

The Board discussed miscellaneous matters arising under the Reorganization Agreement with Universal Foods, including the creation of an escrow expense fund, the Company's commitment to pay health and life insurance for life for retired executive officers, continuation of the Company's directors and officers liability policy, the settlement of long term contractual arrangements with officers and the status of the split dollar policies currently held by key executive officers, and certain other matters arising under the Reorganization Agreement.

On motion duly made, seconded and unanimously carried, the following resolutions were adopted:

> RESOLVED, that no funds will be committed at this time for the expenses of the agents of the shareholders appointed under the Reorganization Agreement and that any amounts needed for the expenses of the agents will be funded at the time of an actual dispute with Universal Foods;

> RESOLVED, that the officers of the Company shall determine from the insurance carrier whether the Company can obtain a two year extended discovery period under the directors and officers liability policy, and, if so, that such an extension be obtained at a cost not to exceed $80,000 in the aggregate;

KENKOHN 0113

4088

RESOLVED, that the Company shall make a lump sum payment to retired executive officers to whom the Company has made a commitment to provide medical insurance for life based on the aggregate undiscounted present value of the cost of premiums they must pay to Universal Foods to continue those or comparable policies with Universal Foods, assuming a life expectancy equal to the maximum suggested by the insurance brokers for the Company;

RESOLVED, that the Company shall either (i) make a lump sum payment to retired executive officers to whom the Company has made a commitment to provide life insurance for life based on the aggregate discounted present value of the cost of premiums they must pay to Universal Foods to continue those or comparable policies with Universal Foods, using a discount rate equal to the rate on treasury notes of approximately equal maturity to the length of time before the respective payments are due, assuming a life expectancy equal to the maximum suggested by the insurance brokers for the Company or (ii) arrange for similar life insurance for the retired executive officers under the group life insurance policy to be adopted by General Color Company.

RESOLVED, that the Company's contractual obligations to Frank J. Lichtenberger and Warren C. Malik shall be satisfied by a lump sum payment based on the discounted present value of the payments using a discount rate equal to the rate on treasury notes of approximately equal maturity to the length of time before the respective payments are due;

RESOLVED, that the Company shall pay the premiums necessary to furnish Messrs. Paul Kohnstamm, Daniel Kaufman, James Broderick, Herbert Ettinger and Warren Malik with fully paid life insurance policies in the amount of $30,000;

RESOLVED, that the resolutions set forth on Attachment No. 2 to these minutes

KENKOHN 0114

4089

> regarding the Split-Up of General Color
> and the Reorganization Agreement are
> ratified, approved and adopted; and
>
> RESOLVED, that the resolutions set forth
> as Attachment No. 3 to these minutes
> regarding the Company's Pension Plan are
> ratified, approved and adopted.

Mr. Paul Kohnstamm discussed his desire to purchase from the Company its shares of Horace Cory PLC at the Closing of the Reorganization Agreement with Universal Foods. Mr. Paul Kohnstamm fully advised the Board of an important acquisition that Cory was about to undertake in England and that the sale required full disclosure to the Board and its consent to the purchase.

On motion duly made, seconded and unanimously carried, the following resolution was adopted:

> RESOLVED, that the sale by the Company to
> Mr. Paul Kohnstamm of all of its holdings
> of Horace Cory PLC at or about the time
> of the Closing of the Reorganization
> Agreement with Universal Foods, at a
> price not less than the market value of
> such shares at the time of sale, is here-
> by approved.

Mr. Paul Kohnstamm then advised the Board that because of the pending material development with Horace Cory PLC he is currently unable to sell the shares of Horace Cory PLC held by the Pension Plan. Mr. Paul Kohnstamm requested authorization to engage legal counsel in England to assist him in connection with the sale of these shares.

On motion duly made, seconded and unanimously carried, the following resolution was adopted:

KENKOHN 0115

4090

RESOLVED, that the Company shall pay the reasonable expenses of legal counsel in England incurred by Paul Kohnstamm in connection with the sale of shares of Horace Cory PLC from the Company's Pension Plan.

There followed a discussion on the declaration of a dividend of the Company's Preferred Stock. On motion duly made, seconded and unanimously carried, the following resolution was adopted:

RESOLVED, that the proper officers of the Company are hereby directed to make a quarterly dividend payment of $2.625 per share on the outstanding shares of the Company's Series A 10 1/2% Preferred Stock on June 15, 1988 to shareholders of record on May 15, 1988.

Mr. Paul Kohnstamm, noting that this meeting would probably be the last meeting of the Board of Directors before the Company is acquired by Universal Foods, thanked each of the members of the Board for his or her contribution and services.

There being no further business to come before the meeting, it was, on motion duly made, seconded and carried, adjourned.

Daniel Kaufman, Secretary

Attachement No. 1

General Color Valuation

4091

## Background

The Board of Directors of H. Kohnstamm & Co., Inc. on November 17, 1987 appointed a committee of the following directors to determine a prudent and professional judgment of the value of General Color. They are D. Kaufman, Vice President and Secretary of H. Kohnstamm; W. P. Shevis, Vice President - Finance, ex officio; and F. Lichtenberger, President, H. Kohnstamm.

## Summary

Kohnstamm's Board of Directors determined that the basis for arriving at the amount being paid by Universal Foods Corporation for H. Kohnstamm's common shares (book value, plus a fixed premium) produced a fair and equitable price to shareholders.

The Committee, therefore, concluded that application of similar reasoning in arriving at a valuation for General Color should produce a fair and equitable price to shareholders for that entity as well.

Using that reasoning, the Committee concludes that General Color's book value of $3,075,000 (approximate book value at January 30, 1988, including certain assets to be transferred from H. Kohnstamm, see "Discussion", below), plus a premium of $300,000 (total $3,375,000) would provide a fair and equitable price to shareholders.

## Background

The General Color Company is a subsidiary of H. Kohnstamm that conducts the pigment/industrial colors business. In addition, immediately prior to the proposed reorganization of Kohnstamm into Universal Foods (UF), Kohnstamm will transfer to General Color its Camden facility, fragrance business and undeveloped Millville property.

A valuation for the businesses known as General Color within the Corporation, H. Kohnstamm & Co., Inc., is necessitated by two factors:

(1) The sale to UF of H. Kohnstamm's flavor and regulated color business. UF expressed no interest in H. Kohnstamm's pigment/industrial products business. In addition, UF also refused to participate in a transaction in which it acquired H. Kohnstamm's Camden production facility. Furthermore, a change of ownership of H. Kohnstamm's New Jersey properties, with the exception of Kearny, would trigger New Jersey's ECRA statutes.

(2) The agreement by the Kohnstamm family to buy out the minority interest of the remaining corporation by allowing the minority to receive more shares of UF common stock. This serves two major purposes. The residual corporation, General Color, will have gross sales of approximately $8.0MM, with $3.0MM of the $8.0MM being a cost-recovery supply contract with UF based on color production in Camden. It was felt that this would be too small an organization to afford the costs of maintaining communication, etc., to a broad shareholder base. In addition, the SEC indicated that, if General Color were "spun off" pro rata to all existing share-holders of H. Kohnstamm, an S-1 registration filing would be required. This would have been a time-consuming and costly endeavor.

KENKOHN 0117

`4092

A valuation is somewhat complicated by the real property generally referred to as Camden. This real property produces and distributes approximately 50 percent of the regulated products business that is being sold to UF. However, UF refused to acquire this asset throughout the bargaining process. In addition, a transfer of ownership would trigger the State of New Jersey's ECRA statutes. This would require clean-up costs estimated to be in excess of its book value/market value. This renders the property economically unsalable.

Nonetheless, UF agreed to include its (Camden's) book value in determining the price it would pay for the flavor and regulated color businesses of H. Kohnstamm. This enables all shareholders of H. Kohnstamm to receive full value for this asset. Therefore, its value was not included in the determin- ation of the value assigned to General Color for the purpose of this trans- action.

Camden has been/will be transferred to General Color to maintain continuity of ownership. The State of New Jersey is fully aware of this transaction and has judged that it is not an ECRA event.

The sale of the regulated color business requires that Camden produce certain products for UF under the terms of a supply contract. This supply contract calls for Camden to operate under a break-even or a cost-recovery basis. That is, during the term of the supply contract, Camden, while not precluded from doing so, is not expected to generate an operating profit. Further, a key element of the ownership of this facility will be the development of new products to be produced there to enable it to continue operating and, therefore, avoid closure and ECRA compliance. It should be noted that the sale to UF of H. Kohnstamm's regulated colors business includes a non- compete clause. Therefore, since the equipment currently in place cannot be used for its intended purpose after the term of the supply contract, substantial capital expenditures will be required to modify it.

It should be noted that the contract for the sale of H. Kohnstamm's flavor and regulated color businesses to UF requires that the price paid for General Color be no less than book value.

The Board of H. Kohnstamm agreed that UF's offer for the flavor and regulated color businesses was acceptable (book plus a premium). We, therefore, assumed that if a like offer were available for all of H. Kohnstamm's business, including General Color, or for General Color alone, the same basis of valuation would be book value plus a premium. The premium over book to be paid by UF is the fixed amount of $1.2MM.

The book value of General Color, prior to the transfer of assets to/from H. Kohnstamm, was $2.545MM at January 30, 1988. The net value of assets to be transferred to/from H. Kohnstamm was $530M at the same date, as follows:

| Millville & fragrance assets | $ 43M |
| Intercompany accounts | 284M |
| Insurance advances to PLK | 195M |
| Other assets - net | 8M |
| Total | $530M |

4093

Therefore, the total net book value placed on General Color was $3.075MM.
The Committee felt that a premium of $300M above that amount, for a total of
$3.375MM, would be a fair and equitable price for General Color. It is to be
understood that the premium of $300 would be applied to the actual book
value of General Color at the closing date, calculated as above.

Once again, it should be noted that the Camden facility already has yielded
book value to all shareholders and is, therefore, not included. The book
value of Camden is approximately $2.6MM.

All assets transferred from H. Kohnstamm to General Color have been valued at
book. The minority shareholders are, therefore, receiving full value under
the terms of the UF transaction from the Kohnstamm family.

KENKOHN 0119

4094

## General Color Prospects

Historically, the General Color (Canada included) after-tax profit profile has been modest; it earned $68M, ($18M) and $129M, in 1987, 1986 and 1985, respectively.

However, its future will be substantially different from its recent history. In addition, to the cadmium/selenium pigments produced in Newark, General Color also will make and/or market other products: aluminum hydrate, velveteen black, plastic color blends -- and act as Warner Jenkinson's distributor for FD & C lakes to the plastics industry.

On a pro-forma basis, General Color is expected to earn between $240M and $350M, pre-tax, per annum.

Its major management tasks will be:

--Extreme sensitivity to cash flow and inventory investment. The price for cadmium metal has escalated dramatically over the past 12 months from $1.50/lb. to $8.25/lb. This cost increase has been passed on to the market. However, the price of cadmium is expected to fall. Therefore, General Color must not be caught with "over-priced" inventory.

--The regulatory status of cadmium and cadmium pigments is in a state of change. While the end point of this evaluation is not yet known, what is certain is that the environmental costs of producing cadmium pigments in a safe environment will increase. These factors also could reduce the market for cadmium pigments.

--The utilization of Camden after the supply contract is critical as closure would trigger ECRA and its costs.

--The management/maintenance of Camden during the supply contract to ensure a positive cash flow and the orderly and timely demolition of the CMC building to maintain insurability.

KENKOHN 0120

4095

## General Color Valuation Factors

--Historical earnings

--Pro-forma income estimates

--Facilities insurance appraisals

--Book value

--ECRA cost estimates for Camden/Newark

--Supply contract with Warner Jenkinson

--Non-compete clause for regulated colors

--Alternate uses for Camden equipment

--Price volatility of cadmium metal

--Uncertain future market for cadmium pigments

--Pending environmental requirements regarding worker exposure to cadmium metal and the cost of implementing

--Downsized corporation supporting corporate overhead

--Real estate appraisals

KENKOHN 0121

4096

H. KOHNSTAMM & CO., INC.
VALUATION OF GENERAL COLOR TO COMMON SHAREHOLDERS
APRIL 30, 1988
(000'S OMITTED)

EXHIBIT C

| | BOOK VALUE AT JAN 30, 1988 | COMMITTEE VALUATION |
|---|---|---|
| GENERAL COLOR/ CANADA | 2,545 | 2,545 |
| ASSETS TRANSFERRED IN: | | |
| INTERCOMPANY ACCOUNTS | 284 | 284 |
| PLK DEBT (INSURANCE) | 195 | 195 |
| COLOR - A/R | 231 | 231 |
| COLOR - INVENTORY | 56 | 56 |
| MILLVILLE PROPERTY | 13 | 13 |
| FRAGRANCE ASSETS | 30 | 30 |
| ASSETS TRANSFERRED OUT: | | |
| CANADA - A/R | (120) | (120) |
| CANADA - INV | (159) | (159) |
| TOTAL | 3,075 | 3075 |
| CAMDEN ASSETS | 2,600 | 0 |
| PREMIUM | | 300 |
| TOTAL | 5,675 | 3,375 |

KENKOHN 0122

CONSOLIDATED PROFORMA BALANCE SHEET (RESTRUCTURED)
AS OF JANUARY 30, 1988
($000)

| ASSETS | ACTUAL GENERAL COLOR | KOHN INC (CANDA) | TOTAL | CONSOLIDATING ADJUSTMENTS REFERENCE | CONSOLIDATING ADJUSTMENTS AMOUNT | CONSOL GENERAL COLOR | PRO-FORMA ADJUSTMENTS REFERENCE | PRO-FORMA ADJUSTMENTS AMOUNT | PRO FORMA GENERAL COLOR |
|---|---|---|---|---|---|---|---|---|---|
| CURRENT ASSETS | | | | | | | | | |
| CASH | 141 | 46 | 187 | | | 187 | (b)(c)(d) | (117) | 70 |
| ACCOUNTS RECEIVABLE | 383 | 239 | 622 | | | 622 | (a)(e) | 111 | 733 |
| LESS: ALLOWANCE FOR BAD DEBTS | (6) | (5) | (11) | | | (11) | | | (11) |
| "A" ACCOUNTS RECEIVABLE | 377 | 234 | 611 | | | 611 | | | 722 |
| CURRENT PORTION OF NOTES RECEIVABLE | 0 | | 0 | | | 0 | | | 0 |
| REFUNDABLE INCOME TAXES RECEIVABLE | | | | | | | | | |
| INVENTORIES | 1,215 | 318 | 1,533 | | | 1,533 | (e)(e) | (334) | 1,430 |
| RECEIVABLES | (1) | 8 | (9) | | | (9) | | 111 | (2) |
| PREPAID EXPENSES | | 2 | | | | | | (103) | |
| TOTAL CURRENT ASSETS | 1,730 | 608 | 2,338 | | | 2,338 | | (326) | 2,012 |
| INVESTMENTS IN AND ADVANCES TO CONSOLIDATED SUBSIDIARIES | 424 | 0 | 424 | (a) | (424) | 0 | | 0 | 0 |
| PROPERTY, PLANT & EQUIPMENT | | | | | | | | | |
| LAND & IMPROVEMENTS | 66 | | 66 | | | 66 | | | 66 |
| BUILDING & IMPROVEMENTS | 425 | 33 | 458 | | | 458 | | | 458 |
| M&E, F&F, TRUCKS & AUTOS | 1,793 | 66 | 1,859 | | | 1,859 | | | 1,859 |
| PP & E - AT COST | 2,284 | 99 | 2,383 | | | 2,383 | | | 2,383 |
| LESS: ALLOWANCE FOR DEPRECIATION | 1,456 | 52 | 1,508 | | | 1,508 | | | 1,508 |
| NET PROPERTY, PLANT & EQUIPMENT | 828 | 47 | 875 | | | 875 | (b) | | 875 |
| OTHER ASSETS | | | | | | | | | |
| SUNDRY | 0 | 0 | 0 | | | | | | 0 |
| DUE FROM OFFICERS | 0 | 8 | 8 | | | 8 | | | 8 |
| TOTAL OTHER ASSETS | 0 | 8 | 8 | | | 8 | | | 8 |
| ACCOUNTS WITH AFFILIATES | | | | | | | | | |
| GENERAL COLOR/KK, INC (CAN) | (440) | 0 | (440) | | | (440) | (b) | 440 | 0 |
| GENERAL COLOR/KOHNSTAMM, INC (CAN) | 277 | (277) | 0 | | | | | | 0 |
| H. KOHNSTAMM/KOHNSTAMM, INC (CAN) | (163) | (163) | 114 | | | 114 | | (114) | 0 |
| TOTAL ACCOUNTS WITH AFFILIATES | (326) | | (326) | | | (326) | | 326 | 0 |
| TOTAL ASSETS | 2,819 | 500 | 3,319 | | (424) | 2,895 | | 0 | 2,895 |

Revised

C-6639
B3GC1038
04-13-88

KENKOHN 0123

GENERAL COLOR COMPANY (RESTRUCTURED)
CONSOLIDATED BALANCE SHEET
AS OF JANUARY 30, 1988
(2000)

Revised

GC-CORP
B3GC1088
01-26-88

4609

| LIABILITIES & EQUITY | ACTUAL GENERAL COLOR | ACTUAL KOHN INC (CANADA) | TOTAL | CONSOLIDATING ADJUSTMENTS REF | CONSOLIDATING ADJUSTMENTS AMOUNT | CONSOL GENERAL COLOR | PRO-FORMA ADJUSTMENTS REF | PRO-FORMA ADJUSTMENTS AMOUNT | PRO-FORMA GENERAL COLOR |
|---|---|---|---|---|---|---|---|---|---|
| CURRENT LIABILITIES | | | | | | | | | |
| NOTES PAYABLE - BANK | 0 | 0 | 0 | | | 0 | | | 0 |
| CURRENT PORTION OF CAPITAL LEASE | 0 | 0 | 0 | | | 0 | | | 0 |
| ACCOUNTS PAYABLE - TRADE | 291 | 65 | 356 | | | 356 | | | 356 |
| ACCRUED EXPENSES | 12 | 0 | 12 | | | 12 | | | 12 |
| ACCRUED INCOME | (150) | 0 | (150) | | | (150) | | | (150) |
| DEFERRED INCOME TAXES PAYABLE | (8) | (8) | (23) | | | (23) | | | (23) |
| TOTAL CURRENT LIABILITIES | 288 | 57 | 345 | | 0 | 345 | | 0 | 345 |
| OTHER LIABILITIES | | | | | | | | | |
| LONG-TERM DEBT (LESS CURRENT) | 0 | 0 | 0 | | | 0 | | | 0 |
| DEFERRED INCOME TAXES | 0 | 0 | 0 | | | 0 | | | 0 |
| LONG-TERM PORTION OF CAPITAL LEASE | 10 | 10 | 10 | | | 10 | | | 10 |
| TOTAL OTHER LIABILITIES | 10 | 10 | 10 | | 0 | 10 | | 0 | 10 |
| TOTAL LIABILITIES | 298 | 57 | 355 | | 0 | 355 | | 0 | 355 |
| SHAREHOLDERS' EQUITY | | | | | | | | | |
| COMMON STOCK | | | | | | | | | |
| PAR VALUE | 10 | 20 | 30 | (a) | (20) | 10 | | | 10 |
| PAID-IN SURPLUS | 0 | 0 | 0 | | | 0 | | | 0 |
| RETAINED EARNINGS | | | | | | | | | |
| BEGINNING (11-01-87) | 2,531 | 441 | 2,972 | (a) | (441) | 2,531 | | | 2,531 |
| CURRENT YEAR EARNINGS | (37) | (37) | (20) | | 17 | (37) | | | (37) |
| INCOME OF SUBSIDIARIES | | | (37) | (a) | 37 | 0 | | | 0 |
| LESS DIVIDENDS PAID | | | | | | | | | |
| TOTAL RETAINED EARNINGS | 2,511 | 404 | 2,915 | | (404) | 2,511 | | 0 | 2,511 |
| EQUITY ADJUSTMENT FROM TRANSLATION | 0 | 19 | 19 | | | 19 | | 0 | 19 |
| LESS SH COM ST IN TREASURY | 0 | 0 | 0 | | | 0 | | | 0 |
| TOTAL SHAREHOLDERS' EQUITY | 2,521 | 443 | 2,964 | | (424) | 2,540 | | 0 | 2,540 |
| TOTAL LIABILITIES & EQUITY | 2,819 | 500 | 3,319 | (a) | (424) | 2,895 | | 0 | 2,895 |
| Check Total of Assets | 2,819 | 500 | 3,319 | | (424) | 2,895 | | 0 | 2,895 |

KENKOHN 0124

GENERAL COLOR COMPANY (RESTRUCTURED)
CONSOLIDATED BALANCE SHEET
CONSOLIDATING AND PROFORMA ADJUSTMENTS
(COD1)

Revised
C-CORP2
BSCCC88
04-13-88

| EXPLANATION | DEBIT | CREDIT |
|---|---|---|
| ============= | ======= | ======= |
| (a) - To consolidate investment accounts | | |
| Common Stock - HK Inc. | 20 | |
| Retained Earnings - Prior | | 37 |
| Retained Earnings - Current | 441 | 424 |
| Investment in HK Inc. | | 461 |
| | ======== | ======== |

4099

| | | |
|---|---|---|
| (b) - To close intercompany accounts | | |
| Cash | 440 | |
| GC to HK & Co. | | 114 |
| HK & Co. to HK Inc. | 326 | 440 |
| | ======== | ======== |

| | | |
|---|---|---|
| (c) - To transfer portion of accounts receivable from HK & Co. | | |
| Cash | 231 | |
| Accounts Receivable | | 231 |
| | ======== | ======== |

| | | |
|---|---|---|
| (d) - To transfer portion of inventories, from HK & Co. | | |
| Cash | 56 | |
| Inventories | | 56 |
| | ======== | ======== |

| | | |
|---|---|---|
| (e) - To transfer portion of Kohnstamm Inc. (Canada) accounts receivable to HK & Co. | | |
| Cash | 120 | |
| Accounts Receivable | | 120 |
| | ======== | ======== |

| | | |
|---|---|---|
| (f) - To transfer portion of Kohnstamm Inc. (Canada) inventories to HK & Co. | | |
| Cash | 159 | |
| Inventories | | 159 |
| | ======== | ======== |

Note: Net cash outlay is $334,000 exclusive of approximately $195,000 owed to HK & Co. by PLK in connection with insurance predicates. This leaves the company with a negative cash balance of $147,000. A substantial cash infusion would have to be made to sustain the business.

KENKOHN 0125

4100

Attachment No.2

Transfer of Assets to

and

Split-Up

of

GENERAL COLOR COMPANY

KENKOHN 0126

11r1d010                                          4101

Attachment No. 2

Transfer of Assets to
and
Split-Up
of
GENERAL COLOR COMPANY

In connection with the Reorganization Agreement (the

"Reorganization Agreement") dated December 11, 1987 among the

Company, General Color Company, Universal Foods Corporation and

certain shareholders of the Company, and as required under the

Reorganization Agreement, the following resolutions are adopted:

> RESOLVED, that prior to the Closing of
> the transactions contemplated under the
> Reorganization Agreement, the following
> assets of the Company shall be trans-
> ferred to General Color, its wholly owned
> subsidiary:  all of the assets of the
> Company comprising its Camden, New Jersey
> real property (including all property,
> plant and equipment at such location),
> such real property identified as Block
> No. 971, Lot No. 1, as same are recorded
> on the books and records of the Company,
> such transfer to be evidenced by a quit-
> claim deed to General Color of the real
> property and a bill of sale of all of
> such other assets;  all of the tangible
> and intangible assets comprising its
> fragrance operations, such transfer to be
> evidenced by a bill of sale;  the unde-
> veloped real property located in
> Millville, New Jersey, identified as
> Block No. 228, Lot No. 52A, such transfer
> to be evidenced by a quit-claim deed to
> General Color;  any and all life insur-
> ance policies on the life of Paul L.
> Kohnstamm, Chairman of the Board of the
> Company, such assignments to be evidenced
> by the filing of the proper assignment
> forms with the applicable insurance com-
> panies;  and, all receivables due from
> Paul L. Kohnstamm, Chairman of the Board
> of the Company, to the Company, for any
> purpose whatsoever including borrowings
> against life insurance policies;
>
> RESOLVED, that the proper officers of the
> Company be, and they are hereby are,
> authorized and directed to execute such

KENKOHN 0127

4102

deeds, bills of sale, or other instru-
ments of transfer or assignment necessary
to effectuate the foregoing resolution;

RESOLVED, that after the completion of
the foregoing transfers, the Company
shall split-up (the "Split-Up") its
holdings of common stock of General Color
by transferring 80,922.1 shares of its
General Color common stock, constituting
all of the issued and outstanding shares
of common stock of General Color, to
certain of its shareholders, defined as
"Kohnstamm Family Shareholders" in the
Reorganization Agreement, whose names and
share holdings are set forth on the
Schedule attached to these Resolutions,
by transferring such holdings to such
shareholders on the basis of one-tenth
(1/10) of one share of General Color
common stock for each share of Company
common stock held by such Kohnstamm
Family Shareholder at the time of the
Split-Up, with fractional shares to be
transferred as appropriate.  Each
Kohnstamm Family Shareholder shall sur-
render to the Company in exchange for the
shares of General Color he will receive
in the Split-Up that portion of shares of
Company Common Stock held by him at the
time of the Split-Up which constitutes
the value of the General Color stock he
receives in the Split-Up in relation to
the total value of General Color common
stock and Universal Foods common stock he
receives in the Split-Up and the Reorgan-
ization.  The computation for each
Kohnstamm Family Shareholder is as
follows:

$$A = \frac{B\left(\dfrac{C}{C + \dfrac{D}{E}(F) - G}\right)}{}$$

Where A =    Number of shares of Company Common Stock
             to be surrendered on the Split-Up by a
             Kohnstamm Family Shareholder in exchange
             for his or her General Color Common
             Stock.

Where B =    Total number of shares of Company Common
             Stock held by such Kohnstamm Family
             Shareholder at the time of the Split-Up.

KENKOHN 0128

4103

Where C =    Value of General Color as defined in the Reorganization Agreement.

Where D =    Total number of shares of Company Common Stock held by all Kohnstamm Family Shareholders at the time of the Split-Up.

Where E =    Total Number of Shares of Common Stock held by all Company shareholders at the time of Split-Up.

Where F =    Adjusted Book Value of the Company as defined in the Reorganization Agreement.

Where G =    Minority Shareholder Premium as defined in the Reorganization Agreement.

RESOLVED, that at the time each certificate representing shares of Company Common Stock held by a Kohnstamm Family Shareholder is surrendered to the escrow agent and transfer agent of Universal Foods, as provided in the Reorganization Agreement and the Escrow Agreement set forth as Exhibit C thereto, the Company shall make arrangements with the escrow agent and transfer agent to treat as surrendered to the Company that portion of such Kohnstamm Family Shareholder's shares of Company Common Stock as are determined to have been surrendered in exchange for shares of General Color Company in accordance with the above formula;

RESOLVED, that the record date for the meeting of the Company's shareholders required under the Proxy/Registration Statement of the Company and Universal Foods, shall be July 29, 1988 and the meeting of the shareholders for such purposes shall be September 7, 1988.

KENKOHN 0129

31EDG005                    Attachement No. 3

.4104

WHEREAS, the Corporation and the General Color Company maintain the H. Kohnstamm & Company, Inc. Pension Plan (the "Pension Plan");

WHEREAS, the Corporation has adopted a tax-free reorganization plan in which all of the shares of stock of the Corporation will be transferred to Universal Foods Corporation;

WHEREAS, in connection with such reorganization, the Board of Directors believes it to be in the best interests of the Corporation and of the participants covered by the Pension Plan to terminate the plan;

WHEREAS, the General Color Company has resolved to terminate the Pension Plan;

WHEREAS, the Corporation desires to make amendments to the Pension Plan which will provide for the termination of benefit accruals under the Pension Plan as of the Closing Date, for all of the assets of the plan to be distributed to members of the plan, and for a required lump distribution from the Pension Plan for accrued benefits valued at $2,000 or less; and

WHEREAS, the Corporation is required by the Internal Revenue Service to make certain amendments to the Pension Plan prior to its termination so that the Pension Plan complies with the then effective provisions of the Tax Reform Act of 1986; it is therefore

RESOLVED, that the amendments to the Pension Plan in the form attached hereto are approved and adopted effective the dates set forth in the amendments; and further

RESOLVED, that all benefit accruals under the Pension Plan shall cease as of the Closing Date; and further

KENKOHN 0130

31EDG005

4105

RESOLVED, that subject to the approval of such termination date by the Pension Benefit Guarantee Corporation (the "PBGC"), the Pension Plan shall be, and it hereby is, terminated effective the Closing Date; and further

RESOLVED, that all participants in the Pension Plan shall be, and they hereby are, fully vested in the benefits accrued to them under the Pension Plan as of the Closing Date, to the extent such accrued benefits are then funded; and further

RESOLVED, that the appropriate officers of the Corporation be, and they hereby are, authorized and directed to take such action as may be necessary, appropriate or advisable to effectuate the termination of the Pension Plan including, but not limited to, notifying the PBGC of the termination and taking such action as is necessary to satisfy applicable PBGC requirements with respect to the termination, applying for a letter of determination with respect to the termination from the Internal Revenue Service, and making any further amendments to the Plan that the officers deem necessary, appropriate or advisable.

KENKOHN 0131

ᴵꜱᴇᴅɢᴏᴏꜱᴋᴏ

4106

### H. KOHNSTAMM & CO., INC. PENSION PLAN

THIS FIFTH AMENDMENT to the H. Kohnstamm & Co., Inc. Pension Plan, dated the year hereinafter set forth, made by H. Kohnstamm & Co., Inc.

### W I T N E S S E T H:

WHEREAS, the Company adopted a pension plan effective November 1, 1970 which was amended and restated effective November 1, 1984;

WHEREAS, the Company is being sold to the Universal Food Corporation and it is anticipated that the closing of such will take place in 1988 (the "Closing Date"); and

WHEREAS, the Company desires to make certain amendments to the Plan, as amended;

NOW, THEREFORE, the Company does hereby adopt the following amendments to the H. Kohnstamm & Co., Inc. Pension Plan, as amended, said amendments to be effective as set forth below:

1. Effective the Closing Date, Section 4.4 of the Plan shall be deleted and the following inserted in its place:

4.4 Special Retirement Allowance: A member shall be eligible for a Special Retirement Allowance in acordance with the provisions of Section 5.4 if his employment terminated for any reason other than death or retirement, regardless of how many Years of Service the Member completed."

KENKOHN 0132

13EDG005KO                                          4107

2.    Effective June 1, 1988 the following shall be
added after Section 6.4 of the Plan:

"6.5  Lump Sum Distribution:  Notwithstanding anything
in the Plan to the contrary, if the Present Value of a Member's
accrued benefit does not exceed $2,000, such Present Value shall
be paid in the form of a lump sum distribution.  For purposes of
this Section 6.5, "Present Value" shall be determined using the
interest rate and mortality factors set forth in Section 2.3(r);
provided, however, that the Applicable Interest Rate shall be
substituted in lieu of the interest rate set forth in Section
2.3(r) if the use of the Applicable Interest Rate will provide a
greater Present Value.   For purposes of this Section 6.5,
"Applicable Interest Rate" shall mean the interest rate which
would be used by the Pension Benefit Guaranty Corporation for
purposes of determining the present value of that Member's
benefits under the Plan if the Plan had terminated on the first
day of the Plan Year in which the distribution occurred with
insufficient assets to provide benefits guaranteed by the Pension
Benefit Guaranty Corporation on that date.   No lump sum
distribution may be made under this Section 6.5 after the
Member's annuity starting date unless the Member and his spouse
(or where the Member has died, his surviving spouse) consents in
writing to such distribution."

KENKOHN 0133

13EDG005KO

4108

3.    Effective the Closing Date add the following after Plan Section 5.7:

"5.8  Cessation of Benefits:  Notwithstanding anything in the Plan to the contrary, effective the Closing Date, no Member shall accrue any benefits under the Plan.  For purposes of this Section 5.8, "Closing Date" shall mean the closing date on which all of the shares of stock of H. Kohnstamm & Co., Inc. are sold to the Universal Food Corporation."

4.    Effective the Closing Date, Section 7.2(c) of the Plan shall be deleted.

5.    Effective June 1, 1988 Section 14.4 of the Plan shall be deleted and the following shall be inserted in its place:

"14.4   Residual Amounts:   In no event shall the Employer receive any amounts from the Trust Fund."

IN WITNESS WHEREOF, this Amendment has been duly signed this        day of        , 1988.

H. KOHNSTAMM & CO., INC.


By:_____

ATTEST:


_____


-3-                                    KENKOHN 0134

13EDG001KO

4109

## H. KOHNSTAMM & CO., INC. PENSION PLAN

THIS FOURTH AMENDMENT to the H. Kohnstamm & Co., Inc. Pension Plan, dated the year hereinafter set forth, made by H. Kohnstamm & Co., Inc.

W I T N E S S E T H:

WHEREAS, the Company adopted a pension plan effective November 1, 1970 which was amended and restated effective November 1, 1984;

WHEREAS, the Company is being sold to the Universal Food Corporation and wishes to terminate such plan; and

WHEREAS, the Company must make certain amendments to the plan prior to its termination so the plan complies with the then effective provisions of the Tax Reform Act of 1986;

NOW, THEREFORE, the Company does hereby adopt the following amendments to the H. Kohnstamm & Co., Inc. Pension Plan, as amended, said amendments to be effective as set forth below:

KENKOHN 0135

13EDG001KO

4110

## SECTION I

### PURPOSE AND EFFECTIVE DATE

1.1.  <u>Purpose</u>.  It is the intention of the Employer to amend the plan to comply with those provisions of the Tax Reform Act of 1986 that are effective prior to the first Plan Year beginning after December 31, 1988.

1.2.  <u>Effective Date</u>.  Except as otherwise provided, this amendment shall be effective as of the first day of the first Plan Year beginning after December 31, 1986.

## SECTION II

### DEFINITIONS

For purposes of this amendment only, the following definitions shall apply.

2.1.  "Adjustment Factor" shall mean the cost of living adjustment factor prescribed by the Secretary of the Treasury under Section 415(d) of the Code for years beginning after December 31, 1987, applied to such items and in such manner as the Secretary shall prescribe.

2.2.  "Affiliated Employer" shall mean the Employer and any corporation which is a member of a controlled group of corporations (as defined in Section 414(b) of the Code) which includes the Employer; any trade or business (whether or not incorporated) which is under common control (as defined in

-2-

KENKOHN 0136

13EDG001KO

4111

Section 414(c) of the Code) with the Employer; any organization (whether or not incorporated) which is a member of an affiliated service group (as defined in Section 414(m) of the Code) which includes the Employer; and any other entity required to be aggregated with the Employer pursuant to regulations under Section 414(o) of the Code.

2.3.    "Code" shall mean the Internal Revenue Code of 1986 and amendments thereto.

2.4.    "Current Accrued Benefit" shall mean a Participant's accrued benefit under the plan, determined as if the Participant had separated from service as of the close of the last Limitation Year beginning before January 1, 1987, when expressed as an annual benefit within the meaning of Section 415(b)(2) of the Code. In determining the amount of a Participant's Current Accrued Benefit, the following shall be disregarded:

  (i)   any change in the terms and conditions of the Plan after May 5,1986; and

  (ii)  any cost of living adjustment occurring after May 5, 1986.

2.5.    "Defined Benefit Dollar Limitation" shall mean the limitation set forth in Section 415(b)(1) of the Code.

2.6.    "Defined Contribution Dollar Limitation" shall mean $30,000 or, if greater, one-fourth of the Defined Benefit Dollar Limitation in effect for the Limitation Year.

-3-

KENKOHN 0137

13EDG001KO

4112

2.7. "Employee" shall mean employees of the Employer and shall include leased employees within the meaning of Section 414(n)(2) of the Code. Notwithstanding the foregoing, if such leased employees constitute less than twenty percent of the Employer's nonhighly compensated work force within the meaning of Section 414(n)(1)(C)(ii) of the Code, the term "Employee" shall not include those leased employees covered by a plan described in Section 414(n)(5) of the Code unless otherwise provided by the terms of the plan other than this amendment.

2.8. "Employee Contributions" shall mean contributions to the plan made by a Participant during the Plan Year.

2.9. "Employer" shall mean the entity that establishes or maintains the plan; any other organization which has adopted the plan with the consent of such establishing employer; and any successor of such employer.

2.10. "Limitation Year" shall mean the limitation year specified in the plan or, if none is specified, the calendar Year.

2.11. "Participant" shall mean any Employee of the Employer who has met the eligibility and participation requirements of the plan.

2.12. "Social Security Retirement Age" shall mean the age used as the retirement age for the Participant under Section 216(l) of the Social Security Act, except that such section shall

-4-

KENKOHN 0138

13EDG001KO

4113

be applied without regard to the age increase factor, and as if the early retirement age under Section 216(1)(2) of such Act were 62.

2.13. "Plan Year" shall mean the plan year otherwise specified in the plan.

## SECTION III
### PROVISIONS RELATING TO LEASED EMPLOYEES

3.1. <u>Safe-Harbor</u>.   Notwithstanding any other provisions of the Plan, for purposes of the pension requirements of Section 414(n)(3) of the Code, the employees of the Employer shall include individuals defined as Employees in Section 2.7 of this amendment.

3.2. <u>Participation and Accrual</u>.   A leased employee within the meaning of Section 414(n)(2) of the Code shall become a Participant in, or accrue benefits under, the plan based on service as a leased employee only as provided in provisions of the plan other than this Section III.

3.3. <u>Effective Date</u>.   This Section III shall be effective for services performed after December 31, 1986.

KENKOHN 0139

13EDG001KO                                    4114

## SECTION IV

## LIMITATIONS ON CONTRIBUTIONS AND BENEFITS

4.1.  Adjustment to Defined Dollar Limitation for Early or Deferred Retirement.

(a)  Adjustment for Early Retirement.  If the retirement benefit of a Participant commences before the Participant's Social Security Retirement Age, the Defined Benefit Dollar Limitation shall be adjusted so that it is the actuarial equivalent of an annual benefit of $90,000, multiplied by the Adjustment Factor, as prescribed by the Secretary of the Treasury, beginning at the Social Security Retirement Age.  The adjustment provided for in the preceding sentence shall be made in such manner as the Secretary of the Treasury may prescribe which is consistent with the reduction for old-age insurance benefits commencing before the Social Security Retirement Age under the Social Security Act.

(b)  Adjustment for Deferred Retirement.  If the retirement benefit of a Participant commences after the Participant's Social Security Retirement Age, the Defined Benefit Dollar Limitation shall be adjusted so that it is the actuarial equivalent of benefit of $90,000 beginning at the Social Security Retirement Age, multiplied by the Adjustment Factor as provided by the Secretary of the Treasury, based on the lesser of the interest rate assumption under the Plan or on an assumption of five percent (5%) per year.

-6-                                    KENKOHN 0140

13EDG001KO

4115

4.2.  Adjustment of Limitation for Years of Service or Participation.

(a)  Defined Benefit Dollar Limitation.  If a Participant has completed less than ten years of participation, the Participant's accrued benefit shall not exceed the Defined Benefit Dollar Limitation as adjusted by multiplying such amount by a fraction, the numerator of which is the Participant's number of years (or part thereof) of participation in the Plan, and the denominator of which is ten.

(b)  Other Defined Benefit Limitation.  If a Participant has completed less than ten years of service with three Affiliated Employers, the limitations described in Sections 415(b)(1)(B) and 415(b)(4) of the Code shall be adjusted by multiplying such amounts by a fraction, the numerator of which is the Participant's number of years of service (or part thereof), and the denominator of which is ten.

(c)  Limitations of Reductions.  In no event shall Sections 4.2(b) and (c) reduce the limitations provided under Sections 415(b)(1) and (4) of the Code to an amount less than one-tenth of the applicable limitation (as determined without regard to this Section 4.2).

(d)  Application to Changes in Benefit Structure.  To the extent provided by the Secretary of the Treasury, this Section 4.2 shall be applied separately with respect to each change in the benefit structure of the plan.

-7-

KENKOHN 0141

13EDG001KO                                        4116

4.3.  Preservation of Current Accrued Benefit Under
Defined Benefit Plan.

(a)  In General.  This section 4.3 shall apply to
defined benefit plans that were in existence on May 6, 1986, and
that met the applicable requirements of Section 415 of the Code
as in effect for all Limitation Years.

(b)  Protection of Current Accrued Benefit.  If
the Current Accrued Benefit of an individual who is a Participant
as of the first day of the Limitation Year beginning or or after
January 1, 1987, exceeds the benefit limitations under Section
415(b) of the Code (as modified by sections 4.1 and 4.2 of this
amendment), then, for purposes of Code Section 415(b) and (e),
the Defined Benefit Dollar Limitation with respect to such
individual shall be equal to such Current Accrued Benefit.

4.4.  Special Rules for Plans Subject to Overall
Limitations Under Code Section 415(e).

(a)  Defined Contribution Plan Fraction.  For
purposes of computing the defined contribution plan fraction of
Section 415(e)(1) of the Code, "Annual Addition" shall mean the
amount allocated to a Participant's account during the Limitation
Year as a result of:

                    (i)   Employer contributions,

                    (ii)  Employee Contributions,

                    (iii) Forfeitures, and

**KENKOHN 0142**

13EDG001KO

4117

    (iv)   Amounts described in Sections 415(l)(l) and 419(A)(d)(2) of the Code.

    (b)  <u>Recomputation Not Required</u>.  The Annual Addition for any Limitation Year beginning before January 1, 1987 shall not be recomputed to treat all Employee Contributions as an Annual Addition.

    (c)  <u>Adjustment of Defined Contribution Plan Fraction</u>.  If the Plan satisfied the applicable requirements of Section 415 of the Code as in effect for all Limitation Years beginning before January 1, 1987, an amount shall be substracted from the numerator of the defined contribution plan fraction (not exceeding such numerator) as prescribed by the Secretary of the Treasury so that the sum of the defined benefit plan fraction and defined contribution plan fraction computed under Section 415(e)(1) of the Code (as revised by this Section IV) does not exceed 1.0 for such Limitation Year.

    4.5.  <u>Special Rules</u>.  The provisions of this Section IV shall be modified as provided in:

    (i)   Section 415(b)(2)(F) of the Code for plans maintained by organizations (other than governmental units) exempt from tax under Subtitle A of the Code, and qualified merchant marine plans; and

    (ii)  Section 415(b)(9) of the Code for plan participants who are commercial airline pilots.

KENKOHN 0143

13EDG001KO

4118

4.6.    Effective Date of Section IV Provisions.    The provisions of this Section IV shall be effective for Limitation Years beginning after December 31, 1986.

## SECTION V

### CALCULATION OF PRESENT VALUE FOR CASH-OUT OF BENEFITS AND FOR DETERMINING AMOUNT OF BENEFITS

5.1.    In General.    This Section V shall apply to all distributions from the plan and from annuity contracts purchased to provide plan benefits other than distributions described in Section 1.417-1T(e)(3) of the Income Tax Regulations issued under the Requirement Equity Act.

5.2.    Determination of Present Value.

(a)    For purposes of determining whether the present value of (i) a Participant's vested accrued benefit; (ii) a qualified joint and survivor annuity, within the meaning of Section 417(b) of the Code; or (iii) a qualified preretirement survivor annuity within the meaning of Section 417(c)(1) of the Code exceeds $3,500, the present value of such benefits or annuities shall be calculated by using an interest rate no greater than the Applicable Interest Rate.

(b)    In no event shall the present value of any such benefit or annuity determined under this Section 5.2 be less than the greater of:

-10-

KENKOHN 0144

13EDG001KO                                        4119

(i)   the present value of such benefits or annuities determined under the plan's provisions for determining the present value of accrued benefits or annuities other than Sections V and IX of this amendment; or

(ii)  the present value of such benefits or annuities determined using the Applicable Interest Rate.

5.3.  Determination of Amount of Benefits.

(a)  For purposes of determining the amount of a Participant's vested accrued benefit, the interest rate used shall not exceed:

(i)   the Applicable Interest Rate if the present value of the benefit (using such rate or rates) is not in excess of $25,000; or

(ii)  120 percent of the Applicable Interest Rate if the present value of the benefit exceeds $25,000 (as determined under clause (i)). In no event shall the present value determined under this clause (ii) be less than $25,000.

(b)  In no event shall the amount of the benefit or annuity determined under this Section 5.3 be less than the greater of:

(i)   the amount of such benefit determined under the plan's provisions for determining the amount of benefits other than Sections V and IX of this amendment; or

(ii)  the amount of such benefit determined using the Applicable Interest Rate if the value determined in Section 5.3(a) is less than $25,000 or 120 percent of the Applicable Interest Rate if the value determined in Section 5.3(a) is not less than $25,000.

-11-                        KENKOHN 0145

13EDG001KO

4120

5.4.  Coordination with Limitations on Contributions and Benefits.  In no event shall the amount of any benefit or annuity determined under this Section V exceed the maximum benefit permitted under Section 415 of the Code.

5.5.  Applicable Interest Rate.

(a)  For purposes of this Section V, "Applicable Interest Rate" shall mean the interest rate or rates which would be used as of the date distribution commences by the Pension Benefit Guaranty Corporation for purposes of determining the present value of that Participant's benefits under the plan if the plan had terminated on the date distribution commences with insufficient assets to provide benefits guaranteed by the Pension Benefit Guaranty Corporation on that date.

(b)  Notwithstanding the foregoing, if the provisions of the plan other than Section 5.5 so provide, the Applicable Interest Rate shall be determined as of the first day of the Plan Year in which a distribution occurs rather than as of the date distribution commences.

5.6.  Effective Dates.

(a)  In General.  This Section V shall apply to distributions in Plan Years beginning after December 31, 1984, other than distributions under annuity contracts distributed to or owned by a Participant prior to September 17, 1985 unless

-12-

KENKOHN 0146

13EDG001KO

4121

additional contributions are made under the plan by the Employer with respect to such contracts.

(b) <u>Special Rule for Distributions Prior to 1987.</u> Notwithstanding the foregoing, this Section V shall not apply to any distributions in Plan Years beginning after December 31, 1984, and before January 1, 1987, if such distributions were made in accordance with the requirements of the Income Tax Regulations issued under the Retirement Equity Act of 1984.

SECTION VI

DETERMINATION OF TOP-HEAVY STATUS

Solely for the purpose of determining if the plan, or any other plan included in a required aggregation group of which this plan is a part, is top-heavy (within the meaning of Section 416(g) of the Code) the accrued benefit of an Employee other than a key employee (within the meaning of Section 416(i)(1) of the Code) shall be determined under (a) the method, if any, that uniformly applies for accrual purposes under all plans maintained by the Affiliated Employers, or (b) if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional accrual rate of Section 411(b)(1)(C) of the Code.

KENKOHN 0147

13EDG001KO

4122

## SECTION VII

### EMPLOYEE CONTRIBUTIONS NOT PERMITTED

The Plan shall accept no Employee Contributions which are accounted for separately (as though they were actually allocated to a separate account) after the last day of the last Plan Year beginning before December 31, 1986.

## SECTION VIII

### REPLACEMENT OF IMMEDIATE ANNUITY RATE WITH APPLICABLE INTEREST RATE

8.1. <u>Replacement of Immediate Annuity Rate</u>. If the provisions of the plan, other than this Section VIII provide that the present value and amount of benefits under Sections 5.2 and 5.3 of this amendment are determined with reference to the immediate annuity rates used by the Pension Benefit Guaranty Corporation, the rate used for such purposes shall instead be the Applicable Interest Rate as defined in Section 5.5 of this amendment or 120 percent of that rate if the present value of the benefit exceeds $25,000 (determined using the Applicable Interest Rate) and provided that the use of 120 percent of such rate shall not reduce the present value or amount of benefits below $25,000.

8.2. <u>Effective Date</u>. This Section VIII shall apply to distributions in Plan Years beginning after December 31, 1986, and shall also apply to any distributions in Plan Years beginning after December 31, 1984 and before January 1, 1987 other than:

-14-                                        **KENKOHN 0148**

13EDG001KO

4123

    (a) Distributions under annuity contracts distribution to or owned by a Participant prior to September 17, 1985 unless additional contributions are made under the plan by the Employer with respect to such contracts; or

    (b) Distributions made in accordance with the requirements of the Income Tax Regulations issued under the Retirement Equity Act of 1984.

    IN WITNESS WHEREOF, this Amendment has been duly signed this    day of    , 1988.

H. KOHNSTAMM & CO., INC.

By:_____

ATTEST:

_____

-15-

KENKOHN 0149

10/19/87

new
escrow
requested

Present proposal "is improved"
    9.5 common stock
    10 yr obligation of shareholders on E
    supply K amendments
    Bd seat contd'l on Bd requesting $5 million shares
      → not authrel by WJ re Eisner
         working capital advance 250m
         100m less reserve fund increase
         ∴ these don't meet Frank's request
         but, basically unclear.

100m increase brings to 2.77 million overall cushion

New proposal (alternative)
    Asset purchase for stock or cash 10 million
    Taxable by HK; taxable again to shareholders
    shareholders would not receive anything
    SEC registration would go quicker & less expensive
    UF would pay severance if leaving
    ∴ no one sees much advantage to this alt.

Bill's Shina #'s
    340m below 8 million balance      7.760  7/26/87
                                          bal.
    650    severance pay
   − 250    UFC
    400    severance pay
    500    K commitments   Warren & Frank
    250    Computer costs which EtW won't capitalize
    200    legal, acct, brokerage fees
    150
    200
    100    UFC

KENKOHN 0065

425 net legal, acct

50 vacation accrual

400 post $4^{th}Q$ 87, 1st Q88 losses (before taxes)

—————

2.025

300 tax benefit of losses

—————

1.725

6.035 net equity v 8 million UFC figure
                                    fr K

1.965 reduction g 9.5 million purchase price

269,107 sh @ 28

To avoid SEC registration of new entity, Bob proposes split off of Gen Color to Kelistein family, minority shareholders would get UFC stock. Donside would be family would have full control of Gen Color. Cost of registration would be 6 figures.

Banks want personal guarantee on loan to Gen Color.

Frank notes that E deadline at Camden rapidly approaching (5/88). No time to negotiate w them

Warren notes pressure from lending banks.

Supply K charges since last Bd - 105M
concession by UF.

Premium on total deal will be 1.5 million over
book ( if book under 8 million which it will probably be)

Bd doesn't see Gen Color shareholder
liability if Camden stays open for duration
of supply K.

NJ has approved transfer of hearing → UF &
Camden → Gen Color. Tho this was based on
24 mo K, now its 18 mo.

Tom: we have no choice but to sell:
① We're losing $
② May, '88 Camden Σ improvements - can't be met

KENKOHN 0090

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CIVIL PART
CAMDEN COUNTY
DOCKET NO.:
A.D.#:_____

PLEASANT GARDENS REALTY,      )
CORP.,                        )
                              )
          Plaintiffs,         )          TRANSCRIPT
                              )              OF
     vs.                      )           HEARING
                              )
H. KOHNSTAMM & CO., INC.,     )
et al.,                       )
                              )
          Defendants.         )


                    Place:  Camden County Courthouse
                            25 N. 5th Street
                            Camden, N.J. 08102

                    Date:   February 30, 2006

BEFORE:

    HONORABLE CHARLES A. LITTLE, J.S.C.

TRANSCRIPT ORDERED BY:

    SHANNA P. O'NEAL, ESQUIRE (Saul, Ewing)

APPEARANCES:

    JOHN F. STOVIAK, ESQUIRE (Saul, Ewing)
    SHANNA P. O'NEAL, ESQUIRE
    Attorney for Dan and Elizabeth Kohnstamm, Kenneth and
    Adam Kohnstamm, Joshua and Ricka Robb Kohnstamm, Peter
    Kohnstamm and Mary Kohnstamm.

    DENNIS KRUMHOLZ, ESQUIRE (Riker, Danzig)
    Attorney for Richard Kohnstamm, David Kohnstamm,
    Jeffrey Kohnstamm, John Kohnstamm and Kevin Kohnstamm.

    ROBERT FELTOON, ESQUIRE (Conrad, O'Brien)
    Attorney for Abby Kohnstamm

2

(Appearances Continued)


    MICHAEL BOGDONOFF, ESQUIRE (Dechert LLP)
    Attorney for Sensient Colors


                        Transcriber Josette Jones
                        DOMAN TRANSCRIBING AND
                        RECORDING SERVICES
                        P.O. Box 129
                        Gibbsboro, NJ   08026
                        PHONE:  (856)435-7172
                        FAX:    (856)435-7124
                        Email:  Dianadoman@Comcast.net

                        Sound Recorded
                        Recording Operator

---

3

1
2                    I N D E X
3
4  Argument By:
5
6  Mr. Stoviak             6, 23, 31
7
8  Mr. Krumholz         12, 25
9
10  Mr. Bogdonoff       17, 28
11
12  Mr. Feltoon          27
13
14  THE COURT:  Ruling     31

Colloquy                                                 4

1       (Court in Session)
2               THE COURT:  Pleasant Gardens.  We have half
3       the people here anyway.  Come on down sport's fans.
4       Are you guys in those other 500 Pleasant Gardens that
5       Judge Colalillo was so nice to assign to me?
6               COUNSEL:  No.
7               THE COURT:  Are we having a jury
8       presentation?
9               COUNSEL:  No, I just wanted to liven it up,
10      Your Honor, if I may with a --
11              THE COURT:  You got to get a little better
12      than boards, I can tell you that.  You get some dancing
13      girls to come across with those.
14              All right, gentlemen, this is -- I lost my
15      place and my mind, too.  That's all right.  Enter your
16      appearances.
17              MR. STOVIAK:  Your Honor, John Stoviak.  And
18      I'm with Shanna O'Neal from Saul, Ewing.  We represent
19      third party defendants that are moving, Dan and
20      Elizabeth Kohnstamm, Kenneth and Adam Kohnstamm, Joshua
21      and Ricka Robb Kohnstamm, Peter Kohnstamm and Mary
22      Kohnstamm.
23              THE COURT:  What about Paul?  Did you name
24      Paul?
25              MR. STOVIAK:  Paul Kenneth is his name, but

Colloquy                                                 5

1       he goes by Kenneth.
2               THE COURT:  You have Mary, Paul, and Peter,
3       what was the singing group?
4               MR. STOVIAK:  Peter, Paul and Mary.
5               THE COURT:  Peter, Paul and Mary.  You don't
6       have any Mary's.
7               MR. STOVIAK:  I do have a Mary.
8               THE COURT:  I have a Rick, Richard, Sarah,
9       Peter, Paul, Paul, Mary -- hey, we do have a Mary --
10      Kevin, Joshua, John, Jeffrey, Elizabeth, David, Daniel
11      and Abby.  Any on the next page?  Yes.  Adam.  Okay.
12      Who do the rest of you guys have?
13              MR. KRUMHOLZ:  Your Honor, Dennis Krumholz,
14      I'm here with Jay Eversman from the Riker, Danzig firm
15      on behalf of third party defendants Richard Kohnstamm,
16      David Kohnstamm, Jeffrey Kohnstamm, John Kohnstamm and
17      Kevin Kohnstamm.
18              MR. FELTOON:  Your Honor, Bob Feltoon from
19      Conrad, O'Brien.  I'm here for just one third party
20      defendant, Abby Kohnstamm.
21              THE COURT:  Abby wouldn't take the stock,
22      right?
23              MR. FELTOON:  Pardon me, Your Honor?
24              THE COURT:  Abby refused to take the stock,
25      she said she didn't want it?

Stoviak - Argument                                    6

1    MR. FELTOON:  Yes.  Abby and her husband
2  Peter did not take the General Color stock.
3    THE COURT:  Right.
4    MR. BOGDONOFF:  Your Honor, Mike Bogdonoff,
5  from Dechert representing Sensient Colors, Inc.  And
6  I'm joined by John Ix, also from Dechert.
7    THE COURT:  Okay.  Who wants to run it?
8    MR. STOVIAK:  Your Honor, if I may?  John
9  Stoviak, again.  I'm going to split up the argument on
10  behalf of the moving third party defendants.  I'm going
11  to talk about why there should be no piercing of the
12  corporate veil, and why the request here, set forth on
13  the third-party complaint, is totally unprecedented.
14    Mr. Krumholz is going to speak to the one
15  basis upon which the third party plaintiff seeks to
16  pierce the corporate veil, the ECRA filings and
17  submissions.
18    And essentially, in light of Your Honor's
19  comment about the shareholders getting out of this
20  case, I'm going to focus my argument on the two
21  individuals that are also directors and why you should
22  also dismiss them from the case.
23    All of the moving third-party defendants are
24  minority shareholders in H. Kohnstamm -- or were
25  minority shareholders in H. Kohnstamm.  Only Kenneth

Stoviak - Argument                                    7

1  Kohnstamm and Richard Kohnstamm were directors of H.
2  Kohnstamm.
3    And essentially why they should be dismissed,
4  even though they were directors of H. Kohnstamm, is the
5  following reason.  Number one, the third party
6  complaint only sues them in their capacity as
7  shareholders.  There are no allegations whatsoever in
8  the third party complaint that either Kenneth Kohnstamm
9  or Richard Kohnstamm engaged in any improper activities
10  as a director of H. Kohnstamm, up until 1988.
11    Or as a --
12    THE COURT:  Richard and Kenneth were both
13  directors?
14    MR. STOVIAK:  Richard and Kenneth were both
15  directors.  Secondly, as a matter of law a corporation
16  cannot pierce its own corporate veil.  And if I may,
17  Your Honor, may I use the chart here to make my point?
18    THE COURT:  Yes.
19    MR. STOVIAK:  Essentially, what you have here
20  in this instance, Your Honor, is you have H. Kohnstamm
21  & Company, Inc. a New York corporation that existed and
22  still exists today.  But from 1922 to 1988, it owned
23  the Camden property, it owned the General Color Company
24  stock and the moving third party defendants only
25  accounted for 25.982 percent of its stock.

Stoviak - Argument                                    8

1      In 1988, the transaction that's at issue,
2  Universal Foods Corporation, which is also represented
3  by the third party plaintiffs here and is a defendant
4  in this case, bought the stock of H. Kohnstamm, and
5  along with it picked up the liabilities as a matter of
6  sort of form of corporate law.
7      When you buy the stock, you pick up the
8  liabilities of that corporation.  Then in, I think,
9  2002, H. Kohnstamm Company still existed as a wholly
10 owned subsidiary of Universal Foods, and it was
11 ultimately renamed Sensient Colors, Inc., a New York
12 corporation, which is the third party plaintiff.
13     So H. Kohnstamm & Company is now Sensient
14 Colors, Inc.  Nothing's changed about it, other than
15 its name has changed, its stock ownership changed in
16 1988 to Universal Foods, but it is the same
17 corporation.
18     And what Sensient Colors, Inc. is trying to
19 do here, as the third party plaintiff, is essentially
20 pierce its own corporate veil and say its own corporate
21 existence is a sham and that you should impose
22 liability on its own shareholders.  The minority moving
23 third party defendants.  Or, in the instance of the
24 directors, but the -- Mr. Richard Kohnstamm and Mr.
25 Kenneth Kohnstamm are only sued as shareholders.

Stoviak - Argument                                    9

1      But there's no -- that argument would still
2  apply as a matter of law that you can't pierce your own
3  corporate veil to impose liability on directors.
4      Particularly here, where there is a total
5  absence of any allegation of fraud, or intentional
6  wrongdoing, or any action that would create a manifest
7  injustice.
8      There is no allegation that Ken or Richard
9  were involved in the ECRA submission, that is the
10 linchpin of the whole theory of this third party
11 complaint to justify piercing the corporate veil.
12     They are sued essentially in their status as
13 shareholders, and, as Mr. Krumholz will cover, the ECRA
14 submission doesn't justify piercing the corporate veil.
15 It was a submission made by H. Kohnstamm & Company,
16 which is now Sensient Colors, the third party
17 plaintiff.
18     And to illustrate why this case should be
19 dismissed now as  a matter of law, you'd simply need to
20 look at the situation in the Arky's case, where you had
21 a situation where there was a Spill Act claim brought
22 by the State Department of Environmental Protection
23 against Arky's Auto Sales, Inc., and two twin brothers,
24 Stanley and Norman Arky.
25     Stanley and Norman Arky happened to go buy a

Stoviak - Argument                    10

1    piece of property in the name of the corporation in
2    1971, a 22 acre parcel.  They shortly thereafter leased
3    out 6 acres, which became a dumping ground for drums.
4              1973 there was a fire on the property and the
5    drums started to explode and leak all over the place.
6    The State Department of Environmental Protection then
7    started an investigation about this activity and found
8    out that the Arky brothers had gone in and dug a pit on
9    the property and were burying these drums in that pit.
10             They sued both Arky's Auto Sales, and the
11   Arky individual brothers.  The trial court found that
12   the corporate veil should be pierced and there should
13   be individual liability on the two twin brothers,
14   Stanley and Norman.
15             The Appellate Division reversed and said,
16   there is no allegation and no evidence, in that case,
17   since it was a trial, of any fraud by those
18   individuals.  And absent that, you can't go pierce the
19   corporate veil and impose the extraordinary equitable
20   remedy of piercing the corporate veil.
21             Well here, you have minority shareholders
22   being sued in their capacity as shareholders.  You
23   simply have no allegation whatsoever of any fraud, any
24   injustice, or any attempt by these minority
25   shareholders, including the two directors, to treat the

Stoviak - Argument                    11

1    corporation as a sham, or to create any fraud.
2              Therefore, you should dismiss the case as a
3    matter of law for failure to state a claim.  In
4    addition, on the personal jurisdiction side, the third
5    party plaintiff has the burden to make out a prima
6    facie case pursuant to the Disney case.  Despite having
7    limited discovery on personal jurisdiction issues, they
8    have not submitted any information, other than their
9    bare-bones allegations in the third party complaint,
10   that the moving third party defendants reside in
11   Oregon, Montana, Minnesota, Connecticut, New York.
12             None of them reside in New Jersey, none of
13   them work in New Jersey.  None of them hold bank
14   accounts in New Jersey.  None of them own any real
15   estate, or lease any real estate in New Jersey.  None
16   of them pay taxes.
17             There is no basis for imposing personal
18   jurisdiction on these individuals.  There is no minimum
19   contact on these individuals that justifies that.  And
20   in fact, the ECRA submission, which is what they argue
21   in their complaint, gives them a right to argue that
22   there was a basis for specific jurisdiction, because
23   there was an ECRA submission to the -- a letter
24   submitted to New Jersey Department of Environmental
25   Protection.

Krumholz - Argument                    12

1    That doesn't give them jurisdiction here,
2  because there's no evidence, and in fact the documents
3  attached to the complaint show that the ECRA
4  submission, the letters, were submitted on behalf of H.
5  Kohnstamm, not on behalf of the shareholders.
6    Not on behalf of the moving third party
7  defendant minority shareholders.  Not on behalf of any
8  of the directors.  It was submitted on behalf of H.
9  Kohnstamm.  There's no allegation that any of the
10 moving third party defendants had any role in the ECRA
11 submission.
12    So that doesn't get you to a point where you
13 can justify imposing personal jurisdiction over these
14 moving third party defendants.
15    I'm happy to answer any questions Your Honor
16 might have.  Obviously, based on your initial comment,
17 I think there's absolutely no basis to keep the
18 shareholders in this case, as well.
19    MR. KRUMHOLZ:  If I may Your Honor?  I'm Mr.
20 Krumholz, on behalf of certain of the moving third
21 party defendants.  And I'd like to focus on the ECRA
22 aspect of this motion.
23    ECRA is now the Industrial Site Recovery Act,
24 but it was adopted in 1983 as the Environmental Cleanup
25 Responsibility Act.

Krumholz - Argument                    13

1    It was enacted by the legislature for a
2  variety of reasons.  The main one of which was that
3  they felt that the Government shouldn't be the only
4  party paying for remediation of hazardous waste sites.
5    They felt that private parties should be
6  responsible.
7    THE COURT:  The only thing that letter said
8  was, based upon the form of transaction, they had no
9  jurisdiction.  Isn't that what the letter said?
10    MR. KRUMHOLZ:  That's basically right.
11 There's --
12    THE COURT:  If they had changed to another
13 form of -- like if they were going to sell it to you,
14 then they had to get approvals from ECRA.
15    MR. KRUMHOLZ:  You're right, Your Honor.  The
16 basis of the submittal was to take advantage of the
17 language in the statute which says, there's no
18 jurisdiction where there's a corporate reorganization
19 not substantially effecting ownership.
20    And the argument that the corporation made
21 was, this is such a transaction.  Before the
22 transaction, there will be certain beneficial owners.
23 After the transaction, essentially the same beneficial
24 owners, even though there's been a transaction on the
25 change in corporations.

Krumholz - Argument                    14

1     And that kind of situation is what we think
2  the legislature meant by a corporate reorganization.
3  That was the basis of the filing, and DEP agrees with
4  the filing. And they granted the letter of
5  non-applicability.
6          Now the third party plaintiff alleges that
7  that even somehow becomes translated into a waiver of
8  the corporate veil protection. And we submit that
9  there is no legal authority for that proposition at
10  all. That's the essence of their case.
11          As Mr. Stoviak said, there's no claim of
12  fraud, or injustice, or sham, or alter ego. None of
13  the traditional bases for piercing the veil is present,
14  is alleged, nor could it in good faith be alleged. The
15  only claim for liability is this ECRA submission.
16          And I submit to you, Your Honor, that that's
17  an insufficient basis for liability. There's no
18  support in the law anywhere, nor any cited by third
19  party plaintiffs to suggest that that's a valid cause
20  of action.
21          Indeed, all the DEP did, nothing more, is to
22  recognize the facts. Which is the beneficial owner
23  doesn't change. In recognizing that the beneficial
24  owner remains the same, that doesn't pierce the veil,
25  that doesn't say the beneficial owner has liability.

Krumholz - Argument                    15

1  ECRA is not a liability statute. And, certainly, the
2  DEP is not a court of equity reaching conclusions about
3  equitable matters like piercing the veil. DEP was
4  simply reaching the conclusion that, on these facts,
5  the transaction met the test of corporate
6  reorganization, but it did not in any way act in
7  derogation or abrogation of the corporate veil
8  principles.
9          And since that is the only allegations and it
10  cannot be made out as a matter of law, we submit that
11  the claim -- the entire third party claim should fail.
12          THE COURT: Think ECRA's decision would have
13  been different, had Universal bought the assets and not
14  just the stock?
15          MR. KRUMHOLZ: If at the time that the assets
16  were transferred, but the Camden facility was not among
17  the assets. I don't think the answer would be
18  different. I think it would be the same. Because what
19  they were focusing on was the Camden facility. And
20  before the transaction, it was owned by a company H.
21  Kohnstamm, whose shareholders were generally the family
22  members, let's say.
23          After the transaction, it was owned by
24  General Color Company, whose shareholders were
25  generally the same individuals. Whether the purchase

Krumholz - Argument                16

1   of the company, H. Kohnstamm, or other assets,
2   non-Camden assets was done, formed not too important
3   with respect to the Camden facility.  That was carved
4   out.
5          And I might add, Your Honor, that it was
6   carved out at the request of the buyer, at the request
7   of Sensient Colors, who said, we will take H. Kohnstamm
8   without Camden.  We don't want Camden.  In fact, you
9   must obtain a letter of non-applicability, or else
10  we're not going to proceed with the transaction.
11         So I don't think the form -- to answer your
12  question, the form of the transaction wouldn't matter,
13  as long as the Camden facility had been eliminated, as
14  it was.
15         THE COURT:  And also there was a property in
16  Newark that was not included?
17         MR. KRUMHOLZ:  There was property in Newark
18  that was owned by General Color, which, since General
19  Color was not transferred to the Universal side, was
20  also not transferred, that's correct.
21         THE COURT:  Has there been any litigation
22  involving that?  Out of curiosity.  I don't want it
23  here, if there is.
24         MR. KRUMHOLZ:  As far as I know, Your Honor,
25  we were curious also, none.  I'm not aware of any.

Bogdonoff - Argument               17

1          THE COURT:  All right.  Thank you.
2          MR. KRUMHOLZ:  Thank you, Your Honor.
3          THE COURT:  All right.
4          MR. BOGDONOFF:  Your Honor, Mike Bogdonoff on
5   behalf of Sensient Colors.  The -- Mr. Krumholz is
6   right that Universal did not want this company.  And --
7   this property in Camden.  This was operated by the
8   Kohnstamm family shareholders, in essence from the
9   period 1922 through 1988.
10         Or the Kohnstamm family generally, not
11  necessarily these specific shareholders.  These movants
12  have portrayed themselves as minority shareholders.
13  They were not the minority shareholders in this
14  particular transaction.  Those minority shareholders
15  were treated much differently than the movants.
16         They were defined separately and they were
17  effectively squeezed out of the transaction.  And they
18  didn't get the benefit of this 10 million dollar deal
19  that ultimately rebounded to the benefit of the
20  Kohnstamm family shareholders in the amount of 8
21  million dollars.
22         They were essentially squeezed out.  None of
23  the true minority shareholders in this case had to do
24  the things that the movants were required to do to make
25  this deal happen.  None of the true minority

Bogdonoff - Argument                          18

1   shareholders were required to sign a shareholder
2   agreement.  They were not required to sign a
3   representation letter.  They weren't required to sign
4   affiliate letters.  They weren't required to sign the
5   reorganization agreement.
6           Essentially, they were given a pass and they
7   walked out of the matter with essentially no benefit of
8   this Universal deal.  These movants, on the other hand,
9   profited wildly on this transaction, and with the
10  understanding that ultimately they would have to be
11  responsible for the cleanup of the Camden property.
12          Now the Camden property is the subject of EPA
13  clean-up, and the movants are nowhere to be heard from.
14  The express understanding of Universal in the
15  transaction, was that they were not going to take the
16  Camden property.  It was well-recognized by Universal
17  and the Kohnstamm family shareholders, that this was an
18  environmentally troubled property.
19          In fact, Abby and Peter elected not to take
20  General Color stock, because they recognized the
21  environmental problems.
22          Paul Kenneth, referred to as Kenneth by Mr.
23  Stoviak, made marginal notes saying that the downside
24  of this transaction is that ultimately it's going to
25  fall on the family to be responsible for General Color.

Bogdonoff - Argument                          19

1           Now the injustice that we're seeking to
2   address here in the piercing of the veil, is
3   essentially telling the DEP, or having representations
4   made to the DEP for the benefit of these folks to let
5   this transaction go through as it was.  That the
6   beneficial ownership of General Color would be the same
7   as the Kohnstamm Company.
8           And, in fact, it wasn't, but they made
9   representations that, notwithstanding the fact that
10  they weren't -- that Kohnstamm was 100 percent
11  shareholder interest of which they had approximately 80
12  percent, less than 100 percent of those shareholders
13  were going to become the owners of General Color.  And
14  they said, recognize this for what it is.  We, the
15  Kohnstamm family shareholders, are -- or they the
16  Kohnstamm family shareholders, are in control of this
17  company, and that will happen -- that will be the case
18  both before and after this transaction, when General
19  Color gets the -- is transferred to those Kohnstamm
20  family shareholders.
21          Now with respect to the personal jurisdiction
22  on the veil piercing, the Phar-Mor case, which is cited
23  in our papers, and the In Re Buildings by Jamie case,
24  speak to this issue of piercing one's own veil.
25          Now recognizing that there are issues with

Bogdonoff - Argument                          20

1   respect to the core proceedings and non-core
2   proceedings, the controlling precedent, the Third
3   Circuit opinion in the <u>Phar-Mor</u> case, does recognize
4   that New Jersey law allows for the piercing of one's
5   own veil and the idea here is that --
6            THE COURT:  Kohnstamm's a New York
7   corporation, isn't it?
8            MR. BOGDONOFF:  That's correct, Your Honor.
9   However, New Jersey has a far greater interest in
10  seeing to it that its environmental sites are cleaned
11  up.  And, certainly, this Court has the authority to
12  exercise jurisdiction and to have its law applied in
13  the circumstance of piercing the veil.
14           The evidence with respect to the piercing is
15  indeed with respect to this ECRA claim and the -- as I
16  described, the submittal was made to the DEP by
17  Kohnstamm Company to say, in essence, these are the
18  same controlling interests as before, as will be in
19  place after, to take advantage of that exemption to
20  ECRA.
21           The reason they needed that exemption to
22  ECRA, was Universal clearly didn't want the property.
23  So that would mean that the Kohnstamm family
24  shareholders and General Color would have to
25  immediately initiate a cleanup, if that exemption were

Bogdonoff - Argument                          21

1   to not -- to be found not to apply.
2            So, basically, we have the Kohnstamm family
3   shareholders and this representation made to the DEP
4   that says, this is the same controlling interest that
5   both before and after the transaction, and as a result,
6   DEP, don't worry the same people will be here after
7   this transaction and will be responsible for the
8   environmental cleanup.
9            What happened, in fact, though, is that the
10  company limped along, and in and around 1990, the
11  company began a series of redemptions that we only
12  found through this limited discovery period that we've
13  had.  And this redemption process effectively had all
14  of these family shareholder interests, had their stock
15  redeemed, albeit four cents on the dollar, and they
16  essentially walked out the back door, leaving this
17  environmentally troubled site to stay with Paul
18  Kohnstamm and General Color Company and its remaining
19  shareholders and insufficient assets available to
20  ultimately cleanup the property.
21           The personal contacts that these individuals
22  had with the State of New Jersey are significant.  Each
23  of them, and these are all laid out in our papers.  But
24  each of them signed one or more documents that were
25  necessary to make this transaction occur.

Bogdonoff - Argument                    22

1   And, as noted, even young Adam, a minor, was
2   required to sign these papers in order to effectuate
3   this transaction. So the fact that these are portrayed
4   as minority is not necessarily the case, because
5   collectively, with the various trusts and with Paul
6   Kohnstamm's share, they equated to approximately 81
7   percent of the share hold interest.
8           Two of these individuals were directors and
9   they had fiduciary obligations to be involved with the
10  company. And to say that they don't have a reasonable
11  expectation to be hailed into Court in New Jersey,
12  given the fact that this transaction involved, not one,
13  but two environmentally troubled sites within the State
14  of New Jersey, as Your Honor correctly noted.
15          The Newark site still exists and is the
16  subject of EPA cleanup, although no litigation as yet.
17  And this Camden property, this is a multi-million
18  dollar business deal, each of them actively reviewing
19  documents and signing documents, representations being
20  made for their benefit to various state agencies.
21  Environmentally troubled sites.
22          And for them to have a sense that they
23  shouldn't be responsible for a New Jersey litigation,
24  doesn't comport with the law.
25          Finally, with respect to the failure to state

Stoviak - Argument                    23

1   a claim. The rules, obviously, are fairly liberal and
2   hospitable and the relief that the movants are
3   requesting is fairly extraordinary. We believe that
4   the veil piercing allegations, based on the evidence as
5   we presented in the personal jurisdiction argument, are
6   meritorious. And we also believe that the direct
7   liability under the Spill Act is appropriate. And
8   particularly in light of this scheme that we've
9   discovered with respect to cashing out, or redeeming
10  out their ownership in General Color.
11          I'd be happy to respond to any questions,
12  Your Honor.
13          MR. STOVIAK: Your Honor, briefly just a
14  couple of rebuttal points. Number one, you're right,
15  H. Kohnstamm is a New York corporation. Number two,
16  the only thing extraordinary is the request to pierce
17  the corporate veil against shareholders who, the issue
18  before this Court are the minority third party -- are
19  the moving third party defendants, who are minority
20  shareholders.
21          Including Adam Kohnstamm, who was five years
22  old in 1988, at the time of the transactions. And what
23  is not before your court is the Estate of Paul
24  Kohnstamm or the trust. We don't represent those
25  trusts, we don't represent the Estate of Paul

Stoviak - Argument                                    24

1    Kohnstamm.  That is not before the Court.
2            And you have to look, as Mr. Bogdonoff in his
3    brief concedes, you have to look at each of these
4    individual third party defendants on an individual
5    basis.
6            And none of them held any controlling share
7    in the company than collectively the moving third party
8    defendants accounted for roughly 26 percent, as you've
9    seen.
10           Secondly, what is before the Court, there is
11   no allegation, even though Mr. Bogdonoff wants to make
12   it that the Kohnstamm family shareholders dominated, or
13   controlled H. Kohnstamm, because they can't make that
14   allegation, because they are H. Kohnstamm.
15           There's no allegation that H. Kohnstamm,
16   which is now the third party plaintiff here, was a
17   corporate sham.  There's no basis in the law that H.
18   Kohnstamm now sends in Color, the third party
19   plaintiff, can turn around and sue its former
20   directors, its former minority shareholders.
21           It doesn't make any sense.  They might be
22   able to sue them for a breach of fiduciary duty, if
23   they thought there was a breach, and the statute of
24   limitations hadn't run.  But they don't have that
25   claim, they haven't alleged that claim.  What is

Krumholz - Argument                                   25

1    alleged, is that they're asking this Court to invoke --
2    or allow them to proceed on a claim to invoke the
3    extraordinary remedy of piercing the corporate veil,
4    based on the status of the moving third party
5    defendants as shareholders, and they were minority
6    shareholders, absent any allegation of fraud.
7            Absent any allegation of any injustice, and
8    absent any allegation that the corporation was treated
9    as a sham.
10           Thank you.
11           MR. KRUMHOLZ:  Just a few points in rebuttal,
12   as well, Your Honor.  I think there are a couple of
13   misstatements.  If the ECRA letter of
14   non-applicability had not been granted, the
15   responsibility for -- and the deal had gone through,
16   the responsibility for the remediation would have been
17   with Sensient.
18           Sensient became H. Kohnstamm, the company
19   that operated the facility.  They would have been
20   responsible for the remediation.  And that's why I made
21   the point earlier that it was in their interest, indeed
22   their insistence, that this facility be taken out of
23   the transaction, so that they could avoid that
24   responsibility.
25           Similarly, down the road, it was never the

Krumholz - Argument                                    26

```
 1    responsibility of the shareholders of General Color for
 2    the remediation of the Camden facility.  It was the
 3    responsibility of the company itself, General Color,
 4    for the remediation.
 5              I think, throughout the arguments, both here
 6    and in their briefs, the third party plaintiffs
 7    confused -- conflate this idea of beneficial owners and
 8    legal owners.
 9              If it were a simple case, which I'd like to
10    suggest to you now, it would be more easily
11    illustratable that this is not the case.  If, for
12    example, Mr. Bogdonoff and I were shareholders in a
13    company, which owned a facility, and we wanted to
14    transfer the ownership of that facility to another
15    company that he and I owned, we would do that and we
16    would go to DEP and we would say, this is a corporate
17    reorganization, because the beneficial owners Mr.
18    Bogdonoff and I, are the same before and the same
19    after.  The only thing that's changed is a blue company
20    to a red company.
21              And DEP likely would say, yes, there's not an
22    ECRA event here.  That's essentially what happened
23    here, if you strip the details away.  That's
24    essentially what happened.  And on that basis, the
25    plaintiffs are arguing, that subjects those beneficial
```

Feltoon - Argument                                     27

```
 1    owners to liability.  In my hypothetical, it would
 2    subject Mr. Bogdonoff and me to liability, even though,
 3    as in this case, there is no allegation of any fraud,
 4    any wrongdoing, any error in the ECRA filing, any alter
 5    ego, or similar theory that our law traditionally
 6    requires for piercing the veil.
 7              So all DEP did was say, these are the facts,
 8    but the fact that the beneficial owners haven't changed
 9    -- haven't changed, doesn't make them in any way
10    liable.  That's the only basis on which this claim is
11    brought.  And that's why we submit to you as matter of
12    law on the motion to dismiss, since there are no facts
13    that could be established to prove that claim.  Since
14    the law doesn't support piercing the veil under these
15    facts, there can be no judgment awarded at the end of
16    the day for the third party plaintiffs.  And,
17    therefore, a motion to dismiss now would be
18    appropriate.
19              MR. FELTOON:  Your Honor, I didn't rise
20    before, but since Mr. Bogdonoff mentioned my client,
21    I'll just make a brief comment.
22              He mentioned that my client Abby Kohnstamm
23    and her husband Peter, in not purchasing General Color
24    shares recognized the environmental problems, that's a
25    gross misstatement of the record, which he even
```

Bogdonoff - Argument                                28

1    recognizes, Mr. Bogdonoff, in his brief at page 10.
2           All my clients recognize was that his client,
3    Universal Foods, had said they believed there were
4    environmental concerns.  Both Abby and Peter Kohnstamm,
5    and all of the other moving third party defendants,
6    have put in sworn certifications saying they, all of
7    them, had no personal knowledge of any environmental
8    issues at the site.
9           And the only thing that anyone knew was that
10   Universal believed there may.  And that record, as to
11   my client and my colleagues clients, is undisputed.
12   Thank you, Your Honor.
13          MR. BOGDONOFF:  Your Honor, if I may?  If I
14   misstated the record with respect to Abby and Peter
15   Kohnstamm, I stand corrected and did not want to
16   mislead the Court.
17          The -- in fact, the affidavits do say that
18   they recognized that Universal had no interest in this
19   because of the environmental issues.  And ultimately,
20   they elected not to take the stock.  And I think that's
21   a fair characterization of what it was that was done.
22          In contrast to what Mr. Stoviak said, there
23   are allegations, Your Honor, in the third party
24   complaint with respect to misuse of the corporate form.
25   At paragraph 37, the allegation reads:


Bogdonoff - Argument                                29

1           "The above referenced representations and
2    actions of third party defendants evidence a level
3    of control over H. Kohnstamm & Company, Inc. and
4    General Color Company, such that these
5    corporations were mere instrumentalities, or alter
6    egos of the Kohnstamm family shareholders, third
7    party defendants."
8           And at paragraph 38, Your Honor, the
9    allegation is that the third party defendants abused
10   the corporate form to further their personal interests.
11   So there are allegations of record that directly
12   address the points that Mr. Stoviak made.
13          With respect to the --
14          THE COURT:  Where's the proof?
15          MR. BOGDONOFF:  Well, Your Honor, the -- as a
16   matter of pleading, the pleadings are sufficient with
17   respect --
18          THE COURT:  I can charge the Bishop of Boston
19   with bothering my child.  But, you know, I have to
20   prove it.
21          MR. BOGDONOFF:  Well, ultimately it will be
22   our burden to prove those things, Your Honor.  And
23   that's what discovery and trials are all about.
24          However, Your Honor, with respect to a motion
25   to dismiss, the standard is, does it fairly apprise our

Bogdonoff - Argument                    30

1   adversaries of the nature of the claims to be brought
2   against them.  In essence, it's a -- we've alleged all
3   the allegations that I've described with respect to the
4   ECRA submittals.  These are based on the ECRA
5   submittals and it's the same -- of interest that these
6   parties asked be recognized.
7                    In other words, that there was Kohnstamm,
8   General Color and the Kohnstamm family shareholders and
9   they were essentially the same, or substantial
10  continuation of that former entity.
11                   The -- all of the movants submit that the
12  Kaufman affidavit that was submitted to ECRA was
13  factually correct, so there's no dispute as to that.
14  So that is evidence, Your Honor, of this level of
15  control as we've alleged in the third party complaint.
16                   With respect to what Mr. Krumholz said about
17  what the outcome might be if the ECRA
18  non-applicability application were denied, there would
19  have been no transaction, it would not have fallen to
20  Universal.  Universal had no intention of buying this
21  property.  And, in fact, there was a condition
22  precedent of the deal that ECRA non-applicability be
23  determined, and if not, then there would have been no
24  acquisition.
25                   Thank you, Your Honor.

Stoviak - Argument/Ruling                  31

1                    MR. STOVIAK:  Your Honor, just a quick
2   rejoinder.  Those allegations are simply incantations
3   of conclusory things.  My point is, there are no facts
4   alleged in the complaint that justifies a claim of
5   fraud, treating the corporation as a sham, or alter
6   ego, other than their claim about the ECRA filing,
7   which we've addressed on its face.
8                    And based on the documents attached to the
9   complaint, doesn't justify invoking the extraordinary
10  remedy of piercing the corporate veil.
11                   They do have an obligation to be able to
12  allege facts, if, in fact, they could prove that would
13  justify a claim as a matter of law.  And they haven't
14  done that here.  They've just simply recited the
15  conclusions.
16                   THE COURT:  They recited the case law.
17                   MR. FELTOON:  Pardon me?
18                   THE COURT:  They recited the case law.  Those
19  things which must be proven in order to pierce the
20  corporate veil.  Such as, was a mere instrumentality,
21  or alter ego of the shareholders, or the shareholders
22  abused the corporate form to perpetuate a fraud, or
23  otherwise circumvent the law.
24                   That proof must be by clear and convincing
25  evidence, by the way.  And based upon the facts, as if

Ruling                                                    32

1   have, in these briefs and in your arguments, I will
2   dismiss those complaints, that part of the complaints
3   where the corporate veil is sought to be pierced,
4   because I see no facts alleged which would support a
5   claim that the corporation was a mere instrumentality
6   or alter ego of the shareholders.
7           At most, you had two of them, Richard and
8   Kenneth, who were directors of the corporations.  They
9   were in a position as directors to do something.  I
10  don't know what they did or didn't do.  But as far as
11  minority shareholders, there's no proof of the mere
12  instrumentality or alter ego of the shareholders when
13  the corporation did what it did, or didn't do what it
14  should have done.
15          And also there are no facts before the Court
16  which would show that the shareholders abused the
17  corporate form to perpetuate -- or perpetrate, I'm
18  sorry, a fraud, or otherwise to circumvent the law.
19          And as I stated earlier, those proofs would
20  have to be by clear and convincing evidence.  So the
21  corporate veil is not pierced.  As far as dismissing as
22  to the individual shareholders, I find this Court has
23  no jurisdiction of those shareholders.
24          I think, one, on the affidavits I've read
25  only one individual stated that he had ever been to New

Ruling                                                    33

1   Jersey.  And I think he came to Camden New Jersey on
2   one occasion.  For what reason, I forget.  But one of
3   the -- and he's probably -- it's either Richard or
4   Kenneth did come to New Jersey.  I don't know which one
5   it was.  But they did come to New Jersey.  And for what
6   reason, I even forget that.  But the -- as far as the
7   individual minority shareholders are concerned, I will
8   grant your motions, there being no personal
9   jurisdiction, no minimum contacts, no contacts, outside
10  of other than the one individual, and I forget which
11  one that was.
12          But still and all there's insufficient
13  contacts with the State of New Jersey to give New
14  Jersey a jurisdiction over that individual.
15          And I think that's it, isn't it?
16          MR. STOVIAK:  Yes, Your Honor.  Thank you.
17          THE COURT:  Are you going to bring the action
18  in New York to pierce the veil?
19          MR. BOGDONOFF:  Excuse me, Your Honor?
20          THE COURT:  Are you going to bring the action
21  in New York to pierce the veil?
22          MR. BOGDONOFF:  We'll be looking into all of
23  our recourse Your Honor.
24          THE COURT:  This was before Fratto, Judge
25  Fratto, and he sent this back to New York, didn't he?

Colloquy                                    34

1      MR. BOGDONOFF:  That was a different matter,
2  Your Honor.
3      THE COURT:  Another one?
4      MR. BOGDONOFF:  Yeah.  And I --
5      COUNSEL:  The insurance case that he sent
6  back to New York.
7      MR. BOGDONOFF:  I think that was just made
8  subject of appeal on Tuesday, Your Honor.
9      THE COURT:  I guess this one will be, too.
10  That's all right.
11     MR. STOVIAK:  Thank you, Your Honor.
12     MR. BOGDONOFF:  Thank you, Your Honor.
13     (Case adjourned)
14                    * * * * *
15

---

35

1
2                     CERTIFICATION
3
4  I, Josette M. Jones, the assigned transcriber, do hereby
5  certify that the foregoing transcript of proceedings on
6  tape number 1, February 3, 2006, index number from 1999 to
7  4956, is prepared in full compliance with the current
8  Transcript Format for Judicial Proceedings and is a true
9  and accurate compressed transcript of the proceedings as
10  recorded.
11
12     Signature:  _Josette M. Jones_
13                 JOSETTE M. JONES
14                 AOC #457
15
16                 DIANA DOMAN TRANSCRIBING
17  Date: _02/24/06_

MR. RICHARD L. KOHNSTAMM
11476 S.W. River Road
Portland, Oregon  97219

BANK OF NEW YORK
Personal Trust Department
Fourth Floor
New York, New York  10286
ATTN:  Ms. Kathryn Higgins

MR. PAUL L. KOHNSTAMM
P. O. Box 378, R.R. 1
Lower Shad Road
Pound Ridge, New York  10576

MRS. ELIZABETH K. OGDEN
Winfield Avenue
Harrison, New York  10528

February 15, 1991

General Color Company
24 Avenue B
Newark, New Jersey  07114

    Re: Express approval of redemption by General
       Color Company of certain of its issued
       and outstanding shares of common stock

Gentlemen:

  Please be advised that we are the Trustees of the
undersigned Trust ("Trust") which is the record or beneficial
owner of 6,222.3 shares of the common stock of General Color
Company.  We hereby expressly authorize General Color Company to
redeem the common stock of General Color Company held by those
shareholders listed on Schedule A attached hereto.  We hereby
expressly waive any right to have General Color Company redeem
shares of common stock of General Color held by the Trust.  We
hereby expressly acknowledge that if we were to insist that these
20,126.7 shares of common stock of General Color be redeemed,
that the redemption of the shares of common stock of those
shareholders listed on Schedule A would not occur by virtue of
General Color Company having insufficient funding therefor.  Our
authority for the redemptions of the common stock of the
shareholders listed on Schedule A and our waiver of our right to
have the Trust's shares of common stock of General Color Company
redeemed are expressly given with full knowledge that the price
per share for which the shares of common stock held by those
shareholders listed on Schedule A shall be $30.00.

  In consideration of $1.00 and other good and valuable
consideration receipt of which by the Trust from General Color
Company is hereby acknowledged, we hereby agree to execute any

-2-

documents or papers necessary to effectuate the redemption of the shares of common stock of General Color owned or beneficially held for the benefit of those shareholders listed on Schedule A.

Very truly yours,


Trust u/w Lothair S.
  Kohnstamm f/b/o Paul
  L. Kohnstamm ("Trust")


_____
Paul L. Kohnstamm, Trustee


_____
Richard L. Kohnstamm, Trustee


_____
Elizabeth K. Ogden, Trustee


_____
Bank of New York, Trustee

by:  _____
     (print name)

OK    00062

Page 2

|                                                        | Number of Shares of General Color Company Held |
| ------------------------------------------------------ | ---------------------------------------------- |
| **Record Owner**                                       |                                                |
| Mary L. Kohnstamm                                      | 2145                                           |
| Elizabeth K. Ogden                                     | 35                                             |
| Richard L. Ogden                                       | 17.5                                           |
| Tom Ogden                                              | 17.5                                           |
| ~~Paul L. Kohnstamm~~                                  | ~~28,692.5~~                                   |
| ~~Richard L. Kohnstamm~~                               | ~~14,035.9~~                                   |
| Trust u/w Lothair S. Kohnstamm f/b/o Elizabeth K. Ogden | 4570.2                                        |
| ~~Trust u/w Lothair S. Kohnstamm f/b/o Paul L. Kohnstamm~~ | ~~6222.3~~                                 |
| ~~Trust u/w Lothair S. Kohnstamm f/b/o Richard L. Kohnstamm~~ | ~~6090.8~~                              |

OK        00064

LAW OFFICES

# CHARLES J. PIVEN

MEMBER MARYLAND
AND FLORIDA BARS

SUITE 2700
THE LEGG MASON TOWER
111 SOUTH CALVERT STREET
BALTIMORE, MARYLAND 21202

FACSIMILE
(301) 385-5201

(301) 332-0030
(301) 385-5250

February 4, 1991

Mr. Richard L. Kohnstamm
11476 S.W. Riverwood Road
Portland, Oregon  97219

Mr. Paul L. Kohnstamm
P.O. Box 378, R.R. 1
Lower Shad Road
Pound Ridge, New York  10576

U.S. Trust Company
114 West 47th Street
New York, New York  10036
ATTN:  E. Bruce Storm

    Re: Redemption of shares of common stock of General
      Color Company owned by Trust u/w Lothair S.
      <u>Kohnstamm f/b/o Elizabeth K. Ogden ("Trust")</u>

Dear Trustee:

  Enclosed please find the original and two copies of a Stock
Redemption Agreement pursuant to which General Color Company has
agreed to redeem the 4570.2 shares of common stock of General
Color Company owned by the Trust.

  In lieu of the closing referenced in paragraph 4.(b) of the
Stock Redemption Agreement, upon my receipt of the following
listed items, I will arrange for General Color Company to forward
to you the Payment in the amount of $13,710.60 together with a
fully executed copy of the enclosed Stock Redemption Agreement
and an executed Subordinated Promissory Note for the balance of
the purchase price for which the Trust's common stock of General
Color Company is being redeemed.

  1. The original and one copy of the Stock Redemption
    Agreement signed by you and witnessed on page 5;

  2. A stock power or stock powers endorsed representing
    4570.2 shares of common stock of General Color Company;

  3. An executed copy of the enclosed Entity Attribution
    Waiver Agreement; and

-2-

4.  The original stock certificate representing 4570.2
    shares of common stock of General Color Company (to be
    forwarded by actual holder).

Please note that you <u>MUST</u> file the Entity Attribution Waiver
Agreement with the Trust's 1991 Federal Income Tax Return.  You
should confirm with the Trust's accountant the adequacy of this
Agreement prior to filing the Trust's 1991 income tax return to
ensure that the form is adequate to protect the Trust from
possible adverse tax consequences.  Please note that I have
relied on the accountants of General Color Company, Richard A.
Eisner & Company, that the enclosed form is adequate to protect
the Trust from adverse tax consequences assuming compliance with
the terms thereof and assuming that the Trust does not acquire
common stock of General Color Company within 10 years from March
1, 1991 other than by bequest or inheritance.  Again, you may
want to confirm this with the Trust's accountant.  If you have
any questions of Richard A. Eisner & Company, you may contact
Leslie Danish at 1-212-891-4014.

I have also enclosed for your signature a letter
constituting your waiver on behalf of the Trust u/w Lothair S.
Kohnstamm f/b/o Richard L. Kohnstamm of any right to have General
Color Company shares held by that Trust redeemed.  Please return
two signed copies of this letter in the enclosed envelope.

If you have any questions whatsoever, before mailing
anything or signing anything, please contact me to avoid any
confusion or mistakes.  This transaction will be accomplished
most simply by your having a clear understanding of what is
expected of you in order to consummate this transaction.  I have
enclosed a stamped, self-addressed envelope to facilitate your
return of the required documents.  I have enclosed two stock
powers "just in case."  Thank you for your anticipated
cooperation.  Best regards.

Very truly yours,

Charles J. Piven

CJP/bjr

cc:  General Color Company
     Elizabeth K. Ogden

OK    00067