**CONRAD, O'BRIEN, GELLMAN & ROHN P.C.**
1515 Market Street, 16th Floor
Philadelphia, PA 19102
(215) 864-9600
Attorneys for Defendants Abby F. Kohnstamm and Sarah F. Kohnstamm

| | |
|---|---|
| SENSIENT COLORS INC., | UNITED STATES DISTRICT COURT |
| | SOUTHERN DISTRICT OF NEW YORK |
| Plaintiff, | |
| vs. | Case No. 07 CIV 7846 (LAP) |
| ABBY F. KOHNSTAMM; PETER L. KOHNSTAMM; SARAH F. KOHNSTAMM; ELIZABETH K. OGDEN; RICHARD L. OGDEN; THOMAS H. OGDEN; JOHN DOE INDIVIDUALS 1-20 (fictitious names); and ABC COMPANIES 1-20 (fictitious names), | CIVIL ACTION |
| | (Filed Electronically) |
| Defendants. | |

## MEMORANDUM OF DEFENDANTS ABBY AND SARAH KOHNSTAMM IN SUPPORT OF THEIR POSITION THAT THE COURT SHOULD NOT STAY THIS CASE PENDING RESOLUTION OF THE MINNESOTA ACTION

June 30, 2008

Defendants Abby F. Kohnstamm and Sarah F. Kohnstamm, Abby's daughter (who was four years old at the time of the relevant events), submit this separate Memorandum in response to the Order of the Court filed on June 3, 2008, requesting that the parties "brief the issue of why this Court should not stay the instant case pending the resolution of the Minnesota action". In support of their position that the Court should not stay this case pending the outcome of the Minnesota action, Abby and Sarah Kohnstamm urge the Court to consider the following points.[1]

*First*, on page one of the Court's June 3, 2008 Order, the Court recites that the defendants in the Minnesota action are "represented by the same counsel as in the instant action". That statement is not correct. As previously brought to the Court's attention in a letter dated April 2, 2008 (copy supplied hereto as Exhibit A), undersigned counsel for Abby and Sarah Kohnstamm is *not* counsel for any of the defendants in the Minnesota action, he did *not* participate in the briefing of the Motion to Dismiss filed in the Minnesota action and he did *not* attend the oral argument on said Motion. Likewise, counsel for the remaining defendants in this case has never represented Abby or Sarah Kohnstamm, either in this case or in the predecessor state court case in New Jersey in which Sensient Colors' third party claims were dismissed.

*Second*, the Court states on page one of the June 3 Order that the Minnesota case is "virtually identical" to this case. That statement too is not correct, most certainly with respect to Abby and Sarah and Peter Kohnstamm. As noted in undersigned counsel's April 2, 2008 letter, all of the defendants in the Minnesota action are alleged to have received shares of General Color, a New Jersey corporation. Largely on that basis, the Court in the Minnesota action applied New Jersey veil piercing law in deciding a motion to dismiss filed by the defendants in

---

[1] Abby Kohnstamm is married to but legally separated from Defendant Peter Kohnstamm, who is represented in this case by counsel for the remaining defendants. The facts recited herein and the associated legal arguments apply equally to Peter Kohnstamm.

that action. (Slip Op. at 9). In the case of Abby and Sarah and Peter Kohnstamm, however, it is undisputed that none of them ever became a shareholder of General Color. Thus, unlike in the Minnesota case, there is no basis in this case to apply New Jersey veil piercing law. The Court is referred to the facts set out in detail in the separate Reply Brief filed by Abby and Sarah Kohnstamm in support of the pending Motion to Dismiss in this case, dated January 15, 2008 (copy, without attachments, supplied herewith as Exhibit B). As discussed in that Memorandum, the only corporation relevant to this case in which Abby, Sarah and Peter Kohnstamm ever owned shares was H. Kohnstamm, a New York corporation. These same facts are discussed by counsel for the remaining defendants in a letter to the Court dated April 2, 2008. Thus, in evaluating Sensient's veil piercing claims against Abby, Sarah and Peter Kohnstamm, it is axiomatic that the Court should apply New York law, and not New Jersey law as applied by the Court in the Minnesota action.[2]

*Third*, in addition to the fact that Abby, Sarah and Peter Kohnstamm never became shareholders of General Color, there are numerous other factual distinctions between these defendants, on the one hand, and certain defendants in the Minnesota action, which further demonstrate why these two cases are not "virtually identical". Attached hereto as Exhibit C is a copy of a Memorandum of Law filed by Sensient Colors in the predecessor New Jersey action in January 2006, in opposition to third party defendants' motion to dismiss in that case. Sensient Colors' brief in the New Jersey case recited numerous facts that were alleged to be directly relevant to Sensient Colors' claims in the New Jersey case (which include the same legal theories

---

[2] In addition to applying substantive New York law, this Court presumably would apply the same rigorous pleading standard it has applied in analogous cases, in which the Court has refused to credit boilerplate allegations of wrongdoing or accept group pleadings in which multiple defendants improperly are lumped together without differentiation. (See Exh. A hereto, citing relevant cases, as well as cases cited in the briefing on the pending motion to dismiss). The decision in the Minnesota Action is not consistent with either of these principles.

2

presented in this case and in the Minnesota case). In particular, Sensient Colors pointed out numerous facts concerning at least one of the defendants now in the Minnesota case (Paul Kenneth Kohnstamm) which do not apply in the case of Abby or Sarah Kohnstamm or Peter Kohnstamm. Among other alleged facts Sensient pointed to was that Paul Kenneth Kohnstamm served as a Director of Kohnstamm Co. at the time of the 1988 Transaction, in which capacity he allegedly voted to approve that Transaction and had other alleged involvement in it. (*See* id. at pp. 7-14, 35-37). As Sensient Colors conceded in its New Jersey brief, however, neither Abby, Sarah or Peter Kohnstamm served in any capacity in Kohnstamm Co. or had any involvement whatsoever in the 1988 Transaction apart from signing the "Shareholders Agreement" and declining to accept shares of General Color. (*See id.*; *see also* Exhibit B hereto at pp. 3-4, reciting the fact that Abby and Peter Kohnstamm signed the Shareholders Agreement only at the express direction of outside counsel for H. Kohnstamm, now Sensient Colors). To be sure, undersigned counsel is not suggesting that these factual distinctions ultimately should lead a Court to find differently in the case of any individual defendant in this case or the Minnesota case. But the fact remains that Sensient Colors itself already has put in issue numerous factual differences between Abby, Sarah and Peter Kohnstamm, on the one hand, and certain defendants in the Minnesota case, thereby further rendering incorrect the Court's observation that this case and the Minnesota case are "virtually identical".[3]

*Fourth*, the Court notes on page one of the Order that Sensient Colors contends that all defendants in the Minnesota case and this case were acting "as part of a conspiracy". As this Court previously ruled in a separate case, it is legally improper and presumptively unfair to

---

[3] In view of the factual differences among various defendants in this case and the Minnesota case previously put at issue by Sensient Colors, the prohibition against "group pleading" followed by Courts in this District applies with particular force. (*See* Exh. A, p. 2 (citing cases)).

impose collateral estoppel against a non-party to a case in which judgment may have been entered against alleged co-conspirators. *State of New York v. Cedar Park Concrete Corp.*, 1997 WL 306909, * 10-11 (S.D.N.Y. Mar. 21, 1997) (Preska, J.), *aff'd in relevant part*, 202 F.3d 82, 86-87 (2d Cir. 2000); *see In re Merrill Lynch & Co., Inc. Research Reports Securities Litig.*, 305 F. Supp. 2d 323, 326 n.2 (S.D.N.Y. 2004) (Pollack, J.) ("Plaintiffs appear to argue that the existence of a conspiracy could give rise to a relationship of privity between the parties. This argument has no legal merit, and is presented without citation to any case law or other authority that would suggest that it does. The authority is in fact to the contrary", citing this Court's ruling in *Cedar Park Concrete Corp.*).

In summary, defendants Abby and Sarah Kohnstamm respectfully state that *all* of the relevant factors noted by the Court in its June 3 Order militate strongly in favor of permitting this case to proceed and not entering a stay: 1) these defendants are not represented by counsel in the Minnesota case and, therefore, their interests are not adequately represented there; 2) this case and the Minnesota case are not "virtually identical" with respect to these defendants; 3) these defendants are not in privity with any of the defendants in the Minnesota case; and 4) these defendants cannot be collaterally estopped by any ruling entered in that case. For these reasons, and those presented by counsel for the remaining defendants, this Court should proceed with this case and decide the pending Motion to Dismiss under New York law, independent of the ruling

issued by the Court in the Minnesota case under New Jersey law, which for reasons previously

presented to this Court was wrong in numerous respects.

Respectfully submitted,

**CONRAD, O'BRIEN, GELLMAN & ROHN, P.C.**
Attorneys for Defendants Abby F. Kohnstamm and
Sarah F. Kohnstamm

By: ___s/Robert N. Feltoon___
      Robert N. Feltoon

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below true and correct copies of the

Memorandum Of Defendants Abby And Sarah Kohnstamm In Support Of Their Position That

The Court Should Not Stay This Case Pending Resolution Of The Minnesota Action

were served by electronic filing:

> Mary M. Chang, Esquire
> Christopher R. Strianese, Esquire
> Bryan Cave, LLP
> 1290 Avenue of the Americas
> New York, New York 10104
>
> John F. Stoviak, Esquire
> Saul Ewing LLP
> Centre Square West
> 1500 market Street
> 38th Fl
> Philadelphia, PA  19102

> s/Robert N. Feltoon
> Robert N. Feltoon

Dated:  June 30, 2008

# EXHIBIT A

 CONRAD
O'BRIEN
GELLMAN
& ROHN, PC

Robert N. Feltoon
*Attorney at Law*
Direct Dial: 215.864.8064
Direct Fax: 215.864.0064
rfeltoon@cogr.com

April 2, 2008

VIA FACSIMILE

Honorable Loretta A. Preska
U.S. District Court
Southern District of New York
500 Pearl Street
Room 1320
New York, NY 10007-1312

RE:    Sensient Colors Inc. v. Kohnstamm, et al.
       Case No. 07 Civ. 7846 (LAP)

Dear Judge Preska:

I represent defendants Abby F. Kohnstamm and her daughter Sarah F. Kohnstamm. I am responding to plaintiff's letter to the Court dated March 28, 2008 concerning a decision rendered in a separate case filed by plaintiff in the District of Minnesota (the "Minnesota Action"). I join in the principal letter submitted this date by counsel for the other defendants in this action, but submit this separate letter on behalf of my clients.

Plaintiff's letter argues that one reason this Court should follow a recent decision in the Minnesota Action rendered on a motion to dismiss is that the same counsel is involved in both that Action and this one. My clients are not parties to the Minnesota Action. Moreover, I do not represent any of the defendants in that Action. I did not participate in the briefing of the motion to dismiss filed in that Action, nor was I present at the oral argument.

Next, according to the decision in the Minnesota Action, all of the defendants in that case are alleged to have received shares of General Color, a New Jersey corporation, and to remain shareholders of General Color to this day. (Slip Op. at 2, 5, 8). As explained in the separate Reply Memorandum I filed on behalf of my clients in this case, dated January 15, 2008, my clients (along with defendant Peter L. Kohnstamm) elected

**CONRAD O'BRIEN GELLMAN & ROHN, PC**

Honorable Loretta A. Preska
April 2, 2008
Page 2

not to receive shares of General Color with the knowledge and consent of counsel for H. Kohnstamm & Co., Inc. (renamed plaintiff Sensient Colors, Inc.). For this reason alone, the decision by the Court in the Minnesota Action to apply New Jersey veil piercing law cannot logically extend to my clients, who are not current or former shareholders in any New Jersey corporation whose veil is sought to be pierced. My clients, along with other Kohnstamm family members, were shareholders in H. Kohnstamm, a New York corporation, and for the reasons stated in the pending motion to dismiss, this Court should apply New York veil piercing law in deciding the pending motion.

But perhaps more important than which substantive law applies, this Court presumably will apply the same rigorous pleading standard it has applied in numerous other veil breaching cases, in terms of the level of specificity required to state a claim based on veil breaching. E.g., Scheidemann v. Qatar Football Assoc., 2008 WL 144846, *5 (S.D.N.Y. Jan. 15, 2008) (Preska, J.) ("veil-piercing is the 'rare exception', applied only in exceptional circumstances"; citation omitted). Under that high standard, this Court should reject the analysis and conclusion of the Minnesota Court that certain bare facts alleged in the complaint in that case were "sufficient to demonstrate the plausibility" of the elements of veil breaching. (See Slip Op. at 9-11). The Minnesota Court based that conclusion entirely on certain letters sent to the NJDEP by counsel for H. Kohnstamm. As I pointed out in my separate Reply Brief, there are no allegations in the Complaint in this case that my clients had any involvement or participation whatsoever in the drafting or sending of those letters, or that my clients were even aware of those letters before plaintiff filed the New Jersey action against them (and other Kohnstamm family members) in 2005. Accordingly, there is no basis to apply veil breaching principals against my clients solely on the basis of those letters, regardless of whether the Court applies the veil breaching law of New York or New Jersey (and even assuming the content of the letters justifies veil breaching against any defendant, which is not the case as explained in the pending motion to dismiss). United Mizrahi Bank Ltd. v. Sullivan, 2000 WL 1678040, *3 (S.D.N.Y. Nov. 6, 2000) (improper for complaint alleging veil breaching to "lump[] all of the Sullivan family together as one actor and all of the Sullivan family corporations as one enterprise, arguing that the Sullivan family is the alter ego of the entire enterprise"); see Appalachian Enter., Inc. v. Epayment Solutions Ltd., 2004 WL 2813121, *7 (S.D.N.Y. Dec. 8, 2004) ("A plaintiff fails to satisfy rule 8, where the complaint 'lump[s] all the defendants together and fail[s] to distinguish their conduct' because such 'allegations fail to give adequate notice to the[ ] defendants as to what they did wrong'."; citations omitted).

**CONRAD O'BRIEN GELLMAN & ROHN, PC**

Honorable Loretta A. Preska
April 2, 2008
Page 3

Finally, for the reasons stated above (as well as in the separate letter to the Court submitted by counsel for other defendants), plaintiff's suggestion that my clients are somehow "collaterally estopped concerning these issues" on the basis of the decision in the Minnesota Action in which they did not participate, directly or through common counsel, has no merit and should be rejected.

Respectfully,

Robert N. Feltoon

RNF/jad

cc:    Mary M. Chang, Esquire (via email)
       Christopher R. Strianese, Esquire (via email)
       John F. Stoviak, Esquire (via email)

# EXHIBIT B

**CONRAD, O'BRIEN, GELLMAN & ROHN P.C.**
1515 Market Street, 16th Floor
Philadelphia, PA 19102
(215) 864-9600
Attorneys for Defendants Abby F. Kohnstamm and Sarah F. Kohnstamm

| | |
|---|---|
| SENSIENT COLORS INC., | UNITED STATES DISTRICT COURT |
| | SOUTHERN DISTRICT OF NEW YORK |
| Plaintiff, | |
| vs. | Case No. 07 CIV 7846 (LAP) |
| ABBY F. KOHNSTAMM; PETER L. KOHNSTAMM; SARAH F. KOHNSTAMM; ELIZABETH K. OGDEN; RICHARD L. OGDEN; THOMAS H. OGDEN; JOHN DOE INDIVIDUALS 1-20 (fictitious names); and ABC COMPANIES 1-20 (fictitious names), | CIVIL ACTION  (Filed Electronically) |
| Defendants. | |

---

**REPLY MEMORANDUM OF DEFENDANTS ABBY AND SARAH KOHNSTAMM IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

---

January 15, 2008

Defendants Abby F. Kohnstamm and Sarah F. Kohnstamm submit this separate Reply Memorandum in support of the Motion to Dismiss the Amended Complaint of Plaintiff Sensient Colors, Inc. ("Sensient Colors" or "Plaintiff"), formerly known as H. Kohnstamm & Co., Inc. ("H. Kohnstamm"). Abby and Sarah Kohnstamm also join the principal Reply Memorandum filed on behalf of the other defendants in this case.

This separate Memorandum responds to the entirely unsupported suggestion in Plaintiff's Memorandum that Abby Kohnstamm, along with her husband Peter (also a defendant in this case) acted wrongfully and committed fraud in connection with the "1988 Transaction" involving the sale of stock of H. Kohnstamm.[1]  Pointing specifically to the fact that Abby and Peter Kohnstamm elected not to receive shares of General Color Company as part of the 1988 Transaction, Plaintiff contends that "these Defendants' refusal to accept General Color stock was itself a wrongful act which had the effect of rendering the NJDEP application false and fraudulent and breaching their obligations under the Shareholders Agreement." (Pl. Mem. 23; see also id. at 1, 8-9, 10, 31-32).

For the reasons set out in the Reply Memorandum filed on behalf of other defendants, this allegation does not satisfy the pleading requirements of Fed. R. Civ. P. 9(b) or, to the extent applicable, Fed. R. Civ. P. 8(a).  The Complaint notably contains no other allegations specifically mentioning Abby or Peter Kohnstamm.  Thus, the Complaint does not allege they had any personal involvement in the 1988 Transaction other than passively as minority shareholders of H. Kohnstamm.  Similarly, notwithstanding that Plaintiff's allegation of fraud and wrongdoing centers on the application submitted by counsel for H. Kohnstamm to the NJDEP, the Complaint

---

[1] Abby and Peter Kohnstamm are legally separated.  Peter is represented in this case by counsel for the remaining Defendants.  As noted in Plaintiff's brief (at 8 n.5), Sarah is their daughter, who was a minor at the time of the 1988 Transaction.

does not allege that Abby or Peter Kohnstamm had any direct or indirect involvement in preparing or submitting that application. In fact, the Complaint does not allege that either Abby or Peter Kohnstamm knew anything about the NJDEP application, or that either of them ever even saw the NJDEP application or the NJDEP's response. Thus, Plaintiff's serious charge of fraud and wrongdoing against Abby and Peter Kohnstamm is based solely on the neutral fact that they elected not to receive shares of General Color, with no other supporting allegations whatsoever.

Moreover, based on the proceedings in the New Jersey litigation, it is evident that Plaintiff cannot credibly supply any additional facts to support its charge of fraud and wrongdoing. Prior to the dismissal of the third party complaint filed by Sensient Colors in that case, Abby and Peter Kohnstamm (along with the other third party defendants in the New Jersey case) supplied certifications followed by answers to interrogatories propounded by Sensient Colors. Those certifications and interrogatory answers, which were filed with the New Jersey court as part of the record on the motion to dismiss Sensient Colors' third party claims, may properly be supplied to this Court in connection with the pending motion to dismiss. 5-Star Management, Inc. v. Rogers, 940 F. Supp. 512, 518-19 (E.D.N.Y. 1996) (on motion to dismiss under Fed.R.Civ.P 12(b)(6), court can take judicial notice of motion papers filed in another proceeding between the same parties).

Attached hereto as Appendix A is a copy of the Certification of Abby F. Kohnstamm dated 11/28/05 (supplied to the New Jersey court by the moving third party defendants on their motion to dismiss), and attached as Appendix B is a copy of the Answers of Third Party Defendant Abby F. Kohnstamm to Sensient Colors Inc.'s Interrogatories, sworn to on 12/30/05 (supplied to the New Jersey court by Sensient Colors in opposition to said motion to dismiss).

As noted in <u>Rogers</u>, <u>supra</u>, this Court is not required to accept these documents for the truth of their contents. However, the following sworn statements by Ms. Kohnstamm highlight and underscore the glaring lack of supporting allegations for the very serious charge of fraud and other wrongdoing suggested in Plaintiff's Complaint:[2]

- Abby Kohnstamm received a gift of 100 shares of stock of H. Kohnstamm in or about 1978, or approximately 1/100 of one percent of the company's shares. (Certif. ¶ 10).
- Abby was never employed by H. Kohnstamm, had no involvement at any time in any business activity of H. Kohnstamm, and had no ability at any time to control or direct the company's management in any aspect of its business. (Certif. ¶ 11).
- Abby was not consulted by H. Kohnstamm on any aspect of the 1988 Transaction. She has no recollection of ever seeing the 1988 Transaction Agreement (Amended Complaint Ex. A) prior to the New Jersey litigation, nor did she execute a copy of it in connection with the 1988 Transaction. (Certif. ¶¶ 13-16; Interrog. 1).
- Abby had no involvement of any kind in the application submitted by H. Kohnstamm to the NJDEP. She was not consulted concerning that application or any statements therein, and has no recollection of seeing the correspondence with the NJDEP prior to the start of the New Jersey litigation. (Certif. ¶ 18).
- In late 1988 or early 1989, Abby and Peter Kohnstamm advised outside counsel for H. Kohnstamm that they did not wish to receive shares of General Color Company, nor should such shares be issued to their then-minor daughter Sarah. The basis for that decision was their general awareness that the stock of H. Kohnstamm was being acquired by a company known as Universal (the parent of Sensient Colors); that Universal had expressed concerns regarding possible environmental claims involving certain properties owned by H. Kohnstamm,

---

[2] Peter Kohnstamm submitted a substantially similar certification and answers to interrogatories, which were also supplied to the New Jersey court.

which were to be transferred to General Color[3]; and that they did not wish to become shareholders of General Color since it would be the owner of the same property that Universal declined to acquire. (Certif. ¶ 17; Interrog. 3-6).

- Abby had no first or second hand knowledge of any actual or potential environmental liabilities relating to the General Color property, nor was she aware of the factual or legal basis for the concerns Universal had expressed about owning those properties. (Interrog. 3, 4, 6).[4]

- Abby signed a copy of the "Shareholders Agreement" (Amended Complaint Ex. B) at the express direction of outside counsel for H. Kohnstamm. Counsel instructed Abby and Peter to sign it even though they would not be receiving shares of General Color, because the Shareholders Agreement also concerned Universal's shares that were to be issued to them as former minority shareholders of H. Kohnstamm. (Interrog. 7-8).

Respectfully submitted,

**CONRAD, O'BRIEN, GELLMAN & ROHN, P.C.**
Attorneys for Defendants Abby F. Kohnstamm and Sarah F. Kohnstamm

By: _Robert N. Feltoon_
Robert N. Feltoon

---

[3] Plaintiff's opposition papers to this Motion include a portion of the Prospectus/Proxy Statement issued by H. Kohnstamm to its shareholders. As stated in that document, "Universal Foods decided not to acquire [the Camden, NJ facility] because of [Universal's] concern over contingent liabilities that might be asserted against the owner of the Camden facility, including environmental claims that might arise under ECRA." (Chang Cert. Ex. 1, at SCI 7943).

[4] Amended Complaint ¶¶ 27-29, which presumably (but not expressly) refer to Abby and Peter Kohnstamm, insinuate the reason they chose not to acquire General Color stock was "because they were aware of or otherwise on notice of potential environmental problems with the Camden Property." In the New Jersey litigation, Plaintiff's counsel initially and similarly suggested to the Court at oral argument on the motion to dismiss that "Abby and Peter elected not to take General Color stock, because they recognized the environmental problems", but then apologized to the Court for "misstat[ing] the record", conceding "in fact, the affidavits do say that they recognized that Universal had no interest in this because of the environmental issues. And ultimately, they elected not to take the stock. And I think that's a fair characterization of what it was that was done." (Lampert Decl. Ex. A, Tr. 18, 27-28).

# EXHIBIT C

Michael A. Bogdonoff, Esq.
John M. Ix, Esq.
**DECHERT LLP**
A PENNSYLVANIA LIMITED LIABILITY PARTNERSHIP
PRINCETON PIKE CORPORATE CENTER
(MAIL TO)        P.O. BOX 5218, PRINCETON, NEW JERSEY 08543-5218
(DELIVER TO)     997 LENOX DRIVE, BUILDING THREE, SUITE 210
                 LAWRENCEVILLE, NEW JERSEY 08648
(609) 620-3200
ATTORNEYS FOR DEFENDANTS H. Kohnstamm & Company, Inc., Warner-Jenkinson Company, Inc., and Sensient Colors Inc.

| | | |
|---|---|---|
| PLEASANT GARDENS REALTY CORPORATION | : | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - CAMDEN COUNTY |
| Plaintiff, | : | DOCKET NO. L 6579-03 |
| v. | : | Civil Action |
| H. KOHNSTAMM & COMPANY, INC. et al. | : | |
| Defendants. | : | |
| SENSIENT COLORS INC. | : | |
| Third-Party Plaintiff, | : | |
| v. | : | |
| DAVID C. BEAL et al. | : | |
| Third-Party Defendants. | : | |

**MEMORANDUM OF LAW IN OPPOSITION TO CERTAIN THIRD-PARTY DEFENDANTS' JOINT MOTION TO DISMISS THE THIRD-PARTY COMPLAINT FOR LACK OF PERSONAL JURISDICTION OR, IN THE ALTERNATIVE, FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................... 4

    A.    The Property.......................................................................................... 4

    B.    The 1988 Transaction ........................................................................... 4

    C.    Movants' Participation in the 1988 Transaction.................................... 8

    D.    Selling Shareholders ........................................................................... 13

    E.    The ECRA Application........................................................................ 15

    F.    Redemption .......................................................................................... 17

ARGUMENT...................................................................................................... 19

    I.    The Court has Personal Jurisdiction Over the Moving Third-Party
        Defendants. .......................................................................................... 19

        A.    Standard ........................................................................................ 19

        B.    Personal Jurisdiction Through Veil-Piercing............................... 20

                1.    Personal Jurisdiction is Available Through Veil-Piercing........... 20

                2.    Standard for Veil-Piercing ........................................................ 21

                3.    New Jersey Courts Allow Corporations to Pierce Own Veil....... 25

                4.    Deference to NJDEP .................................................................. 26

        C.    Third-Party Defendants Have Sufficient Minimum Contacts with
            New Jersey..................................................................................... 30

        D.    The Assertion of Personal Jurisdiction Over Third-Party
            Defendants Would Not Offend Traditional Notions of Fair Play
            and Substantial Justice. ................................................................ 37

    II.    The Third-Party Complaint States A Cause of Action Upon Which Relief
        May Be Granted................................................................................... 39

        A.    Standard on Motion to Dismiss.................................................... 39

        B.    Movants Are Liable as Persons Responsible for a Discharge ....... 39

        C.    Movants Are Liable As Alter Egos of Kohnstamm Company and
            General Color................................................................................. 41

        D.    Counts III, IV & V ........................................................................ 43

CONCLUSION.................................................................................................... 44

# TABLE OF AUTHORITIES

## FEDERAL CASES

Asahi Metal Industry. Co. v. Superior Court of California,
    480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)................................................30, 37

Burger King Corp. v. Rudzewicz,
    471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)....................................................20

Calder v. Jones,
    465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)....................................................31

Educational Testing Service v. Katzman,
    631 F. Supp. 550 (D.N.J. 1986) ........................................................................32, 33

Hanson v. Denckla,
    357 U.S. 235, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958).....................................................20

In re Buildings by Jaime, Inc.,
    230 B.R. 36 (Bankr. D.N.J. 1998) ..................................................................25, 26

In re Guild and Gallery Plus, Inc.,
    72 F.3d 1171 (3d Cir. 1996)...........................................................................26

In re Wood,
    825 F.2d 90 (5th Cir. 1987) ..........................................................................26

International Shoe Co. v. Washington,
    326 U.S. 310, 320, 66 S. Ct. 154, 160, 90 L. Ed. 95 (1945)...............................................20

Keeton v. Hustler Magazine, Inc.,
    465 U.S. 770, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)....................................................31

McGee v. International Life Insurance Co.,
    355 U.S. 220, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957)........................................................31

Phar-Mor, Inc. v. Coopers & Lybrand,
    22 F.3d at 1288 (3d Cir. 1994)........................................................................26

Shaffer v. Heitner,
    433 U.S. 186, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977).....................................................37

## STATE CASES

Avdel Corp. v. Mecure,
    58 N.J. 264 (1971) ............................................................................................... 19

Bayway Refining Co. v. State Utilities, Inc.,
    333 N.J. Super. 420 (App. Div. 2000) ............................................................ 19

Blakey v. Continental Airlines, Inc.,
    164 N.J. 38 (2000) ............................................................................................. 37

Boardwalk Regency Corp. v. New Jersey Casino Control Commission,
    352 N.J. Super. 285 (2002) ........................................................................ 28, 29

Charles Gendler & Co. v. Telecom Equipment Corp.,
    102 N.J. 460 (1986) ................................................................................ 19, 20, 30

Clowes v. Terminix International, Inc.,
    109 N.J. 575 (1988) ...................................................................................... 27, 30

In re Authorization for Freshwater Wetlands General Permits,
    372 N.J. Super. 578 (App. Div. 2004) ............................................................ 27

Di Cristofaro v. Laurel Grove Memorial Park,
    43 N.J. Super. 244 (App. Div. 1957) .............................................................. 39

First Trenton Indemnity Co. v. River Imaging, P.A.,
    2004 WL 3316874 (N.J. Super. Law Div. March 22, 2004) ........................... 32

In re Adoption of N.J.A.C. 7:26B,
    128 N.J. 442 (1992) .......................................................................................... 29

In re Railroad Realty Associates,
    313 N.J. Super. 225 (App. Div. 1998) ............................................................ 38

Lebel v. Everglades Marina, Inc.,
    115 N.J. 317 (1989) .......................................................................................... 19

Lyon v. Barrett,
    89 N.J. 294 (1982) ............................................................................................ 21

McGlynn v. Schultz,
    95 N.J. Super. 412 (App. Div. 1967) .......................................................... 31, 32

Printing Mart-Morristown v. Sharp Electronics Corp.,
    116 N.J. 739 (1989) ........................................................................................39

Sensale v. Applikon Dyeing & Printing Corp.,
    12 N.J. Super. 171 (App. Div. 1951)) ...........................................................31, 32

Smith v. SBC Communications Inc.,
    178 N.J. 265 (2004) ........................................................................................39

Star Video Entertainment, L.P. v. Video USA Associates 1 L.P.,
    253 N.J. Super. 216 (App. Div. 1992) .................................................20, 21, 24,
                                                                                                31, 34

State, New Jersey Dep't of Envtl. Prot. v. Ventron Corp.,
    94 N.J. 473 (1983) .........................................................................21, 22, 40,
                                                                                                41

The Mall at IV Group Properties, LLC v. Roberts,
    2005 WL 3338369 (D.N.J. Dec. 8, 2005) .........................................................22

Trustees of Structural Steel v. Huber,
    136 N.J. Super. 501 (App. Div. 1975) .........................................................31, 32

Walensky v. Jonathan Royce Int'l, Inc.,
    264 N.J. Super. 276 (App. Div. 1993) ...............................................................22

Waste Management, Inc. v. Admiral Ins. Co.,
    138 N.J. 106 (1994) .......................................................................19, 20, 30,
                                                                                                37, 38

## FEDERAL STATUTES

17 C.F.R. §230.405 ...................................................................................................34

## STATE STATUTES

N.J.A.C. 7:1E-1.6....................................................................................................43

19 N.J. Reg. 681(a) ..................................................................................................29

36 N.J. Reg. 4298(c) ................................................................................................29

N.J. Stat. Ann. §§ 13:1K-6 et seq ........................................................................5, 6, 7

N.J. Stat. Ann. 13:1K-6 <u>et seq</u> .................................................................................................5

R. 4:4-4(b)(1) .......................................................................................................................19

## MISCELLANEOUS

1 William Meade Fletcher et al., <u>Fletcher Cyclopedia of the Law of Private Corporations,</u>
    § 41.30....................................................................................................................22

## PRELIMINARY STATEMENT

This matter involves responsibility for alleged environmental conditions and damages at

an apartment complex in Camden, New Jersey owned by Plaintiff Pleasant Gardens Realty

Corporation. Plaintiff has sued Sensient Colors, Inc. ("Sensient"), claiming that it is responsible

for such conditions and damages due to its alleged nexus to an adjacent General Color Property

known as the General Color Company site ("the General Color Property"). Sensient does not

own the General Color Property. Instead, its alleged nexus derives from a 1988 Transaction,

described _infra_, wherein Sensient's parent acquired the stock of the company that had operated at

the General Color Property from 1922 through 1988. That company was known as H.

Kohnstamm & Company, Inc. ("Kohnstamm Company"), a company whose shares were

principally owned by Kohnstamm Family Shareholders. Sensient is now Kohnstamm Company.

Before that 1988 Transaction occurred, however, Sensient's parent made it clear that it had no

desire to own or operate the General Color Property due to its contingent environmental

liabilities. Indeed, for that reason, it was expressly excluded from that 1988 Transaction, and

instead, General Color Company and responsibility for its environmental conditions remained

with General Color and with those who had owned and operated it for that 1922-1988 period:

Kohnstamm Family Shareholders. Accordingly, this Court granted Sensient leave to join

Kohnstamm Family Shareholders as Third-Party Defendants in this action.

Third-Party Defendants seek to dismiss the Third-Party Complaint by claiming lack of

personal jurisdiction and that it fails to state a claim upon which relief may be granted. Each of

these bases is without merit. The Third-Party Defendants' concerted actions taken in connection

with the 1988 Transaction and their actions that followed demonstrate their knowledge of and

responsibility for the environmental conditions at the General Color Property. They took the

fundamental steps necessary to effectuate the 1988 Transaction, without which it would not have

occurred. Representations were made to the New Jersey Department of Environmental

Protection ("NJDEP") that were necessary predicates to the closing of the 1988 Transaction and

which allowed the postponement of remediation at the General Color Property notwithstanding

the known environmental conditions. That postponement was permitted by NJDEP based on

representations made by General Color Company, an entity controlled by Kohnstamm Family

Shareholders. They represented to the State of New Jersey, "[a]s a result of the proposed

transaction, beneficial ownership of the Camden and Newark facilities will remain where it is

today--in the shareholders of Kohnstamm." Thus, NJDEP understood that there was no

functional distinction between Kohnstamm Company, General Color Company and the

Kohnstamm Family Shareholders.

    Third-Party Defendants seek to diminish their involvement in this matter by citing the

size of their individual Kohnstamm Company and General Color Company share holdings and

by citing their ages and current status as librarians or violin teachers or other occupations

throughout the country. One, a significant percentage shareholder, modestly refers to himself as

a retired former ski lodge operator. Yet these are the very people who held the keys to this

transaction. The Kohnstamm Family Shareholders profited from the 1988 Transaction by more

than $8,000,000. Each of the moving Third-Party Defendants could have dissented from the

1988 Transaction. Each could have refused to execute the Shareholder's Agreement and other

necessary transaction documents. They did not. They worked together to allow the General

Color Property to be transferred to themselves and to allow the sale of Kohnstamm Company to

go forward, leaving the General Color Property unremediated. Subsequent to their involvement in the transaction, and knowing of the environmental conditions, many acted in concert to divest themselves of such responsibility through a stock redemption program.

As demonstrated herein, through the limited discovery that has been completed to date, each of the moving Third-Party Defendants has undertaken actions purposefully directed toward New Jersey to avail themselves of the benefits and protections of New Jersey law. Accordingly, their contacts are sufficient to meet the due process requirement of "minimum contacts." Further, Third-Party Defendants should not be permitted to stand outside the corporate veil to take advantage of New Jersey laws and thereafter use the corporate veil as a shield to avoid their environmental responsibilities. The Kohnstamm family, and not Sensient, were the parties involved in the Kohnstamm Company operations for the period 1922 through 1988. The Third-Party Defendants, and not Sensient, were the parties involved with the 1988 Transaction that placed the General Color Property in General Color Company, and were predominantly involved with General Color in the years that followed. It is appropriate that this Court pierce the corporate veil and find these Third-Party Defendants responsible for the General Color Property environmental conditions to prevent manifest injustice. The Third-Party Complaint clearly states appropriate claims against Third-Party Defendants consistent with New Jersey pleading requirements. New Jersey law does not support granting such extraordinary relief.

## STATEMENT OF FACTS

**A.    The Property**

Plaintiff Pleasant Gardens Realty Corporation owns an apartment complex on a piece of

property known as Lot 1, Block 983 and Lots 1 and 20 of Block 985 on the Municipal Tax Map

of the City of Camden, Camden County, New Jersey (hereinafter "Plaintiff's Property"). (See

Complaint, ¶ 9 (attached to Certification of Movants' Counsel ("Movants' Cert.") as Exhibit A).)

Plaintiff's Property is adjacent to the General Color Property. (See Complaint, ¶ 10.) The

General Color Property was owned by Kohnstamm Company, a New York corporation, until

1988, when it was transferred to Defendant General Color Company ("General Color"), a New

Jersey corporation and a wholly owned subsidiary of Kohnstamm Company. (See Complaint, ¶¶

2, 7 & 11, Third-Party Complaint, ¶ 24 (attached to Movants' Cert. as Exhibit B).)

**B.    The 1988 Transaction**

On December 11, 1987, Universal Foods Corporation (the parent corporation of

Defendant/Third-Party Plaintiff Sensient Colors, Inc.), a Wisconsin corporation, Kohnstamm

Company, and General Color executed a document entitled Agreement and Plan of

Reorganization ("Reorganization Agreement"). (See Reorganization Agreement, p. 1 (attached

to Certification of John M. Ix, Esq. ("Ix Cert.") as Exhibit A).) At the time, Kohnstamm

Company was a closely-held corporation, having approximately 300 shareholders and with an

estimated 75% of Common Stock held, directly or in trust, by members of the Kohnstamm

family ("Kohnstamm Family Shareholders"). (See August 1987 letter from Daniel Rabinowitz

4

to the NJDEP (Ix Cert., Exhibit B.)[1]  Under the transaction proposed by the Reorganization

Agreement, Kohnstamm Company and its shareholders intended to: (1) transfer the General

Color Property from Kohnstamm Company to General Color; (2) spin off General Color stock on

a pro rata basis to the Kohnstamm Family Shareholders; and (3) sell the stock of Kohnstamm

Company to Universal Foods in a tax-free stock-for-stock exchange. (See Reorganization

Agreement, pp. 1-3, 12, & 83 (Ix Cert., Exhibit A).)

Article V of the Reorganization Agreement is entitled, "Obligations of the Selling

Shareholders and the Company." (See Id. at p. 64.)  Section 5.3 of the Reorganization

Agreement required the Selling Shareholders and Kohnstamm Company to "promptly take all

necessary steps to obtain a determination(s) of [Environmental Cleanup Responsibility Act, N.J.

STAT. ANN. 13:1K-6 et seq.[2]] nonapplicability ("Determination") for the transaction

contemplated [by the Agreement] from the New Jersey Department of Environmental Protection

("NJDEP")." (See Id. at 65.)  This section further stated that the necessary steps included "a

prompt filing of a complete initial notice to the NJDEP, and a prompt application for a favorable

determination." (See Id.)

To complete the transaction contemplated by the Reorganization Agreement, a

Prospectus/Proxy Statement dated August 8, 1988 was prepared and provided to, inter alia, each

---

[1]  The Kohnstamm Family Shareholders were listed in an attachment to the Shareholders
     Agreement, a contract necessary to consummate the transaction contemplated by the
     Reorganization Agreement.  (See Shareholders Agreement (Ix Cert., Exhibit C), Letter
     dated September 30, 1988 from Mark Silverstein (Ix Cert., Exhibit D), and Letter dated
     January 6, 1989 from Mark Silverstein (Ix Cert., Exhibit E).)

[2]  In 1993, ECRA was supplemented, amended and renamed as the Industrial Site Recovery Act
     (ISRA), N.J. STAT. ANN. §§ 13:1K-6 et seq. (West 2003).

Kohnstamm Company shareholder, including the Kohnstamm Family Shareholders. (See August 9, 1988 letter to shareholders (Ix Cert., Exhibit F, Bates Nos. SCI 7907-09), and September 30, 1988 letter from Mark Silverstein (Ix Cert., Exhibit D).) The Prospectus/Proxy Statement advised that the General Color Property would be transferred to General Color and that General Color would be transferred to just the Kohnstamm Family Shareholders. (See Ix Cert., Exhibit F, Bates Nos. SCI 7921-22.) The Reorganization Agreement was attached to the Prospectus/Proxy Statement. (See Id. at SCI 7939.) The Prospectus/Proxy Statement advised that: (a) Universal Foods refused to acquire the General Color Property because of "concern over contingent liabilities that might be asserted against the owner of the Camden facility, including environmental claims that might arise under ECRA"; (b) the General Color Property would operate after consummation of the proposed transaction for a period of eighteen months, pursuant to a Supply Contract with a subsidiary of Universal Foods; (c) it was uncertain that General Color would realize any income during the term of the Supply Contract; (d) after the expiration of the Supply Contract, the General Color Property would be subject to a covenant not to compete which would prohibit it from being used for its primary use; and (e) the General Color Property would be subject to "required clean-up" under ECRA "if it ceased to operate as a manufacturing facility or was transferred or sold." (See Id. at SCI 7941-43.) The Prospectus/Proxy Statement also advised that, for these reasons, it was decided not to include the $2,700,000 book value of the General Color Property in the fair value of General Color. (See Id. at SCI 7943.) Thus, the Kohnstamm Family Shareholders, through their acquisition of all of the stock of General Color, acquired the General Color Property without having to pay the book value. Without having to pay the value of the General Color Property or to incur the costs of

investigating or remediating the environmental condition of the General Color Property, the Kohnstamm Family Shareholders received $8,166,618 from the 1988 Transaction ($4,207,618 in Universal Foods shares and $3,959,000 in General Color shares). (See Id. at SCI 7947-48.)

Like the Reorganization Agreement, the Prospectus/Proxy Statement referred to two classes of "Selling Shareholders": Kohnstamm Family Shareholders and Minority Shareholders. (See Id. at SCI 7947.) Also like the Reorganization Agreement, it referred to the obligation of Kohnstamm Company and the Selling Shareholders to obtain "clearance" under ECRA, and identified Paul Kohnstamm, Richard Kohnstamm, Paul Kenneth Kohnstamm and Katherine Piven as "certain of the Selling Shareholders." (See Id. at SCI 7954-55.) It further advised that each shareholder had the right to object to the proposed transaction, in which case the shareholder would receive payment of the fair value of their Kohnstamm Company stock. (See Id. at SCI 7929.)

On or about September 7, 1988, the transaction closed. Kohnstamm Company transferred the General Color Property to General Color. (See Third-Party Complaint, ¶ 24 (Movants' Cert., Exhibit B).) Then, Kohnstamm Company transferred the stock of General Color, tax free, to the Kohnstamm Family Shareholders, which had the effect of dissolving the parent-subsidiary relationship which previously existed between Kohnstamm Company and General Color. (See Id. at ¶ 25.) The stock of Kohnstamm Company then was acquired officially by Universal Foods Corporation (hereinafter, the transfer of the General Color Property to General Color, the transfer of the stock of General Color to the Kohnstamm Family Shareholders and the sale of the stock of Kohnstamm Company to Universal Foods Corporation shall be referred to as the "1988

7

Transaction"). (See Id. at ¶ 26.) The effect of this 1988 Transaction was to make Kohnstamm a wholly-owned subsidiary of Universal Foods Corporation. (See Id.) Kohnstamm Company changed its name to Warner-Jenkinson Company, Inc. on or about September 18, 1990, and Warner-Jenkinson Company, Inc. changed its name to Sensient Colors, Inc. on or about December 31, 2002. (See Id. at ¶ 28.)

Universal Foods Corporation did not acquire any interest in General Color, which was no longer a subsidiary of Kohnstamm Company at the time of the 1988 Transaction, nor did Universal Foods Corporation acquire any liability or interest associated with the operations of Kohnstamm Company or General Color on the General Color Property. (See Reorganization Agreement at p. 52 (Ix Cert, Exhibit A).)

## C.    Movants' Participation in the 1988 Transaction

The motion to dismiss does not claim that any of the moving Third-Party Defendants exercised their right as shareholders to dissent from the proposed 1988 Transaction and to receive the value of their Kohnstamm Company stock. Rather, the moving Third-Party Defendants actively and cohesively participated in the 1988 Transaction. Each executed one or more documents necessary for the consummation of the 1988 Transaction. Moving Third-Party Defendant, Richard L. Kohnstamm, executed the Reorganization Agreement. (See Ix Cert., Exhibit A.) On or about September 7, 1988, the moving Third-Party Defendants[3] executed a "Shareholders Agreement." (See Ix Cert., Exhibit C; See also Peter Kohnstamm Interrogatory

---

[3] Naomi Perman signed the Shareholders Agreement on behalf of moving third-party defendant Adam Michael Kohnstamm.

Response No. 8 (Ix Cert., Exhibit G) and Abby Kohnstamm Interrogatory Response No. 7 (Ix Cert., Exhibit H).)[4] Execution of the Shareholders Agreement by each of the Kohnstamm Family Shareholders was necessary to consummate the transactions contemplated by the Reorganization Agreement. (See Ix Cert., Exhibits D & E.) The Shareholders Agreement referred to General Color as a "New Jersey corporation," the Reorganization Agreement, the transfer of the facilities at issue to General Color, and the transfer of General Color to the Kohnstamm Family Shareholders, prior to the exchange of shares of common and preferred stock of Kohnstamm Company for shares of common stock of Universal Foods. (See Ix, Cert., Exhibit C.)

At least five of the moving Third-Party Defendants, Paul Kenneth Kohnstamm, Adam Michael Kohnstamm[5], Mary L. Kohnstamm, Richard L. Kohnstamm and Kevin Kohnstamm also executed an Affiliate Letter. (See Ix Cert., Exhibit I.) That document affirmed that the signatories were "affiliates" of Kohnstamm Company, as that term is used in the Securities Act of 1933, rather than mere minority shareholders. (See Id.) All but two of the moving Third-

---

[4]  Sensient was permitted to take discovery on the personal jurisdiction issue during a limited period between December 6, 2005 and January 12, 2006. Given the brevity of that period, and as a courtesy to the third-party defendants and their counsel in light of the Holiday period, Sensient elected not to notice depositions during that period. Rather, Sensient issued interrogatories to five of the moving third-party defendants.

[5]  Naomi Perman executed the Affiliate Letter on behalf of moving third-party defendant Adam Michael Kohnstamm.

Party Defendants[6] signed a Representation Letter. (See Ix Cert., Exhibit J.) That letter contained the following statement:

> The undersigned acknowledges that the undersigned and the undersigned's purchaser representative, if applicable, have been supplied with all information and documents as they have deemed necessary, desirable or appropriate in order to evaluate the merits and risks of an investment in General Color stock pursuant to the Split-Up.

(See Id.) Moving Third-Party Defendants Peter Kohnstamm and Abby Kohnstamm, as well as their daughter, Sarah Kohnstamm, did not sign the Representation Letter. Peter Kohnstamm did not sign the Representation Letter because he "did not want shares of General Color." He did not "want to get involved in the General Color company, because [he and his wife, Abby Kohnstamm] had the understanding that Universal Foods had concerns about environmental issues at General Color." (See Ix Cert., Exhibit G, Response Nos. 4 & 9.) Abby Kohnstamm did not sign the Representation Letter because she did not want to become a shareholder of General Color. She did not want to become a shareholder of General Color because Universal Foods "had concerns regarding possible environmental claims." (See Ix Cert., Exhibit H, Response Nos. 8 & 6.)

At the time of the 1988 Transaction, moving Third-Party Defendants Richard Kohnstamm and Paul Kenneth Kohnstamm were both Directors of Kohnstamm Company. Each voted to approve the Reorganization Agreement and to ratify, approve and adopt a report entitled "General Color Valuation", which had been prepared by a committee of Kohnstamm Company

---

[6] Naomi Perman signed the Representation Letter on behalf of moving third-party defendant Adam Michael Kohnstamm.

Directors. (See Ix Cert., Exhibit F, p. SCI 7928 and Ix Cert., Exhibit K, p. KENKOHN 0111.)

As summarized in the Prospectus/Proxy Statement, the General Color Valuation report stated

that Universal Foods refused to participate in a transaction in which it acquired the General

Color Property and that "a change of ownership of H. Kohnstamm's New Jersey properties …

would trigger New Jersey's ECRA statutes." (See Id. at KENKOHN 117.)  Further, it stated that

the ECRA clean-up costs would "be in excess of [the General Color Property's] book

value/market value" and would render the General Color Property "economically unsalable."

(See Id. at KENKOHN 118.)  The General Color Valuation report also confirmed the

understanding that transferring the General Color Property to General Color would "maintain

continuity of ownership." (See Id.)  It also included the following statements:

> The sale of the regulated color business requires that Camden produce certain
> products for [Universal Foods] under the terms of a supply contract.  This supply
> contract calls for Camden to operate under a break-even or a cost-recovery basis.
> That is, during the term of the supply contract, Camden, while not precluded from
> doing so, is not expected to generate an operating profit.  Further, a key element
> of the ownership of this facility will be the development of new products to be
> produced to enable it to continue operating and, therefore, avoid closure and
> ECRA compliance.

(See Id.)

The following chart summarizes the Movants' participation:

| Moving Third-Party Defendant | Director of Kohnstamm Company | Executed the Reorganization Agreement | Executed the Shareholders Agreement | Executed the Affiliate Letter | Executed the Representation Letter |
|---|---|---|---|---|---|
| Richard Kohnstamm | Yes | Yes | Yes | Yes | Yes |
| Paul Kenneth Kohnstamm | Yes | | Yes | Yes | Yes |

11

| | | | Yes | Yes | Yes |
|---|---|---|---|---|---|
| Mary L. Kohnstamm | | | Yes | Yes | Yes |
| Kevin Kohnstamm | | | Yes | Yes | Yes |
| Daniel F. Kohnstamm | | | Yes | | Yes |
| Elizabeth Bryan Kohnstamm | | | Yes | | Yes |
| Joshua Kohnstamm | | | Yes | | Yes |
| Ricka Robb Kohnstamm | | | Yes | | Yes |
| David Kohnstamm | | | Yes | | Yes |
| Jeffrey Kohnstamm | | | Yes | | Yes |
| John Kohnstamm | | | Yes | | Yes |
| Adam Michael Kohnstamm[7] | | | Yes | | Yes |
| Peter L. Kohnstamm | | | Yes | | |
| Abby F. Kohnstamm | | | Yes | | |

Handwritten notes written by Paul Kenneth Kohnstamm that refer to the transfer of General Color to just the Kohnstamm Family Shareholders include the following statement: "Downside would be family would have full control of Gen. Color." (Ix Cert., Exhibit L, p. KENKOHN 0065-66.) Other Paul Kenneth Kohnstamm handwritten notes include the following

---

[7] Documents were executed by Naomi Perman on behalf of Adam Michael Kohnstamm.

statement: "Bob doesn't see Gen. Color shareholder liability if Camden stays open for duration of supply K." (Ix Cert., Exhibit L, p. KENKOHN 0090.) The paragraph that follows this statement refers to the NJDEP ECRA approvals and the Supply Contract duration. (See Id.)

Both Paul Kenneth Kohnstamm and Richard Kohnstamm attended Kohnstamm Company Board of Directors meeting in New Jersey. Paul Kenneth Kohnstamm recalled attending five such meetings in New Jersey. (See Ix Cert., Exhibit M, Response No. 4.) One of those meetings was held at the General Color Property. (See Id. at Response No. 1.) Richard Kohnstamm recalls attending one such meeting in New Jersey and also recalls visiting the General Color Property in his capacity as a Director of Kohnstamm Company. (See Ix Cert., Exhibit N, Responses 1 & 4).

D.    **Selling Shareholders**

As noted above, Section 5.3 of the Reorganization Agreement imposed a joint obligation on the Selling Shareholders and Kohnstamm Company to obtain an ECRA nonapplicability determination from the NJDEP. The first page of the Reorganization Agreement refers to the "Selling Shareholders" as "the shareholders of the Company who have executed this Agreement on the signature pages hereof personally or by power of attorney …." (See Ix Cert., Exhibit A.) The Selling Shareholders signature lines of the Reorganization Agreement were signed by Paul Kohnstamm, twice, and by moving Third-Party Defendant Richard Kohnstamm. (See Ix Cert., Exhibit O, SCI 8360) Schedule A to the Reorganization Agreement, entitled "List of Selling Shareholders," listed Paul Kohnstamm, moving Third-Party Defendant Richard Kohnstamm, the Trust u/w of Lothair S. Kohnstamm f/b/o Paul L. Kohnstamm, the Trust u/w Lothair S.

Kohnstamm f/b/o Richard L. Kohnstamm, and the Trust u/w Lothair S. Kohnstamm f/b/o

Elizabeth Kohnstamm (the three trusts are collectively referred to herein as the "Trusts"). (See

Ix Cert., Exhibit P.) However, based on other provisions of the Reorganization Agreement,

Schedule A does not appear complete. Specifically, page two of the Reorganization Agreement

states that the Selling Shareholders "own in the aggregate approximately eighty percent (80%) of

the Company's issued and outstanding Company Common Stock." (See Ix Cert., Exhibit A.)

Paul Kohnstamm, Richard Kohnstamm and the Trusts collectively owned 636,115 shares, which

is only approximately 60% of the shares issued (1,057,752) and 63% of the shares outstanding

(1,012,292). (See Ix Cert., Exhibit P; See also Ix Cert, Exhibit A, p. 1.) However, the total

number of shares owned by the Kohnstamm Family Shareholders (809,221) equals

approximately 77% of the shares issued and 80% of the shares outstanding. (See Ix Cert.,

Exhibit C, pp. SCI 7400-02.) In addition, the Reorganization Agreement defines the term

"Kohnstamm Family Shareholders" as "those Selling Shareholders marked and indicated on

Schedule A as Kohnstamm Family Shareholders." (See Ix Cert., Exhibit A, p. 6.) That

definition would indicate that the Kohnstamm Family Shareholders were a subset of the Selling

Shareholders. Such interpretation is supported by Article XII of the Reorganization Agreement,

which includes a covenant not to compete by "Selling Shareholders Paul L. Kohnstamm, Richard

Kohnstamm, Paul Kenneth Kohnstamm and Katherine Piven." (See Id. at p. 99.) Thus, the term

Selling Shareholders in the Reorganization Agreement was intended to mean at least the

Kohnstamm Family Shareholders.

14

**E.    The ECRA Application**

In response to the obligation of Kohnstamm Company and the Selling Shareholders under the Reorganization Agreement to obtain an ECRA nonapplicability determination, an attorney named Daniel Rabinowitz sent a letter to the NJDEP dated August 31, 1987. (See Ix Cert., Exhibit B.) The letter was accompanied by an affidavit signed by Daniel Kaufman, Vice President of Kohnstamm Company, requesting a determination that the proposed transaction contained in the Reorganization Agreement fell within an exception to ECRA. (See Id.) Specifically, the Rabinowitz letter asked the NJDEP to disregard the corporate form and treat both the formal change of ownership of the General Color Property from Kohnstamm Company to General Color and the formal change of ownership of General Color from Kohnstamm Company to all Kohnstamm Shareholders as "a corporate reorganization not substantially affecting the ownership of the [General Color Property]."[8]  (See Id. )  The letter argued that "both before and after the Closing of the proposed transaction, the shareholders of Kohnstamm remain beneficial and equitable owners of General Color's assets, including [the Camden industrial establishment]." (See Id. )  The letter further stated that "[a]fter the spin off, these shareholders will own directly what they formerly owned indirectly by virtue of their Kohnstamm shares." (See Id.)  Both the letter and the Kaufman affidavit asserted that "[a]s a result of the proposed transaction, beneficial ownership of the Camden and Newark facilities will remain where it is today--in the shareholders of Kohnstamm." (See Id.)

---

[8]  This letter was sent to NJDEP at a time when it was contemplated that General Color would be spun-off to all of the Kohnstamm Company shareholders.

On October 21, 1987, NJDEP issued a response to Rabinowitz's August 31 letter. (See Id.) The NJDEP found that the transfer of the Camden facility from Kohnstamm Company to its wholly-owned subsidiary, General Color, followed by the transfer of shares of General Color on a pro-rata basis to all Kohnstamm Company shareholders were collectively considered a corporate reorganization not substantially affecting ownership of the General Color Property, and thus were not subject to ECRA. (See Id.)

On January 12, 1988, Rabinowitz submitted to the NJDEP an amended application for a letter of non-applicability, along with a supplemental affidavit of Kaufman, based on two modifications to the initially proposed transaction. (See Id.) First, General Color's shares would not be spun-off on a pro-rata basis to all shareholders of Kohnstamm Company, but instead would be distributed on a pro-rata basis to only the Kohnstamm Family Shareholders, who by that time owned 81% of the stock of Kohnstamm Company. (See Id.) Second, General Color and the third-party buyer of Kohnstamm Company, Universal Foods, would enter into a Supply Contract, pursuant to which General Color would supply certified colors to Universal Foods. (See Id.) The reason for the change in the proposed transaction, as expressed in both the January 12 letter and the attached affidavit, was:

> in substantial part because a pro-rata spin-off would, in the opinion of the staff of the Securities and Exchange Commission, which was consulted on the point, require a Registration Statement. This would be expensive, time consuming and unnecessary in light of the fact that the Kohnstamm family, both before and after the spin-off, will have control of the Company.

(See Id., emphasis added.) Because of the change, Rabinowitz now argued that "the controlling interest in the Camden and Newark industrial establishments will remain where it is today—in the Kohnstamm family." (See Id.) On January 27, 1988, the NJDEP issued a response letter to

the amended application for non-applicability, in which it found the proposed transaction, with these changes included, was not subject to the provisions of ECRA. (See Id.)

If the NJDEP did not ignore the corporate form, but rather determined that ECRA did apply to the transactions involving the General Color Property, the NJDEP would have required an ECRA environmental investigation and remediation of the General Color Property at the time of the transaction (1988). The transaction documents clearly reflect that Universal Foods refused to acquire the General Color Property because of the potential environmental liability. (See Ix Cert., Exhibit F, pp. SCI 7943.) Thus, Universal Foods would not have allowed the cost of the ECRA investigation and remediation to be retained by Kohnstamm Company when it was transferred to Universal Foods. If the ECRA nonapplicability determination had not been granted by NJDEP, the most likely result would have been that in order to complete the transaction with Universal Foods, General Color would have to have assumed the ECRA liability pursuant to N.J.S.A. 13:1K-9c., which, at the time provided: "The cleanup plan and detoxification of the site shall be implemented by the owner or operator, provided that the purchaser, transferee, mortgagee or other party to the transfer may assume that responsibility pursuant to the provisions of this act." N.J.S.A. 13:1K-9c. (West 1991).

## F.    Redemption

As noted above, following the transaction contemplated in the Reorganization Agreement, General Color (owned completely by the Kohnstamm Family Shareholders) was to have operated for eighteen months on a break-even basis pursuant to a Supply Contract with a subsidiary of Universal Foods. At the time of the 1988 Transaction, it was clear that General

17

Color would incur ECRA costs greater than the $2,700,000 book value of the General Color Property if it ceased operating. It was also clear that it would be contractually prohibited from continuing its primary business after the expiration of the Supply Agreement. Further, it was clear that General Color continued to operate after the 1988 Transaction to avoid the ECRA clean-up costs. The Supply Agreement expired on or about March of 1990. (See Ix Cert., Exhibit Q.) At least as early as October 1990, General Color began to redeem the stock of the Kohnstamm Family Shareholders. (See Ix Cert., Exhibit R, pp. OK 00046-47.) The redemption form letter issued by General Color on February 4, 1991 indicates that the recipients (Kohnstamm Family Shareholders) would be "pleased" about the redemption. (See Id. at pp. OK 00005, OK 00065, OK 00086, OK 00103, OK 00120, OK 00137, DFEBKOHN 0204, KENKOHN 0187, & KENKOHN 0222.) From the documents produced by the moving Third-Party Defendants, it appears that General Color did not have sufficient funds to complete the redemption. A letter dated February 15, 1991 to the trustees of the Trust u/w Lothair S. Kohnstamm f/b/o Paul L. Kohnstamm requested that the Trust waive its right to redemption since General Color had "insufficient funding therefor." (See Id. at p. OK 00061.) Moreover, it appears from the documents produced that most of the redemptions were accomplished with a 10% cash payment and a promissory note for the remainder. (See, e.g., Id. at pp. OK 00066-67, OK 00086, OK 00103, OK 00120, OK 00137, DFEBKOHN 0204, KENKOHN 0187, & KENKOHN 0222.)

## ARGUMENT

I.    THE COURT HAS PERSONAL JURISDICTION OVER THE MOVING THIRD-PARTY DEFENDANTS.

### A.    Standard

A New Jersey court's assertion of personal jurisdiction over a non-resident defendant

must comport with New Jersey Court Rule 4:4-4(b)(1), which permits service of process on non-

resident defendants "consistent with due process of law." *R*. 4:4-4(b)(1).  Under Rule 4:4-

4(b)(1), New Jersey courts "will allow out-of-state service to the uttermost limits permitted by

the United States Constitution." Avdel Corp. v. Mecure, 58 N.J. 264, 268 (1971).  If a defendant

maintains "continuous and systematic activities" in the forum state, that defendant is subject to

the "general" jurisdiction of the forum state on any matter, irrespective of its relation to the state.

See Waste Management, Inc. v. Admiral Ins. Co., 138 N.J. 106, 119 (1994); Lebel v. Everglades

Marina, Inc., 115 N.J. 317, 323 (1989); Bayway Refining Co. v. State Utilities, Inc., 333 N.J.

Super. 420, 428 (App. Div. 2000).  If, however, the cause of action arises directly out of a

defendant's contacts with the forum state, the court's jurisdiction is "specific." Waste

Management,138 N.J. at 119 (citing Lebel, 115 N.J. at 322).  In this case, because the cause of

action against Third-Party Defendants arises directly out of the 1988 Transaction, which

occurred in New Jersey, involved a facility in New Jersey and required approval of a New Jersey

regulatory agency, the court's jurisdiction is specific.

New Jersey courts apply a two-part test for determining if assertion of specific personal

jurisdiction would satisfy the jurisdictional requirement of due process.  The first part requires

the court to determine if the defendant in question has sufficient minimum contacts. Charles

Gendler & Co. v. Telecom Equipment Corp., 102 N.J. 460, 470-72 (1986). In short, the defendant must perform "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefit and protection of its laws." Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240, 2 L. Ed. 2d 1283 (1958). "[T]he defendant should reasonably anticipate being haled into court in the forum state." Waste Management, 138 N.J. at 120 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985)). The second part requires the court to evaluate those contacts "in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" Gendler, 102 N.J. at 471 (quoting Burger King, 471 U.S. at 474, 105 S. Ct. at 2174 (quoting International Shoe Co. v. Washington, 326 U.S. 310, 320, 66 S. Ct. 154, 160, 90 L. Ed. 95 (1945)). Movants' contacts with New Jersey satisfy both parts of the New Jersey test for specific personal jurisdiction.

### B.    Personal Jurisdiction Through Veil-Piercing

#### 1.    Personal Jurisdiction is Available Through Veil-Piercing

If a court has personal jurisdiction over a corporation, that jurisdiction automatically attaches to its shareholders, regardless of their individual contacts with the forum, when the corporate veil is pierced. Star Video Entertainment, L.P. v. Video USA Associates 1 L.P., 253 N.J. Super. 216 (App. Div. 1992). The seminal case in this area of law, Star Video Entertainment, proves instructive. Star Video supplied videocassettes to Video USA which purchased them on behalf of several limited partnerships involved in video rental and sales. Id. at 219. After Video USA had incurred $556,000 in debt, Star Video brought suit against Video

USA, its shareholders, and several of its limited partnerships. Id. at 220. Although the trial court

determined that Video USA and its non-resident limited partnerships were both subject to its

jurisdiction, it refused to extend personal jurisdiction over the out-of-state shareholders. Id. at

221. Their status as shareholders and officers of the general partners, without more, was

insufficient to fulfill the due process requirement of purposeful availment. Id.

The Appellate Division disagreed finding that the exercise of jurisdiction over

shareholders who obtain pecuniary benefits through contractual relationships with in-state

corporations does not "offend traditional notions of fair play and substantial justice." Id. at 226.

The court explained, "If the disputed facts are resolved sufficiently to provide a basis for holding

liable the individual defendants under alter ego theory, their presence for jurisdictional purposes

cannot be said to be either unfair or unreasonable." Id. at 223-24. In its application of these

principles, the Appellate Division determined that because Star Video had alleged facts sufficient

to prove its veil piercing theory at trial, it had also alleged facts sufficient to support a finding of

jurisdiction. Id.

## 2.    Standard for Veil-Piercing

The New Jersey Supreme Court has consistently held that "[e]xcept in cases of fraud,

injustice, or the like, courts will not pierce a corporate veil." State, New Jersey Dep't of Envtl.

Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983) (citing Lyon v. Barrett, 89 N.J. 294, 300 (1982)).

"The purpose of the doctrine of piercing the corporate veil is to prevent an independent

corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a

crime, or otherwise evade the law." Id. (citations omitted). Accordingly, New Jersey courts

"have not hesitated to pierce the corporate veil of a closely held corporation in order to impose

personal liability." Walensky v. Jonathan Royce Int'l, Inc., 264 N.J. Super. 276, 283 (App. Div.

1993), cert. denied, 134 N.J. 480 (1993).  There are two "overarching elements" necessary to

pierce the corporate veil:

> First, there must be such unity of interest and ownership that the separate
> personalities of the corporation and the individual no longer exist.  Second, the
> circumstances must indicate that adherence to the fiction of separate corporate
> existence would sanction a fraud or promote injustice.

The Mall at IV Group Properties, LLC v. Roberts, 2005 WL 3338369 at * 3 (D.N.J. Dec. 8,

2005) (quoting 1 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private

Corporations, § 41.30 (perm.ed., rev.vol.1999), and citing Ventron, 94 N.J. at 500).  The factors

considered in determining the first element include whether "the corporation is merely a façade

for the operations of the dominant shareholders or stockholders." Roberts, 2005 WL 3338369 at

*3.  With regard to the second element, the Roberts Court held that there "must be some 'wrong'

beyond simply a judgment creditor's inability to collect," but a plaintiff need not prove common

law fraud.  Id.  Rather, a plaintiff need only meet "the less rigid standard of 'fraud, injustice or

the like.'" Id. (quoting Kuibyshevnefteorgsythez v. Model, 1995 WL 66371 at *15 (D.N.J. Feb.

6, 1995), and Ventron, 94 N.J. at 500).

The ECRA application addresses the first element, asking NJDEP to recognize a unity of

interest and ownership between Kohnstamm Company, General Color and the Kohnstamm

Family Shareholders.  It asks NJDEP to ignore the legal transfer of ownership of the General

Color Property from Kohnstamm Company to General Color and the legal transfer of ownership

of General Color from Kohnstamm Company to the Kohnstamm Family Shareholders.  The

Third-Party Complaint asks the Court to recognize in equity the unity of interest and ownership recognized under ECRA by NJDEP.

As to the second element, to allow the Kohnstamm Family Shareholders to hide behind the corporate fiction would defeat the ends of justice and permit them to evade environmental investigation and remediation costs that would have been incurred pursuant to ECRA. The Reorganization Agreement and Prospectus/Proxy Statement demonstrate that Universal Foods refused to acquire the General Color Property because of the environmental liability associated with it. Universal Foods would not have acquired Kohnstamm Company if it were burdened by ECRA liability triggered by the 1988 Transaction. If NJDEP had not granted an exception to ECRA, that liability would have to have been assumed by General Color, the transferee of the General Color Property and an entity 100 percent owned by the Kohnstamm Family Shareholders. NJDEP granted an exception to ECRA based on a determination that, in the ECRA context, there was no distinction between Kohnstamm Company, General Color and the Kohnstamm Family Shareholders. NJDEP's determination was based on the sworn statement of Daniel Kaufman, Kohnstamm Company's Vice President. Given Universal Foods' unequivocal position on not acquiring General Color Property environmental liability through the acquisition of Kohnstamm Company, the application to NJDEP was clearly made for the benefit of those who would otherwise have had to bear the cost of the environmental investigation and remediation--the Kohnstamm Family Shareholders. The Reorganization Agreement, itself, imposed an obligation on both the "Selling Shareholders" and Kohnstamm Company to obtain ECRA clearance. Moreover, several provisions of the Reorganization Agreement suggest that the term "Selling Shareholders" was intended to include the Kohnstamm Family Shareholders.

23

In addition, it is clear that the principal purpose of the Supply Contract for General Color and the Kohnstamm Family Shareholders was to further postpone an ECRA trigger and the associated environmental investigation and remediation costs. Shortly after the expiration of that Supply Contract, General Color began to redeem its shares from the Kohnstamm Family Shareholders, even though it did not have sufficient funds to do so. The handwritten notes of Paul Kenneth Kohnstamm, a moving Third-Party Defendant and former Director of Kohnstamm Company, memorialize his understanding of the link between continued operation of the General Color Property and the avoidance of shareholder liability. It cannot be coincidence that shortly after the termination of the Supply Contract which kept the General Color Property operating, the Kohnstamm Family Shareholders began to extricate themselves from ownership of General Color.

One cannot ignore the pattern here, the "functional reality" discussed by the Appellate Division in Star Video. Id., 253 N.J. Super. at 222. The Kohnstamm Family Shareholders, the majority shareholders of Kohnstamm Company prior to the 1988 Transaction and the sole owners of General Color after the 1988 Transaction, were not required to undertake an ECRA investigation and remediation in 1988 because NJDEP concluded there was no relevant distinction between them and the two corporations for purposes of environmental cleanup responsibility. It would be grossly unjust, if not perverse, to now recognize those distinctions and, thereby, allow the Kohnstamm Family Shareholders to evade environmental cleanup responsibility.

24

### 3.    New Jersey Courts Allow Corporations to Pierce Own Veil

Relying on New York law to support their proposition, the moving Third-Party

Defendants assert that Sensient Colors should not be permitted to pierce its own corporate veil.

However, this issue is a matter of state law, and, contrary to the Movants' assertion not only have

courts applying New Jersey law addressed this issue, but they have also determined that a

corporation may pierce its own veil. In re Buildings by Jaime, Inc., 230 B.R. 36 (Bankr. D.N.J.

1998).

In In re Buildings by Jaime, Inc., several creditors and the trustee of a bankrupt

corporation sued the debtors for "breach of fiduciary duty, fraud and fraudulent concealment,

conversion, breach of contract, turnover of estate property, and unjust enrichment." Id. at 40.

The debtors contended that the trustee, as representative of the corporation, did not have standing

to assert such claims. Relying on New Jersey alter ego law, the court held that the trustee had

standing because "an alter ego action is an equitable remedy that belongs to the corporate entity

and may be asserted by the corporation when it suffers harm from the fraudulent acts of its

principals." Id. at 43. In coming to this conclusion, the court relied on a Third Circuit decision

addressing a substantially similar situation, which stated:

> It may seem strange to allow a corporation to pierce its own veil, since it cannot
> claim to be either a creditor that was deceived or defrauded by the corporate
> fiction, or an involuntary tort creditor.  In some states, however, piercing the
> corporate veil and alter ego actions are allowed to prevent unjust or inequitable
> results;  they are not based solely on a policy of protecting creditors.... New
> Jersey alter ego or veil piercing law is currently based on such a theory....
> Because piercing the corporate veil or alter ego causes of action are based upon
> preventing inequity or unfairness, it is not incompatible with the purposes of the
> doctrines to allow a debtor corporation to pursue a claim based upon such a
> theory.

Id. at 42-43, (citing Phar-Mor, Inc. v. Coopers & Lybrand, 22 F.3d 1228, 1240 n.20 (3d Cir. 1994)) (applying New Jersey law).

Although both Buildings by Jaime, supra, and Phar-Mor, supra, address piercing one's own veil in the bankruptcy context, the rule of law is equally applicable to issues involving corporate law. In bankruptcy actions, a "core proceeding" is one that either "involves a right created by the federal bankruptcy law" or "one that would arise only in bankruptcy." In re Guild and Gallery Plus, Inc., 72 F.3d 1171, 1178 (3d Cir. 1996) (quoting In re Wood, 825 F.2d 90, 97 (5th Cir. 1987)). In comparison, a "non-core proceeding" exists independently of the federal bankruptcy laws. Id. Veil piercing issues are typically considered non-core proceedings. Phar-Mor, 22 F.3d at 1239. Accordingly, the Phar-Mor court found that piercing one's own corporate veil is a corporate state law issue, not rooted in bankruptcy. Id.

**4.    Deference to NJDEP**

Through the ECRA nonapplicability determination, NJDEP already determined that the transaction contemplated by the Reorganization Agreement was a "corporate reorganization not substantially effecting ownership" of the General Color Property. NJDEP already determined that the transfer of ownership of the General Color Property from Kohnstamm Company to its subsidiary General Color was not a change in ownership. NJDEP already determined that the transfer of ownership of General Color from Kohnstamm Company to the Kohnstamm Family Shareholders was not a change in ownership. Thus, NJDEP already determined that the apparent change in the direct owner and indirect owner of the General Color Property was not a change in ownership. Based on the sworn statements of Daniel Kaufman, NJDEP pierced the corporate

26

distinctions between Kohnstamm Company, General Color and the Kohnstamm Family
Shareholders, and determined that in the context of responsibility for the environmental
investigation and remediation of the General Color Property, there is no distinction between
them. With this understanding, NJDEP allowed the transaction to close without requiring an
environmental investigation and remediation of the General Color Property. The moving Third-
Party Defendants are asking this Court to disregard the prior factual determination of NJDEP.

The factual determinations of an administrative agency are afforded great deference when
the subject matter falls within the purview of the agency's expertise. Compare In re
Authorization for Freshwater Wetlands General Permits, 372 N.J. Super. 578 (App. Div. 2004)
(giving great deference to NJDEP's factual findings leading to determination of whether certain
property fell within statutory definition of "freshwater wetland"), with Clowes v. Terminix
International, Inc., 109 N.J. 575 (1988) (concluding deference unnecessary because Division of
Civil Rights was no better equipped to diagnose alcoholism and evaluate an employee's sales
productivity than the court). A court must examine the record for "competent evidence" which
supports the factual determinations of the administrative agency. Clowes, 109 N.J. at 587. This
review "calls for careful and principled consideration of the agency record and findings." Id. If
there is a dearth of support, the court may remand the case to the agency to further explain its
decision. Authorization for Freshwater Wetlands General Permits, 372 N.J. Super. at 598. In
situations where an agency's factual determination is "so plainly unwarranted that the interests of
justice demand intervention and correction," the court is justified in making its own findings.
Clowes, 109 N.J. at 588.

27

Courts employ great deference regardless of whether an agency factual determination is

the subject of a direct appeal. In <u>Boardwalk Regency Corp. v. New Jersey Casino Control</u>

<u>Commission</u>, 352 N.J. Super. 285 (2002), <u>cert. denied</u>, 174 N.J. 366 (2002), casino President

Gary DiBartolomeo was placed on paid leave after an initial investigation by the Division of

Gaming Enforcement (the Division) indicated that he may have violated several terms of his

casino key employee license, a prerequisite of his employment. <u>Id.</u> at 294-295. After a thorough

investigation, the Division issued a report recommending that DiBartolomeo's key employee

license be revoked and that he be terminated as President. <u>Id.</u> at 295-296. The Division based its

recommendation on several factors including, <u>inter alia</u>, that he had misrepresented certain facts

in obtaining his license, he had gambled on 23 different occasions in violation of his license, and

he had lied about the aforementioned licensing violations at the time he was promoted to

President of the casino. <u>Id.</u> The New Jersey Casino Control Commission conducted a hearing

on the matter. After the hearing, but before any decision had been rendered, DiBartolomeo and

the casino filed a joint petition with the Commission outlining the details of a proposed

severance agreement. <u>Id.</u> at 296-297. The Commission issued decisions on both

DiBartolomeo's licensure status and his severance agreement on the same day. In reliance on the

factual findings of the Division, the Commission revoked DiBartolomeo's key employee license.

<u>Id.</u> at 298. In a separate decision, the Commission terminated DiBartolomeo's severance

agreement. <u>Id.</u>

On appeal, DiBartolomeo argued, <u>inter alia</u>, that the severance agreement was reasonable.

However, the court held that the decision to void the severance agreement was supported by the

record given that "the Commission found that DiBartolomeo blatantly violated the terms of a

28

Commission order, lied repeatedly to regulatory officials about his gambling, and testified falsely during his licensing hearing." Id. at 307. The court explained its reliance on these facts as follows: "We may not substitute our judgment of the facts for that of an administrative agency. The findings of fact made by an agency are binding on appeal when supported by adequate, substantial and credible evidence." Id. Thus, despite the fact that the Commission's licensure decision was not on appeal, the court relied on, and gave great deference to, the findings made in that decision in its adjudication of the validity of DiBartolomeo's severance agreement.

This Court should defer to the factual findings made by the NJDEP in 1988. Specifically, the NJDEP found that the transfers of the General Color Property and General Color did not "result in a change of ownership or control." 19 N.J. Reg. 681(a) (December 21, 1987), repealed by 29 N.J. Reg. 16(a) (November 17, 1997) (current version at 36 N.J. Reg. 4298(c) (August 16, 2004)). This factual finding was a prerequisite for the NJDEP's conclusion that the transaction was not subject to the provisions of ECRA because it constituted a "corporate reorganization not substantially affecting ownership." Id. According to NJDEP, the Kohnstamm Family Shareholders owned the General Color Property both before and after its sale.

Moreover, the circumstances in Boardwalk Regency Corp., supra, reveal that this Court should afford the same amount of deference to these findings as if the NJDEP's decision itself were on appeal. Deference is particularly appropriate given that the subject matter fell within the NJDEP's expertise. The Legislature delegated to NJDEP responsibility for making factual determinations regarding the applicability of ECRA, including identifying corporate reorganizations that do not substantially affect ownership. In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 449 (1992).

Further, in accordance with <u>Clowes</u>, <u>supra</u>, there is competent evidence on the record supporting the NJDEP's factual findings. The NJDEP explained that it made its decision based on a review of the affidavit of Kohnstamm Company's Vice President, Daniel Kaufman. (Letter from DEP to Daniel Rabinowitz of 1/27/88, at 1). The NJDEP found, on the basis of Mr. Kaufman's sworn statement, that "as a result of the proposed transaction, beneficial ownership of the Camden and Newark facilities will remain where it is today – in the shareholders of Kohnstamm." (Kaufman Aff. ¶ 5). As the decision is not "plainly unwarranted," this factual determination should stand. <u>Clowes</u>, 109 N.J. at 588.

### C.    Third-Party Defendants Have Sufficient Minimum Contacts with New Jersey.

Even without piercing the corporate veil, this Court has personal jurisdiction over the moving Third-Party Defendants. To meet the sufficiency requirement, the minimum contacts of a particular case "must come about by an action of the defendant purposefully directed toward the forum State." <u>Asahi Metal Industry. Co. v. Superior Court of California</u>, 480 U.S. 102, 112, 107 S. Ct. 1026, 1032, 94 L. Ed. 2d 92 (1987). "Critical to the due process analysis is the question whether the defendant should reasonably anticipate being haled into court in the forum state." <u>Waste Management</u>, 138 N.J. at 120 (<u>citing</u> <u>Burger King</u>, 471 U.S. at 474, 105 S. Ct. at 2183). The New Jersey Supreme Court has explained that "[t]he greater the benefits derived from the defendant's contacts with the forum state, the more reasonable it is to require the defendant to be subject to the jurisdiction of the forum." <u>Gendler</u>, 102 N.J. at 473.

The number of contacts with the forum state, while part of the analysis, is not dispositive so long as the number of contacts is greater than zero for each individual defendant. As the

United States Supreme Court noted in <u>McGee v. International Life Insurance Co.</u>, as long as it creates a "substantial connection" with the forum, even a single act can support jurisdiction. <u>Id.</u>, 355 U.S. 220, 223, 78 S. Ct. 199, 201, 2 L. Ed. 2d 223 (1957). The minimum contacts analysis must look beyond the status of the non-resident defendants to the actual contacts of each individual defendant with the forum state. <u>See Calder v. Jones</u>, 465 U.S. 783, 789-90, 104 S. Ct. 1482, 1487, 79 L. Ed. 2d 804 (1984) (noting that defendants' "status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually."). Personal jurisdiction over agents of corporations does not exist simply because the corporation itself is amenable to personal jurisdiction. <u>See</u> <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 779-80, 104 S. Ct. 1473, 1480-81, 79 L. Ed. 2d 790 (1984). However, "where appropriate, courts of New Jersey have looked beyond the corporate form to the functional reality behind it." <u>Star Video</u>, 253 N.J. Super. at 223 (citing <u>Taca Int'l Airlines v. Rolls Royce, Ltd.</u>, 84 N.J. Super. 140 (Law Div. 1964)). Therefore, in the context of business torts, the New Jersey Superior Court Appellate Division noted that "while a director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character, if he directs the tortious act to be done, or participates or cooperates therein, he is personally liable to third persons injured or damaged thereby, even though liability may also attach to the corporation." <u>Trustees of Structural Steel v. Huber</u>, 136 N.J. Super. 501, 505 (App. Div. 1975), <u>cert. denied</u>, 70 N.J. 143 (1976) (citing <u>McGlynn v. Schultz</u>, 95 N.J. Super. 412, 416 (App. Div. 1967), <u>cert. denied</u>, 50 N.J. 409 (1967), and <u>Sensale v. Applikon Dyeing & Printing Corp.</u>, 12 N.J. Super. 171, 175 (App. Div. 1951)).

Applying these principles, New Jersey courts have extended their exercise of personal jurisdiction to non-resident directors or shareholders where such individuals entered into agreements affecting the state, placing themselves on notice that they could be haled into court in New Jersey in litigation connected to their activities. In <u>Huber</u>, the Superior Court of New Jersey Appellate Division held that, where the sole business contact with New Jersey of a president and controlling stockholder of a corporation was the signing of a collective bargaining agreement with certain unions and subsequent phone calls for payment under that agreement, "it was enough in the existing circumstances to support the long-arm service of process." <u>Id.</u> at 506. The court reasoned that "[t]he transactions in which he was involved as president and controlling stockholder . . . had substantial incidents in New Jersey, not the least of which was the corporation's contractual obligation" that was directly connected to the asserted causes of action. <u>Id.</u>

In a recent unreported case, the Superior Court of New Jersey held that a non-resident director of a New Jersey corporation was subject to personal jurisdiction in New Jersey. <u>First Trenton Indemnity Co. v. River Imaging, P.A.</u>, 2004 WL 3316874, at *11 (N.J. Super. Law Div. March 22, 2004); <u>see also</u> <u>Educational Testing Service v. Katzman</u>, 631 F. Supp. 550, 561-62 (D.N.J. 1986) (applying New Jersey law and finding that the non-resident director and sole shareholder of a non-resident corporation "certainly could have foreseen that he might be called into [New Jersey] court to explain the[] actions" at issue in the case). The court in <u>First Trenton</u> asserted that because the director knew that any failure of the corporation to comply with the regulations of New Jersey, which were contained in a statement he read and signed, could give

32

rise to a lawsuit against the corporation, the director should have reasonably anticipated that he would be haled into court in New Jersey. Id.

Applying these principles to the instant case, it is clear that the moving Third-Party Defendants had sufficient minimum contacts in New Jersey to reasonably anticipate being haled into court in New Jersey. The moving Third-Party Defendants actively participated in a transaction involving: (1) the transfer of ownership of real property in New Jersey; (2) the transfer of ownership of a New Jersey corporation, General Color, to just their family; and (3) New Jersey's ECRA statute. By virtue of the information contained within the Reorganization Agreement, the Prospectus/Proxy Statement and the Shareholders Agreement, each of the moving Third-Party Defendants was aware that the transaction involved these three elements. Moreover, by virtue of the information contained within the Prospectus/Proxy Statement, each of the moving Third-Party Defendants was aware: (1) that the General Color Property was burdened by environmental issues, the cost of which exceeded its book value; (2) that continued operation of the General Color Property would be necessary to delay incurring those ECRA costs; (3) that the General Color Property would be operated on a break-even basis for eighteen months following the closing and (4) that the ability to operate the General Color Property beyond the Supply Contract was uncertain.

The Movants would like this Court to believe that they were merely minority shareholders of Kohnstamm Company. Even a passing review of the Reorganization Agreement and other transaction documents would suffice to reject such claim. The Reorganization Agreement makes clear that "Minority Shareholders" were those shareholders other than the

Kohnstamm Family Shareholders. More importantly, the Reorganization Agreement treats the Kohnstamm Family Shareholders differently from the Minority Shareholders. Finally, the Kohnstamm Family Shareholders, unlike the Minority Shareholders, executed documents necessary for the consummation of the proposed transaction. The Minority Shareholders, with less than one-third of the Kohnstamm Company shares, were powerless to stop the transaction. The Kohnstamm Family Shareholders controlled the transaction and profited by more than $8,000,000. As instructed by the Court in Star Video, supra, one must look at the functional reality behind the corporate form. Id. at 223. Although none of the moving Third-Party Defendants individually owned a majority of the stock of Kohnstamm Company, together the family owned approximately 80 percent. Here, the Reorganization Agreement treated the family as a unit and the family acted as a unit in taking the steps necessary to consummate the proposed transaction.

Richard Kohnstamm executed the Reorganization Agreement, itself, the Shareholder's Agreement, the Representation Letter and the Affiliate Letter. As noted previously, the Affiliate Letter affirmed that the signatory was an "affiliate" of Kohnstamm Company, as that term is used in the Securities Act of 1933. The term "affiliate" is defined in the Securities Exchange Commission regulations as "a person that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified." 17 C.F.R. §230.405. So, each of the individuals, including Richard Kohnstamm, who signed the Affiliate Letter affirmed that they controlled Kohnstamm Company. He was also a Director of Kohnstamm Company, who voted in favor of the Reorganization Agreement and the General Color Valuation report. He visited the General Color Property in his capacity as a

34

Director and attended at least one Kohnstamm Company Board of Directors meeting in New Jersey.

Paul Kenneth Kohnstamm executed the Shareholder's Agreement, the Representation Letter and the Affiliate Letter. He was also a Director of Kohnstamm Company, who voted in favor of the Reorganization Agreement and the General Color Valuation report. He visited the General Color Property in his capacity as a Director and attended at least five Kohnstamm Company Board of Directors meetings in New Jersey.

Mary L. Kohnstamm executed the Shareholder's Agreement, the Representation Letter and the Affiliate Letter.

Kevin Kohnstamm executed the Shareholder's Agreement, the Representation Letter and the Affiliate Letter.

Daniel F. Kohnstamm executed the Shareholder's Agreement and the Representation Letter.

Elizabeth Bryan Kohnstamm executed the Shareholder's Agreement and the Representation Letter.

Joshua G. Kohnstamm executed the Shareholder's Agreement and the Representation Letter.

Ricka Robb Kohnstamm executed the Shareholder's Agreement and the Representation Letter.

35

David Kohnstamm executed the Shareholder's Agreement and the Representation Letter.

Jeffrey Kohnstamm executed the Shareholder's Agreement and the Representation Letter.

John Kohnstamm executed the Shareholder's Agreement and the Representation Letter.

Adam Michael Kohnstamm was a minor at the time. Naomi Perman executed the Shareholder's Agreement, the Representation Letter and the Affiliate Letter on his behalf.

Peter L. Kohnstamm executed the Shareholder's Agreement.

Abby F. Kohnstamm executed the Shareholder's Agreement.

Each of the moving Third-Party Defendants could have dissented and could have refused to execute the Shareholder's Agreement and other documents. They did not.[9] Each of their actions was purposefully directed toward New Jersey to avail the Third-Party Defendants of the benefit and protection of New Jersey law. Accordingly, these contacts are sufficient to meet the due process requirement of "minimum contacts."

Having freely participated in a business transaction involving the transfer to them of a New Jersey corporation, a transfer to that New Jersey corporation of real property situated in New Jersey and approval under New Jersey's ECRA statute, the Third-Party Defendants cannot convincingly argue that they did not purposefully avail themselves of the privilege of doing

---

[9] As previously noted, Abby Kohnstamm and Peter Kohnstamm did not execute the Representation Letter because they did not want to participate in ownership of General Color. However, they did execute the Shareholder's Agreement, which was necessary to complete the 1988 Transaction.

36

business in New Jersey. Their participation put them on notice that they could be haled into a New Jersey court for actions arising out of the 1988 Transaction. Certainly, Paul Kenneth Kohnstamm cannot dispute this, since his handwritten notes reflect concern over General Color shareholder liability if the General Color Property stopped operating during the duration of the Supply Contract.

### D.    The Assertion of Personal Jurisdiction Over Third-Party Defendants Would Not Offend Traditional Notions of Fair Play and Substantial Justice.

After finding that the sufficient minimum contacts threshold is met, a court then must evaluate those contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice. Waste Management, 138 N.J. at 121. "In the context of specific jurisdiction, the minimum contacts inquiry must focus on 'the relationship among the defendants, the forum, and the litigation.'" Blakey v. Continental Airlines, Inc., 164 N.J. 38, 67 (2000) (quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S. Ct. 2569, 2580, 53 L. Ed. 2d 683 (1977)). In Asahi Metal, supra, the United States Supreme Court set forth five factors to evaluate the reasonableness of exercise of jurisdiction on a case-by-case basis: "the burden on the defendant, the interests of the forum state, the third-party plaintiff's interest in obtaining relief, the interstate judicial system's interest in efficient resolution of controversies, and the shared interest of the States in furthering substantive social policies." Waste Management, 138 N.J. at 122 (citing Asahi Metal, 480 U.S. at 113, 107 S. Ct. at 1033).

In this case, an analysis of these factors weighs in favor of exercising jurisdiction over the moving Third-Party Defendants. First, that the Movants would have to travel to New Jersey to litigate is not sufficient to defeat jurisdiction. As the New Jersey Supreme Court stated in Waste

Management, "the burden of a defendant coming to the plaintiff's state, as opposed to the plaintiff going to the defendant's home state, is too slight an imbalance to defeat jurisdiction." Id. at 125 (citing Lebel, 115 N.J. at 328-29). Additionally, in cases with multiple defendants residing in several states, litigating the entire case in one forum serves the interstate judicial system's interest in efficient resolution of controversies.

The states collectively share an interest in promoting responsibility in the realm of environmental contamination, and the State of New Jersey has a very strong public interest in litigating this particular action in its courts. ECRA (now known as the Industrial Site Recovery Act) requires owners and operators of industrial sites to demonstrate the property is environmentally sound as a precondition for certain events, such as sale or transfer of the property or the closure of the business. In re Railroad Realty Associates, 313 N.J. Super. 225, 228 (App. Div. 1998). On the basis of an application benefiting the Movants, NJDEP determined that the potential ECRA triggering events of 1988 were corporate reorganizations not substantially affecting ownership, and as a result, the General Color Property remained contaminated. The State has a substantial interest not only in the clean-up of the General Color Property, but also in holding the appropriate parties responsible for the cost of the clean-up. In this case, it is clear that the appropriate parties to hold responsible for the clean-up of the General Color Property are the Kohnstamm Family Shareholders, including the Movants, the "beneficial and equitable" owners of the General Color Property both before and after the 1988 Transaction.

## II. THE THIRD-PARTY COMPLAINT STATES A CAUSE OF ACTION UPON WHICH RELIEF MAY BE GRANTED.

### A. Standard on Motion to Dismiss

On a motion to dismiss for failure to state a cause of action, a reviewing court is required to search the complaint "in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim ...." Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746 (1989) (quoting Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 252 (App. Div. 1957)); accord, Smith v. SBC Communications Inc., 178 N.J. 265, 282 (2004). The inquiry is not whether the plaintiff can prove the allegations of the complaint. Id. All reasonable inferences are accorded to the plaintiff. Id. The review of the complaint "should be one that is at once painstaking and undertaken with a generous and hospitable approach." Id. A motion to dismiss is granted "only in rare instances and ordinarily without prejudice." Smith, 178 N.J. at 282.

### B. Movants Are Liable as Persons Responsible for a Discharge

Liability under New Jersey's Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 et seq., attaches to any person responsible for a discharge of hazardous substances. The term "responsible for a discharge" is defined at N.J.A.C. 7:1E-1.6 to include, inter alia, each owner or operator of a facility from which a discharge has occurred and any person who has directly or indirectly caused a discharge. The Spill Act must be "liberally construed to effect its purposes." N.J.S.A. 58:10-23.11x.

39

In <u>Ventron</u>, <u>supra</u>, the New Jersey Supreme Court found inadequate under the traditional common law test for veil piercing the evidence proffered against a parent corporation. <u>Id.</u> at 502-03. Nevertheless, the Court held the parent corporation jointly and severally liable for the environmental harm caused by the subsidiary based on liberal construction of the phrase "in any way responsible." <u>Id.</u> at 502. The Court determined that "the privilege of incorporation should not [under the facts of that case] become a device for avoiding statutory responsibility," and that a contrary result "would permit corporations, merely by creating wholly-owned subsidiaries, to pollute for profit under circumstances when the Legislature intended liability to be imposed." <u>Id.</u> at 502-03.

The Third-Party Complaint alleges in Count I that the Third-Party Defendants were the beneficial and equitable owners of the General Color Property and, therefore, liable under the Spill Act. (Third-Party Complaint, ¶ 47.) It also alleges that the Third-Party Defendants controlled Kohnstamm Company and the General Color Property and, therefore, were liable under the Spill Act. (Third-Party Complaint, ¶ 48.) Those allegations are based on the statements contained in the ECRA application filed with the NJDEP. Movants concede that the statements made to NJDEP are true. (Movants' Brief, p. 20.)

Given the liberality with which the Spill Act must be construed, the allegations in the Third-Party Complaint more than suffice to withstand a motion to dismiss. Owners are liable under the Spill Act. The Third-Party Complaint alleges that the Third-Party Defendants are owners. Operators and those who directly or indirectly cause a discharge are liable under the Spill Act. The Third-Party Complaint alleges that the Third-Party Defendants controlled the

40

General Color Property. A reasonable inference from such control is that the Third-Party

Defendants were operators or, at the very least, were indirectly responsible for discharges of

hazardous substances at the General Color Property. The Ventron Court's decision to hold the

parent liable was based on its ownership of real property and on its ability to control. Id., 94 N.J.

at 502. Like the parent corporation in Ventron, the Third-Party Defendants--through their

equitable/beneficial ownership of and control over the General Color Property--could have

prevented the discharge of hazardous substances.

### C.    Movants Are Liable As Alter Egos of Kohnstamm Company and General Color

Count II of the Third-Party Complaint, entitled "Contribution Under the Spill Act - Veil

Piercing" alleges that there is no relevant distinction between the Kohnstamm Family

Shareholders, Kohnstamm Company or General Color. As noted in the Third-Party Complaint,

the allegation is based on the statements contained within the ECRA application relied upon by

the NJDEP. (Third-Party Complaint, ¶ 54) Paragraphs 29 through 43 of the Third-Party

Complaint allege many of the facts discussed in the personal jurisdiction section of this

memorandum of law. In particular, but without limitation, the Third-Party Complaint alleges

participation by the Kohnstamm Family Shareholders in the 1988 Transaction (¶¶ 30, 31, & 32),

that each of the Kohnstamm Family Shareholders was a "Selling Shareholder" pursuant to the

Reorganization Agreement (¶ 30), that the applications made to the NJDEP were made on behalf

of the Selling Shareholders (¶¶ 32, 34 & 35), that the applications made to the NJDEP asked

NJDEP to disregard the corporate distinctions between Kohnstamm Company, General Color

and the Kohnstamm Family Shareholders (¶ 33), and that but for the NJDEP's decision to

41

disregard those corporate distinctions, the environmental condition of the General Color Property would have been addressed directly or indirectly by the Kohnstamm Family Shareholders. (¶¶ 36 & 43)  In short, the Third-Party Complaint alleges sufficient facts upon which this Court could find that to disregard the corporate form in the limited environmental context of this case (as did the NJDEP) would prevent the corporate form from being used to defeat the ends of justice or to evade the law.  [10]

The allegations of the Third-Party Complaint provide the framework upon which Sensient's case against the Third-Party Defendants will be built.  Even the limited discovery permitted by the Court on the issue of personal jurisdiction has yielded additional evidence supporting Sensient's claim that the corporate form should be disregarded.  In particular, this limited discovery confirmed the active participation--well beyond that of "minority shareholders"--by the moving Third-Party Defendants in the 1988 Transaction.  It also produced evidence that Kohnstamm Family Shareholders were concerned about environmental liabilities associated with the General Color Property and about the potential for shareholder liability given their control over General Color.  Moreover, the limited discovery sketched the outline of a plan to avoid an ECRA trigger in 1988, further postpone ECRA compliance through 18 months of profitless operation of the General Color Property, and, at the end of that 18 month period, to cash-out of General Color and the General Color Property through an unfunded redemption scheme.  While the "fundamentals of a cause of action" based on veil-piercing can easily be

---

[10]   Section IB of this Memorandum of Law more completely outlines the factual and legal bases
        for piercing the corporate veil.

42

"gleaned" from the Third-Party Complaint, the limited discovery has provided confirmatory and enlightening detail.

A finding that the Third-Party Complaint adequately alleges a basis for veil-piercing, undeniably leads to a finding that the Third-Party Complaint states a cause of action under the Spill Act. Prior to the 1988 Transaction, Kohnstamm Company was the title owner of the General Color Property. Following the 1988 Transaction, General Color was the title owner of the General Color Property. The owner of real property is liable under the Spill Act. N.J.A.C. 7:1E-1.6. If the corporate distinction between Kohnstamm Company, General Color and the Kohnstamm Family Shareholders is not recognized by the Court, the Kohnstamm Family Shareholders would be the owners of the General Color Property both before and after the 1988 Transaction. Accordingly, the factual allegations of the Third-Party Complaint more than suffice, given the standard of review, to withstand the motion to dismiss.

### D.    Counts III, IV & V

Sensient agrees with the Movants that liability pursuant to Count III - Contribution Under the Joint Tortfeasors Contribution Act, Count IV - Common Law Indemnification, and Count V - Unjust Enrichment is dependent on Movants' liability either under the Spill Act or through veil-piercing.

43

## CONCLUSION

For the reasons set forth above, Sensient respectfully requests that the Court deny the motion to dismiss the Third-Party Complaint for lack of personal jurisdiction and for failure to state a claim upon which relief may be granted.

Respectfully submitted,

Dechert LLP
Attorneys for Defendant/Third-Party Plaintiff,
Sensient Colors Inc.

By: _____
.Michael A. Bogdonoff
John M. Ix

January 19, 2006

44